**VOLUME II OF II, Pages Appx2594-29431**

**2023-2241**

# United States Court of Appeals for the Federal Circuit

TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., NORTON (WATERFORD) LTD.,

*Plaintiffs-Appellees,*

– v. –

CIPLA LTD.,

*Defendant-Appellant.*

*On Appeal from the United States District Court for the District of New Jersey in No. 2:20-cv-10172-JXN-MAH Honorable Julien X. Neals, Judge*

## JOINT APPENDIX

DAVID I. BERL
BENJAMIN M. GREENBLUM
ELISE M. BAUMGARTEN
KATHRYN S. KAYALI
BEN PICOZZI
RICHARDO LEYVA
WILLIAMS & CONNOLLY LLP
680 MAINE AVENUE, SW
WASHINGTON, DC 20024
(202) 424-5000
dberl@wc.com
bgreenblum@wc.com
ebaumgarten@wc.com
kkayali@wc.com
bpicozzi@wc.com
rleyva@wc.com

*Counsel for Plaintiffs-Appellees*

ANIL H. PATEL
ADAM S. BERLIN
K&L GATES LLP
609 Main Street, Suite 4150
Houston, Texas 77002
(713) 815-7300
anil.patel@klgates.com
adam.berlin@klgates.com

HAROLD STOREY
K&L GATES LLP
925 Fourth Avenue, Suite 2900
Seattle, Washington 98104
(206) 623-7580
harold.storey@klgates.com

PETER GIUNTA
K&L GATES LLP
599 Lexington Avenue
New York, New York 10022
(212) 536-3900
peter.giunta@klgates.com

*Counsel for Defendant-Appellant*

**TABLE OF CONTENTS**
**JOINT APPENDIX**

| PAGE NO. | DATE | DKT. NO. | DESCRIPTION | TRIAL EX. NO. |
|---|---|---|---|---|
| Appx1-44 | 6/21/2023 | 301 | Opinion | |
| Appx45-46 | 6/21/2023 | 302 | Order Directing Parties to Submit a Joint Proposed Form of Judgment consistent with Opinion & Order | |
| Appx47-48 | 6/29/2023 | 304 | Joint Final Judgment Order | |
| Appx49-86 | - | | Docket Sheet Comprising the Record before the United States District Court, District of New Jersey, Case No. 2:20-cv-10172-JXN-MAH | |
| Appx87-117 | 10/11/2016 | | Certified U.S. Patent No. 9,463,289 (JTX-003) | JTX-003 |
| Appx118-150 | 11/7/2017 | | Certified U.S. Patent No. 9,808,587 (JTX-004) | JTX-004 |
| Appx151-182 | 2/18/2020 | | Certified U.S. Patent No. 10,561,808 (JTX-002) | JTX-002 |
| Appx183-210 | 9/10/2008 | | International Publication No. WO 2008/119552 (DTX-162) | DTX-162 |
| Appx211-307 | 1/11/2007 | | International Publication No. WO 2007/124406 (DTX-161) | DTX-161 |
| Appx308-356 | 11/12/2003 | | International Publication No. WO 03/101514 (DTX-165) | DTX-165 |
| Appx357-370 | 1/27/2002 | | U.S. Patent Publication No. US 2002/0078950 (DTX-159) | DTX-159 |
| Appx371 | | | Certified File History for U.S. Patent No. 10,561,808 (JTX-006) | JTX-006 |
| Appx2675 | 11/17/2022 | | Gregor Anderson Direct Testimony on Invalidity on Behalf of Cipla (DDX-3) | DDX-3 |
| Appx2706 | 11/16/2022 | 241 | Transcript of Bench Trial Volume 1 (Redacted) | |
| Appx3446 | 11/17/2022 | 243 | Transcript of Bench Trial Volume 2 | |
| Appx3773 | 11/18/2022 | 244 | Transcript of Bench Trial Volume 3 | |

| PAGE NO. | DATE | DKT. NO. | DESCRIPTION | TRIAL EX. NO. |
|---|---|---|---|---|
| Appx4020 | | | JTX-008 Certified File History for U.S. Patent 9,808,587 | JTX-008 |
| Appx6503 | | | PTX-208 Teva C2 DFM/DFA Report | PTX-208 |
| Appx6617 | | | PTX-231 Design Drawing | PTX-231 |
| Appx6624 | | | PTX-247 Brainstorm Spiromax "Tape Loosening" | PTX-247 |
| Appx7105 | | | PTX-372 Rote Ex. 03 - Drawing 120 Dose Counter Assembly DC (7100-011) | PTX-372 |
| Appx7231 | | | DTX-137 U.S. Patent 4,817,822 | DTX-137 |
| Appx7241 | | | DTX-153 U.S. Patent Publication No. US 2006/0289008 | DTX-153 |
| Appx7255 | | | DTX-168 United Kingdom Patent No. GB 994,755 | DTX-168 |
| Appx7260 | | | DTX-172 International Publication No. WO 2004/060260 | DTX-172 |
| Appx7297 | | | DTX-174 U.S. Design Patent No. D416,998 | DTX-174 |
| Appx9895 | 7/6/2021 | 102 | STATEMENT Joint Claim Construction and Prehearing Statement on Behalf of All Parties by All Plaintiffs. (Attachments: # 1 Exhibit) | |
| Appx13121 | | 157-15 | Expert Report of Gregor Anderson, dated April 29, 2022 | |
| Appx18584 | 1/17/2023 | 249 | TRIAL BRIEF Post-Trial by CIPLA LTD. | |
| Appx19559 | 2/27/2023 | 265 | Cipla RESPONSE re 262 Trial Brief. | |
| Appx19687 | 2/27/2023 | 267 | TRIAL BRIEF Post-Trial by NORTON (WATERFORD) LTD., TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC.. (Attachments: # 1 Declaration of Liza M. Walsh, # 2 Exhibit A | |

| PAGE NO. | DATE | DKT. NO. | DESCRIPTION | TRIAL EX. NO. |
|---|---|---|---|---|
| Appx19787 | 2/27/2023 | 268 | Proposed Findings of Fact by NORTON (WATERFORD) LTD., TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC. | |
| Appx27898 | | | JTX-007 Certified File History for U.S. Patent 9,463,289 | JTX-007 |
| Appx29430 | | | PDX-4 Dr. David Lewis Direct Examination: Validity Demonstratives | PDX-4 |

**VIA ELECTRONIC FILING**

**PATENT**

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**
**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

| | | | |
|---|---|---|---|
| In Re: | Patent Application of Declan Walsh *et al.* | : | Confirmation No.: 1099 |
| | | : | Group Art Unit: 2876 |
| Appln. No.: | 15/262,818 | : | |
| | | : | Examiner: Daniel A. Hess |
| Filed: | September 12, 2016 | : | |
| | | : | Attorney Docket No.: 026723-02-5043-US15 |
| For: | DOSE COUNTER FOR INHALER HAVING AN ANTI-REVERSE ROTATION ACTUATOR | : | |

---

Mail Stop Appeal Brief - Patents
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

**APPELLANT'S BRIEF UNDER 37 C.F.R. § 41.37**

This Brief is in furtherance of the Notice of Appeal filed January 19, 2018 in the above-identified patent application, which appeals from the Final Office Action dated July 19, 2017 (hereinafter "Office Action").

The Director is hereby authorized to charge any required fees, including any necessary fees under 37 C.F.R. §§ 1.17 and 41.20, or credit any overpayments in connection with this submission to Deposit Account No. **50-0310** (Billing No. 026723-02-5043-US15).

DB1/ 97309210.1

## I. REAL PARTIES IN INTEREST

The real party in interest is TEVA PHARMACEUTICALS, INC., which is the parent corporation of the assignees of record, NORTON (WATERFORD) LIMITED, IVAX PHARMACEUTICALS IRELAND, and TEVA PHARMACEUTICALS IRELAND.

## II. RELATED APPEALS AND INTERFERENCES

Appellant is not aware of any other appeals or interferences that will directly affect, or be directly affected by, or have a bearing on the Board's decision in this appeal.

## III. SUMMARY OF CLAIMED SUBJECT MATTER

Claims 1-29 are pending. A copy of the claims is attached as an Appendix immediately following this Brief.

A summary of the rejected independent claim 1 follows, with reference to Appellant's Specification and Drawings as originally filed:

*Claim 1:*

Independent claim 1 is directed to a dose counter for an inhaler (*see*, *e.g.*, page 4, lines 6-7), the dose counter having a counter display (*see, e.g.,* FIG. 6C, tape 112) arranged to indicate dosage information (*see*, *e.g.*, page 4, lines 7-8; page 23, lines 11-14), a drive system arranged to move the counter display incrementally in a first direction from a first station to a second station in response to actuation input (*see*, *e.g.*, page 4, lines 8-10), wherein a regulator is provided which is arranged to act upon the counter display at the first station to regulate motion of the counter display at the first station to incremental movements (*see*, *e.g.*, page 4, lines 10-12).

## IV. ARGUMENT

### A. The rejection of claims 1-13, 16, 17, and 20-29 under 35 U.S.C. § 103 over O'Leary is improper:

Claims 1-13, 16, 17, and 20-29 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over U.S. Patent Application Publication No. US 2002/0078950 (hereinafter "O'Leary").

Claim 1 of the present application recites:

> A dose counter for an inhaler, the dose counter having a counter display arranged to indicate dosage information, a drive system arranged to move the counter display incrementally in a first direction from a first station to a second station in response to actuation input, ***wherein a regulator is provided which is arranged to act upon the counter display at the first station to regulate motion of the counter display at the first station to incremental movements***.

[emphasis added]

As described in the present specification, the regulator recited in claim 1 is highly advantageous, as it allows the counter display (*e.g.*, tape) to advance so that doses are accurately counted, but also prevents the counter display from loosening if the inhaler is dropped onto a hard surface. Thus, the counter display is prevented from moving into a position that would provide an incorrect dose count (*see, e.g.,* page 33, line 19 to page 34, line 2 of the present specification). By regulating the counter display with incremental movements, instead of a constant application of force, the accuracy of the counter display is maintained without applying undesirably high friction against the counter display as it passes over other components of the dose counter (*see, e.g.,* page 34, lines 3-22 of the present specification). Thus, regulating the motion of the counter display with incremental movements achieves at least two objectives: it prevents undesirable movement of the counter display if the inhaler is dropped, and avoids the use of high friction against the counter display.

By way of example, according to an embodiment illustrated by FIGS. 6D, 6F, and 15 of the present application, reproduced below, the regulator may be formed by the inner engagement surface 300 of a bobbin 110, which has concavities that engage incrementally with control elements 128, 130 disposed on the forks 124, 126 of a shaft upon which the bobbin is rotatably mounted.

**FIG. 6D of the present application**

**FIG. 6F of the present application**

**FIG. 15 of the present application**

In rejecting claims under 35 U.S.C. § 103, it is incumbent upon the Examiner to establish a factual basis to support the legal conclusion of obviousness. *See, In re Fine*, 837 F.2d 1071, 1073, (Fed. Cir. 1988). In so doing, the Examiner must make the factual determinations set forth in Graham v. John Deere Co., 383 U.S. 1, 17 (1966). "[T]he examiner bears the initial burden, on review of the prior art or on any other ground, of presenting a *prima facie* case of unpatentability." *In re Oetiker*, 977 F.2d 1443, 1445 (Fed. Cir. 1992). Furthermore, "'there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness'" *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed.

Cir. 2006)). Moreover, "[a] factfinder should be aware, of course, of the distortion caused by hindsight bias and must be cautious of argument reliant upon ex post reasoning." *Id.* at 421.

Appellant respectfully submits that the Examiner's findings with respect to the scope and content of O'Leary have no factual basis; and that the erroneous factual findings are a result of impermissible hindsight. Therefore, the Office has not met its burden and a *prima facie* case of obviousness has not been established.

1. *O'Leary does not teach, suggest or disclose a regulator that regulates motion of the counter display with incremental movements.*

O'Leary discloses a dose counter for an inhaler with a ribbon 128 having successive numbers printed thereon, a rotatable bobbin 132, and an indexing spool 134 rotatable in a single direction, wherein the ribbon 128 unrolls from the bobbin 132 so that the numbers are successively displayed as the spool 134 is rotated or advanced, as shown in Fig. 15 of O'Leary, reproduced below. *See* O'Leary ¶ [0054].

**Fig. 15 of O'Leary**

Additionally, O'Leary describes a bobbin 132 which is rotatably mounted on the bobbin shaft 142. O'Leary states that "[t]he bobbin shaft is preferably forked and includes radial nubs 146 for creating a [*i.e.* singular] resilient resistance to rotation of the bobbin 132 on the shaft". O'Leary ¶ [0057]. *This is the only disclosure provided by O'Leary that relates to resisting the motion of the counter display. O'Leary does not disclose or suggest a regulator that uses incremental movements to regulate the movement of a counter display, and provides no reason for a skilled artisan to employ such incremental movements.*

The Examiner acknowledges that "O'Leary does not show what is inside the bobbin 132 beyond the hexagonal part." Office Action page 5. Instead, the Examiner states that features of independent claim 1 ***could be*** met by O'Leary "***if*** there are some kind of complementary features inside of the bobbin 132 that match the nubs 146 of the shaft 142." *Id.* (emphasis added). The Examiner then concludes that "[n]evertheless, it is reasonable to expect that there would be some kind of complementary features to match the nubs 146 because connecting parts are typically complementary…the nubs 146 should be interacting with something complementary inside of 132, otherwise the nubs aren't interacting with anything." *Id.* at pages 5-6. The Examiner further states, "If the corresponding inner surface of O'Leary were smooth, then the nubs would not 'create a resilient resistance to rotation' as O'Leary requires. In order to 'create a resilient resistance to rotation' as O'Leary states that there is, the nubs should slip into corresponding concavities." *Id.* at page 6.

The Examiner has erred for several reasons. First, the Examiner has misconstrued the scope and content of the prior art in stating that there should be complementary features to match O'Leary's nubs because "connecting parts are typically complementary" and the nubs are non-functional without such complementary features. This interpretation of O'Leary is unfounded, as the nubs taught by O'Leary are not intended to "connect" to anything, as the Examiner asserts. O'Leary clearly states that the purpose of the nubs is to create a resilient resistance to rotation of the bobbin on the shaft, *i.e.*, the protruding nubs provide added friction as they are urged against the bobbin. There are no teachings in O'Leary that suggest the nubs are supposed to function as "connecting parts" or to complement another feature, as stated by the Examiner. Indeed, O'Leary states that it is the radial nubs 146 that create the resilient resistance to rotation. O'Leary discloses

no other structure as cooperating with the nubs, as the Examiner suggests. For at least that reason, a skilled artisan may interpret O'Leary as describing a device wherein the radial nubs engage a smooth inner shaft of the bobbin to provide continuous resistance force as the bobbin rotates, in order to prevent free spooling of the bobbin. The Examiner's rejection of this interpretation based on a finding, without evidence, that a smooth inner surface could not "create a resilient resistance to rotation" is misplaced. The type of "resilient resistance" described by O'Leary is commonly applied in numerous contexts; for example, common brake pads on a bicycle wheel provide resilient resistance against a smooth wheel rim, thereby slowing the rotation of the wheel. There is absolutely no requirement for corresponding concavities to achieve the type of resilient resistance described by O'Leary. Thus, the Examiner has misconstrued the scope and content of O'Leary by making unfounded factual findings.

Second, even if it were possible to modify the subject matter disclosed in O'Leary to arrive at the claimed invention, the mere possibility of doing so does not make the claimed invention obvious in view of O'Leary. That is especially true where, as here, there is no articulated rationale to modify O'Leary to arrive at the claimed invention. There must be a reason to modify a reference in the specific manner as claimed, but O'Leary provides no reason to modify a dose counter so that it regulates the counter display with incremental movements. As stated in the present specification, the incremental movements provided by the claimed invention solve the problem of dose miscounting due to an accidental advance of the dose counter if an inhaler is dropped, and without the application of constant friction against the counter display. These objectives are not stated or suggested by O'Leary. *In fact, the claimed invention solves a problem presented by the arrangement taught by O'Leary, in which the protruding nubs provide constant friction against the bobbin.* O'Leary does not acknowledge or suggest that there is a problem – this is simply the arrangement taught by O'Leary, whereby protruding nubs create a resilient resistance to the bobbin in a manner that is commonly used to slow down rotation. O'Leary provides no suggestion whatsoever that a modification to this arrangement would be desirable. The problem to be solved must be gleaned from the prior art, not from an applicant's specification, and O'Leary is silent with regard to any of the problems solved by the claimed invention.

The Examiner has made an erroneous factual finding, seemingly as a result of impermissible hindsight. Unsupported speculation as to the significance and functionality of a prior art disclosure, or how that prior art might be modified, does not satisfy the Office's burden of articulating a reasoned basis for a determination of *prime facie* obviousness. The key requirement of *prima facie* obviousness under 35 U.S.C. § 103(a) is a clear articulation of a reason with a *rational* underpinning to support the legal conclusion of obviousness. M.P.E.P. § 2141. The reason offered in support of the present rejection is based on a factual error with respect to the teachings of O'Leary and therefore lacks a rational underpinning. For at least the foregoing reasons, O'Leary fails to render obvious independent claim 1. Accordingly, the rejection of independent claim 1 as well as dependent claims 2-13, 16, 17, and 20-29 under 35 U.S.C. § 103(a) is considered improper. If an independent claim is nonobvious under 35 U.S.C. 103, then any claim depending therefrom is nonobvious. M.P.E.P. § 2143.03 citing *In re Fine*, 837 F.2d 1071 (Fed. Cir. 1988).

Appellant notes that claims 14-15 and 18-19 were deemed allowable by the Examiner, but declined to rewrite the claims into independent form in view of the arguments presented above.

**(1) Grounds of Rejection to be Reviewed on Appeal**

Every ground of rejection set forth in the Office action dated 7/19/2017 from which the appeal is taken is being maintained by the examiner except for the grounds of rejection (if any) listed under the subheading "WITHDRAWN REJECTIONS." New grounds of rejection (if any) are provided under the subheading "NEW GROUNDS OF REJECTION."

The following ground(s) of rejection are applicable to the appealed claims.

***Claim Rejections - 35 USC § 103***

The following is a quotation of pre-AIA 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

The factual inquiries set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 148 USPQ 459 (1966), that are applied for establishing a background for determining obviousness under pre-AIA 35 U.S.C. 103(a) are summarized as follows:

1. Determining the scope and contents of the prior art.

2. Ascertaining the differences between the prior art and the claims at issue.

3. Resolving the level of ordinary skill in the pertinent art.

4. Considering objective evidence present in the application indicating obviousness or nonobviousness.

Claims 1-13, 16, 17 and 20-29 are rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over O'Leary (US 2002/0078950).

Re claim 1:

Attention is drawn particularly to figures 14 and 15 of O'Leary and paragraphs 0053 to 0057 of O'Leary.

O'Leary teaches a dose counter with a counter display to indicate dosage information (counter numerals on the tape in figures 14 and 15). There is a pawl 138 (see para 0055, and figures 3 and 11) that engages teeth 136 to drive the counter incrementally in a first direction from a first station (bobbin 132 onto which ribbon 128 is initially placed) onto a second station (uptake spool 134 which collects the ribbon as it unrolls from bobbin 132.)

There is a regulator in O'Leary that is almost identical to the regulator of the claims. In particular, O'Leary teaches at para 0057, "The bobbin shaft 142 is preferably forked and includes radially nubs 146 for creating a resilient resistance to rotation of the bobbin 132 on the shaft 142."

Regarding a regulator that acts on the counter in an incremental way, the claim limitations could be met if there are some kind of complementary features inside of the bobbin 132 that match the nubs 146 of shaft 142.

O'Leary does not show what is inside the bobbin 132 beyond the hexagonal part. Nevertheless, it is reasonable to expect that there would be some kind of complementary features to match the nubs 146 because connecting parts are typically complementary.

It is reasonable that there should be some complementary features in the bobbin 132 that correspond to nubs 146 because the alternative, a smooth opening, would seem to render the nubs pointless and non-functional. In short, the nubs 146 should be interacting with something complementary inside of 132, otherwise the nubs aren't interacting with anything

If the inside of bobbin 132 is simply complementary (i.e. with indentations exactly matching the nubs) -- a reasonable/obvious assumption since connectors are usually complementary, then an incremental regulator would result. If the opening of bobbin 132 were merely matched to the nubs, then there would be resistance as the nubs nestle in matching indentations, less resistance when the nubs slide between indentations, and more resistance again as the nubs fall into the next indentations. This would regulate toward incremental movements.

The examiner is not merely speculating but is following O'Leary's statements about these nubs.

O'Leary teaches at para 0057,
"The bobbin shaft 142 is preferably forked and includes radially nubs 146 for creating a resilient resistance to rotation of the bobbin 132 on the shaft 142."

If the corresponding inner surface of O'Leary were smooth, then the nubs would not "create a resilient resistance to rotation" as O'Leary requires. In order to "create a resilient resistance to rotation" as O'Leary states that there is, the nubs should slip into corresponding concavities.

Re claims 2 and 3: As figures 14 and 15 illustrate, the counter display is a tape with indicia.

Re claim 4: As figures 14 and 15 of O'Leary and paragraphs 0053 to 0057 show, the tape unwinds from the first shaft to move onto the second shaft.

Re claim 5: See figure 15. Element 132 is mounted for rotation on the fixed shaft 142 of the dose counter.

Re claim 6: See discussion re claim 1, above.

Re claims 7 and 8: There are exactly two projections, or nubs. Figure 15 shows one nub 146 and the symmetrical shaft 142 would plainly have second matching nub hidden from view on the second fork, as is apparent in figure 15.

Re claim 9: The nubs 146 of O'Leary figure 15 can be regarded as radiused.

Re claim 10: The nubs 146 are located on shaft 142 which rotationally fixed, and the shaft/bobbin 132 is rotationally mounted thereon.

Re claims 11-13: Again, view figure 15 of O'Leary which shows the fixed shaft 142 with two flexible legs, each with a nub. As for complementary formations, see discussion re claim 1, above.

The difference between six and "eight to twelve" formations is a matter of obvious design choice. For example, if the numbers on the tape were smaller so that it takes more numbers to travel the circumference of the bobbin, there should be correspondingly more grooves closer together for the nubs to rest.

Various solutions with different numbers of formations on the interior of the shaft/bobbin 132 are equivalent.

Re claim 16: The six corners of the interior hexagon of the shaft/bobbin 132 are concavities.

Re claim 17: Although not directly shown in O'Leary, it is obvious and conventional for a receptacle to be complementary in shape to that which plugs into it. If the receptacle inside 132 of O'Leary was merely complementary to the outer shape of shaft 142, then the claim limitation would be met.

Re claims 20-22: See figure 15 of O'Leary.

Re claims 23-25: See figures 14 and 15 of O'Leary and paragraphs 0053 to 0057 of O'Leary.

Re claim 26: The dose metering system in O'Leary is described as a ratchet (para 0048). As commonly understood in the art, a ratchet is a one-way gearing system which operates by an anti-back-drive pawl. The ratchet is an old and conventional mechanical system.

Re claims 27-29: O'Leary is silent on the specific amounts of rotationally-resisting force involved in his regulator. However the rotationally-resisting force is a function of the shape of the shaft 142 and the shape of the interior of bobbin 132 in figure 15 of O'Leary. With complementary indentations as per claim 1 above, it would be reasonable to expect that the resistance forces will be similar.

**(2) Response to Argument**

The appellant suggests that the examiner fails to meet the burden of proof in suggesting that O'Leary has a regulator that will regulate the motion of the counter to incremental movements (page 6 of Appeal Brief).

The examiner strongly disagrees for a number of reasons:

**(1) Incremental movement will result from the interaction of nubs 146 with the hexagonal interior of bobbin 132.**

The appellant makes argues that the interior of bobbin 132 is smooth, when figure 15 of O'Leary clearly demonstrates that it is not.

A wavy interior of the bobbin (instant figure 15) is not necessary to achieve 'incremental movements'. The hexagonal interior as shown on the bobbin 132 in figure 15 of O'Leary is enough to achieve incremental movements. During rotation, the nubs 146 will alternately slip into the corners of the hexagon (resisting movement) and slide along the sides of the hexagon (promoting movement).

Thus the claimed regulator action is achieved with just the structure visible in figure 15 of O'Leary (inner hexagonal shape of bobbin 132), even without the additional wavelike structure of instant figure 15.

**(2) The likeliest configuration of the inside of the bobbin 132 would be to have some kind of correspondence with the nubs 146 of the shaft 142.** It is logical to expect that the nubs engage with something on the inside of the bobbin.

Why would the nubs be present on the shaft 142 if there is nothing on the inside of the bobbin 132 to correspond to them? The appellant has no answer.

It is more difficult to make the shaft 142 with the nubs 146 than without them. O'Leary states that the purpose of the nubs is to create resilient resistance to rotation. If the inner surface of the bobbin 132 is smooth as the appellant suggests, then O'Leary's nubs would be not add anything. If the inner surface of the bobbin 132 were smooth, then one of ordinary skill in the art knows that a smooth rubber shaft would work just as well, in terms of resistance to rotation.

The only way that the nubs add resistance to rotation (O'Leary's stated goal). If the inner surface of the bobbin is smooth as the appellant suggests then the nubs are superfluous and unnecessary.

**(3) It is the appellant who makes unsupported assumptions when suggesting that the interior of bobbin 132 in O'Leary is smooth (even though the interior part of bobbin 132 that can be seen is not smooth but hexagonal).**

The interior of O'Leary is visible to a certain depth, and it is not smooth. If the nubs 146 of O'Leary interface with the hexagonal interior then incremental movements will result, just as in the claims.

The examiner argues it is the appellant not the examiner making an unsupported assumption when the appellant posits that the inner surface of the bobbin is smooth (Appeal

Brief page 7) – when the inner surface of the bobbin visibly is not smooth. This is a bold assumption by the appellant against the evidence, given that (a) this would assume that the bobbin does NOT correspond to the shaft that goes inside it, and (b) the part of the inside of the bobbin 132 in figure 15 of O'Leary that can be seen is **NOT** smooth but hexagon-shaped.

The appellant gives the example of common brake pads on a bicycle interacting with a smooth rim (Appeal Brief, page 7). But bicycle brake pads themselves are smooth and are not analogous to the shaft 142 of O'Leary which has nubs 146.

If the shaft of O'Leary were smooth, it might be reasonable to assume that the bobbin is also correspondingly smooth. Instead the appellant assumes that the inner face of the bobbin is smooth in a way that does NOT correspond to the shaft.

**(4) Duplicated drawings relating to the same dose counter regulator suggest overwhelming similarity between O'Leary and the instant invention.**

Compare figure 15 of O'Leary with instant figure 24. These are the same identical figure, and it seems certain that O'Leary is the source for instant figure 24, since O'Leary was the earlier of the two applications by ten years and the appellant disclosed O'Leary in the IDS of this application and the parent applications.

This duplication of drawings is closely connected to the very features at issue in the claims.

Instant figure 24 shows an important view of the claimed regulator (the instant specification describes "radially nubs 5146 for creating a resilient resistance to rotation of the

bobbin 110") and this figure, which is central to the claims, is an exact duplicate of figure 15 of O'Leary with only the reference numerals changed.

Instant figure 24 and figure 15 of O'Leary notably share the very same shaft (ref. 108 in instant figure 24 and ref. 142 in figure 15 of O'Leary) right down to the split tines of the shaft and right down to the number and shape of the nubs shaft (ref. 5146 in instant figure 24 and ref. 146 in figure 15 of O'Leary).

The suggestion that these are the same thing is very strong. It is only because O'Leary lacks a view deep inside the bobbin 132 that the examiner rejects under 35 USC 103 rather than 35 USC 102.

**(5) Claim 1 is very generic and very broad and does not recite any structure of regulator beyond what O'Leary shows.** The appellant argues that there are differences in a hidden portion (inner surface of the bobbin) but the independent claim 1 at issue does not describe the shape of the inner surface of the bobbin. The inner hexagonal shape seen with bobbin 132 in O'Leary is enough to 'sequentially resist and then promote movement.'

The appellant's arguments are based on more narrow unclaimed features, rather than the very broad language of the claim. Indeed, in other claims (e.g. claims 14, 15, 18 and 19), where the appellant did recite narrow and specific inner structure of the bobbin, which were not shown or made obvious by O'Leary, those claims have already been indicated as allowable.

For the above reasons, it is believed that the rejections should be sustained.

Respectfully submitted,

## I. ARGUMENT

In the Examiner's Answer dated August 7, 2018, the Examiner presented five reasons for rebutting Appellant's assertion that a *prima facie* case of obviousness has not been established with respect to O'Leary. Appellant addresses, in order, each of the Examiner's reasons below.

(1) "Incremental movement will result from the interaction of nubs 146 with the hexagonal interior of the bobbin." Examiner's Answer, page 7.

In support of this assertion, the Examiner argues that "the nubs 146 will alternately slip into the corners of the hexagon (resisting movement) and slide along the sides of the hexagon (promoting movement)." The interpretation of O'Leary presented in the Examiner's Answer is unsubstantiated by O'Leary's teachings. O'Leary's only statement that relates to resisting the motion of the counter display is that "[t]he bobbin shaft is preferably forked and includes radial nubs 146 for creating ***a resilient resistance*** to rotation of the bobbin 132 on the shaft". O'Leary ¶ [0057] (emphasis added). O'Leary does not mention or suggest the use of incremental movements, as presently claimed. Indeed, it is evident from O'Leary's Figures 14 and 15, reproduced below, that the hexagonal region only extends a short distance along the end of bobbin 132.

**Fig. 14 of O'Leary**

**Partial View of Fig. 15 of O'Leary**

As illustrated by Figure 14, neither the nubs 146, nor the forked end of the shaft 142, are visible within the truncated hexagonal region of bobbin 132 when assembled. O'Leary clearly illustrates, in Figure 15, that shaft 142 is the shorter of two shafts and would not be expected, from this figure, to extend far enough into bobbin 132 to impact the truncated hexagonal region. Indeed, a comparison between the length of the bobbin 132 and the spool 134, and their corresponding shafts, places the nubs in a location that is well outside the truncated hexagonal region of bobbin 132. Moreover, O'Leary does not even suggest that there could be some hidden hexagonal region upon which the resilient nubs could act, or that such a hidden feature could produce incremental movements, as claimed.

**The flawed interpretation of O'Leary that is now being advanced by the Office was previously questioned by the Examiner during prosecution**. The Examiner previously concluded that the nubs 146 may not interact with the hexagonal interior of the bobbin 132. In the Office Action dated April 11, 2017, the Examiner stated the following at page 3:

> The examiner concedes that one cannot know for sure that the nubs 146 in figure 15 of O'Leary interact with the hexagonal opening of bobbin 132. It could be that the hexagonal opening is very shallow (only for insertion of a winding tool), and that the shaft 142 does not extend all the way to the hexagonal opening.

In a subsequent Office Action dated July 19, 2017, the Examiner again stated at page 5, "O'Leary does not show what is inside the bobbin 132 beyond the hexagonal part."

Thus, the interpretation of O'Leary presented in the Examiner's Answer, that an incremental movement would result from the nubs 146 slipping into corners of the hexagon, is contrary to both a reasoned analysis of what O'Leary actually discloses and the interpretation presented by the Office during prosecution. Office personnel fulfill the critical role of factfinder when resolving the *Graham* inquiries, and contradictory interpretations of a prior art reference do not satisfy the Office's burden of articulating a reasoned basis for *prima facie* obviousness.

Finally, the assertion presented in the Examiner's Answer, that the hexagon would be understood by a skilled artisan as necessarily providing incremental movement, is not at all supported by O'Leary's specification and figures. Since O'Leary's teachings provide no basis for a skilled artisan to conclude that O'Leary's dose counter includes a regulator that is arranged to act upon a counter display at the first station to regulate motion of the counter display to

incremental movements, this interpretation appears to be hindsight reconstruction of O'Leary based upon Applicant's own application.

(2) "The likeliest configuration of the inside of the bobbin 132 would be to have some kind of correspondence with the nubs 146 of the shaft 142." Examiner's Answer, page 7.

In support of this assertion, the Examiner further states on page 8, "Why would the nubs be present on the shaft 142 if there is nothing on the inside of the bobbin 132 to correspond to them? The appellant has no answer." Appellant has, in fact, addressed this question in the Appeal Brief filed on May 21, 2018. Without wishing to repeat all the arguments presented therein, Appellant again submits that there is absolutely no requirement in O'Leary for corresponding concavities to achieve the type of resilient resistance described by O'Leary. It is certainly reasonable that, if the inner surface of the bobbin 132 is smooth, the nubs could provide acute pressure points on the inside of the shaft to create the ***resilient resistance to rotation*** described by O'Leary, in a manner commonly used to slow down rotation.

The Examiner further states on page 8 that "[i]t is more difficult to make the shaft 142 with the nubs 146 than without them." However, this argument disregards the well-known fact that the design of an industrial object must account for its manufacture as a whole, not just an individual part. The forked shaft of O'Leary provides resistance, in part, by being deflected while it is within the bobbin. By employing nubs that are situated away from the end of the fork, the end of the forked shaft can have an outer diameter that is comfortably less than the inner diameter of the bobbin. This allows the bobbin to be placed over the end of the fork with ease, and the fork to be progressively deflected thereafter as the bobbin is slid over the shaft thereby causing the bobbin to engage the nubs. For argument's sake, even if it is more difficult to make a shaft with nubs than without, the nubs enable the counter to be manufactured more easily than the alternative of having a fork that requires deflection before it is inserted in the bobbin. Thus, the Examiner's argument that the additional manufacturing step of adding nubs establishes the need for corresponding concavities is unfounded.

(3) "It is the appellant who makes unsupported assumptions when suggesting that the interior of the bobbin 132 in O'Leary is smooth (even though the interior part of bobbin 132 that can be seen is not smooth but hexagonal)." Examiner's Answer, page 8.

In support of this assertion, the Examiner further argues on page 9 that "the part of the inside of the bobbin 132 in figure 15 of O'Leary that can be seen is **NOT** smooth but hexagon-shaped" (emphasis in original). Appellant has addressed these arguments above and in the Appeal Brief. The nubs may provide a ***resilient resistance to rotation*** by providing acute pressure points along a smooth interior of the bobbin, and O'Leary provides no evidence that the nubs would interact with a hexagonal formation hidden from the figures and not described in the O'Leary specification. As previously noted, the illustrated hexagonal portion is shown to terminate near the end of bobbin 132.

(4) "Duplicated drawings relating to the same dose counter regulator suggest overwhelming similarity between O'Leary and the instant invention." Examiner's Answer, page 9.

In support of this assertion, the Examiner points to similarities between Figure 15 of O'Leary and Figure 24 of the present application. The United States patent system encourages inventors to make improvements over the prior art. The fact that one or more figures in a pending application are similar or identical to figures in the prior art is not evidence of obviousness where an element of the claim is not fully illustrated in the identified drawing. Figures do not define the claimed invention and the Examiner's reliance on a comparison between the figures in the present application and the prior art is erroneous.

(5) "Claim 1 is very generic and very broad and does not recite any structure of regulator beyond what O'Leary shows." Examiner's Answer, page 10.

This statement is clearly an expression of the Examiner's personal feeling that claim 1 is seemingly too broad to be allowable, without the support of an appropriate rationale under 35 U.S.C. § 103. An examiner's subjective view that a claim seems "very generic and very broad" does not support a proper determination of obviousness. The burden still remains on the Office to support the legal conclusion of *prima facie* obviousness with a clear rationale. However, the

reasons offered in support of the present rejection are based on factual errors with respect to the teachings of O'Leary and therefore lack a rational underpinning. The Office's burden has not been met in the instant case, as O'Leary does not teach or suggest all the elements of claim 1, in particular, a dose counter having a regulator that is arranged to regulate motion of the counter display with incremental movements, as claimed. The Examiner's interpretation of O'Leary is seemingly the result of impermissible hindsight – without the knowledge of Appellant's present specification, on what basis would a skilled artisan have reason to believe that O'Leary's dose counter includes a regulator that is arranged to regulate motion of the counter display at the first station to incremental movements, as claimed? O'Leary's teachings at paragraph [0057] and Figures 14 and 15 provide no basis whatsoever.

For the reasons in the Appeal Brief and those set forth above, Appellant submits that O'Leary does not teach or suggest all the elements of claim 1. Therefore, the Office has not met its burden of establishing *prima facie* obviousness. Reversal of the rejection of the pending claims under 35 U.S.C. § 103 is respectfully requested.

Respectfully submitted,

Date: October 4, 2018

By: /Lisa Mead/
LISA MEAD
Registration No. 64,253
KENNETH J. DAVIS
Registration No. 50,688

**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103-2921
Telephone: (215) 963-5000
**Direct Dial: (215) 963-5247**
Facsimile: (215) 963-5001
E-Mail: lisa.mead@morganlewis.com

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

*Ex parte* DECLAN WALSH, DEREK FENLON,
SIMON KAAR, JAN GEERT HAZENBERG,
DANIEL BUCK, PAUL CLANCY,
ROBERT CHARLES USCHOLD, and JEFFREY A. KARG

---

Appeal 2019–000453
Application 15/262,818
Technology Center 2800

---

Before JEFFREY T. SMITH, BRIAN D. RANGE, and MERRELL C. CASHION, JR., *Administrative Patent Judges*.

RANGE, *Administrative Patent Judge*.

DECISION ON APPEAL

SUMMARY

Pursuant to 35 U.S.C. § 134(a), Appellant[1] appeals from the Examiner's decision to reject claims 1–13, 16, 17, and 20–29. We have jurisdiction under 35 U.S.C. § 6(b).

We REVERSE.

---

[1] We use the word "Appellant" to refer to "applicant" as defined in 37 C.F.R. § 1.42. Appellant identifies the real party in interest as "TEVA PHARMACEUTICALS, INC., which is the parent corporation of the assignees of record, NORTON (WATERFORD) LIMITED, IVAX PHARMACEUTICALS IRELAND, and TEVA PHARMACEUTICALS IRELAND." Appeal Br. 2.

STATEMENT OF THE CASE[2]

Appellant describes the invention as relating to a metered dose inhaler. Spec. 1:19–22. In particular, the invention seeks to count how many doses of any inhaler have been used while not counting doses where the inhaler canister does not fire. *Id.* at 3:9–28. Claim 1 is illustrative of the claimed subject matter:

> 1. A dose counter for an inhaler, the dose counter having a counter display arranged to indicate dosage information, a drive system arranged to move the counter display incrementally in a first direction from a first station to a second station in response to actuation input, wherein a regulator is provided which is arranged to act upon the counter display at the first station to regulate motion of the counter display at the first station to incremental movements.

Appeal Br. 10 (Claims App.).

REJECTIONS

On appeal, the Examiner maintains the rejection of claims 1–13, 16, 17, and 20–29 under 35 U.S.C. § 103 as unpatentable over O'Leary, US 2002/0078950 A1, Jun. 27, 2002.[3] Ans. 3.

---

[2] In this Decision, we refer to the Final Office Action dated July 19, 2017 ("Final Act."), the Appeal Brief filed May 21, 2018 ("Appeal Br."), the Examiner's Answer dated August 7, 2018 ("Ans."), and the Reply Brief filed October 4, 2018 ("Reply Br.").

[3] Claims 14, 15, 18, and 19 have been objected by the Examiner as being dependent upon a rejected base claim, but would be allowable if rewritten in independent form including all of the limitations of the base claim and any intervening claims. Final Act. 9. Accordingly, these claims are not before us for review on appeal.

ANALYSIS

The Examiner has the initial burden of establishing a prima facie case of obviousness based on an inherent or explicit disclosure of the claimed subject matter under 35 U.S.C. § 103. *In re Oetiker*, 977 F.2d 1443, 1445 (Fed. Cir. 1992) ("[T]he examiner bears the initial burden, on review of the prior art or on any other ground, of presenting a *prima facie* case of unpatentability."). To establish a prima facie case of obviousness, the Examiner must show that each and every limitation of the claim is described or suggested by the prior art or would have been obvious based on the knowledge of those of ordinary skill in the art or the inferences and creative steps a person of ordinary skill in the art would have employed. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007); *In re Fine*, 837 F.2d 1071, 1074 (Fed. Cir. 1988).

To resolve this appeal, we focus on the Appellant's arguments that identify error and on the Examiner's determinations that relate to the error. In particular, the Examiner finds that O'Leary teaches a regulator "that is almost identical to the regulator of the claims." Ans. 3. The Examiner states "[r]egarding a regulator that acts on the counter in an incremental way, the claim limitations *could* be met *if* there were some kind of complementary features inside of the bobbin 132 that match the nubs 146 of shaft 142." *Id.* (emphases added). The Examiner determines that it is reasonable to infer such a system from O'Leary based on Figure 15 of O'Leary (reproduced below) and O'Leary's description of Figure 15. *Id.*

FIG. 15

Figure 15 of O'Leary is an exploded enlarged isometric view of a dose counter. O'Leary ¶ 28. O'Leary describes the pertinent portion of Figure 15 as follows: "The bobbin shaft **142** is preferably forked and includes radially nubs **146** for creating a resilient resistance to rotation of the bobbin **132** on the shaft **142**." *Id.* ¶ 57.

Appellant argues that O'Leary does not suggest a regulator that regulates motion of the counter display of incremental movements as claimed and that the Examiner's rejection is based on impermissible hindsight. Appeal Br. 5. Appellant's argument is persuasive. Claim 1 requires a regulator capable of "regulat[ing] motion of the counter display at the first station to incremental movements." Appeal Br. 10. The Specification explains that incremental movement means rotating from one incremental position to another with, for example, a clicking action. Spec. 5:1–4, 33:19–34:2; *see also* Appeal Br. 3–5.

The evidence of record does not adequately support the Examiner's determination that O'Leary's device is capable of such regulated motion. In particular, O'Leary is ambiguous whether or not bobbin 132 necessarily has complementary features to match the nubs of shaft 142. As Appellant explains, O'Leary merely teaches that its nubs serve to "creat[e] a resilient resistance to rotation of the bobbin 132 on the shaft 142" (O'Leary ¶ 57) and the nubs could serve this purpose without the bobbin having complementary features. Appeal Br. 6–7. While O'Leary's Figure 15 depicts a hexagonal opening to bobbin 132, it is unclear whether this hexagonal structure continues into the interior of bobbin 132 or engages with the nubs 146. The Examiner has previously conceded as much. Reply Br. 3 (quoting a prior Office Action where the Examiner concedes that "one cannot know for sure that the nubs 146 in figure 15 of O'Leary interact with the hexagonal opening of bobbin 132"). Appellant persuasively explains that O'Leary may have included nubs for other reasons. Reply Br. 4–5

Furthermore, even if the evidence adequately supported that O'Leary nubs 146 interact with the hexagonal structure or some other corresponding structure of bobbin 132, it is not clear that the interaction would, as the Examiner contends, necessarily result in incremental movement. Ans. 7 ("During rotation, the nubs 146 will alternately slip into the corners of the hexagon (resisting movement) and slide along the sides of the hexagon (promoting movement)."). The Examiner has the burden of adequately supporting the obviousness rejection in the first instance, and here, the Examiner fails to establish that a person of skill in the art would have reached a regulator capable of regulating motion in the manner claim 1 recites based upon the teachings of O'Leary or otherwise.

For this reason above, we do not sustain the Examiner's rejection of claim 1. Because the Examiner's treatment of the dependent claims does not cure the error addressed above, we also do not sustain the rejection of those claims.

DECISION

In summary:

| Claims Rejected | Basis | Affirmed | Reversed |
|---|---|---|---|
| 1–13, 16, 17, 20–29 | § 103 O'Leary | | 1–13, 16, 17, 20–29 |
| **Overall Outcome** | | | 1–13, 16, 17, 20–29 |

REVERSED



# ’808 Patent is Invalid

## Claim 28 of the ’808 Patent Would Have Been Obvious Over the ’552 Publication

| ’808 Patent Claim 1 |
| --- |
| 1. A dose counter for an inhaler, |
| the dose counter having a counter display arranged to indicate dosage information, |
| a drive system arranged to move the counter display incrementally in a first direction from a first station to a second station in response to actuation input |
| wherein a regulator is provided which is arranged to act upon the counter display at the first station to regulate motion of the counter display at the first station to incremental movements. |

JTX-002 (’808 Patent), Claim 1 (colored)

DTX-162 (’552 Publication), Fig. 6 (colored and annotated).

JTX-002 (‘808 Patent), Fig. 6A (colored and annotated).

Prior Art ’552 Publication’s Regulator Disclosure Consistent with the ’808 Patent’s Disclosure

DDX3.14

# ’808 Patent Would Have Been Obvious

## Claim 28 of the ’808 Patent Would Have Been Obvious Over the ’552 Publication

### ’808 Patent Claim 27

27. The dose counter as claimed in **claim 1** in which the regulator provides a resistance force of greater than 0.1 N against movement of the counter display.

JTX-002 (’808 Patent), Claim 27.

### ’808 Patent Claim 28

28. The dose counter as claimed in **claim 27** in which the resistance force is greater than 0.3 N.

JTX-002 (’808 Patent), Claim 28.

**’808 Patent**

transit or if the inhaler **12** is dropped. It has been found during testing that a force of 0.3 to 0.4 N needs to be applied to the tape **112** to overcome the regulator at the stock bobbin **110**. 0.32 N is achieved with the control elements **128** having the profile shown in FIG. **19**C and 0.38 N is achieved with the profile of the control elements **128** altered to be as shown as described with reference to FIG. **6**F. These forces are substantially higher than the 0.1 N force mentioned above and undesirable movement of the tape is substantially avoided even if the inhaler is dropped onto a hard surface.

JTX-002 (’808 Patent), 19:28-37 (highlighted).

**Prior Art ’552 Publication**

DTX-162 (’552 Publication ), Fig. 6 (annotated).

Claim 28 would have been obvious

- Design of ‘552 Publication’s regulator same as ‘808 Patent’s regulator
- ’808 Patent’s claimed force values are experimental details based on testing
- Matter of routine optimization for a POSA to find requisite force against movement of counter display to prevent unwinding, while driving incrementally to move the counter display

DDX3.16

# ’808 Patent Would Have Been Obvious

## No Secondary Considerations

- None of the alleged secondary considerations that Teva has raised overcome the obviousness of claim 28 of the ’808 Patent

DDX3.19

\- - -

I N D E X

\- - -

| Opening Statements | Page |
|---|---|
| OPENING STATEMENT MR. GREENBLUM | 8 |
| OPENING STATEMENT MR. ADAMS | 39 |

E X A M I N A T I O N S

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **DECLAN WALSH** | | | | |
| BY MR. SMITH | | 99 | | |
| BY MR. PICOZZI | 61 | | 114 | |
| **DAVID LEWIS** | | | | |
| BY MS. KAYALI | 124 | | | |
| BY MR. ZIMMERMAN | | 302 | | |

E X H I B I T S

| NUMBER | ADMITTED PAGE |
|---|---|
| JTX-002 | 98 |
| JTX-003 | 98 |
| JTX-004 | 98 |
| DTX-016 | 98 |
| DTX-18 | 114 |
| DTX-19 | 114 |
| PTX-74 | 114 |

Q. Thank you, Mr. Walsh.

What is your educational background?

A. Yeah. I have a master's in engineering from Dublin City University, and I also have a bachelor's degree in engineering as well from the Atlantic Technological University of Sligo.

Q. What positions at Teva have you held, Mr. Walsh?

A. Yes. I started with Teva in 2006 as a design engineer, and I continued to work with Teva to my current position, which is director of R & D and combination product and device.

Q. Can you explain for the Court what a combination product is?

A. Yeah. A combination product is any combination of medicinal product and a device element. An example of a combination product is an inhaler, and it is also an injectable.

Q. Why is it Teva has a separate group for combination products?

A. Yeah. Combination products, they are complex by nature. They are small, hand-held devices. Generally, there is a lot going on. There is lot of small parts. Each of the components, they are very much dependent on each other.

Teva recognized that this was a complex area, required its due attention. So it created a dedicated department for combination products to ensure that we supported their development and also supported their manufacture towards the

market.

Q. Mr. Walsh, were you involved in redesigning ProAir® and Qvar® to incorporate a dose counter?

A. I was, yes.

Q. What was your involvement?

A. I was a design engineer. So my involvement really was to focus on the design and development of those products.

Q. And what kinds of inhalers are those products, Mr. Walsh?

A. Yeah. They are called pressurized meter dose inhalers because the contents of the canister is pressurized, metered dose inhalers because they meter a specific amount each and every time they press it, unlike, say, continuous sprayers like you might have in household products, and they're handheld. They are held by patients, and they are hand actuated as well.

Q. Mr. Walsh, will you understand me if I refer to them as hand actuated or press and breathe inhalers as a shorthand?

A. I do, yes.

Q. Great. Thank you.

Now, Mr. Walsh, has your work at Teva resulted in any patents?

A. It has, yes.

Q. Okay. I would like to put up JTX-003, 004 and 002. These are the patents that are being asserted by Teva in this case.

Mr. Walsh, are you an inventor on these patents?

A. I am, yes.

Q. Did you work with anyone else at Teva on the research and development programs that led to these patents?

A. I did, yes. There was a team of us in Teva who worked on these product developments.

Q. Okay. And who are those other individuals at Teva that you worked with?

A. It is listed here. There is myself, Derek Fenlon, Simon Karr, Jan Geert Hasenberg, Daniel Buck and Paul Clancy.

Q. And what were their roles?

A. They were all contributors to the projects.

So myself and Derek Fenlon, we are design engineers. Simon Karr was the head of the department. Jan Geert Hasenbeg, his experience was in finite element analysis. So that's materials, types of plastic components, how they come together, how they interact, because there is a significant world of plastic components and some act well together, some don't.

Then, of course, we have Daniel Buck and Paul Clancy, and their expertise is in manufacture and automation because, again, we are not looking just to make one. We have to be able to make these in the millions. So we have to bring all these expertise together.

Q. Mr. Walsh, I see that there are two other individuals that are named on this patent, Robert Uschold and Jeffrey Karg.

Who are they?

A. Yeah, that's right.

Robert Ushchold and Jeffrey Karg, they also worked on the project and they worked for a different company called Radius Technologies.

It is a company that Teva contracted to help with the development of the product.

Q. What did Radius bring to the table?

A. So Radius brought another team of engineers. They had expertise in terms of industrial design. Industrial designers look at how the product is going to be held in people's hands, how people are going to interact with it, is it going to be user friendly, all of that kind of stuff. They also had design engineers, so this was a means of getting more people onto the team, and then they were also using some state of the art, what we would call tolerance analysis, but that's really about, okay, so you take all of these components. They are really small. The features on the components are even smaller again. They are all equally dependent on each other. So -- you know, so when one moves, another one moves and you want them to move the right amount and not too much, and you don't want them to jam up or seize up and not move.

So that element was of critical importance to us in terms of the tolerance analysis to ensure that we could bring it all together and ensure function as we intended it to.

Q. Mr. Walsh, why was it important to have people from different backgrounds involved in the research and development?

A. Yeah. So you will find most of the team are mechanical engineers, but mechanical engineering is a pretty broad discipline, but it is quite important. So we had -- if you like, we covered off design, we covered off the structured elements. We had the industrial design. And then we had the analytics to go with it. All of that was critical and we also had the, you know, the design for manufacture. All of that was critical to have a successful outcome. To put it simply, if we had six or seven people with the same background or same as me, that wouldn't make for a very good outcome.

Q. Thank you, Mr. Walsh.

Now, was there a decision at Teva to develop a hand-actuated inhaler with a dose counter?

A. There was, yes.

Q. Were you involved in that decision-making process?

A. My role at that point in time in Teva was to create technical presentations, present technical information to the management team or the decision makers. So we would have compiled technical presentations, made recommendations, and then, of course, the senior management team, they were the ones tasked with the decision-making.

Q. Why was Teva considering developing a hand-actuated inhaler with a dose counter?

A. So Teva already had products on the market and Teva was really looking to address the unmet need. And that was

essentially giving people the information that they very much needed, which was how many doses remained in their inhaler. You know, the products in question that we are talking about, they are rescue medicines and they are also relievers as well. If someone has a rescue medicine, this is a life-saving medicine, you know. If they have an asthma attack coming on and they can't breathe, when they reach for their inhaler, they really want to know that there is doses in there because if there is not, we are talking about, you know, admission to emergency room or worse case. That was very front and center as part of us as a design team at the time to ensure that we address that need.

Q. I would like to put up what's been marked as PTX-216.

Mr. Walsh, were you involved in preparing this presentation?

A. I was, yes.

Q. About when was this presentation created?

A. This was created around the end of 2008.

Q. Can you explain for the Court what the purpose of this presentation was?

A. Yeah. This is a technical presentation. The purpose of the presentation was to present the idea of a Teva internal or in-house development program for a hand-actuated inhaler with a dose counter.

Q. And at the time that Teva was thinking about making its

own hand-actuated inhaler with a dose counter, had Teva successfully developed other dose counters?

A. At that point in time Teva had, I suppose a history of and an established development for dose counters. We had developed dose counters for other Teva inhalers at that point in time, yes.

Q. Let's take a look at the page ending in Bates number TEVAQVAR 911.

Now, Mr. Walsh, these other dose counters that Teva had developed, were they used in the same kinds of inhalers as ProAir® and Qvar®, or are they different kinds of inhalers?

A. These are different inhalers. So we have, if we look across, we have the one on the left-hand side, which is Spiromax. So that is a dry powder inhaler. It is not pressurized. The contents are powered. They are not in, say, a liquid form like we have in the MDI version.

And then we have the one in the middle which is the Easi-Breathe inhaler. It is also worth pointing out, both of those inhalers, they are what we would term breath actuated. So that person just picks up the inhaler and in both of these cases, they open a dust cover off the inhaler. And then they inhale. The inhaler automatically dispenses the dose as they inhale through the inhaler. So there is no interaction with the hand, the person isn't tasked with pushing down the canister, the dose spraying out. There is another element here

which is breath coordination. It is quite more difficult than people expect. A lot of people just look at these inhalers and they think they are quite simple. And they are. It is a simple idea. You press the canister and you inhale. But very, very difficult for people to get it right. Those other two inhalers, they are breath actuated to address that.

Q. Now, Mr. Walsh, is it harder or easier to develop a dose counter for a hand-actuated inhaler or one of these other devices that you have mentioned?

A. As we found out as we worked through this, it was certainly easier to develop a dose counter for the other two inhalers. Because there are mechanisms, we know that the movement within the inhaler is a particular movement of a number of millimeters.

And then we -- the mechanism will do that. It is going to do it reliably each and every time. So again, as a team of engineers, we took full advantage of that when it came to the dose counters. So we knew it was going to travel at a pretty large distance relatively speaking. And we took advantage of it.

We knew the challenge moving over to the hand-actuated inhaler. It is not a reliable mechanism. People are going to press it. Different people will do it in a different way. Someone might press it quickly and hard. Someone else might press it lightly. And someone else might stab it a little bit,

you know, jab it quickly. And that's, you know, that in itself isn't a problem. As a design team we understand it is people. They are going to do it differently.

Our task is to design around it. But the design around and figuring that out meant that we needed to get the counter for the hand-actuated inhaler to count the same time that the canister dispensed the dose. And it had to be at the same time otherwise we would have inaccurate communication of the number of doses remaining in the inhaler.

Q. Mr. Walsh, can you give the Court a sense of how small the distance was that you were working with for these various components?

A. Yeah. The distance, it is really small. You know, that the canisters, they dispense a dose around a movement of about 1.5, 1.7 in movement. Putting that in context that is about 1/16th of an inch. It is tiny. And then on the flip side the other ones that had automatic mechanisms, they travel around three to four millimeters. We are talking significant differences. I know they are really small numbers and sometimes you throw numbers out and unless someone has a ruler or something, it is hard to comprehend, but, you know, as an engineer some of our task is to turn the feeling into a number or vice versa. But it is incredibly different to get a mechanism to register, reliably register a count and also to have a display that's going to move sufficiently for people to

discern that it is actually moved from one number to the next.

Q. Mr. Walsh, could you at Teva just take one of those older dose counters and stick it in a hand-actuated inhaler?

A. No. We couldn't because it wouldn't work. It wasn't designed to work in that manner.

Q. Now, Mr. Walsh, at this time, did you make any initial assessments about what potential modifications you might need to make to develop a hand-actuated inhaler with a dose counter?

A. As engineers I suppose we had, you know, we had a vision that the next step was to move on and develop a dose counter for the handheld inhaler. And I suppose again as engineers, we did have -- we did have ideas, I have to say very much assumptions, as to what if you change this, we can get it to work. That task was to get it to count in the shorter distance.

So we were kind of coming up with ideas on how we could make this work, yes.

Q. Now, Mr. Reynolds, let's turn to the page ending Bates number 913.

Mr. Walsh, what kinds of general changes were you considering at the time?

A. Yeah, so this slide here again was part of that presentation. We are looking at the dose counter and the types, the changes that might need to be made. We looked at the actuation pane itself, some of the other components in

there that would have to be modified.

I suppose, you know, it is somewhat worth pointing out when you look at it there is almost an arrow going to every component on the screen or part of the dose counter. Each one at that point in time we thought needed a modification.

Q. Now, Mr. Walsh, did any of those changes include adding support rails?

A. No, they didn't.

Q. Did any of those changes include adding a regulator?

A. No, they did not.

Q. You mentioned at the outset that Teva was considering whether to design its own in-house inhaler and dose counter. Did Teva ever consider any alternatives?

A. Yeah, Teva did.

We took a look at some third-party alternatives. You know, it is not unusual for a company like Teva to have other companies approach and say we have this technology. So we did take a look at that, yes.

Q. And what were those companies offerings that you considered, Mr. Walsh?

A. Yeah, some of them we considered the Valois or Aptar Pharma as they are called now. They have one called Landmark® at the time. We also considered Trudell Medical offering at that point in time as well.

Q. Now, Mr. Walsh, were any of those devices suitable?

would be technically feasible to develop a hand-actuated inhaler with a dose counter?

A. Yeah, in summary, the conclusion from the feasibility phase was that, yes, we needed to make some changes. But it was feasible that we could develop a dose counter and have a successful product. It also highlighted that the task at hand was going to be quite challenging as well.

Q. Did any of those changes include adding support rails?

A. No, they did not.

Q. Did any of those changes include adding a regulator?

A. No.

Q. So after you had the results of the feasibility assessment, what was the next thing that you did?

A. So following the feasibility phase, we then entered into a development detail design phase. That's really where we take what we already know, what we have. We kind of pick it apart, try to improve our understanding. And then we build it back up again in terms of design engineering drawings. Then we get components made and we bring them in to a test phase.

Q. Did you hire anyone else to help out during that detailed design phase?

A. We did, yes.

It was at that point in time that we contracted Radius Technologies, yes.

Q. I would like to put up what's been marked PTX-208.

Mr. Walsh, were you involved in reviewing this report?

A. I was, yes.

Q. What is this report?

A. So this is a report from Radius Technologies. It deals with Teva's hand-actuated inhaler. And it is a design for a manufacture and a design for an assembly report.

Q. What is designed for manufacturing or designed for assembly?

A. So as part of a design process, we have a number of key elements. So there is -- first and foremost there is the patient centric, so that is design for people, for usability. And then there is design for manufacture, can we make it. And then there is design for assembly, so can we put together what we made.

So that's essentially what this is and deals with some of the challenges we were encountering at the time.

Q. Let's take a look at the page ending in Bates number 854.

Mr. Walsh, did you make any changes to the inhaler body?

A. Yeah. The inhaler body that existed before dose counter naturally didn't have any space in it to contain the dose counter. So we had to find where we put the dose counter.

Our decision was to place it at the back of the inhaler and down towards the bottom.

And, you know, in addition to that, then, as we worked through our development, we discovered that we had issues or

challenges with the dose counter caused by the canister rocking.

And that required us to modify the guide rails that were already there. We had guide rails, but they just weren't sufficient, I suppose, or we had to change their intended use. Because up until that point, the guide rails and the purpose for the guide rails at that point was during assembly the canister is laid down flat and so is the actuator. And one is pushed into the other.

That is how we assembled them. That is the purpose of the guide rails, to guide the canister in and ensure it is centered in the central outlet port.

But during testing of the dose counter that we worked on at that time, we found that the rocking of the canister could cause the counter to count too soon or too late. That is when we found we needed additional rails, and critical to that, we also needed one rail to be aligned on a common plane with the central outlet port and the actuation member.

Q. Mr. Walsh, what do you mean by the dose counter counting too soon or too late?

A. Yeah. So when the dose counter counts and what we're trying to do is maintain accuracy because we want, again, to ensure that we communicate the most accurate information to the user. So with the scenario where the counter can count too soon or too late, it is known as undercounting and

overcounting.

So overcounting is where the counter counts too much and so what happens there is the counter will display there is no doses remaining, but in the canister there could be ten, for example. That is bad because the patient will, you know, dispose of their inhaler when there is medication in it. That is wasteful.

But the other side is far worse, and that is undercounting. That is when the inhaler has dispensed all of its medicine but the counter is telling the patient that there's maybe ten doses remaining. That's critical because that's the one that can lead to somebody during an asthma exacerbation not having the medicine that they need, end up in an emergency room or worse case, death. That was one we really needed to avoid.

Q. Mr. Walsh, how does undercounting and overcounting relate to the direction in which the canister rocks?

A. Yeah, I don't want to get into the specifics, but it is essentially trigonometry. So, you know, you are dealing with a triangle effect. So if the canister -- and remember it has been actuated by a person.

So people, as they put their finger or thumb, depending on how they hold it, on top of the canister, their intention is to push the canister down because they want to get a dose out. But unintentionally what they are also doing is maybe pulling

the canister or pushing the canister over against those guide rails. You know, they don't even know they are doing this, but it's happening and we pick it up in the mechanism.

So if they push it away from the actuation member, that causes the counter to count late. If they pull it closer to the actuation member, that can cause it to count sooner, but as I said, it is in terms of mechanically it translates into pretty simple trigonometry, yeah.

Q. Thank you, Mr. Walsh. I'm glad you find it simple.

Mr. Walsh, does this depict the configuration of the support rails in ProAir® and Qvar®?

A. It does, yes.

Q. And before you were involved in the research and development of this project, did you think that canister rocking would be a problem?

A. We didn't, no.

Q. Is it always a problem?

A. Canister rocking, you know, it's not always a problem, no.

It's not.

It exists in most of these types of inhalers because the canister has to have freedom to be pressed up and down so it has to have clearance, which means it has freedom to move radially. As I said, we had guide rails there previous to this. And we found during our development that for us the canister rocking was definitely a problem, yes.

Q. Mr. Walsh, did you consider any alternatives to changing the configuration of the rails?

A. Yeah. We did.

We had a number of alternatives. A lot of these problems, we look at the problem and then we look at many solutions. We had a couple -- one was to increase the length of the inhaler, but that would have had a similar effect. Again, you are back to your trigonometry and minimizing the amount of movement of the canister radially within the inhaler.

So if you grew the inhaler body, it would have had a similar effect.

The other one was if we introduced an additional component at the top of the inhaler. That in itself would have had a similar effect because we could have minimized the rocking of the canister. They were ideas. Neither of those made their way through the kind of selection process that we worked through.

Q. Mr. Walsh, if you hadn't had a canister rocking problem, would you have added support rails?

A. No.

As I said, we had them there already. They were for a very different purpose. Our intention at the start was they would be sufficient as well, but that wasn't our finding as we worked through development.

Q. Did you have any concerns that changing the configuration

of the rails would affect airflow through the device?

A. Yeah. We did. There is a number of design criteria that we would have typical enough for a product like this. You know, I mentioned the counter accuracy would be one. But the other, of course, is airflow or resistance through the inhaler or the ease of which airflow travels through the inhaler. Any changes you make to the inside of the inhaler has the potential to restrict airflow through the inhaler.

You know, again, people taking the product where they have an asthmatic attack or exacerbation, their airways are already restricted. So we want to ensure that they can get to those with as much ease as possible. So it was quite important for us that we didn't change the airflow resistance.

So we would have tested the airflow resistance of the inhaler without the dose counter and compared it to the one with the dose counter as well. So adding the rails, that was a risk itself, that it would impact that flow resistance, yes.

Q. Did you have any concerns about complexity?

A. We did, of course, yeah. Complexity is a good example in terms of why the addition of another component wasn't selected because every component has its own story and its own complexity. The products are complex themselves already by nature. So making any change to a complex system is not unlikely because we, then, have to take it forward and test it and ensure that, yeah, we may have fixed this problem, but have

we unintentionally created one or two others that we didn't anticipate.

Q. Mr. Walsh, when you discover a problem at Teva, how do you come up with a solution?

A. So in Teva we have a process that we tend to follow. It is one where we find or discover a problem. We capture it in terms of what is the problem statement. And then we bring a team together and we have what we call a brainstorming session. So a team of people into a meeting room, we go through the problem statement, and then we invite ideas as in potential solutions. That phase of the problem, that's very much creative. Nobody can criticize any idea because we want them all. We want as many as we can get.

Then when the brainstorming part finishes, then we look at, you know, a spectrum of ideas. Sometimes they are easily enough categorized, but we try and categorize them and short-list them. And then when we have a list, we then look at that again with other selection criteria, like, is it adding complexity, is it easy to manufacture, you know, sometimes the ideas are a bit out there, can it even be made.

We look at all of that and we select them down. The idea is we get to two, maximum three, ideas that we bring forward into the design-make test phase. So at that point in time they are ideas, maybe something written or a sketch. So then we convert it to an engineering drawing.

We make some prototypes, we test them, and it's only at the end of that phase would we believe that that idea was sufficient to go forward into the development phase where, again, it's going to be tested far more again.

Q. Mr. Walsh, is that a process that you followed to solve the problem with canister rocking?

A. It is, yes.

Q. We can go ahead and take that document down.

Mr. Walsh, I would like to turn to some other changes that you made.

Can we put up what has been marked as PTX-231.

Mr. Walsh, were you involved in reviewing these drawings?

A. I was, yes.

Q. What are these drawings?

A. So this is an engineering drawing for the actuator body.

Q. I would like to move to the page ending in Bates number 027, specifically focus on the component that is under the number three.

Mr. Walsh, can you explain for the Court what this component is?

A. Yeah. This component is called -- we call it a chassis component. So it is probably one of the most integral components of the dose counter. It holds the dose counter display. It holds the dose counter in the actuator itself.

And you know, a lot of the other components, the actuation member interacts with this component as well. So it is one of the most critical components within the counter. They are all critical or they wouldn't be there, but this one does a lot of work.

Q. Thank you, Mr. Walsh.

And I see that there are a number of numbers that are around that particular component drawing.

Can you explain to me what units of measurement those numbers are in?

A. Yeah. Those units, they are millimeters. It gives an idea of the size of the component. If the component is tiny, it looks huge on the screen, but it is actually tiny. The features on the component themselves, they are even smaller again. This is one of the few components in all my time as an engineer where we have gone out to have it manufactured. We presented it to the company that was going to mold the component and one of the guys in the meeting room just goes, wow, we have a component here. It's quarter of a size of a matchbox and you have got over 100 dimensions on it. I don't know if we can make this one.

Q. Now, Mr. Walsh, did you ever have any problem with the counter display?

A. We did, yes. Yeah. The counter, we found the counter display wasn't maintaining accuracy as we needed and intended

 it to, and that was because it had the ability to move back and forth of its own accord, yes.

Q. And why is it bad if the counter display moves too much?

A. It is back to the accuracy of the information communicated to the patient. You know, it is critically important the patient has the right information and when they need the product and when they rely on the product most, that they actually have doses in the inhaler.

Q. Now, Mr. Walsh, how did you solve the problem with the counter display moving too much?

A. Yeah. The solution was the addition of a regulator at that point in time.

Q. Can you explain for the Court what you mean by that regulator?

A. Yeah. I don't have a pointer, but it is the two features. They are shown on the diagram -- thank you -- they have highlighted there. So they are seen top and bottom of that cylindrical pin.

Q. Thank you, Mr. Walsh.

And before working on this project, did you know that you would need to change the force on the counter display?

A. We did not, no.

Q. Did you consider any alternatives to the regulator?

A. We did, yeah. We had a similar process that I described, and we came up with a number of other ideas as well.

Q. Did this problem with the counter display moving too much come up on any other projects that you worked on?

A. It did, yes. It also presented itself on one of our other inhalers, the Spiromax inhaler. We saw it earlier on, and that inhaler had a similar issue. So, yeah, that we saw it there also.

Q. I would like to put up what's been marked as plaintiff's Exhibit PTX-247.

Mr. Walsh, were you involved in preparing this document?

A. I was, yes.

Q. What is this document?

A. So this is a record of a brainstorm. So it is a record of a brainstorming session we would have had, and I think the problem stating for this one was the dose counter display changing, as we mentioned.

Q. Okay. I would like to take a look at the image in the center of that page.

Mr. Walsh, can you explain the significance of this picture?

A. Yeah. So this is -- actually, it's a photograph of a whiteboard in one of our meeting rooms. So this comes from the kind of brainstorming phase, and it's the end of that session where people would have brought forward their ideas.

Again, people do things differently. So some of the team like to stand up and they will sketch their ideas on the

board. Other people, you know, they will write down their ideas on a sticky note and that's stuck to the board, so you can kind of see the sticky notes around the board as well.

So it is just a capture of all of that. It just goes to show some of the ideas and the amount of information that can flow in one of those meetings.

Q. Now, Mr. Walsh, turning back to the page, how did you decide what options to short list?

A. Yeah. So we create a list of the various ideas, some of them, they naturally categorize and others don't. And I think in this case, we ended up with a list of about six different ideas on the bottom of the page.

They were taken on, then, into the next phase, which is assess them for, you know, do we believe they'll technically solve the problem? Do they add complexity into the mechanism? Will they require an additional component? Maybe, do they require more space? Because, you know, when this presented itself, we already had the actuator body designed. We had quite a few of the features already designed. So changing the actuator body by a quarter of an inch or something wasn't really an option. It is always an option, but definitely wasn't our lead option at that point in time.

So we take these six ideas and the goal is to reduce them down to maximum two, kind of -- sorry -- maximum three but two is kind of preferable, and they are the ones we take

forward into the -- you know, create engineering drawings, make them and test them.

Q. Now I would like to turn to the next page of this document, page ending in Bates number 381.

Mr. Walsh, of those potential solutions, what was the one that you ultimately selected?

A. It is the one that is -- it's labeled "Number 1" there on the sketch pad.

So that was the one that we ultimately selected for that particular product, yes.

Q. And can you explain for the Court what this solution represents?

A. Yeah. So the solution, it is looking at, you know, one of the components of the dose counter display and the idea here was that we created a feature to regulate the movement of the dose counter display.

Q. Now, Mr. Walsh, was this the same solution that you chose for the ProAir® project that we just saw?

A. No, it wasn't.

It is one of these examples where you have one problem manifests across multiple products, but this solution wasn't suitable for the other MDI inhaler because it actually required too much force and because on the ProAir® inhaler, it is a low force to count, dose counter. So this one required too much force for that dose counter. So we came up with a different

solution.

Q. And you used the term "MDI."

That's a metered dose inhaler?

A. That's right, a metered dose inhaler or that hand-held inhaler, yeah.

Q. We can go ahead and take that down.

Now, Mr. Walsh, I would like to put up the document that's been marked PTX-257.

Were you involved in the testing of the hand-actuated inhaler and dose counter combination that Teva developed?

A. I was, yes.

Q. And were you involved in reviewing this document?

A. I was, yes.

Q. Can you explain for the Court what this document is?

A. Yeah. This is a test report for the hand-actuated inhaler. It is from the engineering phase of the product development.

Q. Let's take a look at the page ending in Bates number 446, specifically focusing on that middle section of the page, 9.1.

Mr. Walsh, can you explain for the Court what this section of the report describes?

A. Yeah. This section of the report deals with dose counter accuracy.

Q. And did you set any particular standards for dose counter accuracy?

A. Yes.

Q. In connection with the development of the dose counter for the ProAir® MDI, Teva evaluated multiple nontape-based dose counters.

Correct?

A. Yes, that's correct. Yes.

Q. But Teva decided to use a tape-based dose counter for the ProAir® MDI.

Correct?

A. Yeah. The decision was to use a Teva development, which turned out to be a tape-based dose counter. Yeah.

Q. And Teva had tape-based dose counters before it started the ProAir® MDI project.

Correct?

A. That's correct, yes.

Q. Can we pull up PTX-231, page 27, which you referred to on your direct.

Can we go to page 27, the page ending in 27.

Can we zoom in on the figure under the number three at the top.

Mr. Walsh, do you recall discussing this figure on your direct?

A. I do, yes.

Q. Do you see the two projections on the split shaft in the figure?

A. I do, yes.

Q. You referred to those two projections in your direct testimony as a regulator.

Correct?

A. Yes, that's correct.

Q. Would this be a regulator as used in the '808 patent on which you are an inventor?

A. Can we take a look, please.

Q. Sure. The '808 patent is JTX-005.

Can you go to Figure 6F, please. JTX-002, Figure 6F, please.

Mr. Walsh, does that refresh your recollection as to whether the figures in -- whether the nubs on the figure in PTX-231 that we just looked at are regulators?

A. Yeah, on the diagram it appears as such.

Yes.

Q. So the nubs by themselves are regulators.

Correct?

A. Without actually -- without actually reading how they are described, they could be regulators. They could be other features also.

Q. You can take that down.

Can we go to PTX-251, please.

Mr. Walsh, this is a design drawing for a stock bobbin.

Correct?

metered dose inhalers.

So it would be hundreds a day at least. I mean, it's easy to get to -- it is easy to get to multiple of hundreds per day. Yes.

Q. You said you always fire by hand for drug delivery.

Is that right?

A. Yes. Absolutely.

You can get quite different results from different, even people in the lab. You can look at data. I can look at data, and I can sometimes tell who has fired the inhalers just by looking at the data.

What we aim to do is make inhalers independent of patients. And those patients could be tens of millions. I need to at least be able to do that with the people in the lab, and so it helps to fire things by hand because we are getting information.

Q. Now, shifting tack slightly, in the course of your 25, 30 years working with metered dose inhalers, have you done any work relating to dose counters for metered dose inhalers?

A. Yes. Yes, I have.

Q. And what work is that?

A. So during the periods where we're looking to add dose counters to products, the products that were already on the market and we were aiming to put the dose counters, I would be responsible for evaluating and also giving my opinion on where

A. There was an FDA guidance in March 2003 that was asking people to -- people, like myself developing inhalers, to include them and to consider.

Q. So let's put up PTX-402. This is the front page.

Is this the guidance you are speaking of, Dr. Lewis?

A. Yes.

Q. And in very general terms, what is this guidance about?

A. So, yeah, this is -- this is the FDA telling people developing metered dose inhalers you must consider a dose counter or dose indicator on your products when you are developing them.

Q. So let's turn to the page ending with the Bates number 32577. I want to look at some language in the background session.

What does FDA say about the state of affairs for patients with MDIs?

A. They pointed out that a patient must guess how many doses are left in the metered dose inhaler, and they have two options. They throw away a metered dose inhaler that may still contain acceptable metered doses, or they use the product when it may be beyond its recommended number of doses and risk not receiving the correct dose.

Q. Are -- if a patient uses their inhaler after the recommended number of doses, is it possible that a spray will still come out?

A. It's possible the spray will still come out.

Q. When that happens, can the patient be sure that the spray that comes out has the correct amount of drug?

A. No.

When metered dose inhalers are developed, you need to demonstrate up to the target number of doses, so up to 200 that you have a correct dosage. After then, after that point a lot of things can happen.

Q. And is one of those things that can happen that the patient doesn't get the medicine they need?

A. Yes, absolutely.

Q. So if we turn to the next page, that's ending 32588, and under general recommendations, what is the FDA recommending to manufacturers here?

A. So the FDA recommended that manufacturers of metered dose inhalers under development for oral inhalation integrate dose counting devices into the development programs of their MDI products.

Q. Let me ask this: How often does FDA publish guidance like this?

A. This is very unusual, very unusual. It is just very rare.

Q. Does FDA often tell companies how to design their products?

A. If they do, normally, they write the word guidance on or draft. This is a guidance, but it doesn't have the word draft.

It is unusual.

Q. It is unusual for the FDA to issue a final guidance? Is that what you're saying?

A. Extremely unusual.

Q. What does that suggest to you about how FDA viewed the problems patients faced in keeping track of their doses?

A. FDA recognized there was a problem. There was a problem at that particular time that hadn't been a problem before. Or recognized before. And needed to be solved.

Q. So do you think the FDA viewed this issue as minor, major, somewhere in between?

A. I consider they considered it extremely important.

Q. So turning back to the recommendation, and we take a look at the next sentence, what does FDA say about what dose counter should provide to patients?

A. So dose counters should provide either a numerical count or color coding, a clear indication of when the MDI is approaching the end of its recommended number of actuations, as well as when it has reached its exceeded number of actuations.

Q. Did we discuss what happens when you exceed the number just a minute ago?

A. If you exceed it, then there may not be any medicine coming out. It may be too much.

Q. And when the FDA references a direct numeric count or color coding, is the FDA providing a manufacturer with options

what is that?

A. That's the central outlet port.

Q. Is that part of the inhaler body or the dose counter?

A. So that, again, is part of the inhaler body.

Q. So if one wanted to understand whether a product met the common plane limitation, would you need both the dose counter and the inhaler body?

A. Yes.

Q. If you had only the dose counter, can you evaluate whether the common plane limitation had been satisfied?

A. No. Two parts are here.

Q. Dr. Lewis, we've identified three things in three colors on this screen.

Right?

A. Yes.

Q. How can one tell whether they lie in a common plane?

A. So the red line will pass through, and that's indicated here. So we have got the orange, the green, and the blue all lying on that straight, red dotted line on the left-hand side.

Again, when we look at the right-hand side, we've got the blue, the green, and the orange. So the three parts, actually, the inner wall canister support formation, the actuation members and the central outlet port all lying in a straight line on that red dotted line.

Q. I should have said this before for the record.

The right image, is that essentially a picture of PTX-411?

A. Yes, it is.

Q. So let me ask this: What else would someone need to know about a product to know -- other than what's shown on the slide, to know whether or not the common plane limitation shown here has been satisfied?

A. That's all you need to know.

Q. Is there another patent in this -- let me back up.

This language comes from the '289 patent.

Right?

A. Yes, it does.

Q. Is there another patent in this case that also contains what the parties have dubbed the common plane limitation?

A. Yes.

Q. What patent is that?

A. That's the '587.

Q. Can we pull up the '587 patent? That's JTX-004.

Is this the patent you mean?

A. Yes.

Q. Mr. Walsh and Mr. Karg, are they both inventors of this patent, too?

A. Yes, they are.

Q. Let's take a look at Claim 1 of the '587 patent in comparison to Claim 1 of the '289 patent by going back to the

Q. And what does that additional limitation require?

A. Protection against unwanted actuation of the dose counter by reducing rocking of the medicament canister relative to the main body of the inhaler.

Q. And let me just be very clear, because I think this is going to be an important point.

Does Claim 1 of the '289 patent require that the first inner wall canister support formation protects against unwanted actuation of the dose counter by reducing rocking of the medicament canister relative to the main body of the inhaler?

A. No.

Q. Now I would like to turn back to what that extra language, the yellow language means in Claim 5 in the '587 patent, Claim 1.

Have you prepared a demonstrative just to illustrate for the Court how it's possible to arrange features of the inhaler to protect against unwanted actuation of the dose counter?

A. Yes.

Q. Dr. Lewis, again, this is an animated slide but before I play it, I see two images in the middle.

How am I looking at the inhaler in those images?

A. So you are looking -- at the middle images, you are looking downwards. So we are looking into the inhaler.

Q. And there are two images on the outside of the slide.

A. Yes.

 Q. How is someone looking at the inhaler in those?
A. So in that image we are looking -- yeah, so we are going to be looking like this.
Q. So kind of a cross section?
A. Yes, it's a cross section.
Q. And then I see a red trapezoid, rectangle on the screen.
What is that?
A. So that's a plane. That is just an imaginary line going straight through the middle.
Q. On the left-hand side of the screen, is there an inner wall canister support formation in the common plane?
A. Yes.
Q. Can you illustrate that?
A. So on the red common plane, we see there the inner wall canister support formation, where I'm indicating with the laser pointer.
Q. How can I tell it is in a common plane?
A. It is on that red line.
Q. With what other things?
A. With the actuation member green and then we have the outlet port in the center.
Q. And then on the right-hand side of the slide, do we have an inner wall canister support formation in that common plane?
A. So there is no inner wall -- there is no wall canister support form ation, and we can see on the center it is missing

here whereas here it is present on the left-hand side.

Q. And on the right-hand side, I see two little ribs at the top of that image.

Do you see what I'm pointing to?

A. Yes, I do.

Q. Could you highlight those, please.

Are those inner wall canister support formations?

A. They are inner wall canister support formations, but they are not in the common plane.

Q. I see.

So now I will play the animation.

Well, what just showed up on the screen in the corner?

A. So we've got the -- this is to depict the dose counter.

Q. And if I play the animation, what do I see on the left-hand side of the screen?

A. So we see on the left-hand side of the screen when the canister is rocked, then it will be -- the rocking will be reduced by touching, meeting the inner wall canister support formation, and that will prevent the actuation member being touched and then, of course, the counter does not move.

Q. On the right-hand side where there is no inner wall canister support formation in the common plane, what's happening?

A. So once you have the ability to then rock, you then create a problem in that the actuation member can get moved and then

you can actually end up with unwanted actuations of the dose counter.

Q. Let's go back to the language of the claims for just a moment. Excuse me.

The animation we just watched about rocking and dose counter actuation, just to be very, very clear, preventing -- excuse me -- reducing rocking, protecting against unwanted actuation of the dose counter by reducing rocking, such as we saw in that animation, is that a requirement of Claim 1 of the '289 patent, Claim 1 of the '587 patent or both?

A. It is only a requirement in the '587.

Q. And the mere fact, the fact that you have an inner wall canister support formation in a common plane, does that mean that that inner wall canister support formation necessarily protects against unwanted actuation of the dose counter by reducing rocking of the medicament canister relative to the main body of the dose counter?

A. It doesn't necessarily protect.

Q. Does it depend on the configuration?

A. Yes. Absolutely, yes.

Q. So does Claim 1 of the '587 patent impose some structural requirements on the claim?

A. Yes, it does.

Q. Excuse me. Let me ask a better question.

Does Claim 1 -- does the extra language, the yellow

language in Claim 1 of the '587 patent, does that impose an additional limitation on the structure of the inhaler that's not in the '289 patent?

A. Yes, it does.

Q. We are going to come back to that, but for now let's go to the third and final patent at issue in this case just to round them out before we start ticking off limitations.

Let's put up the front page of the '808 patent, and that's JTX-002.

Again, Dr. Lewis, is this a Teva patent?

A. Yes, it is.

Q. And are Mr. Walsh and Mr. Karg, are they both inventors of this patent?

A. Yes, they are.

Q. Have the parties in this case affectionately named this patent the regulator patent?

A. Yes, they have.

Q. So if I say "regulator patent," what am I talking about?

A. So this is the '808 patent, yes.

Q. Let's take a look at page 22 of the pdf. I'm looking at column 2, lines 54 through 63.

Dr. Lewis, what is Teva explaining here in its '808 patent?

A. So they are explaining a regulator is an advantage and help s prevent unwanted motion of the counter display if the

counter is dropped, for example.

Q. And is there a second problem that -- or a second nuance to the regulator?

A. Yes. It needs to be above a certain force.

Q. Dr. Lewis, before Teva invented the regulator, what could happen with -- if dose counters -- excuse me -- if inhalers with dose counters were dropped?

A. Inhalers, if you drop them, they may fire. So they may break.

Q. Let's take that down and put up the slides.

What could happen if instead of dropping the inhaler, you just kind of bumped it in your pocket by accident?

A. If you bump -- I mean, you, obviously, design these to not break or try and get them not to fire when you drop things, but we do test when you drop and thump these inhalers.

Q. Without a regulator, without Teva's regulator invention, have you prepared a demonstrative to illustrate what can happen in that inhaler?

A. Yes, I have.

Q. So on the left-hand side, what happens when a patient just nudges the inhaler?

A. So with just nudging and not actually firing the inhaler, if you don't have a regulator, then the numbers may start to move, which is unwanted.

Q. So is that a dose counter problem? Is that an error?

 A. Absolutely, yes.

Q. Now, if you add a regulator to the dose counter, what happens if the dose counter gets -- excuse me -- if the canister gets nudged?

A. So if you add the regulator and it is just getting nudged, then it won't move until you fire it fully.

Q. So I think we had user error on that animation. Let's see if I can try that again for you.

If you just nudge the dose counter, what happens when there is a regulator?

A. So the animation is showing that when you just nudge, you don't see any movement but then when you do press fully, of course, the complication is you have to then, obviously, register a dose. So you've got to distinguish between those two things. The regulator allows for that distinction.

Q. So are you balancing between the nudge and the full push?

A. Yes. And that's a very fine balance.

Q. Are there any other problems that can happen without a regulator?

A. Yes, for sure. Yes.

Q. And, again, have you illustrated a second set of problems here?

A. Yes.

Q. On the left-hand side, what can happen when a dose counter is pushed and it doesn't have a regulator?

A. One of the problems is that it may not go to exactly the number. It might not move all the way.

Q. And does a dose counter always move forward in the absence of a regulator?

A. Well, this is another problem, which is solved by the regulator.

So it prevents it from moving backwards. So it will always move from one station to the next station. So we're going from -- if we have 104, it should go to 103 but exactly to 103, not in between.

Q. And here it's shown there is sort of a half count shown.

Should a dose counter ever show a half count?

A. No, that is something that needs to be designed out.

Q. And does a regulator assist with that problem?

A. Yes. That was found to in the Teva invention to solve that problem, yes.

Q. So a counter with a regulator, does the dose counter ever move backwards?

A. No.

Q. In a counter with a regulator, does the dose counter ever accidentally record half a count?

A. With the regulator, the design is to always go to the exact count and not in between and not to go backwards.

Q. So again let me ask.

These two problems, I will call them the nudging problem

MS. KAYALI: In this binder, your Honor, there are both Dr. Lewis' opening report and his reply report, both concerning infringement. I think it is easiest to start with his reply.

There's a blue tab in there. I am looking at paragraph 60, which begins on page 34, and it continues, then, paragraph 61 on page 35.

So I want to make two points.

First, on the middle of page 35, Dr. Lewis describes the data that we put up in the -- yeah, on the chart that we showed.

And he says, As I demonstrate in my opening report, citing to that paragraph, and leading up to that he says, I disagree that any analysis would be necessary to establish that the rib closest to the mouthpiece, that is the one we're fighting about, of the device limits rocking. By extending into the cavity of the inhaler, it necessarily limits the canister's freedom of movement. It is just another way of saying it gets in the way or it touches the canister when the canister is rocked in the direction of the front of the device, as I demonstrate in my opening report.

And then citing back, as your Honor can see, on -- in paragraph 181 of his opening report, which I believe is on page 86, there Dr. Lewis is characterizing the data he showed and saying this data -- I understand this front rib to limit

A. Yes, we have.
Q. Was that what we spent the last hour doing, in fact?
A. Yes, that was it.
Q. So in your opinion does Cipla's ANDA product, is that inhaler as claimed in Claim 1?
A. Yes, it is.
Q. Now, the second part of this limitation, what, if anything, is the significance of a medication canister being movable relative to a dose counter?
A. Well, until the Cipla invention, dose counters, the ones that were -- that was successful, let's put it that way, were clipped to the canister. So it was one part.

And here we are actually taking the dose counter and now we are going to move relative.

So we are going to move that canister, the silver part down towards the dose counter, which is very difficult.
Q. So I have a couple of follow-up questions, but I want to start at the beginning.

I think in the beginning you said Cipla's invention was the first to do that.

Is that what you meant?
A. I apologize.

The Teva invention was the first to solve this problem. That's what I meant. Sorry. Apologies.

Strike that from the record.

Q. Thank you, Dr. Lewis.

The inhaler, the canister being affixed or not being affixed to the dose counter, is it harder to makE a dose counter with an affixed canister or a not -- that's not affixed to the canister?

A. When you fix a dose counter to the canister, you've solved the rocking problem.

And now you know -- so the answer is it's -- everything is hard. Everything is difficult, but you don't have to solve the rocking problem.

Q. You don't have to solve the rocking problem if you affix it to the -- the dose counter to the canister or if you don't affix the dose counter to the canister?

A. If you affix it to the canister, if you fix the dose counter to the canister, you don't have to solve the rocking problem because it is fixed to the canister.

Q. And why does affixing to the canister alleviate the need to solve the rocking problem?

A. Because now if it's separate, if you've got that rocking, you can't tell how far the stroke has gone. So if you don't know when it's going to fire, then you can't then decide when to count. That's the difficult part.

So Claim 2 is very important.

Here Teva highlights they have invented the canister moves relative to the dose counter.

Q. And is that at the time of this invention, is that what most people were doing, most inhaler companies?

A. That was the direction that you would take if you were -- yes, that is -- yeah.

Q. Which direction is the direction you would take?

A. The affixing to the canister.

Q. Now, again is there any dispute that Cipla's device meets this limitation?

A. No.

Q. And how can you tell the canister is movable relative to the dose counter?

A. The dose counter is fixed, is in the inhaler body. When we press down, when the patient presses down, then the canister will move towards the dose counter. So it is moving relative to the dose counter.

Q. So in your opinion, does Cipla's product infringe Claim 2?

A. Yes.

Q. Let's turn to Claim 4.

Claim 4 requires the inhaler as claimed in Claim 1 and what else?

A. Wherein the first inner wall canister support formation comprises support rails which extend longitudinally along the inside surface of the main body.

Q. In your opinion, does the rib in question here, does that extend longitudinally inside the surface of the main body?

to actuation input?

A. Yes.

Q. Now turning to the final limitation of Claim 1 of the '808 patent, I realize there is some background highlighting here that I think has been perhaps mooted by things no longer disputed, but let's focus on the language in the foreground.

What is the last limitation of Claim 1 of the '808 patent?

A. Regulator is provided which is arranged to act upon the counter display at the first station to regulate motion of the counter display at the first station to incremental movements.

Q. Now, Dr. Lewis, before we go into whether there is a regulator in Cipla's product and whether it performs the rest of this requirement, let's turn to the Court's construction. -- the parties' agreed construction of regulator.

You can find that at DI102 at 4.

If you could put that up, please.

Let's look at Terms 11 and 12.

Dr. Lewis, what did the parties agree that regulator meant?

A. Regulator was agreed that a structure of a dose counter that modulates motion of the counter display.

Q. And similarly what does regulate motion of the counter display mean?

A. Modulate motion of the counter display.

Q. So if we can go back to Claim 1, what construction are you applying in analyzing whether there is a regulator in Cipla's product?

A. So we are using the parties' construction.

Q. Now, is there a device or a component of Cipla's product that modulates motion of the counter display?

A. Yes.

Q. What is that device?

A. That's the leaf spring, which is shown in yellow. And in the photo.

Q. And remind me in this image on the left you have the other pieces of Cipla's dose counter.

What is the counter display in Cipla's product? Where is that shown?

A. You see that's below. So we have the leaf spring in the middle. The unit's display ring underneath, which is the counter display. And the unit's teeth ring above.

Q. Now, the regulator needs to act upon the counter display.

So can you describe -- in your opinion does the leaf spring act upon the counter display?

A. Yes.

Q. How -- describe that for the Court?

A. The leaf spring is pushing up on the unit's teeth ring, which is the drive surface and, of course, if it's pushing up, by the laws of Newton, third law equal -- and every action has

Q. In your opinion -- let me stop there.

Since we are not asserting Claim 1, what do we have to do next?

So in order to determine -- let me ask a better question. In order to determine whether Cipla's dose counter infringes Claim 28 of the '808 patent, what additional analysis did you have to perform?

A. So I need to determine that there is more than .3 Newtons on the force being applied.

Q. And how did you analyze that?

A. So I have taken the spring out. I've isolated the spring, and then I have measured the compressions. So on the screen, the distance that you press down on a spring and then the force that will result from that compression and they could cause a count. We're looking at between one and two millimeters. So we are going to be somewhere between 4 to 6 Newtons, which is a lot larger than .3 Newtons.

Q. In your opinion, does Cipla's -- does the leaf spring of Cipla's ANDA product apply a resistance force greater than .3 Newtons?

A. Yes, it does. Yes.

Q. Does it apply that resistance force on the counter display ring?

A. Yes, yes.

Q. And are you aware that Mr. Anderson disputes that by

A. Yes. Correct.

Q. And it's your opinion that Cipla's leaf spring applies a resistance force opposite to the direction of the motion of the counter display before it counts.

Right?

A. It is going to provide a resistance downwards, so it's pushing downwards against the unit's -- the display ring is being pushed downwards, it will stop it from rotating. There will be resist --

Q. Let me see if I can be more clear so we are on the same page.

You wrote in your expert report, in this case, "Cipla's regulator, one, applies a resistance force opposite to the direction of the motion of the counter display before it counts."

Didn't you?

A. Yes.

Q. Okay.

And the counter display we just determined rotates counterclockwise.

Right?

A. It does move counterclockwise.

Yes.

Q. So a force opposite to the direction of that motion would be counterclockwise.

- - -

I N D E X

- - -

E X A M I N A T I O N S

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **DAVID LEWIS** | | | | |
| BY MR. ZIMMERMAN | | 331 | | |
| BY MS. KAYALI | | | 396 | |
| **GREGOR ANDERSON** | | | | |
| BY MR. ADAMS | 102 | | | |
| BY MR. GREENBLUM | | 174 | | |
| **KIRAN ROTE** | | | | |
| BY MR. BACHAND | 205 | | | |
| **GREGOR ANDERSON** | | | | |
| BY MR. ADAMS | 219 | | | |
| BY MR. GREENBLUM | 261 | | | |

A. Sorry.

Q. Have you formed any opinions whether Cipla's ANDA product infringes the dependent Claims 2, 4, 6, 7 of the '587 patent?

A. They do not infringe.

Q. And what is that opinion based on?

A. Analysis that I've done.

Q. And in that analysis of the dependent claims, do you have any opinion whether the dependent claims infringe -- are infringed by Cipla's ANDA product because they depend from Claim 1?

A. That's right.

Q. Now, Mr. Anderson, can you provide us your opinion regarding why you believe Cipla's ANDA product doesn't infringe Claim 1 of the '587 patent.

A. Yeah.

It's primarily because it's -- there are, essentially, that all three claims do recite the common plane patent -- sorry -- limitation and Claims 1 and 12, they have got added parts to them, and the '587 patent, Claim 1, it is unwanted actuation. And then the '587, Claim 12, it's count errors, but these are primarily driven by the fact that there is no, first, inner wall canister support formation that is protecting against rocking.

Q. Is it -- do you have an opinion whether Cipla's ANDA product infringes, for the middle column, the '587 patent,

Claim 1, whether Cipla's ANDA product meets the inner wall canister support formation in a common plane limitation?

A. It does not infringe.

Q. What is the basis for that opinion?

A. I did some experimental work to evaluate limitation.

Q. And I want to focus just on the limitation, inner wall canister support formation in a common plane in the '587 patent.

A. Yeah.

Q. Do you have an opinion whether that limitation is met by Cipla's ANDA product, any opinion that's different from your analysis on the '289 patent?

A. No.

Q. Is your opinion the same in the '587, Claim 1 limitation, inner wall canister support formation is missing in the '587, the same opinion as the '289?

A. Yes.

Q. Are there any additional limitations in '587 patent, Claim 1 that, in your opinion, aren't met by Cipla's ANDA device?

A. The rocking.

Q. Mr. Anderson, can you be a little more specific in terms of what limitation -- in the '587 patent, Claim 1, what additional limitations ae missing in Cipla's ANDA product?

A. Yeah, such that the first inner wall canister support

formation protects against unwanted actuation of the dose counter by reducing rocking of the medicament canister relative to the main body of the inhaler.

Q. Now, Mr. Anderson, can you please explain, you mentioned a minute ago you did some analysis to inform your opinion of whether Cipla's ANDA product infringes Claim 12 of the '587 patent.

Can you please describe what that was?

A. Yeah. I had a look at the risk of looking at unwanted actuation within the dose counter on looking at reducing rocking.

And I did -- well, I did a bit of math modeling just to try and understand how much rocking was going to be needed to cause a count. And based on the information that I had, I did an analysis and the summary was that Cipla ANDA product does not meet that common plane limitation or unwanted actuation of the dose counter by reducing rocking, which is, obviously, the limitation of the '587 patent, but, in summary, it is not possible to rock Cipla's canister enough to create a count. So it does not infringe Claim 1 of the unwanted actuation.

Q. Thank you.

MR. GREENBLUM: I am sorry. Your Honor, can we just have a standing objection to the usage of the phrase reducing rocking that was inside the answer?

THE COURT: Standing objection.

MR. GREENBLUM: Thank you, your Honor.

MR. ADAMS: Your Honor, this is a different claim limitation that we talked about earlier.

THE COURT: Yes.

MR. ADAMS: And as Mr. Anderson just testified, he has done analysis on this additional claim limitation. In fact, we see that on the screen in front of us.

So I believe this limitation is not the one we just talked about in the common plane.

THE COURT: Right. And this is from his report.

MR. ADAMS: It is, your Honor. It is cut and paste out of his report. Those figures that he just described.

MR. GREENBLUM: The figures are. I agree with Mr. Adams about that. The words in the answers about reducing rocking are not copied and pasted from his report.

THE COURT: Understood.

Standing objection noted.

BY MR. ADAMS:

Q. Now, Mr. Anderson, do you have an opinion whether or not the Claims 2, 4, 6, and 7 of the '587 patent which depend from Claim 1, whether they are infringed by Cipla's ANDA product?

A. They are not infringed.

Q. And what's the basis for your opinion?

A. Again, I did some more analysis on this.

Q. And do you have an understanding whether those claims also

depend from Claim 1?

A. I do, yes.

Q. Do you have an opinion based on that whether or not Claims 2, 4, 6, and 7 are infringed by Cipla's ANDA product?

A. They are not infringed by Cipla's ANDA product.

Q. If we can move to the Claim 12 of the '587 patent.

Do you have an opinion whether Cipla's ANDA product infringes Claim 12 of the '587 patent?

A. So this is around dose count errors by reducing rocking of the medicament canister towards and away from the actuation member. And again, I did an analysis on that using essentially the same principles. And it does not meet the common plane limitation or protect against dose count errors by reducing rocking limitations of the '587 patent. And so in summary, the ANDA product does not infringe Claim 12, the missing dose count errors limitation.

Q. Thank you, Mr. Anderson.

I see on this slide DDX-2.44 and we just saw on the last slide as well what looks like some blue cans in a schematic there.

Can you explain your analysis what you were doing there?

A. Sure.

So those drawings are actually from the Cipla product drawings. So they are accurate. And I also used commonly known dimensions of cans that have been used by the product.

And hence, that's the blue outline that you see.

I had the assumption that it was in the stem block and fully inserted in the stem block. I know that there's a distance that the actuator has to be actuated before it counts. So on the left-hand image that you see there, that's me pushing it as far as I can on the screen obviously, to determine that that counter has counted and moved down by 1.4 millimeters. So if I was to really squeeze that over and if -- and I don't think it would -- but if the counter was to count, you obviously would hit the side of the main body long before you got a count.

So that was the principle that I used.

And then on the right-hand side of that image, I did want to determine, obviously, what movement that we had. The reason that I made it that the back of the device is that's the bit that's actually the lowest down whereas up here it's higher. So it was the worst scenario. Bear in mind that it is pivoting there that I used to back. That is why I used the back of this device when doing this modeling.

Again, I scaled the drawing. I only have so many samples. But it's an approach to ensure that there was no way of that happening because the device is essentially being designed taking the measurements I had to restrict that movement. That is why it's kind of that shape.

Q. Can we pull up PTX-373.

Mr. Anderson, we pulled up PTX-373.

Do you recognize this drawing?

A. I do. That is the drawing reference that I used. That's the Cipla.

You can see the middle cross section that's been cut through there.

Q. Thank you, Mr. Anderson.

Now, Mr. Anderson, were you in the courtroom yesterday and this morning when Dr. Lewis testified?

A. Yes, I was.

Q. Did you see and hear Dr. Lewis testify regarding videos that he had put together?

A. I did, yes.

Q. And have you now had a chance to review those videos?

A. I have, yes.

Q. Let's pull up PTX-178. Let's start at the beginning and play this video.

A. Okay.

BY MR. ADAMS:

Q. Mr. Anderson, were you able to see PTX-178?

A. I was, yes.

Q. Do you have an opinion regarding Dr. Lewis' video we marked as PTX-178?

A. Yeah, sure.

So very briefly, and just to explain to everyone,

Mr. Walsh did this yesterday. When you are designing this device and following the FDA guidance, the key thing that they were saying is that they appreciate that you want to be as reliable as possible. So every time -- you ideally want the can to fire at the same time it's going to count.

There is a realization that that's not going to happen every time.

So the way that this device has been designed, it does actually have the potential to overcount. So it will count before it fires. And the down side of that is you might be left with product at the end, but if you did a fire not count, so it was the other way around, what can end up happening is that you have -- your counter says you've got 70, but you've actually only got 50. So that's in the can.

That's why if you have a look at the FDA guidance, it says you must avoid undercounting.

And this design has been, you know, created deliberately to just slightly overcount.

So what you're seeing there is that's the way it's supposed to work, slightly overcount. But also Dr. Lewis is holding the device, he is actually compressing and squeezing and manipulating the components. And patients don't move these devices incredibly slowly. I mean, again, you can understand there is a force there, but there is an understanding that this is a risk. So you make it overcount.

So all that video is showing the overcounting.

Again, you can see the force that's been applied. And the reality is the way it is actually being held, the reality is that patients hold it like this. They don't hold it like this because they have to stick this in their mouth at the same time that they are pressing and breathing.

So it's not representative of how it's used.

And it is actually behaving as it's supposed to use because if I have to do it, if I have to bias one way, I will bias to overcounting. And again, that was following the FDA guidelines.

Q. Thank you, Mr. Anderson.

Let's pull up PTX-179 and play this video.

Watch it first.

BY MR. ADAMS:

Q. Mr. Anderson, now that you've seen PTX-179 do you have an opinion regarding Dr. Lewis' testing in this video?

A. Yeah. And what I should have said on this previous one is he didn't prime that. So whatever we do testingwise, I should have mentioned that, it says in all the instructions you have to, when you take the can out, you have to put the can back in, seat it, test fire, and recommendations certainly on this leaflet are two primes. As Dr. Lewis said, he sometimes does five.

So, you know, this is where the priming is really

important because what that's doing is it's taking this bit of plastic and it's force -- it sits in the stem block and it sits. It's not fully seated. And it has to be, again, an interference fit. And the reason it has to be an interference fit is to make sure it doesn't fall out when you do that. But more importantly, if you don't have a good fit, the gas can leak out where the stem is, the stem block, that's the stem. The gas can leak out. So that's why you have to do that every time.

And at least once. The typical recommendation is twice.

On this one you can see that the device has been put in and it's not being properly seated. Yeah. And what can end up happening is if it's not properly seated and it's been essentially squeezed, and it will end up doing a fire not count. And as this design is specifically oriented to overcounting, what this is now doing is undercounting. And that's because it's still sitting up quite high. Because it's sitting up high when I press it, it will fire, but not count.

So I'm not surprised that you get that result at all. And if it was primed, it would have been -- it would have worked I think perfectly.

Q. Thank you, Mr. Anderson.

I'm not going to ask you another question about it, but I want to play it one more time here just so we can understand and you describe it as we watch it?

MR. GREENBLUM: Objection, your Honor. If there is no question about it, then I don't know that we have to play it again.

MR. ADAMS: I will ask another question.

BY MR. ADAMS:

Q. Mr. Anderson, in that video did you see the canister hit the front wall?

A. No.

Q. Can we pull up PTX-181 and play this video.

Mr. Anderson, now that you've had a chance to watch PTX-181, do you have an opinion regarding Dr. Lewis' video?

A. Yeah. It's been manipulated and you can tell here what's happening.

So there is a huge hole cut in the side of the main body, which is going to impact the strength. It might even impact how that counter is actually held in there because as we've described that we do have these ribs that come down to hold the counter in place.

And the other thing -- so not only is it weak to start with, the other thing that I'm definitely seeing is the thumb is used to kind of stop that from sitting in properly. I might be wrong. But you can see the thumb press ing to stop that can going down fully into the stem when he is assembling it. It is not primed. But when it is actually actuated the first time, it does allow it to seat. What you see is the counter not

moving, but what's ending up happening is the can is actually being located correctly. And then when he does it again, it actually works.

Q. Thank you, Mr. Anderson.

Now that you've had a chance to look at PTX-178, 179, and 181, do any of videos change your opinion as to whether or not Cipla's ANDA product infringes the '289 and '587 patents.

A. It does not infringe.

MR. ADAMS: I have no further questions for the witness at this time. But I do have some exhibits.

THE COURT: Thank you.

Do you want to introduce your exhibits, Counsel?

MR. ADAMS: I would like to move into evidence DTX-073. DTX-321. PTX-372. And PTX-373.

(Exhibit DTX-073 admitted into evidence.)

(Exhibit DTX-321 admitted into evidence.)

(Exhibit PTX-372 admitted into evidence.)

(Exhibit PTX-373 admitted into evidence.)

THE COURT: Any objections, Counsel?

MR. GREENBLUM: No objection.

I'm sorry, your Honor.

May I approach the witness, your Honor.

I promise we won't be using all of it, but we had to be prepared.

THE COURT: Absolutely.

CROSS-EXAMINATION

BY MR. GREENBLUM:

Q. Good afternoon Mr. Anderson. My name is Ben Greenblum. I represent Teva.

I would like to start with how you approached your infringement analysis.

Mr. Reynolds, could you put up Mr. Anderson's slide deck, slide 20. That's DDX-2.20.

You can look up here. It is also on your screen, sir.

A. Yeah.

Q. So I want to make sure I understand that you understood your assignment on infringement was to compare Cipla's product to the actual claims of Teva's patents.

Is that correct?

A. Yes.

Q. What you actually did in order to determine which limitations of Claim 1 of the '289 patent defendant's product did not infringe, the analysis you did, sir, was to compare the product to Teva's Qvar® device.

Right?

A. Several devices.

Q. I am asking you whether instead of comparing Cipla's device to the claims of Teva's patents, what you really did was you compared Cipla's device to Teva's device?

A. No. It was the claims that I went through.

So it was the claims of the key document that I went through line by line by line. Line by line.

Q. Could you pull up transcript snap Number 7, please.

You were deposed in this case, Mr. Anderson?

A. I was deposed, yes.

Q. By my colleague, Ms. Kayali.

A. Yes.

Q. You recall the testimony you gave at that deposition?

A. Yes.

Q. I assume you attempted to be truthful and accurate and complete at your deposition?

A. I did, yes.

Q. So this was the question you were asked:

"In order to determine which limitations of Claim 1 of the '289 patent defendant's products did not infringe, the analysis you did was to compare those products to Teva's Qvar® device.

Right?"

Your answer was: "Correct."

Do you see that?

A. You put no time to that.

I obviously went through the claims, yeah, in great detail.

Q. So that --

A. That's what I was comparing against.

Q. So that's not what you did, what you said you did.
You didn't compare it to Teva's device?
A. I compared it to the patent.
Q. Not to Teva's device?
A. The patent first. The patent. Patent. Patent --
Q. The testimony I heard this afternoon about what we see when we have a look at plaintiff's product, at Teva's product, that's not the basis for your infringement analysis then.
Is it?
A. No, it is the patent I was looking at.
Q. Thank you for clarifying that.
I want to focus for a minute. I think we're down to one issue on Claim 1 of the '289 patent.
Your testimony is that that rib, as Mr. Adams aptly put it, at 6 o'clock, is not an inner wall canister support formation.
That is the testimony you gave on direct examination.
Correct?
A. Say that again, Ben.
Q. Sure.
Your testimony -- strike that.
The only reason that you offered on direct examination for why Cipla's product does not infringe Claim 1 of the '289 patent is that the rib that lies in the common plane, that rib at 6 o'clock --

A. Yeah.

Q. -- is not, in your opinion, an inner wall canister support formation?

A. It is not. It is not.

Q. And that is the only basis upon which you are arguing or opining, to be more precise, that Cipla's product does not infringe Claim 1 of the '289 patent?

A. It does not infringe the '289 patent because it's -- I know what it's doing.

Q. Let me try my question again to make sure we are communicating, sir.

The only basis on which you are opining that Cipla's product does not infringe Claim 1 of the '289 patent is that that one rib is not an inner wall canister support formation?

A. No. Because you got the regulator as well. That's a different...

Q. That's a different patent. That is the '808 patent.

Right?

A. Yeah.

Q. Let me ask my question again to get a clear answer on just the '289 and just Claim 1.

Okay?

The only basis on which you were opining that Cipla's product does not infringe Claim 1 of the '289 patent is that, in your opinion, that one rib at 6 o'clock is not an inner wall

canister support formation.

Correct?

A. It's a rib that is in theory in the common plane and when you look at it, and the claims that are in the patent is around, obviously, being an inner wall. And they are supporting the can, and it's not.

Q. Sir, I am not ready to get to that part of it yet. I'm trying to winnow this down and make it go faster because it is going to be a long afternoon otherwise, and I know you are going to get called again on validity. Let's try to get through this together.

Okay.

The only basis on which you are opining that Cipla's product does not infringe Claim 1 of the '289 patent is that, in your opinion, that one rib that does lie in the common plane is not, in your opinion, an inner wall canister support formation?

A. Sorry, Ben.

Say that again.

Q. You would like me to ask it again?

A. Yeah.

Q. Sure.

The only basis for your opinion that Cipla's product does not infringe Claim 1 of the '289 patent is that, in your opinion, that one rib that lies in the common plane is not an

inner wall canister support formation?

That is the only basis for your opinion? That is the only one we heard about on direct examination.

A. Yeah.

Q. I want you to turn to -- in your noninfringement report, which in that, I apologize, voluminous binder, is tab 3.

I want you to turn to paragraph 79.

Put up the image and to focus in on the image there.

I will let you have a minute, Mr. Anderson, to orient yourself to paragraph 79 and that image.

Are you there?

A. I'm there, yes.

Q. Are you looking at an image that has a red line and then several purple lines on it?

A. I am, yes.

MR. ADAMS: Objection, your Honor, this is first of all, outside the scope of his direct, number one. Number two, this is an Aurobindo ANDA product that he is putting in front of the witness.

THE COURT: The products were -- I am sorry. Go ahead.

Respond.

MR. GREENBLUM: I believe that image is in -- so that's a mistake on our part. It is the exact same image in the other report.

If your Honor wants to give us a minute, I apologize. It is the same product. It is the same image for both.

It should say up here Cipla's and he served a report that has the same image.

THE COURT: Do you want to pull up the other image?

MR. GREENBLUM: Sure.

Do you have the noninfringement report that Mr. Anderson served as to Cipla?

THE COURT: For the record, in the binder, it's Cipla's. It says Cipla in the binder.

MR. GREENBLUM: We are having a technical issue with what we're putting up on the screen.

I apologize.

If you could put up from Mr. Anderson's direct examination slides, slide 34. It's got the exact same image.

Thank you.

MR. ADAMS: Your Honor, this is -- Mr. Anderson didn't testify to this slide. This is outside the scope of his direct.

MR. GREENBLUM: Your Honor will recall that your Honor permitted him to offer the opinion at that high level of generality that that rib right there is not an inner wall canister support formation. That is the only basis for the opinion. And that is what their defense is. So that's all I'm going to probe.

THE COURT: Counsel, the image is the same. The images are the same in terms of what is in the binder at Exhibit 3.

So on that basis in terms of testifying as to the actual images, I don't see any -- I don't see any prejudice or any reason why we wouldn't be able to have him testify as to those images.

MR. ADAMS: Again, your Honor, he didn't testify to this slide. And that image that we saw from the expert report on direct, that that was from the report. There is a lot in the report about a lot of patents and claims and limitations that aren't being discussed today, as your Honor is well aware, regarding claim constructionism.

So from this perspective, the slide that's on the screen, wasn't presented on direct.

THE COURT: Well, here is the appropriate slide.

MR. ADAMS: Thank you, your Honor.

THE COURT: Thank you, Counsel.

BY MR. GREENBLUM:

Q. I apologize, Mr. Anderson.

Do you see that on the screen?

A. Yes, I do.

Q. What you did here was you reproduced, in paragraph 79 of your report, an image from Dr. Lewis' report and then you have drawn purple lines on it.

Right?

A. Well, I'm not at the right page on the report.

Which report?

Three, you said?

Q. Yes. Paragraph 79.

THE COURT: Page 27.

THE WITNESS: 79.

MR. GREENBLUM: Thank you, your Honor.

THE WITNESS: Okay.

BY MR. GREENBLUM:

Q. Let me know when you're ready.

A. I'm ready.

Q. What you did here was you reproduced an image from Dr. Lewis' report, and then you have drawn purple lines on it.

Correct?

A. That's right.

Q. The red line was part of Dr. Lewis' report, the same line with the yellow dots.

Correct?

A. Yes.

Q. And the purple lines are what you added.

Correct?

A. Yes.

Q. There is one inner wall canister support formation in defendant's ANDA product that has been marked with a yellow dot

that is in the common plane.

Do you see that?

A. Yes, I do.

Q. That's the inner wall canister support formation that's right here at 6 o'clock.

Right?

A. No, that's the -- that's the wall that enables the can to be put in properly -- not the can.

The counter to be put in properly. It is the connecting. It is it counter-connecting rib. I mean, that's what it's there to do. And it's marked, you know, it's there. The purple ones, obviously, are from the ribs going through the center.

Q. So your testimony today is that it's not -- that the dot there is not on an inner wall canister support formation.

Right?

A. It's, it's a rib that locks the can in.

Q. Could you bring up transcript snap Number 4 from Mr. Anderson's deposition.

Do you see here during your deposition, Mr. Anderson, Ms. Kayali asked you, "You agree that there are seven inner wall canister support formations in defendant's ANDA products that do not lie in a common plane with the center of the central outlet port and castellation?"

She was asking you about inner wall canister support

formations that don't lie in a common plane.

Do you see that question?

A. I'm looking at the answer. Wait a minute. There is one that is in the common plane. And it has been marked with a yellow dot.

Q. That is -- that was your answer. That's what you testified to in deposition.

You testified that, "Wait, there is an inner wall canister support formation in the common plane."

Do you see that testimony right here from your deposition?

A. Yeah, but I wasn't given this in the claim construction context. It was pointing something at me, but there was no other detail around that. That was kind of just there you go. And I said, well, wait a minute. And there is one that is obviously -- I don't see what it is, but I haven't got the full construction in that point.

I then went on in great detail to explain exactly what it is.

Q. You are right. You did go on. And you repeatedly called it an inner wall canister support formation. So let's work through it --

A. No, no, no.

I explained in great detail. I couldn't see any more about that rib to be honest. And its function. Yeah.

Q. You spent a lot of time studying that device before your deposition.

Right, sir?

A. I spent a lot of time during my deposition looking at it.

Q. How about before your deposition?

A. It was -- I was -- reviewed samples, yes.

Q. Could you call up video clip A.

This is from your deposition, sir.

(Video played.)

BY MR. GREENBLUM:

Q. Do you see that testimony, sir?

A. I see it.

Q. So you testified a second time in deposition -- let me finish my question.

You testified a second time in deposition, when Ms. Kayali probed further to make sure she understood your opinion correctly to make sure it wouldn't change at trial, she confirmed that that rib in between the two mounting tabs, that's an inner wall canister support formation.

Right?

A. I was not given the claim construction. I was not given it in context, and I am not a legal expert. I was looking at it and I could have -- you know, I'm sure that I do see it is a rib, you know, but it was not in context, and she was using those words, and I, you know, said it -- well, I probably said

it's a rib. Again, it wasn't in context, and it wasn't in context to claim construction.

MR. ADAMS: Your Honor, I just want to make --

BY MR. GREENBLUM:

Q. Mr. -- sorry.

MR. ADAMS: -- an objection and ask counsel not to yell at the witness.

MR. GREENBLUM: I am often accused of standing far too close to the mic.

I apologize, your Honor.

BY MR. GREENBLUM:

Q. Could you call up video clip B, please.

(Video played.)

MR. ADAMS: Your Honor, this is improper impeachment. He is just pulling up deposition video, showing it. He hasn't established that he could impeach with his deposition.

MR. GREENBLUM: Your Honor, the witness has testified that he didn't understand the question or that wasn't what he intended to say, and we've now established that he said it four different times while my colleague was trying to establish the boundaries of his opinion during his deposition. That is all I need to establish.

THE COURT: With regard to this, this is a portion of the deposition testimony that they are presenting. If there is further context that needs to be provided with regard to the

answer, that would be appropriate at redirect.

MR. ADAMS: Thank you, your Honor.

BY MR. GREENBLUM:

Q. There were other times in your deposition, sir, where Ms. Kayali asked you about whether something was an inner wall canister support formation, and you said no.

Do you recall that?

A. I don't know -- no, I don't. Again, this is where the words were being bantered around. Again, no claim construction during this.

As I say, I'm not a lawyer, but, you know, I was -- if you are pointing at something, you know, you are looking at something, essentially, at the end of the day, it's a rib in between two large alignment posts.

Q. Can we just, just for terminology sake to be clear with the Court, you mean the mounting tabs?

A. The mounting tabs.

Q. Okay.

And you were clear with Ms. Kayali during your deposition that the mounting tabs were not inner wall canister support formations.

Right?

A. I've made clear exactly what that rib was doing.

Q. No, sir. I am asking you about the mounting tabs. Let's not switch back and forth.

A. No. The mounting tabs -- well, the clue is in the name. The mounting tabs are there to actually run the counter down through the two arms.

Q. So you were well able -- without claim construction analysis, you were well able in your deposition to distinguish between whether something was an inner wall canister support formation or whether it wasn't.

Right, sir?

A. Well, no. Let's just go back. A rib.

You know, you are now using what, four, five, six words to describe a rib whereas we are calling the two counter alignment things, we are calling them -- you know, we've got a simpler name. It is literally keeping the language simple.

Again, it was, you know, pointing at it and it's a rib.

Q. It's a rib.

Is that your testimony?

A. It's a connecting --

Q. Oh. It's --

A. -- counter connecting -- if we now want to start using the full word, yeah, it is a counter connecting rib, because that's what it does.

Q. We will get to that term. I want to come back to that. That is a helpful point, sir. I appreciate it. We will come right back to that. Let me finish this one line of questions.

One more time if, you would pull up transcript snap

number 6.

Here again, separate place in your deposition, you are asked: In between the two mounting tabs is a small inner wall canister support formation.

Right?

Your answer, unqualified without objection, is yes.

Do you see that, sir?

A. That was the way that the conversation, the words were being used, and, again, I had no claim construction in front of me, and I didn't have the patent in front of me. You know, this is where -- again, it was, you know, pointing at things. I mean, it showed me the video, but it was like -- it's just the rib, yes. It's the rib. It was point -- there is nothing else in between those two mounting tabs.

Q. Sir, you keep pointing to claim construction. You keep saying that your opinion changed because of claim construction.

Are you saying that in the wake of the Court's *Markman* opinion that the parties received last week that you have changed your opinion and, therefore, changed your testimony from the deposition?

MR. ADAMS: Objection.

THE WITNESS: No.

MR. ADAMS: Mischaracterizes his testimony.

MR. GREENBLUM: That is not a basis for an objection at trial. We are not a deposition.

 THE COURT: Let me handle that.

You want to make your objection based on?

MR. ADAMS: He is testifying and mischaracterizing his testimony.

THE COURT: It's cross so there is some latitude.

The objection is noted.

BY MR. GREENBLUM:

Q. Let me ask the question again, Mr. Anderson.

Is it your testimony here today in Court that the reason your opinions have changed from the testimony that you gave repeatedly in your deposition is because of the claim construction analysis in an opinion the Court issued last week?

A. No. It's purely down to the fact that -- and you could call it ten things, okay, but now we've actually got -- I was calling it something that -- and it does a function that isn't one of the inner wall canister support formations because it's quite -- you know, it goes back to this design of this device, really, because it's got -- it's kind of round and it's got the two mounting tabs, round can, round device. Yeah.

Q. Just to be clear for the record, sir, we're not -- the issue isn't claim construction or how that changed your analysis. That's not the excuse for changing your testimony.

Right?

A. I -- no, it's not an excuse.

There was no claim construction at the time in detail,

you know. We were -- there is a name, but the key thing is that they were -- we were flipping over from calling things ribs, mounting tabs, and that is, essentially, where I've ended up saying on this one, yes, but then I did go on in great detail, three pages' worth. I went through lots of stuff exactly explaining what they were doing.

Q. Sir, you mentioned a moment ago the phrase dose counter connecting rib.

Do you recall that testimony?

A. Yes.

Q. You never once used that term in this entire case.

Is that right?

A. Are you done?

I mean, I can't remember every word I write down, but it does exactly what it says on the tin. It's a counter connecting rib.

Q. So today your testimony is that that rib at 6 o'clock, that's a dose counter connecting rib.

Right?

A. Yeah.

Q. Okay.

So I checked all of the expert reports that you served in this case.

Does it surprise you that that phrase appears nowhere?

A. It doesn't surprise me.

Q. How about anywhere in your deposition, does it surprise you that at no time did you use that phrase?
A. It doesn't surprise me because we were flipping around with the words and what they were. It's what it does is the key thing.
Q. How about any of the 50 patents that Mr. Adams elicited direct examination from you? I checked those. No reference to a dose counter connecting rib.
Right?
A. Right.
So are you talking about the patents that I've done?
Q. Well, or how about the patents here in this case, they don't use that term either.
Do they, sir?
A. I don't know.
Q. The answer is no.
I checked your publications from your CV. Never uses that term either.
Does that surprise you?
A. Well, I'll tell you why.
Because if you are going through my CV and if you're going through, actually, many of the other counters that are available, this is the only one that is pushed in and locked in because there are other ones that lock in on the stem and the ones that I have done at GSK, for example, I can tell you now,

the counter comes out with the can.

So why on earth would I have it fit so that I can't pull it out? So that is why you're not hearing the word "counter connecting" anywhere.

Q. Nobody uses it. Nobody anywhere in your field. Nobody in any other field, sir.

Right?

A. You can't prove that. I can't prove that.

Q. I did an experiment of my own last night.

I Googled it.

A. Oh. What a fantastic tool.

Q. Zero hits. Not one. Not one time.

A. It's -- it's just -- it's -- I don't know.

Is Google acceptable in the Court?

I don't know. It might be. There might be a case where it is.

Q. I don't have a master's in engineering.

THE COURT: Let's just take a pause for a second.

Mr. Anderson, if you could not ask questions, just try to answer them.

THE WITNESS: Sorry.

THE COURT: And, Counsel, let's try and keep it from getting too argumentative, and let's just stick to some questions with some anticipated direct answers.

MR. GREENBLUM: Understood.

 BY MR. GREENBLUM:

Q. I want to talk a little bit about the graphic you put up on the screen in your direct exam.

Could you please call up slide DDX-2.43.

Do you recall this slide from your direct examination, sir?

A. I do, Ben, yeah.

Q. While you were testifying, I heard you catch yourself. I heard you start to describe this as an experiment, and you changed your wording because you are careful with wording, and you called it math modeling.

Do you recall that?

A. Yeah, I do, actually.

Q. And that's because you didn't run experiments in a laboratory to do or to depict what you've shown here. These are mathematical calculations that you've run.

Correct?

A. Yeah.

Q. Unlike the videos that you have criticized from Dr. Lewis, you didn't bring any videos. You didn't disclose any videos. You didn't take any videos of any experiment that you did for your work in this case.

Correct?

A. I -- I didn't produce any videos because I think that in my background videos are not accepted by the regulators.

Animations are not accepted by the regulators. They want to see something that's a drawing, yeah, based on a drawing, you know, that is used to create the product, and they will want to see how you modeled it.

So that's why I've gone from -- and I've, obviously, played around with the product, but, again, that product can be -- I don't know how old it is. I don't know which batch it came from whereas I'm working from a drawing. I know the drawing is right, and the can profile is right as well.

Again, it's like -- it is a little bit of common sense that says if I put these two together and I'm using a drawing and the drawing I got of the can was from a drawing from a can supplier, can and valve supplier and the drawing was obviously from Cipla or Presspart. So I knew -- again, it was a case of let's just see. Let's just see what's in my hand and let's verify that with a drawing with that detail.

Q. You mentioned you did play around with the device a little bit to form your opinions.

Is that true?

A. Yeah. I played around. Why wouldn't I?

Q. One of the things I noticed in reading your deposition is that there was a sample that you had brought to the deposition that I think you had said you had played around with.

It was all cut up. It was essentially destroyed.

Do you recall that?

A. I do, yes.

Q. So there is no physical record anywhere of any experiment or any playing around that you did with the device for your opinions in this case.

Right, sir?

A. No.

Q. I am sorry. I didn't hear the answer.

A. No.

Q. I want to shift gears to the dependent claims of the '289 patent.

I would like to try to do this quickly.

Mr. Reynolds, if you could call up slide 36. DDX-2.36.

Thank you so much. This is from your direct exam.

Do you recall this?

A. I do, yeah.

Q. I want to make sure, because I heard Mr. Adams phrase his questions very carefully on this point. And I want to make sure we have a clear record of what opinion you are offering on the dependent claims.

The dependent claims at issue for the '289 patent and the '587 patent are 2, 4, 6, and 7.

Do you recall that?

A. Yes.

Q. The only basis on which you testified today that Cipla's product does not infringe those dependent claims is the opinion

you offered today about why Cipla's product doesn't infringe Claim 1.

Right, sir?

A. Yes.

Q. There is no -- you didn't do any other noninfringement analysis of the additional limitations of those dependent claims.

Right, sir?

Would you -- I am sorry. Would you like me to ask the question again?

A. Please.

Q. Sure.

A. I am checking.

Q. The dependent claims that Mr. Adams asked you about are 2, 4, 6, and 7.

And if -- I can bring them up on the screen -- I was trying to save time.

A. I just want to double check.

Q. Mr. Reynolds, could you call up the '289 patent which is JTX-003 and scroll to the back where we see the claims.

Could you zoom in a little bit because I know I can't see it on 2, 4, 6, and 7.

Let's start with 2.

Dependent Claim 2, if you could highlight that, the inhaler as claimed in Claim 1 where the medicament canister is

movable relative to the dose counter.

Do you see that, sir?

Your noninfringement opinion about Claim 2 is only your opinion that it doesn't infringe Claim 1.

You are not disputing that Cipla's product has a medicament canister movable relative to the dose counter.

Right?

A. Right.

Q. Claim 4. I am going to ask you the same question just so you know where I'm going.

The inhaler as claimed in Claim 1, that's your basis for disputing infringement of Claim 4. The rest of the language here in Claim 4, you are not disputing infringement of that.

Right?

A. No, I would extend longitudinally along the inside surface of the main body.

Q. You're testifying now that the inner wall canister support formation doesn't extend longitudinally along the inside surface of the main body?

A. Well, it --

Q. Let me rephrase my question, sir.

A. No, I am just reading it. I know what you're saying.

Q. Let me try and ask a better question for you.

A. So that is -- if we don't have it, yeah, we don't have that inner wall canister support. It's not supporting the can.

I probably, you know, all it's saying is that it goes all the way down.

Q. Sir, I understand that in Court today you're disputing that that is an inner wall canister support formation.

So I'm not trying to get you to waive that. Okay. That is inside of Claim 1. The rest of the language you are not disputing infringement of.

Right?

A. We don't infringe it because we haven't got an inner wall canister support formation.

Q. So your testimony is you don't infringe dependent Claim 4 for the same reasons you offered on Claim 1. Right?

A. Okay.

Q. Is that a yes?

A. Say it again.

Q. Your testimony is that the reason that Cipla's product doesn't infringe Claim 4 is because for the same reasons and only the same reasons that it doesn't infringe Claim 1.

Right?

A. Claim 1 is the key one because Claim 2 to A are all dependent on Claim 1.

Q. I just need a yes or no, sir.

Would it be helpful if I repeated my question?

A. Yeah. Sorry. I am just --

Q. I will grant you that the concept of independent and

dependent claims gets confusing. I'm trying to work with you on this.

The inhaler is claimed in Claim 1, you dispute that because you now say it is not an inner wall canister support formation.

Right?

A. Yeah.

Q. But the rest of the language here, you are not -- you didn't offer on direct exam. You didn't even talk about Claim 4, any argument that the rest of the language is not infringed.

A. It's irrelevant. I'm going to stick with we do not infringe. Yeah. And it's kind of irrelevant because we are focused on Claim 1.

Q. So that's your way of saying it. I just need for the record an answer to my question, which is your basis for saying that Claim 4 isn't infringed is just the same basis as saying Claim 1 isn't infringed.

Right?

A. It's not infringed.

Correct.

Q. Just for that reason. Right, sir?

A. Yeah.

Q. Okay. Thank you. Claim 6 is dependent on Claim 4. And then it's got some further language further comprising a plurality of support rails each of which extends longitudinally

along an inside surface of the main body.

You don't dispute that Cipla's product infringes those additional limitations.

Correct?

A. They don't infringe them, no.

Q. So you do dispute that?

Do I need to show you Cipla's product and show you that there is a plurality of other support rails going vertically inside the canister?

A. I'm -- are they supporting the can, I suppose is the other question.

Q. Do you see that language in here in the claim, sir?

A. I've done no testing to find out if they do support the can or not.

Q. Let's go to dependent Claim 7. That is dependent on 6. The inhaler is claimed in Claim 6 where in two of those plurality of support rails are positioned at opposite ends of the inside surface.

Do you recall that drawing we did at the top of your cross-examination with the purple lines? There are other support rails that are at opposite ends from one another.

Right, sir?

A. How would you say they are opposite? If you are going to draw a line through them, then they are not actually opposite.

Q. So your testimony -- your construction of the claim is you

have to be able to draw a line between them in order for them to be opposite one another?

A. Depends what you are using as the axis.

Q. Okay.

A. It really does depend on what you are using as the axis, to be honest.

Q. You didn't offer any testimony on direct about what you are using as the axis.

Right?

A. No.

Q. Let's leave it at that then.

Let's move on to the '808 patent just briefly, sir.

Can you pull up from Mr. Anderson's direct examination, Mr. Reynolds, slide 29.

Do you recall your slide from your discussion with Mr. Adams?

A. Yes.

Q. I think I heard you say, because I wrote it down -- let me step back.

This slide represents your criticisms of Dr. Lewis' testing of the leaf spring in Cipla's device.

Right?

A. Yeah.

Q. And I heard you say in your direct examination, quote, I would have done it differently. I would have done that testing

differently.

Do you recall saying that?

A. Yes.

Q. The Court did not hear in your direct examination about any testing that you did to measure the force imparted by the leaf spring.

Correct?

A. That's right.

I haven't done testing on the leaf spring.

Q. And the Court didn't hear you offer any testimony about testing that you've done to measure whether or not there is force against movement of the counter display.

Right?

A. Well, the thing is that this spring essentially just sits there. So there is no force on it. Yeah. Until you start indexing it.

And I haven't seen any data to prove that otherwise.

I've got data that says when I squeeze the spring down, but it's a spring that sat there. If you don't mind, it sat there and there's a force being pushed on it.

Q. When you say you've got data, you mean you've got Dr. Lewis' data. You don't have any of your own.

Right?

A. I have seen Dr. Lewis' data then.

Q. You didn't create any data of your own --

A. No. No.

MR. GREENBLUM: If your Honor will give me one minute, I will confirm that there is nobody in the gallery who's going to get mad for me sitting down.

THE COURT: Yes.

MR. GREENBLUM: Thank you very much for your time this afternoon, Mr. Anderson.

MR. ADAMS: No questions, your Honor.

THE COURT: No questions.

Mr. Anderson, thank you. You are finished.

THE WITNESS: Thank you.

MR. BACHAND: Your Honor, the next witness is a fact witness that's sequestered. So we just need to grab him.

Your Honor, we will call Mr. Rote and ask him to come up to the stand.

Your Honor, Mr. Rote is the director of research and development at Cipla. He is responsible for Cipla's development of pressurized metered dose inhaler.

(**KIRAN ROTE**, DEFENSE WITNESS, having been duly sworn, testified as follows:).

THE WITNESS: My name is Kiran Rote. I am from Cipla India.

THE COURT: Good afternoon, Mr. Rote.

THE WITNESS: Thank you, sir.

BY MR. BACHAND:

Q. Good afternoon, Mr. Rote.
A. Good afternoon.
Q. I appreciate you waiting around for a couple days for your testimony. I know you have been in town since last Friday.
Can you tell the Court where your current occupation is?
A. So I'm a director of research and development at Cipla India.
Q. What do you do in this role?
A. So I'm looking after the metered-dose inhalation development program for Cipla. This -- I oversee the product development, pharmaceutical development, the process development, and analytical development and the devices as a whole.
Q. When did you start working at Cipla?
A. Sorry. I couldn't get that.
Q. Sorry.
When did you start working at Cipla?
A. I started working at Cipla in around 1996.
Q. And where geographically are you typically located?
A. So I worked at Cipla facilities at Mumbai, India.
Q. And what were you doing before you joined Cipla?
A. Well, I was undergraduating my electrical engineering from the University of Mumbai and post that, I joined Cipla in the maintenance department.
Q. Electrical engineering, I have not known a lot of

electrical engineers in the pharmaceutical industry.

Can you explain to the Court how you ended up working for Cipla?

A. When I started working at Cipla in '96, I was -- actually, I joined in the engineering group for the production.

But in '98, Cipla decided to pursue development in the metered-dose inhalation for more ecologically friendly propellants and for that they required a team of engineers and pharmacists and because they wanted to set up a new plant, new process, all together a new development to send it.

So I was very much interested in that, and it was -- the maintenance was a routine job for me. So I just decided to shift from the maintenance to the hard core research and development.

Q. What do you mean by more ecologically friendly propellants?

A. So the ecologically friendly means environmentally friendly.

In old days, when the PMDIs, the metered dose inhalers, were manufactured, they were manufactured with the chlorofluorocarbon as a propellant and later on they found out that this chlorofluorocarbon propellants were actually depleting the ozone layer of the earth and because of that there was a need to develop a new alternatives, which doesn't have a chlorofluorocarbon. That means we didn't have chlorine,

and that is how they call this hydrofluoroalkanes. So that is how Cipla started working on that program.

In fact, eventually, Cipla was the first Indian pharmaceutical company who shifted all their CFC propellants into the hydrofluoralkane, new HFA propellants in India.

Q. You have been at Cipla for over 25 years.

Can you explain to the Court what Cipla is?

A. Well, yeah.

Cipla, as the name stands, Cipla is a chemical industries and pharmaceutical laboratories. It is founded in 1935. So it is almost 87-year-old company.

Cipla has about -- presence in about 80 countries and territories, and Cipla has about 1500 products across 50 dosage forms, and Cipla employs about 25,000 people worldwide.

Q. I would like to --

THE COURT: I am just going to ask if you could speak just a little slower for our court reporter.

THE WITNESS: I am sure.

Thank you.

THE COURT: Thank you.

Counsel.

THE WITNESS: Sure.

MR. BACHAND: I will also speak more slowly, your Honor.

BY MR. BACHAND:

Q. I would like to shift and transition to talking about Cipla's generic product that's at issue in this case, Mr. Rote.

Can you tell us when Cipla began exploring potential development of a generic version of the Qvar® HFA metered dose inhaler?

A. Yeah.

So Cipla started looking at the generic program somewhere in 2013.

Q. Why did Cipla decide to try and make a generic version of Qvar® at that time?

A. So this was a business decision, and I was not involved in that. But Cipla, being a respiratory leader, was always looking for a business opportunity to expand.

Q. Does Cipla's generic version of Qvar® include a dose counter?

A. Yes.

Q. Why does Cipla's generic Qvar® include a dose counter?

A. Can you repeat the question, please?

Q. Sure.

Why does Cipla's generic Qvar® product include a dose counter?

A. Yeah.

So there are mainly two reasons. One is because when Cipla started this development in 2013, Qvar® didn't have a dose counter but, eventually, in 2014, the dose counter was

introduced and according to the FDA guidelines, which clearly states that a generic drug product manufacturer should have a dose counter if the brand product has, and that is how Cipla decided to pursue the development with the dose counter.

Q. Does the FDA require the use of the same dose counter Teva has?

A. No.

MR. GREENBLUM: Let me just object, your Honor.

THE COURT: Basis?

MR. GREENBLUM: The witness hasn't been qualified as an expert. To the extent he is going to offer expert testimony abut what the FDA does or doesn't require, that's not appropriate.

THE COURT: Is this expert testimony --

MR. BACHAND: We are not offering him as an expert witness. He is just testifying about his understanding of the FDA requirements.

THE COURT: Just as to the contents of the FDA requirements?

MR. BACHAND: His understanding of the FDA guidance related to dose counters.

THE COURT: That's allowed.

MR. GREENBLUM: Thank you, your Honor.

BY MR. BACHAND:

Q. Let me repeat the question.

Does the FDA require the use of the same dose counter Teva has?

A. Yes.

My understanding, there is no such regulation. The only concern it has is when it goes into the patient's hand. From the user's perspective, the device should be looked into.

Q. And what do you mean by the user's perspective?

A. User's perspective means when a device reaches to the patient's hand, how the patient reacts, interacts with the device, how he treats the device.

So the internal mechanics of the device can be different but when it comes to the form, feel and shape of the device, that should be similar because the ultimate user is a patient and -- who has been using the device. So while using a new device, he should make the less errors and should make best use of it.

Q. Thank you.

Are you familiar with the term "threshold analysis" in the context of FDA approval of generic drug delivery devices?

A. Yes, I do.

Q. What is your understanding of threshold analysis in that context?

A. So threshold analysis comes from the FDA's human factor guidance wherein FDA expects that a generic drug product manufacturer should compare its device with the brand product

and, in turn -- so there are three categories. One is a labeling comparison, which is instruction for use for a patient. Then second is a device comparison, and the third is the task comparison. That means what are the tasks a patient has to do before he inhales the product.

So FDA expects that generic drug product manufacturer should have similar characteristics as that of brand so as to have a minimum error for the patient.

Q. Earlier you testified that Teva added the dose counter in 2014 to Qvar®.

How did Teva's addition of the dose counter impact Cipla's decision to pursue a generic Qvar®?

A. Well, it did not impact our decision because Cipla, as a business, we have already taken the decision to pursue the development. The introduction of a dose counter only meant that we will now introduce a dose counter in our program as well.

Q. Is Teva's Qvar® HFA metered dose inhaler still on the market?

A. No. So they discontinued the product in 2018.

Q. Does Cipla make its own inhaler devices?

A. So Cipla is a pharmaceutical company. So we don't make any delivery devices. Cipla's expertise lies with the pharmaceutical development, the product development, the analytical development, and so Cipla doesn't manufacture any

devices.

But, typically, when there is a requirement -- so we get these mechanical components from the third-party suppliers and we assemble to make a full inhaler.

So whenever there is a requirement, Cipla approaches the drug device -- the device manufacturers for appropriate device.

Q. And what did Cipla do to obtain a dose counter for its Qvar® generic product specifically?

A. Well, Cipla contacted the approved supplier, because Cipla has a list of suppliers and we have been working with them over the years.

So whenever such requirement comes, usually, Cipla approaches the supplier. Then we evaluated a few of them, and then, finally, we decided to go ahead with Presspart because they had a dose counter, which was already approved in the U.S. market.

Q. And is the dose counter the only mechanical feature that you buy from the suppliers?

A. Sorry.

Can you repeat that?

Q. Sure.

Is the dose counter the only mechanical part of the inhaler that you buy from the suppliers?

A. Yeah.

So there are various mechanical components like, can

valve, then the actuator and the dose counter, which we, typically, buy from the third party, such as Bespak, Aptar and Presspart for their devices.

Q. Can you explain to the Court what an actuator is?

A. Yes. So actuator is a plastic device, plastic piece, which is a small aperture of the small orifice at the bottom, and it houses the metallic canister. And when the metallic canister is pressed into this actuator, it produces a soft plume through the orifice, which is then inhaled by a patient to cure the asthma or the COPD.

MR. BACHAND: And if I could approach with some samples, your Honor.

BY MR. BACHAND:

Q. Mr. Rote, I just handed you four things, three different samples.

If you could take a look, one of the ones that's out of the box is DTX-73.

Can you tell me what DTX-73 is?

A. Yeah. So this is Cipla's generic beclomethasone 40MCG inhalation aerosol pack.

Q. Could you show the Court what you are calling the actuator?

A. The actuator is this. This is a white piece with the cap on it.

Q. Thank you.

Earlier in your testimony you mentioned a supplier named Presspart.

What is Presspart?

A. Presspart is a manufacturing company in Spain. They have various products in the market. They are a delivery -- they are device manufacturers, and they are one of the suppliers, approved supplier. So whenever Cipla has such requirements, Cipla approaches Presspart for the appropriate device.

Q. Is Presspart related at all to 3M?

A. So, Presspart and 3M, what we understand is they are two different companies. But when it comes to the generic Qvar® development, 3M has licensed their dose counter with Presspart.

Q. And you mean they licensed -- Presspart licensed a dose counter from 3M.

Is that right?

A. That's correct, yeah.

Q. And why does Cipla buy these devices for its generic Qvar® product from Presspart?

A. So as I mentioned earlier, the Presspart is one of the suppliers, approved supplier. Cipla has a long working relationship with Presspart.

They have a strong manufacturing and quality practices followed in the company. They have various products also approved in the market.

So whenever such requirement comes for development in

the United States, Cipla, usually, approach Presspart for the appropriate device.

Q. And did Cipla consider any other suppliers for the dose counter and actuator in Cipla's generic Qvar® product?

A. Yes. We also considered the device from a company called RPC in Germany.

Q. Why did Cipla select Presspart's offering over RPC's?

A. So this decision was mainly because of the FDA's regulation on human factors because when we looked at the Presspart dose counter -- the Presspart device, it had a dose counter which counts a dose by dose, which was more preferable. And also the location of the dose counter was at the back of the device.

So this -- what this means is based on the human guidance -- human factor guidance, that we -- doesn't have to make a lot of changes in our instruction for use for a patient.

And this was an approach for us.

However, in contrast, if you look at the RPC device, they had a device with an actuator and with the dose indicator. They didn't have a dose counter. That means the numbers were displayed after every 20 doses.

And obviously that was not a preferred choice for us because being the indicator, and secondly, also the location of the dose indicator was at the front of the device, which is completely opposite as that of brand. So what we felt is this

might run into the risk from the FDA's approvability point of view, that FDA may consider this device not as substitutable with the brand.

Q. Thank you.

MR. BACHAND: Your Honor, I need to ask him about a few documents to get them in the record.

BY MR. BACHAND:

Q. If you could turn to PTX-093 in the binder.

Mr. Rote, do you recognize this document?

A. Yeah.

So this is an instruction for use for Cipla's generic Qvar® product.

Q. Would these be the instructions for use that were submitted to the FDA for approval?

A. That's correct.

Q. And if you could turn to your binder to PTX-308.

A. Yes.

Q. Do you recognize this document?

A. Yes. This is a pharmaceutical development report, which we call as a PDR, which summarizes the entire product development which we did for the generic Qvar® development.

Q. Thank you.

Would that be another document that Cipla submitted to the FDA?

A. Yes. There are many documents, apart from the PDR, which

we submit for the approval.

Q. And I already handed you some samples. I'd like to ask you about two of the other ones we have up there.

The physical marked DTX-218A, can you pick that up. It should be still in the box, I believe. Just let me know what that is.

A. Yes.

So this is a complete pack including a product of Cipla's generic beclomethasone 40MC strength.

Q. Also up there in a box should be another physical marked DTX-218B, as in boy.

Can you tell me what that is, please?

A. This is also Cipla's generic beclomethasone product boxed.

Q. Thank you, Mr. Rote.

MR. BACHAND: We have no further questions, your Honor.

Can I move a few exhibits in that might have already been moved in, but just to be safe?

THE COURT: Yes, please.

MR. BACHAND: It is PTX-093. PTX-308. DTX-073. DTX-218A. DTX-218B.

I will pass the witness.

(Exhibit PTX-093 admitted into evidence.)

(Exhibit PTX-038 admitted into evidence.)

(Exhibit DTX-073 admitted into evidence.)

(Exhibit DTX-218A admitted into evidence.)

(Exhibit DTX-218B admitted into evidence.)

MR. GREENBLUM: No, objection.

No cross, your Honor.

THE COURT: No cross.

Thank you, Mr. Rote.

THE WITNESS: Thank you, sir.

MR. GREENBLUM: Your Honor, just looking ahead.

We are about to switch phases in the case. Would now be a good time for a break just relative to the 7 o'clock.

THE COURT: Absolutely.

How much, ten minutes? Is that enough time?

MR. GREENBLUM: That's fine for us.

MR. ADAMS: That's great, your Honor.

THE COURT: Thank you.

THE COURTROOM DEPUTY: All rise.

(Recess taken at 4:45 p.m. to 4:59 p.m.)

THE COURTROOM DEPUTY: All rise.

MR. ADAMS: Just to give you an idea where we're at, defendant Cipla has now completed their rebuttal to plaintiff's infringement case and we are going to move into the -- our case in validity.

THE COURT: Thank you, Counsel.

MR. ADAMS: With that Cipla calls Mr. Anderson back to the stand.

THE COURT: All right.

Mr. Anderson, you remain under oath, sir.

You don't need to be sworn in.

MR. ADAMS: Your Honor, Cipla calls Mr. Anderson back and he will be offered at this time to present expert testimony regarding the question of validity of the '808, '289 and '587 patents. Mr. Anderson will also provide information and analysis regarding the state of the prior art relevant to his opinions.

THE COURT: Thank you, Counsel.

DIRECT EXAMINATION

BY MR. ADAMS:

Q. Welcome back, Mr. Anderson.

A. Hello.

Q. It's been a while since I saw you.

A. Yeah, a long time.

Too long.

Q. So, Mr. Anderson, have you had demonstratives prepared to assist you in explaining your testimony regarding the validity question of the asserted patents?

A. Yes, I have. Yeah.

Q. If you could look at the screen and in your binder there as well, and start here with DDX-3.1.

Are these your demonstratives?

A. Yes, they are.

 Q. Mr. Anderson, what were you asked to do in this case as it relates to invalidity of the asserted patents?

A. I was asked to provide the background discussion and information to explain the relevant technology at issue here also provide opinions regarding the knowledge of the art related to the asserted U.S. patent, the '808 patent, and analyze the question of the validity of the asserted claim of the '808 patent.

And then finally, I was asked to provide opinions regarding the knowledge of the art related to the asserted U.S. patent '289 and '587, known as the common plane patents, and analyze the question of validity of the asserted claims of those two patents.

Q. Thank you, Mr. Anderson.

Can you briefly summarize any conclusions you might have drawn based on your patent invalidity analysis?

A. Yeah, sure.

The asserted Claim 28 of the '808 patent would have been obvious in view of the prior art. The asserted claims, 1, 2, 4, 6, and 7, of the '289 patent would have been obvious in view of the prior art. Then finally the asserted claims, 1, 2, 4, 6 to 7 and 12, of the '587 patent would have been obvious in view of the prior art.

Q. Mr. Anderson, can you explain how you conducted your analysis of the asserted patents with respect to obviousness?

A. Yeah. I used, obviously, the legal standard. And the claim is obvious if the differences between the subject matter of the claim and the prior art are such that the subject matter of the claim as a whole would have been obvious to a person of ordinary skill in the art, POSA, at the time the patent was filed.

Four primary factors that are considered:

Obviously, there is the scope and the content of the prior art;

The differences between the prior art and the claims;

The level of ordinary skill in the pertinent art;

And secondary considerations of nonobviousness.

And the POSA would definitely be motivated to combine and modify the prior art with a reasonable expectation of success in doing that.

Q. And, Mr. Anderson, I heard you say POSA. When you say POSA, are you referring to the "person of ordinary skill in the art"?

A. I am, yes.

Q. And in doing your analysis of obviousness in this case, can you explain what time frame you were looking at?

A. I was looking at prior art before May 18, 2010. That's been my -- the line I have been working to.

Q. And do you understand, Mr. Anderson, there's been some, we will say discussion, about a potential different priority date

of 2009?

A. Yes.

Q. Do your opinions in this case regarding the obviousness change if you use the 2009 date?

A. No.

Q. And you might have answered this question already.

What was the priority date of the '808 patent?

A. It was exactly the same. It was May 18, 2010.

Q. Thank you.

And, Mr. Anderson, you referred to the common plane patents as the '587 and '289.

Can you tell me what the priority date of those two patents was?

A. Again. Yeah, sorry. That was May 18, 2010.

Q. You mentioned a POSA, a Person of Ordinary Skill in the Art.

Do you understand that the -- strike that.

Do you have a definition of the Person of Ordinary Skill in the Art that you are using to do your obviousness analysis in this case?

A. Yes. It's up here. It is someone with at least a bachelor's degree in pharma science or a related discipline with at least two to three years of product development experience with the design and manufacture of metered dose inhalers.

Alternatively, a POSA could have a master's degree or a Ph.D., again, pharmaceutical science; mechanical, or medical device engineering; or a related discipline with two -- one to two years of product development experience with metered dose inhalers and counter systems.

And then finally, a POSA would also have worked as part of a multi-disciplinary team of scientists in pursuit of developing a pharmaceutical product and drawn upon not only his own skills, but also those -- consulted with others of a team with similar specialized skills.

Q. And did you use your POSA definition here to provide your obviousness opinions in this case with regards to the perspective of what one would be looking at?

A. Yes. And I was obviously looking at the time that patents were published, by the priority date, which is 2010. I think that's...

Q. Do you consider yourself to be at least one of ordinary skill in the art?

A. In 2010, at least one of them, if not three, but yes, I do.

Q. Do you understand that Dr. Lewis provided a different definition of the POSA?

A. I do.

Q. If Dr. Lewis' definition of POSA were to apply in this case, would it change your obviousness opinions?

A. No.

Q. Now, you testified that the priority date was around 2010, May 2010 time frame.

I want to talk to you a little bit about what the state of the art was like at the time.

Can you -- strike that.

Are inhalers a recent introduction into the pharmaceutical industry?

A. No. I mean, inhalers have been around. They were actually invented in 1956 by two Americans, a guy called Dr. George Maison and Dr. Charles Thiel. Charles Thiel is still alive and kicking. A very, very nice guy.

But they worked for a company called Riker. And essentially what they did was they realized that there was an opportunity to bring together medicine in -- and put it into a pressurized container, valve development that really started at that time.

So when they actually brought the drug and the pressurized gas and the container together, they could actually use it as an inhaler product. And interestingly, Riker, who they worked for, was then merged with 3M, who are the Minnesota Mining and Manufacturing Company.

So, you know, this is where -- a lot of history is actually in the U.S.

Q. Are dose counters for use in inhalers a recent

development?

A. No. I think everyone's has heard about the really important document that came from the FDA in 2003. The word dose counter is beforehand, but they weren't really made to a specific standard or expectation. And the FDA really put a really important stake in the ground here by saying that, you know, it should meet these expectations as a minimum. And it meant that it was kind of a level playing field for products coming into the U.S. after that. You know, there was a strong recommend -- when the FDA recommends something, you pretty much do it. But obviously after that date the industry, if they wanted to market products in the U.S., they had to include counters.

Q. And that FDA guidance was 2003.

Is that correct?

A. That was 2003.

Yeah.

Q. Between the time of 2003 and we will say 2009, were there commercial products that came out using dose counters?

A. Yeah. So obviously GSK had at least three. They launched Ventolin in 2005. Flovent and Advair in 2006. And I believe Atrovent probably came out I think it was actually in May 7, 2009. Dr. Lewis' mother's birthday.

Q. Can we pull up DTX-010.

Can you look at DTX-010, Mr. Anderson. It should be in

your binder as well.

Can you tell me what this is?

A. Yeah. This is the FDA guidance on dose counters for MDIs specifically.

Q. I want to turn to the '808 patent and your invalidity arguments. Can you please provide an overview of your arguments with regard to the '808 patent?

A. Yes, this one specifically.

The '808 patent is invalid. Claim 28 would have been obvious in view of the '552 publication. And if the Cipla product is found to infringe Claim 28, then Claim 28 would have been obvious in view of the '406 publication.

MR. GREENBLUM: Your Honor, if I could just ask, I think the witness is reading from the slides which are not put up on the screen. I just ask that they be put up on the screen.

MR. ADAMS: Sorry. It was a miscommunication.

MR. GREENBLUM: No problem.

MR. ADAMS: 3.9.

BY MR. ADAMS:

Q. That wasn't intentional, but, Mr. Anderson, was this -- what's on the screen is 3.9.

Is this an overview of your obviousness opinions with regard to the '808 patent?

A. Yes, it is.

Q. Now, I want to talk to you in a little bit more depth about the first opinion you have there.

Could we pull up DTX-162.

What is DTX-162, Mr. Anderson?

A. This is the '552 patent.

Q. And what year was this published?

A. It was published in 2007.

Q. Now, Mr. Anderson, do you have an understanding of how Claim 28 of the '808 patent relates to Claim 1 and Claim 27?

A. Yes. It's the '808 patent Claim 28 is -- hangs off Claim 27 of the '808 patent, which hangs off the -- or dependent on the '808 patent Claim 1 of the '808 patent.

So Claim 28 depends from Claim 27 which depends on Claim 1.

Q. Thank you, Mr. Anderson.

What claim construction of the '808 patent did you apply in providing your opinions in this case?

A. So I used the agreed-upon constructions, but also the Court constructions as well.

Q. These are the constructions that you provided on defendant's Exhibit 2.1. Is that right?

A. Yes, that's absolutely right.

Q. Can you please explain the basis for your opinion that Claim 28 of the '808 patent would have been obvious in view of the '552 publication?

A. Sure.

Well, I walk through this, is that okay?

Q. Sure. However you would like to do it.

A. Okay. So Claim 28 of the '808 patent would have been obvious over the '552. And if I go through this in a bit more detail, you have two systems here, so the '552 is on the right. And you have to almost imagine that that gear and the circle underneath it, I've got a tube coming out of there, a bobbin, yeah. But it's obviously a dose counter for an inhaler. The dose counter has a counter display arranged to indicate dosage information. So that would be the tape shown in green. A drive system arranged to move the counter display incrementally in the first direction from the first station which would be the bottom one, 70, up to another station, a second station. And then last point here is wherein a regulator is provided, which is arranged to act upon the counter display at the first station to regulate motion of the counter display to the first station to incremental movements. And on that image there, you can actually see the regulator circled -- the bobbin 68 is actually placed over the shaft 70. And you can see on shaft 70 there is a small detail. We will expand that in a minute. But you can definitely see there is a regulator on that '552 patent.

As such, the '552 publication discloses every element of Claim 1 of the '808 patent.

Q. Do you have any opinion about how the '552 publication disclosure that you just described compares to the patent disclosure of the '808?

A. Yes.

It -- the disclosure is absolutely consistent with the '808 patent disclosure, the regulator. Sorry.

Q. Can you explain that using slide 3.14.

A. Yeah. We've got the same features. So in Figure 6 as I've just said, you can see that we've got the regulator circled in gold. That's from the '552. And you can see on that product there's some protrusions on it. And it's got a fork that it's actually two arms. And if you have a look on Figure 6A, it's actually a better drawing if I'm honest. But it's actually got the two arms. It shows the forks. And it actually shows the protrusions or the nubs as they are called. But again, you can see the stations. You can see the drive system and you can see the counter display.

Q. Thank you, Mr. Anderson.

Just so I'm clear and the record is clear, what -- where does the Figure 6 in the middle of the screen, what publication is that from?

A. That's from the '552.

Q. And then the figure at 6A on the right-hand side, where did that come from?

A. That's the '808. And as such Claim 28 of the '808 patent

would have been obvious over the '552.

Q. Now, Mr. Anderson, can you explain in more detail how the '552 publication discloses the last limitation of Claim 1 of the '808 patent?

A. Sure. I will just read that just to get everyone aligned. Where the regulator is provided, which is arranged to act upon the counter display that the first station to regulate motion of the counter display at the first station to incremental movements.

So just going through this, you can see here there is a blown-up image of the shaft, the station projections. And you can see that obviously that component there is forked, a forked design. And the forks actually have the shaft slid over it. So, again, a POSA would understand that the '552 publication does disclose a regulator because it discloses the projections and a surface for the projections to actually physically engage with when it will modulate the motion of the counter display to incremental movements.

So the '552 publication does disclose every limitation of Claim 1 of the '808.

Q. Mr. Anderson, I want to move now to Claim 28.

Can you please explain your opinion that Claim 28 which depends from 27 and 1 of the '808 patent would have been obvious in view of the '552 publication?

A. Yeah. So a little bit more detail here. There is a

number being put to this resistance that we talked about on the previous slide. The number that's been put forward here, it starts off at .1 of a Newton. Those forks are pushing against the bobbin, you know, the inside of the bobbin which makes sense. That force is increased. And I'm assuming that the reason it was increased because underneath that you can see that it was actually found out during testing that the force was adjusted. Again, that's from the '808 patent --

MR. GREENBLUM: Objection, your Honor.

Sorry.

THE COURT: Counsel, basis.

MR. GREENBLUM: That testimony about from the patent that they found this during testing, that is not in his report.

Most of the other text on the slide is in his report. But the lower left-hand corner, that description of it has been found during testing that Mr. Anderson just testified to, not disclosed in his expert report. That's our only objection.

MR. ADAMS: May I respond, your Honor.

THE COURT: Yes.

MR. ADAMS: This is the patent. That's from the patent. He talked -- he talks all about the patent, but this is a patent litigation case. He is pulling up the patent and talking about in the context of the patent, what these things do and what these things mean.

And so if I took the patents and put everything from the

patents which are 30, 40 pages long into every report, it wouldn't make sense.

He talked about in his report why this claim would be obvious in view of the '552 publication. He has talked throughout his report about his analysis of the patent. But again, I don't think the standard is to take every word out of the patent and always incorporate it into the report.

MR. GREENBLUM: These words aren't in the report. But as long as we can have a standing objection, your Honor, that's fine.

THE COURT: Noted.

THE WITNESS: Just summarizing here that the design of the '552 publication, the regulator, it's the same as the '808 regulator. The '808 patent, the force values that are claimed are experimental. And they are based obviously on testing.

And as a matter of routine optimization for any POSA, they would find the appropriate force against movement of the counter display to make sure that unwinding of that tape didn't happen while allowing it to drive incrementally to move the counter display.

So it's a fine balance between not going backwards, but allowing it to go forwards.

BY MR. ADAMS:

Q. Mr. Anderson, in view of that, do you have an opinion whether Claim 28 of the '808 patent would have been obvious in

view of the '552 publication?

A. The Claim 28 of the '808 patent would have been obvious over the '552.

Q. I will move to your opinion regarding whether or not Claim 28 of the '808 patent would have been obvious in view of the '406 publication.

A. Okay.

Q. Can you -- before we do that, can we pull up DTX-161.

Mr. Anderson, you should have DTX-161 in your binder and the cover sheet is on the page here, on the screen here.

A. Yeah.

Q. Do you recognize DTX-161?

A. I do, yes. It is the '406 patent.

Q. The '406 publication?

A. The publication. Sorry.

Q. When was it published?

A. April 2007 -- the first of November, 2007.

Q. Using DDX-3.18, can you explain your opinion regarding whether or not Claim 28 would be obvious in view of the '406 publication?

A. Yes. The Claim 28 if infringed is obvious in view of the '406 publication.

I think that's quite clear on this one because you can see the actual Cipla ANDA product, if it infringes Claim 28, then that claim would have been obvious over the '406

publication.

Q. Thank you for the high-level summary, Mr. Anderson.

Can you tell me what you're showing on the left-hand side of this slide?

A. Sure. This is Dr. Lewis' opinion on infringement.

Q. What do you mean by that?

A. Well, he is essentially saying that the Cipla device is that. And the '406 is obviously the previous publication.

Q. So in the center of this slide under Dr. Lewis' infringement opinion, can you tell me what that device is?

A. In the center one?

Q. Yes.

A. That's the Cipla device.

Q. Can you speak into the mic a little bit more?

A. Sorry. That's the Cipla device, the Cipla counter.

Q. Is it your understanding that Dr. Lewis has given the opinion that this device, this dose counter of Cipla's would infringe Claim 28 of the '808 patent?

A. Yes.

Q. Do you agree with Dr. Lewis' opinion?

A. No, not at all.

Q. And you have described that earlier today so I won't rehash that.

Can you explain to me how, in your view, the '406 publication would render obvious Claim 28 if infringed?

A. Yeah. It's got every single component that we discussed today, the '406. It's got all the main body. It's got the indexer. It's got the tens cone. It's got the spring. It's got all the components.

Q. Can you walk through Claims 127 and 28. Let's start with Claim 1 over here because I know Claim 28 depends from it.

Can you tell me whether or not the '406 publication on the right-hand side discloses -- we will start with the dose counter for an inhaler.

A. Yes, it does.

Q. How does it disclose that element?

A. They're both pretty much exactly the same and they are both dose counters.

Q. For this question, I'm going to just focus on the '406 --

A. Okay.

Q. -- on the right-hand side.

A. Yeah.

Q. So is the picture on the right-hand side in the '406, is that a dose counter for an inhaler?

A. Yes, it is. It's got a counter display, and it's arranged to indicate dosage information. It has got a drive system arranged to move the counter display incrementally in the first direction, and it doesn't have a regulator. It's got a spring there that we are discussing earlier today. It hasn't got a regulator.

Q. Can you tell me where in the '406, what -- I know we color coded this, but what color are we looking at in the '406 for the leaf spring you just mentioned?

A. It's the yellow. So it's the 306. It's labeled as 306.

Q. And that's a leaf spring.

Is that your testimony?

A. That is a leaf spring. It is not a very good drawing of it, but it is definitely labeled as a leaf spring and it is there as a leaf spring. It is a leaf spring.

Q. And is that leaf spring in the '406 -- is that leaf spring in the '406 similar to the one in the middle drawing of Cipla's dose counter?

A. Absolutely, yes.

Q. Are there any differences?

A. No.

You can't tell from that drawing, but there won't be any. You can put a spring either way, but, you know, the -- it's still the spring, and it's still doing exactly the same job.

Q. Does the '406 publication disclose anything about putting the spring either way?

A. No.

I think it says that you can actually put it either way. Again, that would depend on the manufacturer, the manufacturing company assembling it. Some manufacturers might put it one

way, some -- but it does the same job, essentially. It's doing -- not essentially, it is doing the same job.

Q. I think you said no in the beginning. Let me ask the question again.

Does the '406 publication say the leaf spring can be turned either --

A. Yes, it does. Yes. Sorry. Sorry.

Q. Is the leaf spring in the '406 publication -- strike that.

Let's look at Claim 27. It depends from Claim 1.

Do you see that?

A. Yeah.

Q. And then Claim 28 further depends from Claim 27.

Do you see that?

A. Yeah.

Q. Now, do you have any understanding of why Dr. Lewis believes that in his infringement opinion Claim 27 meets this -- strike that.

-- Cipla's ANDA product meets this limitation of force greater than .3 Newtons for Claim 28?

A. Well, certainly, on Claim 28, if the Cipla product does infringe, then the claim would have been obvious over the '406.

Q. Why do you say that?

A. Because the '406 has been around for a long time, and it, ultimately, hasn't got a regulator either.

Q. So just to make sure I follow you and understand here,

Mr. Anderson. The picture in the middle is Cipla's ANDA product.

Correct?

A. Yup.

Q. And that's been accused of infringement in this case?

A. Yeah.

Q. And in the '406 publication, that's in the prior art.

A. That's right.

Q. In view of this discussion we just had, is it your opinion that if Claim 28 of the '808 patent is infringed, then it would have been obvious in view of the '406 publication?

A. Yeah. With Claim 28, if it is infringed, then it would be obvious in view of the '406 because the components are -- I mean, even when you have a look at the number and the way they are laid out, they are the same.

Q. Now, in forming your obviousness opinions in this case, did you consider any secondary considerations?

A. None of the alleged considerations that I've looked at that Teva have raised have overcome the obviousness of Claim 28 of the '808 patent.

Q. Thank you. I want to move to the common plane patents.

Do you have an opinion whether or not the common plane patents would have been obvious in view of the prior art?

A. I do, yes.

Q. Can you tell me what that opinion is?

 A. I believe that they would have been obvious.

Q. And what would they have been obvious in view of?

A. Bringing the '406 and the -- there's a patent, the '514, essentially, together.

Q. If we can turn to DTX-165, Mr. Anderson.

Do you recognize DTX-165?

A. Yeah. This is the '514 patent, and that was published 11th of December, 2003. Again, this was from 3M.

Q. Can you provide -- can you explain your basis for your opinion that all the asserted claims of the '289 and '587 patents would have been obvious in view of the '406 in combination with the '514?

A. Yeah.

Because as a POSA, you know, you definitely would have been motivated to combine the disclosure of the '406 with the '514, and you would have a reasonable expectation of success of this and because of this, essentially, the asserted claims of the common plane patent would have been obvious over the '406 publication in combination with the '514.

Q. I think I heard you right, but I want to make sure.

Is it your opinion that Claims 1, 2, 4, 6, and 7 of the '289 patent would have been obvious in view of the '406 and '514?

A. Yes, definitely.

Q. What about the '587 patent, can you tell me what claims

you believe would have been obvious in view of the '406 or the '514?

A. The same.

Q. And that's Claims 1, 2 --

A. Sorry. I should really read it.

Q. Let me ask you the question again, Mr. Anderson.

Can you tell me what your opinion is whether -- with regards to whether certain claims of the '587 would have been obvious?

A. Yeah.

So the '406 publication in combination with the '514 publication does disclose all elements of Claims 1, 2, 4, 6 to 7 of the '289 patent and Claims 1 to 2, 4, 6 to 7 and 12 of the '587 patent.

Q. So in view of that, would those claims in patents you just mentioned, then, obvious in view of the '406 with the '514?

A. Yes, they would.

(Reporter clarification.)

BY MR. GREENBLUM:

Q. In view of that, would the Claims 1, 2, 4, 6, 7, 12 of the '587 patent been obvious in view of the '406 or the '514?

A. Yes, they would.

Apologies.

Q. That's okay.

Now, Mr. Anderson, what claim constructions did you

apply when rendering your obviousness opinions in this case?
A. On this one, on the '289, the claim constructions I used were the agreed-upon constructions but, also, the Court's constructions as well.
Q. And are these the constructions that are on slide 3.22?
A. Yes, they are.
Q. Let's start with the '289 patent and dive a little deeper.
Can you please explain your opinion that Claim 1 of the '289 patent would have been obvious over the '406 publication or the '514 publication?
A. Sure.
So if I just pick off the top three here, so we have an inhaler for a metered-dose inhalation and the inhaler does comprise of a main body, which would be the outer part and the medicament canister, which is movable relative to the canister housing, and it's also retained in a central outlet port of the canister housing arranged to mate with a canister fire stem of the medicament canister. And you can see that in that cross-section view and the arrows are pointing to those key components.
Q. So --
A. Sorry.
On the right-hand side, we've got the '406 and from that patent publication, it describes the same components and the function of them, actually, as well.

Q. So, Mr. Anderson, does the '406 publication disclose the first element inhaler for metered-dose inhalation?
A. Yes, it does.
Q. And that's your blue arrow?
A. Yes. Yes.
Q. Does the '406 publication disclose a main body having canister housing?
A. Yes, it does.
Q. And that's your green arrow?
A. Yes.
Q. Does the '406 publication disclose medicament canister which is movable relative to canister housing?
A. Yes, it does.
Q. And where is that? What color is that?
A. Which one?
Q. The canister which is movable relative to the canister housing?
A. You can see it on -- it's the purple one, 70.
Q. Does the '406 publication disclose the last element there, retained in a central outlet port of the canister housing arranged to mate with a canister fire stem of the medicament canister?
A. Yes, it does.
Q. Where is that in the '406 publication?
A. It says the -- it says it in 00150.

The inhaler is actuated to dispense a dose of medication by pressing down on the aerosol container.

Q. Is that what you've indicated with the orange arrows?

A. It's the purple one.

Isn't it?

Q. Sorry.

Mr. Anderson, I'm talking about the location, the central outlet port of the canister housing arranged to mate with a canister fire stem.

A. Yeah. Sorry. That's the gold one. That's -- yeah.

Q. So that element is disclosed in the '406?

A. Oh, yes.

Q. Let's move to the next limitation.

Does the '406 publication disclose a dose counter having an actuation member having at least a portion thereof located in the canister housing for operation by movement of the medicament canister?

A. Yes, it does. And that's the -- you can see it circled. So the little circle is the canister housing, okay, the purple one. The red one is highlighting where the actual indexer is and that, as we discussed earlier, it goes all the way across. So it definitely does contain the actuation member because we agreed on that.

So the Claim 1 of the '289 is obvious over the '406 with the '514, and those details are shown on both the left and the

right-hand side.
Q. So is the actuation member, if I can follow your color here, is that what you colored in blue in Figure 27 --
A. Blue, yeah, yeah.
Q. Let me finish my question.
Is the actuation member of Claim 1 of the '289 patent, is that what you've colored in blue in the Figure 27 of the '406 publication?
A. Yes, it is.
Sorry.
Q. Now let's move to the next limitation of claim on the '289 patent.
Does the '406 publication disclose where in the canister housing has an inner wall?
A. It does. And they are the two gold lines, so you can quite clearly see them.
Q. Now, the next part of that limitation is a first inner wall canister support formation extending inwardly from a main surface of the inner wall.
Do you see that?
A. I do, yeah.
Q. Is that disclosed in the '406 publication?
A. Not expressly, but, obviously, the '406 publication does disclose the inner wall, the gold one. And as we've got there highlighted, the first inner wall canister support formation

extending inwardly from a main surface of the inner wall was commonplace in the prior art before 2010 and they were known as ribs, and the '514 does actually detail these and discloses these. So that publication does disclose that limitation.

Q. What do you mean, Mr. Anderson, by ribs were commonplace?

A. That ribs have been used in actuators -- not actuators -- in the main body for many, many years. And that's for various reasons, to get airflow down the sides, to help stabilize the can. Some companies used it for that.

You know, they have been around for a long, long, long time. And I believe 1965 was the first year that they were actually mentioned, you know, in publications, in papers.

So these ribs are not new. They have been around almost as long as the MDIs themselves.

Q. So I'm looking at your slide 3.26.

What do you portray in here?

A. This one, if you would just go around in a circle starting at the stop left, this is a description. There is not a drawing of it as such.

But it talks about -- in a figure they have got spacer ribs, may be provided in the housing to hold the external surface of the container, which is the can, spaced from the internal surface of the housing to support the stem block. Again, this is being talked about and this is 1989.

Ten years later you have another picture here. It's

another patent. But again, you can see the -- four ribs is very common. And that's because you ideally want to balance the can. So you don't want one rib. You don't want two. You may want three, but to be honest, four is probably best as a minimum. So four is a very common number.

Figure 8A is the '514 publication. Again, you can see two ribs on that, but that's a cross-section. So if you flip that round, it has four ribs.

And that's shown in other images on that patent.

I believe that's a GSK one, the 2006 one. We had ribs that we had in the device. That was for our dose counter device. You can tell it's our dose counter because it's got a window at the back. But we still had ribs going down there. And lastly, that is another view from another patent. That is 2004.

So ribs were ubiquitous prior art. I think that's the message here.

I could have put a lot more images here, but let's just stick with these one s.

Q. Let me direct you to DTX-137.

Could you please identify DTX-137?

A. Yeah. This is a GSK patent '822, Paul Rand who I used to work with.

Q. Was this is one of the patents you --

A. It is, yeah, yeah, yeah. Again, that's -- one of the

images that are actually taken from that. So that's a Glaxo patent. It was just before I joined, actually, '89.

Q. Thank you, Mr. Anderson. Let me direct you to DTX-174.

Can you please identify DTX-174?

A. Yeah, it is one of AstraZeneca's inhalers. That's one that's got ribs in it. That's one of the images there. That's the second image. That was what the device looks like from a perspective view.

Q. Let's look at DTX-172.

Can you please identify this document?

A. Yeah, that's 172, that's another GSK device.

Q. And let's pull up DTX-153.

Can you identify DTX-153?

A. Yeah. That's the GSK counter, one of the patents.

Q. Is that U.S. patent publication ending in '008?

A. Yes, it is.

Yes, it is.

Q. Can you tell me when it was published?

A. Published date 2006 in December.

Q. Mr. Anderson, we just pulled up four documents.

Were all four of those documents prior art to the common plane patents?

A. Yes.

Q. And did all four of those documents disclose the use of ribs?

A. Yes. Yes, they did.

Q. And I know you use the use of ribs here.

When you're talking about the claim language, inner wall canister support formation and you walk through that analysis, were you saying the ribs were the same as the inner wall canister support formation?

A. No. They can have two different purposes really. These ones in the prior art, they are used to hold the devices in place. Yeah.

Q. Now, let's turn back to your opinion regarding obviousness of the '289.

I want to go to the next slide.

Let's look at the next limitation here, "wherein the canister housing has an inner wall."

Do you see that?

A. Yes, I do.

Q. And is this disclosed in the '514 publication?

A. Yes, it is.

It discloses the can wall. It discloses the form and shape of the actual ribs. It does disclose that they actually are four equally spaced ribs through different images in the patent.

So logically, although it does, disclose the first inner wall canister support formation extending inwardly from a main surface of the inner wall. And the red arrows show clearly the

inward extension and the dotted circle; again, you can see that level of detail of the actual rib itself.

So the '514 definitely does disclose this limitation. The obvious thing is really a POSA would be absolutely motivated to combine the '406 and the '514.

Q. Why would a POSA, as the priority date of the common plane, '289 patent, why would a POSA be motivated to combine the '406 publication with a '514 publication with an expectation of success?

A. This -- I will run through these, but there are many -- more than one reason.

As I mentioned earlier, you know, 1965 is the first publication that I can certainly find where the standard actuator was used in inhalers with four equally spaced ribs to locate the canister and provide an annular passageway to draw air through the actual main body when the can is inside. Ribs were also used to prevent accidental opening of the valve.

What that means is when the valves were -- a long time ago before, you know, we really improved our manufacturing processes, if you held the valve and it moved slightly, you could get gassing round here, so that's why they tried to tighten up the inside of the actuator. And obviously the valves have improved over time.

So gassing is less of an issue, but it was still a risk then.

By 2010 the use of ribs were ubiquitous and all over the industry. They were known. It doesn't cost you anything to add a rib, so why wouldn't you put it in to enhance the product. Again, sometimes if you've got different label sizes, you know, allows you to have something that's easy to adjust as opposed to changing the whole of the inside.

So they were really well known and understood.

It does help put in the can in the valve -- in the main body. So again, that can be a bit -- in the manufacturing process, but also it can -- the patients, it helps them put the can back into the actual actuator body itself. It just helps all line up.

What else?

Better control of tolerances. Again, that was something that was more important. That's when it did actually become really key, and we used it when we were developing our counter. We actually used the ribs to make sure that when you put the counter back in, that product could be washed. It is recommended you wash it, the nozzle. And that made sure that when the patient put the device back in, it really located very accurately.

Years of evidence indicating the benefits. We have been doing it for a long, long time.

To actually not do it, you would have to challenge that.

It just became as I say, ubiquitous. So doing this and

incorporating it into an actuator body, it's -- you would find it difficult to find a reason not to do it. And that's why if you look at any MDI, any puffer body, they have got ribs in them. So we are motivated, without a doubt, to bring -- or incorporate ribs into the devices, and the expectation of success is very high.

Q. Mr. Anderson, thank you for that.

Would a POSA be motivated, in view of what you just told me, to combine the '406 publication with a '514 publication disclosing these ribs with expectation of success?

A. Yeah. They would definitely be motivated to combine the '406 with the '514 and a high expectation of success.

Q. I want to move on to the final limitation here of Claim 1.

I want to ask you what claim constructions you applied to this limitation?

A. I used the agreed-upon constructions. So formation arranged to reduce canister rocking. But I also used the Court constructions, which is lying in the common plane coincident with a longitudinal axis. And also with the actuation member in a component of the dose counter actuator that transmits motion from the canister to the actuator.

Q. In view of that, can you tell me whether or not the last limitation of the Claim 1 the '289 patent is disclosed in the '406 with the '514?

A. Yes. So with this one, you've got the two components. So

we have highlighted the axis of the actual cross-section of the '406 product. You can see that it has a longitudinal axis. So we highlighted that, 322.

But we've also got the actuation member or the indexer from the '406 publication as well.

And again, Claim 1 of '289, it is obvious over the '406 publication with the '514. It would have been obvious with the common planes.

Q. So in view of that, is it your opinion that the last limitation of the '289 patent Claim 1 is disclosed in the '406 with the '514?

A. Yes.

Q. Now, I want to ask you why is your opinion that a POSA would have had expectation of success when combining the '406 or the '514 regarding your obviousness opinion on Claim 1 of the '289 patent.

A. So with this one, the last part of that claim, we've got the -- we're in the canister housing, so we've got the longitudinal axis, which passes through the center of the central outlet port. We've got the inner wall support formation. We've got the actuation member. And we've got the line in an axis in a plane coincident with a longitudinal axis.

And as we have been discussing, the '514 discloses the inner wall canister support formation. That is the red. We've got the ribs that would be -- again, they would be put in

place.

If we're looking at a -- the common plane, which is the purple line, that purple line goes through the central outlet port. It goes through the inner wall canister support formation. I'm sorry, the other ribs -- I got that wrong. Apologies. And obviously the actuation member.

So in summary, the Claim 1 of the '289 patent would have been obvious over the '406 publication when brought together with the '514 publication.

Q. Let's talk about dependent Claim 1. Dependent claim is -- sorry. Dependent Claim 2 depends from Claim 1.

Can you explain your opinion that -- why Claim 2 of the '289 patent would have been obvious over the '406 with the '514?

A. Yeah.

So on this one, we've got an inhaler labeled the medicament canister. You can see they actually cut the top off it. But you can see the outline of that can. And it is obviously movable relative to the dose counter.

So in summary, the canister, 70, is movable relative to the dose counter, which is, as we mentioned earlier, clipped into the bottom of the main body.

So Claim 2 would have been obvious over the '406 and the '514.

Q. Let's talk about dependent Claim 4.

Can you describe -- provide your basis for your opinion that Claim 4 of the '289 patent would have been obvious in view of the '406 with the '514?

A. Yes. On this one, the inhaler, as you say, is claimed in Claim 1, with the first inner wall canister support formation combines as a support rail which extends longitudinally along the inside surface of the main body.

So the '514 has a first inner wall canister support formation. That is the two gold lines. It does disclose a support rail which extends longitudinally along the inside surface of that main body.

So let's follow the red arrow.

So the '514 publication does disclose this. And again, a POSA would be absolutely motivated to combine the '406 with the '514 with a high expectation of success for the reasons I have already talked about. And Claim 4 would have been obvious over the '406 and the '514.

Q. Let's move to Claim 6.

Can you please explain your opinion, why you believe Claim 6 of the '289 patent would have been obvious in view of the '406 with the '514?

A. Again, with this one, the inhaler is claimed in Claim 4, comprising of the plurality of support rails, each of which extends longitudinally along the inside of the surface of the main body.

Again, the '514 publication discloses this. It shows a canister housing with plurality of support rails. And that's the gold lines. And it does disclose each of which extends longitudinally along the inside surface of the main body.

And, therefore, the '514 publication does disclose this limitation. Again, the POSA would have been motivated to combine the '406 with the '514 with the expectation of success for reasons previously discussed regarding Claims 1 and 4.

So Claim 6 would have been obvious over the '406 and the '514.

Q. Let's move to the final claim of the '289, Claim 7.

Can you explain your opinion regarding whether or not Claim 7 of the '289 patent would have been obvious in view of the '406 with the '514?

A. Sure.

So again, the inhaler is claimed in Claim 6 where two of the plurality of support rails are positioned at opposite ends of the inside surface of the main body to face each other.

Again, on this one, on the actual patent, this is four shown, but here you can have two. But the '514 publication does disclose two of them, of the plurality of support rails. They are the gold lines that come down. It does disclose the opposition to opposite ends of the surface of the main body to face each other, so the '514 publication does disclose this limitation. And again, the POSA would have been motivated to

combine the '406 with the '514 with an expectation of success for reasons previously discussed regarding Claims 1, 4, and 6.

So Claim 7 would have been obvious.

Q. Mr. Anderson, can we turn to the '587 patent.

THE COURT: Let's take a ten-minute break before you go to the next patent.

Let's take a ten-minute break. It is 6:02. We will be back at 6:12.

Thank you.

THE COURTROOM DEPUTY: All rise.

(Recess taken at 6:02 p.m. to 6:14 p.m.)

THE COURT: Thank you all. Please be seated.

BY MR. ADAMS:

Q. Can we pull up JTX-004.

Mr. Anderson, can you tell me what this is?

A. Yeah. Yeah, this is the '587 patent.

Q. And did you provide obviousness opinion regarding the '587 patent?

A. Yes, I did. Yeah.

Q. Let's pull up JTX-008.

What is JTX-008?

A. That's the filing history. It's kind of the whole document that's got everything in it that I was asked to review and quite considerable -- well, in quite a lot of detail.

Q. Is it your understanding this is the prosecution history

No objection.

If the Court could give us one minute to set up, I'll be quick.

THE COURT: Absolutely.

MR. GREENBLUM: May I approach?

THE WITNESS:

CROSS-EXAMINATION

BY MR. GREENBLUM:

Q. Welcome back, Mr. Anderson.

A. Hi.

Q. I want to start I think where you started on the '808 patent.

I would like to pull up a portion of your expert report addressing that patent.

Mr. Reynolds, this is tab 4 in the cross binder and for the Court and for Mr. Anderson, tab 4 is your reply report on validity.

I would like to ask Mr. Reynolds to call up paragraph 151.

If you could highlight the language in the middle. Initially I note that both the '552 and '950 publications disclose the same configuration.

A. Sorry, Ben. Which report is this?

Q. This is your reply report. It should be tab --

A. Number three.

 Q. Huh?

A. Number three?

Q. Number four.

A. Number four.

Q. And paragraph 151.

A. I've got it.

Q. This was the portion of your report in which you discussed the figures you see down below.

Correct?

A. Yup.

Q. On direct examination with Mr. Adams, you didn't talk about both of these.

You only talked about the '552.

Do you recall that?

A. That is right.

Q. But in your report, you talked about both of them and you noted that they both disclose the same configuration.

Right?

A. Yeah, except one was obviously got a spring at the end of it. And that was taken from the Spiromax because it's got a spring but obviously they removed the spring, but from the drawings that I can see there, one has got a slightly thicker outline than the other. They are referenced differently. Interesting, they have individual counts on the numbers. Indicia, yeah.

And there is a spring on there. And as I say, that spring, it was used in an earlier device. It is not on what we are discussing.

Q. I'm just trying to establish the basic point that in your report the opinion you offered was that these two publications disclose the same configuration.

Can we agree on that?

MR. ADAMS: Objection, your Honor.

We didn't talk about the '950 publication today. Counsel is asking about the '950 from a report. He is not using it to impeach. He's asking in the report about the '950 publication.

THE COURT: He is referencing, this is the doctor's materials.

MR. GREENBLUM: Correct.

THE COURT: He is just referencing -- I mean, that's fair. That's fair question.

Objection noted.

But I will allow it.

BY MR. GREENBLUM:

Q. So, Mr. Anderson, you are aware that the '950 publication that disclosed the same consideration was considered by the patent trial and appeal board?

MR. ADAMS: Objection, your Honor.

Again, it this is outside the scope of our direct. He

did not talk about the '950 on direct today.

MR. GREENBLUM: My point is that he didn't talk about the '950 on direct today. He didn't talk about it because he knows it is exactly the same as the publication. He chose to talk about even though in his report he talked about both. Today he only talked about one because the one it is the same as the same argument he is making here that was presented to the PTAB was rejected. That is the only point I'm trying to establish. I am connecting it to the '552 which he discussed under oath.

MR. ADAMS: Your Honor, may I respond?

THE COURT: Yes.

MR. ADAMS: I think I just heard him admit we didn't talk about the '950. It is outside the scope of our testimony today. The reasons for why he did or didn't talk about it certainly in terms of time, it's -- he testifying the '950 is not within the scope of our direct.

THE WITNESS: If it was part of his report and if there is some either inconsistency or some basis for the reason why the '552 was compared to '950 in the first place, he is entitled to inquire. I have to give him some latitude to lay a foundation in terms of what is his intention with regard to '950.

MR. GREENBLUM: I will tie it up quickly, your Honor. Thank you.

BY MR. GREENBLUM:

Q. Mr. Reynolds, can you call up JTX-006.

This is the prosecution history of the patent.

Mr. Reynolds, it's on the screen.

A. I'm Mr. Anderson.

Q. I'm sorry. I apologize.

A. I'm still reading, if you don't mind.

Q. Sure.

Mr. Anderson, just --

A. No, no, no. Wait. You asked me a previous question. I'm still trying to capture it with --

THE COURT: There is a question. There's an open question pending.

MR. GREENBLUM: I don't understand a question to be pending at this time, your Honor.

THE COURT: Mr. Anderson, which question in particular were you reading?

THE WITNESS: About the '950.

THE COURT: He has questions that are coming about '950.

So let's have a question.

BY MR. GREENBLUM:

Q. I am going to ask you about a portion of the prosecution history we are going to put up on the screen about the '950.

The '950 was considered by the patent trial and appeal

board.

Do you recall that? Correct?

MR. ADAMS: Objection, your Honor. Again, we're talking about the '950. It is outside the scope of -- there's a lot in his report that we didn't talk about at trial. '950 is one analysis. It is outside the scope of our direct.

THE COURT: Objection noted.

Counsel, proceed.

MR. GREENBLUM: Thank you, your Honor.

BY MR. GREENBLUM:

Q. If you could turn to page 5 and call up snap number 2 from the patent trial and appeal board's decision.

If you look on your screen, Mr. Anderson, I want to direct you to the last sentence, a portion of which we've highlighted.

It says, The examiner has the burden of adequately supporting the obviousness rejection in the first instance. And here, the examiner on the '808 patent fails to establish that a person of skill in the art would have reached a regulator capable of regulating motion in the manner Claim 1 recites based upon the teachings of O'Leary or otherwise.

Do you see that, sir?

A. Uh-hum.

Q. And O'Leary was --

A. Yes. Sorry. Sorry.

Q. O'Leary was the '950. You recall that.
Right?
I need a verbal answer, sir.
A. Yes.
Sorry.
Q. So what the PTAB decided was that a person of skill in the art would not have reached a regulator capable of regulating motion in the manner Claim 1 of the '808 patent recites based upon the teachings of the '950 or otherwise.
Right?
A. No. Because the '950, the components of the '950 and the '808 -- the '808 doesn't actually have the -- the return spring because it is a different device. All it's using is some of the components. So it is a different device.
One was an automated inhaler that was talked about yesterday and the other one, it's not automated. It doesn't have that automatic reset.
Q. So you disagree with the PTAB's decision that Claim 1 of the '808 patent was not obvious over the '950 publication or otherwise.
Is that right, sir?
A. No. I think it is obvious because it is still acting as a regulator. The spring is there because it's, essentially, just resetting the mouthpiece.
So the actual mechanism and the reason it is there is to

regulate that tape.

Q. Do you know why the PTAB disagreed with you on that, sir?

A. No.

Q. Okay. Let's move on.

If you could call up from Mr. Anderson's slides, slide 16.

Do you recall testifying about this slide during your direct examination?

A. Yes, I do.

Q. And I was listening to what you were saying, and I took a look at the transcript and I wrote down that you said that you assumed that the reason that the force was increased was because underneath -- and you were pointing the Court to the lower left-hand corner of the screen where you have an excerpt from the specification of the '808 patent -- you can see that it was actually found out during testing that the force was adjusted.

Do you recall that testimony from your direct exam?

A. Well, I'm just, essentially, saying what it says in the patent, which is it was found that during testing that a force of -- well, they keep changing it. It goes from .1 to .3 to .4. I think they end up settling in .38. Yeah.

So there was some pretty random numbers being thrown around there, nothing -- the only scope that they give greater than .3.

Q. And so you were relying here on the specification of the '808 patent.

Is that right?

A. It's the information that I have got, that we have all got, where they associate a number and all the way through the -- certainly, the '808 patent. There's loads of numbers and detail.

Q. Why did you decide to rely on the specification of the patent?

A. Because it guides you. It informs you, and some of it is experimental, but some of it is very, very well defined. And they actually provide you charts showing the tolerances that they then worked to, and they give you nominals as well to work from.

Q. Thank you.

Could you call up slide 29.

Thank you.

Mr. Anderson, do you recall testifying about this on direct?

A. Yes.

Q. I just want to orient the Court that what's going on here is you've got a depiction, Figure 27 from the '406 patent, and then you've got Figure 8A flipped around and annotated from the '514 publication.

Is that what we're seeing here?

A. That's correct, yes.

Q. And, essentially, in summary, your obviousness opinion is that you can splice together different aspects of these drawings to render obvious Claim 1 of the '289 patent.

Is that right?

A. Well, can you bring up Figure 2A, I think it is, from the '514?

Q. I am sorry. Figure 2A?

A. Yeah.

Q. I am focused on the figure you put on the screen, sir. So, I mean --

A. Yeah. Okay.

Q. -- I don't have 2A with me.

So stick with me here.

Your obviousness opinion is predicated on splicing together the different pieces and configurations of these two figures -- or figures from these two publications to render obvious Claim 1 of the '289?

A. I think splice is a bit of a harsh word.

I would say I'm taking the ribs, yeah, from the '514 and I'm transferring them over onto the '406 drawing.

So it's not splicing. It's just saying, right, these can fit over there. There is enough scope to put them in there.

Q. Is it your testimony that to fit the ribs from the '514

inside the '406, you wouldn't have to widen the upper body of the '406 to make those ribs fit?

Is that your testimony, sir?

A. What? It depends on scale. I would have to -- I would have to measure it, obviously.

I would have to leave enough room in between the canister and the main body because if you get the ribs wrong, the can can actually stick against the side. So you always need to leave a little bit of room.

But, again, a person with skill in the art would make sure that you could move that over, and, you know, it's not to scale.

Where does it say to scale?

Q. I am not asking you about scale, sir.

I am just asking you: You don't know whether or not you would have to widen this out to fit the ribs in or do you?

A. I don't know if I would have to narrow it.

Q. You don't know one way or the other?

A. I would make sure that it allowed the canister to be moved in the housing and supported, ideally for -- you know, these are all very well known, understood prior art that has been around since 1965.

Q. We heard on your direct exam about how long counters had been around and how many different types of counters there are.

Correct, sir?

Q. Well, we will probably have to agree to disagree on that. I don't want to take up more time.

I see two.

Let's pull up slide 32.

You see that purple line that you drew there?

A. Yeah.

Q. I want to make sure it's clear to the Court, the purple line isn't in any of -- either of the '406 or the '514.

Right?

The purple line you superimposed on the drawing when you spliced them both together.

Right?

A. I integrated them.

Q. Okay.

When you integrated the two images we saw on the prior slide and we put them together into a device that I don't think anywhere exists and you ran a purple line through it, that purple line, that's yours.

Right, sir?

A. It's not anyone else's.

Q. Can I take that as a yes?

A. Yes.

Q. There is no disclosure anywhere in the '406 publication or the '514 publication that suggests it is important to put support rails in particular places to prevent canister rocking.

Right?

A. Why would you put them in not an important place?

Q. So your answer is there is such a disclosure?

A. Yeah. Look at the images.

THE COURT: Please try not to answer a question with a question.

THE WITNESS: Sorry.

BY MR. GREENBLUM:

Q. Could you pull up depo clip Number 4.

Thank you. If you could pull up 231 of Mr. Anderson's deposition, starting at 23 running to line 3 of page 232.

Sir, I asked you this question. When Ms. Kayali asked you the question, she asked you the same question. There is no disclosure in the '406, the '514, or the '021 -- that is another piece of prior art you relied upon that we didn't hear about today -- that suggests it is important to put cans -- to put support rails in particular places to prevent canister rocking.

That was the question you got.

Right?

A. Yeah, I'm just going to read this.

So the question is -- is the disclosure and those three patents that's important to support rails in particular places to prevent can rocking?

Q. Yes.

And today you said yes. And at your deposition you said no.

A. I disagree with this because the places that you put the rails or the ribs, I mean, ultimately you are given quite a lot of choice. And within the actual space that you are talking about, yet you got to choose carefully -- you do have to choose carefully where you put them. And you do have to think about it.

So it's a yes-or-no thing. It depends on what you are actuator is. It depends if you got a counter in there.

It depends on the complexity of the metered dose inhaler. If it's a very simple one, yeah. But if it's got a counter, you've got to try and, you know, make sure they are -- obviously on the '406, you kind of know where the components are because you've got that level of detail.

So as the case is saying, I can take my four -- don't forget, the one thing that's really important here is that you can -- that they are balanced. So having two doesn't make sense, having three as a minimum. As long as that product can be supported, I think the word I probably use is symmetrical. So is it important -- you asked the wrong question.

Is it important it's symmetrical.

Yeah. So you can cut it, so it actually supports something that's round. Yeah.

It could be three. I would recommend that as a minimum.

You can put in six.

Why would you put in too many, but three minimum.

Q. Last question.

Can we agree that you didn't say any of that when my colleague asked you the same question at your deposition?

A. She didn't ask me that question. She didn't say should you have a symmetrical choice of ribs? What is the best layout?

She didn't say that.

MR. GREENBLUM: I have no further questions.

Thank you for your time.

THE COURT: Redirect.

MR. ADAMS: Short redirect, your Honor.

REDIRECT EXAMINATION

BY MR. ADAMS:

Q. Mr. Anderson, do you recall counsel asking you questions about Figure 8A of the '514 publication?

A. Yes, I do.

Q. Can we pull up Exhibit DTX-165.

Go to Figure 8A.

Mr. Anderson, is this Figure 8A of the '514 publication?

A. Yes.

Q. Is this a cross-sectional view of this Figure 8A?

A. Yes.

Q. Is it a cross-sectional view with a canister sitting in

- - -

I N D E X

- - -

E X A M I N A T I O N S

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **JEFFREY KARG** | | | | |
| BY MR. PICOZZI | 617 | | | |
| BY MR. BACHAND | | **640** | | |
| **DAVID LEWIS** | | | | |
| BY MS. KAYALI | 669 | | 187 | |
| BY MR. BACHAND | | 120 | | |
| **REYNOLD PANETTIERI, MD** | | | | |
| BY MR. LEYVA | 188 | | | |
| BY MR. SMITH | | 201 | | |
| **GREGOR ANDERSON** | | | | |
| BY MR. SMITH | 203 | | | |
| BY MR. GREENBLUM | | 206 | | |

E X H I B I T S

| NUMBER | ADMITTED PAGE |
|---|---|
| JTX-002 | 640 |
| JTX-003 | 640 |
| JTX-004 | 640 |
| PTX-033 | 811 |

 A. I did.

We were a little lean in engineering, and also I could tell this was a specialized skill set. The mathematics I could see that was going to be required for this, I went to my leadership and I said, you know, we need to get somebody else to come in. And we asked Bert Uschold to join us.

Q. Why Mr. Uschold?

A. Bert Uschold was a great mechanical engineer. He was great with plastic parts and on top of that he was also really an expert in tolerance analysis.

And some of that math, I'm not particularly great at, I get it all, but he understood the deep math. We made a good team.

Q. Now, is Mr. Uschold another one of the inventors on the patents?

A. Yes, he is.

Q. Let's go ahead and put up PTX-227.

Mr. Karg, is this a presentation you were involved in preparing?

A. Yes.

Q. Let's go to the page ending in Bates 312.

When Teva asked you to work on the project, what did they ask you to do?

A. This a good distillation objective, so we would have written this. It was literally to take a counter that was

proved to work in -- and we used the nomenclature here BAI, but the breath-activated inhaler. So it was an old counter and the breath activated inhaler, and to put it into the new manually activated inhaler body that we referred to as C2, and to do that with minimal changes.

Q. Let's break that down a little bit.

You mentioned two types of inhalers, breath-actuated inhalers and hand-actuated inhalers.

Now, we heard a little bit about those, but what is the difference between those two kinds of inhalers?

A. Well, they are very different. I mean, they both deliver the drug but a breath-activated inhaler, the user arms it. They either rotate it or do something to arm it, pull a lever, and what that does is that sets a trap door. And one of the issues with inhalers are timing, timing the breath with the explosion of the cloud. Like, if you a fire the cloud and wait a second and then breathe, you are not going to get any drug.

So breath-activated inhaler did two really key things. It perfectly timed the inhalation with the breath, the inhalation with the explosion of the drug, the cloud, and, also, actuated the counter. So it did it all mechanically.

So a breath-activated inhaler was really easy for the user to use every time correctly.

Q. Now, from a human-use perspective, is it easier to develop a dose counter for a breath-actuated inhaler or a hand-actuated

inhaler?

MR. BACHAND: Your Honor, I object to the extent he is asking for expert testimony.

MR. PICOZZI: I can limit the question to his experience.

THE COURT: Thank you.

THE WITNESS: So my experience in working with all the industrial designers that I did over the years is that the user is fickle, and it is much harder to develop products that rely completely on user actuation. And in this case, it was very hard to develop a counter that would work with the users variable engagement with the product.

BY MR. PICOZZI:

Q. Now, Mr. Karg, at the end of that objective statement is the line minimal changes.

Why was it that you sought to make minimal changes?

A. Well, any time you make a change, you really don't know what else -- what's going to happen in the rest of the mechanism. It was during this project that I learned the phrase knock-on effects. You know, I would have just called it, you know, you change something and now it doesn't work, but there are always knock-on effects. When you change one thing, there's a spillover down into the rest of the mechanism that you just don't know what's going to happen.

It's always beneficial to try to use the same thing over

Q. I would like to put up what's been marked as PTX-231.

Mr. Karg, can you explain for the Court what this document is?

A. This is a detailed or fairly detailed part drawing of the C2 housing, the body of it.

Q. And the C2 housing is the housing for the hand-actuated inhaler?

A. That is correct.

Q. Now, I would like to focus on the upper left-hand corner of the screen.

What component of the inhaler is this, Mr. Karg?

A. This is the part of the inhaler body that the canister would be inserted into.

Q. And, Mr. Karg, did you make any changes to the inside of the inhaler body over the course of the project?

A. Yes, we did.

Q. What were those changes?

A. Well, from the sensitivity analysis, you know, we learned that the relationship between the body and the canister was very important and to reduce the range of variation, we had to keep the canister moving as much vertically as possible without sideward movement and so we had to put in these ribs, these support rails to keep the canister within the allowable tolerance from tilting.

Q. And, Mr. Karg, before you performed that analysis, did you

 know that you would need to add support rails?

A. No, we did not.

Q. Did Teva tell you in advance that you would need to add support rails?

A. No.

The objective was to put the BAI, the breath-activated inhaler counter into the new housing. That was our -- that was what we got.

Q. Mr. Karg, you mentioned that you wanted to keep the canister vertical.

Why is that important?

A. Well, if the canister twists, tilts too much, then the part that would impact the actuation member would then -- then that would change. And so it's the accumulation of tolerances through the entire mechanism that would cause the failure.

So at every point along the way, we wanted to control variation as best as possible.

Q. Without the benefit of hindsight, would you have known that you would need to add support rails?

A. No.

Q. Without the benefit of hindsight, would you have known that canister rocking would be a problem?

MR. BACHAND: Objection to the extent he is calling for expert testimony, your Honor.

THE COURT: Objection noted.

THE WITNESS: What was the question, please?

BY MR. PICOZZI:

Q. Based on your experience at the time, would you have expected that you would need to change -- would you have expected canister rocking to be a problem?

A. Not in the beginning, but once the sensitivity analysis pointed us in those directions, we began to understand the problem.

Q. And at that time were you aware of any inhalers that didn't rely on support rails to prevent canister rocking?

A. No.

Q. Mr. Karg, I would like to turn to the page ending in Bates number 027.

I would like to focus on the component of the device under the number three.

Mr. Karg, what is the purpose of this component?

A. This is the chassis frame, part of the chassis frame. This is the shaft that the source spool was mounted onto.

Q. And, Mr. Karg, what is the purpose of the component relative to the counter display?

A. Well, the counter display was on, I guess, a wheel or a bobbin, we called it.

And that would be inserted over that. This was the shaft and the bobbin was like the wheel, if you will.

Q. Mr. Karg, did you make any changes to that component?

A. Yes, we did.

Q. What were those changes?

A. The changes came out of very late stage testing. We had already built tooling. We were in design verification testing at this point, which is a process that we had to go through before the FDA would say it was okay. And so we found out that during this testing that at some point the number that said how many inhalations were left in the device was not centered in the window, which was one of the requirements of the program. And we determined that to be this bobbin, this spool, was rotating too freely. And it would allow the counter display to move and, therefore, become harder to read by the user.

That's how we determined that.

Q. Okay. Now, Mr. Karg, what did you do once you noticed that problem?

A. Well, we went through the regular process of, you know, making sure we understood the problem. And then we brainstormed and then came up with concepts on how we might solve that problem.

Q. What did you arrive at?

A. We wanted to increase or to reduce the movement, the free movement of the bobbin on the shaft. And we developed these two protrusions to interfere slightly with the internal surface of the bobbin thereby not allowing it to float freely.

Q. Did you have any concerns that increasing the resistance

would cause problems?

A. Yes, very much so.

Another part of the mechanism which was the pulldown part that pulled on the gear to advance the counter, it was a very narrow kind of U-shaped piece. And because of the way that it was molded, the plastic would come up the two sides and then join in the center, which made it a very fragile part. When plastic comes together in a mold, it could become weak where the plastic comes in, in at that point.

So we knew we had to find a very fine balance between protecting all the small parts so that they wouldn't break, yet still constrain the rotation enough so that the counter display could not freely rotate in the counter device, counter body.

Q. Now, Mr. Karg, you testified at the outset that you have been a design engineer for 30 years.

A. Uh-hum.

Q. You worked on how many projects over that time?

A. Hundreds.

Q. How would you rate the complexity of the Teva project compared to those other ones?

A. Well, it was a different complexity.

Every project brings its own complexity.

This one was extraordinarily difficult because the solution window was just so small. There were so many moving parts. The math around all of the geometries, the 3D

geometries were difficult. And so this was a tough problem when it comes to raw, raw mechanics.

Q. And looking back at that project, Mr. Karg, how do you feel about your work on it?

A. Well, every engineer loves to see his products in the marketplace and everybody knows the red inhaler. So this was an awesome project for my head. I probably have five projects that I think about that way over the course of 30 years. And this is one of them.

MR. PICOZZI: One moment, your Honor.

THE COURT: Sure.

BY MR. PICOZZI:

Q. Mr. Karg, I just want to go back to one question I asked. I think you might have misheard the question.

Mr. Karg, are you aware of a product called Flovent?

A. Yes. In fact, I am. That comes back to me now.

Thank you.

Q. Does Flovent contain support rails?

A. I'm not sure. I think it does, but it's not support rails in the sense of the canister alignment.

The important part about Flovent is that the counter is actually mounted to the canister itself.

So the boundary line for the difficulty in the C2, the new body was that the canister was separated. It was not a part of the counting mechanism.

The important part about Flovent is that the counter is manufactured to the canister. So they are always able to exactly control the relationship between the canister and the counter.

So we didn't have the luxury of manufacturing a unibody kind of construction that the Flovent counter and canister have.

MR. PICOZZI: One second.

BY MR. PICOZZI:

Q. Mr. Karg, did you hear me correctly when I asked you whether there were any inhalers that included -- that did not include support rails?

A. I did not hear that correctly.

I'm sorry.

MR. PICOZZI: No further questions, your Honor.

One additional clarification, phase 3 is actually plaintiff's rebuttal case on validity as well as their case in chief on objective indicia.

I can either move to enter some exhibits now or do that afterwards at your Honor's preference.

THE COURT: We can do that now.

MR. PICOZZI: Plaintiffs move to enter JTX-002. 003. 004. PTX-223. PTX-227. PTX-231.

MR. BACHAND: No objections, your Honor.

THE COURT: Thank you. So moved.

actuation members that are at least, partially located in the canister housing?

A. No, not possible.

Q. So if the POSA chose to put the dose counter on the top of the canister, as you just testified they would have done in 2009 to 2010, would the POSA have arrived at the invention of the '289 and the '587 patents?

A. No.

Q. I am going to ask you to make another assumption now.

I understand the opinion you just offered that the POSA, who chose to make a dose counter, would have chosen to put it on top of the canister in 2009 to 2010.

Again, same idea. For the remainder of your testimony on obviousness about the common plane patents, I need you to assume that that was wrong, that you are wrong about that and I need you to assume contrary to your opinion that the POSA would have chosen to take a dose counter and put it inside such that there is an actuation member, at least a portion thereof, located in the canister housing.

Do you understand?

A. Yes, I do.

Q. Can you make that assumption as we go forward?

A. Yes, I can.

Q. So moving forward through the design choices, if the POSA in 2009 and 2010 chose to make a counter and chose to put it in

the inhaler body such that at least a portion of its actuation member was located in the canister housing, would the POSA next have faced a choice about whether or not to attach that dose counter to the canister?

A. Yes, absolutely. Absolutely, yes.

Q. And in the 2009 to 2010 time frame, were there any marketed MDIs with dose counters on the market?

A. There was one.

Q. Which one was that?

A. Well, it was the Seretide. It's purple, 2004. It was the first on the market.

Q. Who makes that one?

A. GSK.

Q. In that marketed Seretide MDI inhaler, are -- where is the dose counter located?

A. The dose counter is located underneath the metered dose inhaler --

Q. And is it --

A. -- underneath the canister.

It's inside the housing, and it's mounted underneath the canister.

Q. And you said mounted underneath the canister.

I'm not sure if that answers the question, but let me ask it to make sure.

In Seretide, is the dose counter physically attached to

 the canister?

A. Yes, it is.

So it's, essentially, clamped. So when you have the metered dose -- when you have the canister, you don't really see the valve because the dose counter is clamped, and it's physically -- it's physically very difficult to remove. I think I possibly removed one once, but it's not something that you can separate. A patient isn't going to separate it. It's clamped. It's really clamped.

Q. And would the presence of a marketed MDI with a dose counter inside the body but affixed to the canister, would that have influenced the skilled person, the POSA's decision about this design choice, whether or not to affix their counter to the canister or to let the canister move relative to the dose counter?

A. Yes. Yes, it would.

Q. And, again, rewinding back to yesterday's testimony, did you ever hear Mr. Anderson testify that the POSA would have preferred to use a dose counter that is movable relative to the canister, rather than affix it to the canister?

A. No.

Q. And in your opinion and the 2009 to 2010 time frame, would the POSA, who chose -- again, contrary to your earlier testimony -- to put the dose counter with the actuation member at least partially inside the canister, would that POSA have

chosen to affix the counter to the canister or to let the canister move relative to the dose counter?

A. You have to affix it. You have to fix the dose counter to the canister.

Q. Can we take a look at Claim 2 of the '289 patents. That's going to be JTX -- thank you -- so this is JTX-003 at Claim 2.

So the inhaler, as claimed in Claim 1, wherein the medicament canister is movable relative to the dose counter.

In that GSK device or, for example, when I asked you whether you would prefer to affix -- excuse me -- whether the POSA would have affixed or allowed the canister to move, how does that relate to the language of Claim 2?

A. Claim 2 relies -- or is a claim wherein the medicament canister is movable relative to the dose counter. So that's completely different.

Q. And I won't take time by putting it up, but do you recall whether Claim 2 of the '587 has the same requirement?

A. Yes, it does.

Q. So if the POSA in 2009 to 2010 chose to affix the counter to the canister, as you've testified they would have done, would the POSA have arrived at the invention of Claim 2 of the '289 and '587 patents?

A. No.

Q. Can we now pull up a portion of Mr. Anderson's validity testimony from yesterday. That's going to be at page 271 of

 off, and I think where that was, was that I had explained I understood your testimony that the POSA would not have selected the dose counter of the '406 publication.

I had just asked you to make that assumption again that for the rest of our discussion regarding the common plane patents and Mr. Anderson's obviousness theory, that your opinion is wrong and that the POSA would, instead, have used the dose counter of the '406 publication as Mr. Anderson assumes.

Okay?

A. Okay. I understand.

Q. And can you apply that assumption?

A. Yes, I will.

Q. Okay.

Can we put up DDX-3.23.

Dr. Lewis, this will appear on the screen.

Do you recall Mr. Anderson testifying about this demonstrative yesterday?

A. Yes.

Q. Let me ask a slightly different question than the one I heard him ask, which is: If the POSA had selected the dose counter of the '406 publication -- again, contrary to your earlier testimony -- what inhaler body would the POSA have chosen to use with the dose counter of the '406 publication?

A. The POSA would have used the inhaler body explained in the

'406 publication.

Q. So would the POSA have imported features from a different inhaler body for use in the '406 -- in the '406 inhaler body with the '406 dose counter?

A. No.

Q. Why not?

A. The '406 publication at no point says there's a problem with the design. In fact, the design is, for this formation of components, the valve, the canister, the dose counter.

It doesn't need -- this looks like it's going to work.

There is no reason to make any changes to this.

Q. Okay. And maybe I will ask a more general question.

Would the skilled person seeking to design a pharmaceutical device ever make a change if they didn't have to?

A. No, not at all.

And specifically if I was using the '406, I would use the can, the valve, and the housing and I'd use the specific parts as designed with this inhaler.

Q. And what is the reason for not wanting to make changes if you don't have to?

A. If you make a change, you are going to bring in a risk. If you do that, it's going to cost time and money and you may fail.

All of those reasons are bad. And if this patent gives

me a solution, I'm going to follow it.

Q. So let me make sure I understand your testimony up to this point.

Would you have selected the '406 publication if you were seeking to design or to comply with the FDA guidance?

A. No, I wouldn't.

Q. But if you had selected the '406 publication contrary to that earlier testimony, that's the assumed that you are wrong part.

Right?

What modifications, if any, would you make to the '406 inhaler body?

A. None.

Q. So is that what you mean by I would follow the '406 if I got to that point?

A. Yes. Yes.

Q. And let me ask this question:

Did you ever hear Mr. Anderson say -- actually, strike that. Let me ask a better question.

Does the unmodified '406 inhaler body have any inner wall canister support formations?

A. No.

Q. Okay. So does the unmodified inhaler of the '406 publication, so that's -- to be clear, that is the inhaler body and the dose counter as disclosed in the '406 publication, does

that meet the common plane limitation?

A. No.

Q. Did you hear any testimony yesterday from Mr. Anderson to the contrary?

A. No, I didn't.

Q. And did you ever hear Mr. Anderson say that if the POSA used the unmodified inhaler body of the '406, that the POSA would have arrived at the asserted claims of the '289 and '587 patent?

A. No.

Q. Again, did you ever hear Mr. Anderson ask -- let me strike that.

Let's take a look at DDX-3.28.

Do you recall that Mr. Anderson testified with respect to this demonstrative yesterday?

A. Yes.

Q. And do you recall that Mr. Anderson testified that these are reasons to use an inhaler body with rails?

A. Yes, I did.

Q. Let me ask this:

If the POSA were using the inhaler body of the '406 publication with the dose counter of the '406 publication, would the POSA have chosen in 2009 to 2010 to add rails to that combination, to the '406 publication?

A. No. There is no reason to.

Q. So were there, in fact, in 2009 to 2010 marketed metered dose inhalers that did not use rails?

A. Yes. Yes, I was working and developing those types of inhalers.

Q. And so do you agree with Mr. Anderson that rails were essentially ubiquitously used in MDIs in 2009 to 2010?

A. No.

Q. And on this slide, Mr. Anderson provided eight reasons to solve various problems, including guiding the inhaler or preventing gassing, preventing rocking.

Any indication whatsoever in the '406 publication that those were problems?

A. There is no indication at all, no.

Q. So would the skilled person reading the '406 inhaler body in combination with the '406 dose counter have thought or expected to experience any of the problems listed on this slide?

A. No.

Q. Am I right then -- I want to, you know, switch gears now and ask you to make another assumption, but before I do I want to make sure we're clear.

Am I correct to understand it's your testimony that the POSA would not have had a reason to add rails to the '406 publication?

A. There would be no reason at all.

Q. Now I want you to assume for the rest of our discussion again that that's wrong.

I want you to assume that you are wrong and that the POSA would have chosen to add rails to the '406 publication.

Can you apply that assumption for me?

A. Yes, I can do that.

Q. So if the POSA in 2009 to 2010 chose to make a dose counter and chose to locate it such that an inner -- strike that and try again.

The POSA in 2009 and 2010 chose to make a counter and chose to locate it such that the actuation member of the dose counter at least a portion of it extended into the canister housing -- excuse me -- I apologize. It's taking me a minute to get this one out. Let's try that again.

If the POSA in 2009 to 2010 chose to make a counter and chose to locate that counter on the metered dose inhaler body such that at least a portion of the actuation member of the dose counter extended into the canister housing, and chose to use the '406 publication and chose to add rails to it, would the next choice for the POSA be about the size, the shape, the location and configuration of rails to use?

A. Yes. Yes.

Q. Okay. So can we pull up DDX-3.26.

Do you recall this slide from Mr. Anderson's testimony yesterday?

 A. Yes, I do.

Q. And do these references reflect rails or inner wall canister support formations in different numbers, shapes, sizes and arrangements?

A. Yes.

Q. Is there any reason that the POSA, who, again, contrary to your testimony, chose to add rails to the '406 publication, would have selected any particular size, shape, or configuration of rails?

A. No.

Q. Did you hear Mr. Anderson offer any explanation?

A. No.

Q. More specifically, do you recall that Mr. Anderson testified that the POSA would not have selected just any rail configuration, but would have selected specifically the rail configuration shown in the '514 publication?

A. Yes, I did.

Q. Now, in your opinion, is there any reason the POSA would have selected out of the sea of possible rail configurations the particular arrangement of rails showed in the '514 inhaler body?

A. No, not at all.

Q. Let's pull up DDX-3.29. Actually before we do that, can I go back and ask to see DDX-3.28.

So I just asked you, Dr. Lewis, whether there was any

reason, whether in 2009, 2010, the POSA would have had a reason to select a particular configuration of support rails used in the '514 publication.

What was your answer?

A. There was no reason.

Q. Okay. The reasons, the motivations that Mr. Anderson suggests on this slide, are any of those motivations to choose -- let me ask a better question.

Did he testify that any of these are motivations to choose the particular configuration of support rails disclosed in the '514 publication?

A. No.

Q. So are these generic motivations or are they specific to the '514?

A. These are...

Q. Let me see if I can ask a better question.

Did Mr. Anderson address these motivations as generic motivations to add rails or did he testify that these are specifically the reason you would have selected the rails of the '514 publication?

A. Yes.

So these are specific to the '514 publication and why that was selected. Yes.

Q. And do you recall him testifying that the connection between these motivations and the particular configuration of

One second.

THE COURT: Take your time, Counsel.

MS. KAYALI: Thank you.

Can we turn to DDX-3.29.

BY MS. KAYALI:

Q. In your opinion, Dr. Lewis, would the POSA have selected the particular arrangement of the rails of the '514 publication to insert into the inhaler body of the '406 using the dose counter of the '406?

A. No, definitely not.

Q. Why not?

A. Well, they -- in the first instance, you can't take one device to another and combine it.

In the second instance, we don't know if they are going to fit. The design is particular to the particular invention of the '514 and it's probably not what you would take away.

Q. Okay. So let's try and break those reasons down. I think the first thing I heard was it wouldn't fit?

A. Yes.

Q. Do you have a pointer with you?

A. Yes, I do.

Q. Can you explain to the Court why it is you say it wouldn't fit if you combined the rails from the '514 publication into the inhaler body of the '406 publication?

A. Yes.

When you start putting rails into an inhaler body, you must consider the canister, the valve that's actually you're using. And in this particular case, we've got some very wide size here, which actually have a specific task. And they are going to be in the way.

So you are not going to, even if it was the right size, then that's not going to work.

Q. So what do you mean they are probably going to get in the way?

Get in the way of what?

A. Well, they are going to get in the way of the movement of the canister and they are going to get in the way of the air stream. You don't know what's going to happen here. They are quite -- yes.

Q. Again, I apologize for summarizing your testimony, but there was some this's and that's in there.

I want to understand for the record.

If you move the rails of Figure 8A from the '514 publication, do those rails get in the way of the canister and dose counter setup in the '406?

A. Yes, they will.

Q. And is there any feature in the rails of the '514 publication that's configured to work with a specific type of dose counter?

A. Yes.

Q. What feature is that? Could you use the pointer again to illustrate?

A. So, these features here are designed to interact specifically with the dose counter indicator on that design.

Q. If I look at -- I think it's reversed so it is a little hard to see and that's the number 27 in reverse is circled on the right-hand side.

Do you see that?

A. Yes, I do.

Q. Is that pointing to one rib in the '514 publication?

A. Yes, it is.

Q. And that red highlighting comes down part of the way, but then there is a bumpout in the rib and it becomes white.

Do you see that?

A. Yes.

Q. Does that rib continue from the red all the way down into the white?

A. No.

Q. How can you tell?

A. It's not drawn on. But here -- yeah, I mean, this effectively would extend, and it would be in the way.

Q. So I think what might be confusing is that the red coloring stops.

What I'm trying to understand, is there a portion of the rib, rib 27, that sticks out into the inhaler body such that

when you push down on the canister, the rib contacts a piece of the dose counter?

A. Yes, it is. Yes.

Q. And is that part of the rib, the thing that's white underneath the red that's colored in?

A. Yes.

Q. So is that white piece actually part of the rib?

A. Yes.

Q. So it's just not colored white -- excuse me.

That's not just colored red on the slide because that's the piece that would get in the way if you moved it into the '406?

A. Yes. Absolutely. It would get in the way of a number of things.

Q. But if the POSA decided to take the ribs from the '514, would the POSA have taken the whole rib or only the part that the defendants colored red?

A. If they taken the ribs and they place them in there and they fit it in the first instance, once you start putting the valve canister in there, it's not going to fit. And I think that's -- yeah, you can't mix and match things.

Q. If I look at the '514 publication more generally, is the '514 publication -- have you reviewed that in full, not just Figure 8A?

A. Yes, I have.

Yes.

Q. And what, in essence, is the '514 publication about?

A. The '514 publications is about -- it is, again, the same motivation in that you are fixing the dose -- the counter dose indicator to the canister.

So once that's fixed and on and around the canister, it's not going to move. So once it starts to move, it then will bump into a wall feature. And then every time it moves, it will then make the dose counter -- dose indicator move on.

That's the objective.

Q. So I heard a couple things there.

First of all, is this consistent with a particular marketed dose counter we talked about earlier?

A. Yes, it is.

Yes.

Q. Which one was that?

A. So that would be very consistent with the one that went on to the market in 2004 where, again, you fix the dose counter to the valve canister. So it's a similar idea around a similar time.

Q. Before we go to the next slide here, fundamentally, if I looked to the essence of the '514 publication, is it about ribs or is it about affixing dose counters to canisters?

A. It's all about fixing the dose counter to the canister.

In fact, it talks about fixing within the patent an

awful lot of times. It repeats it again and again.

It's very much about solving that problem.

Q. And so if the POSA, again, plucked the '514 publication out of the sea of prior art, and said I'm going to take something from this publication and put it in my inhaler, would the POSA have looked at this publication for the ribs or to affix the dose counter to the canister?

A. No, no.

Again, it's another great idea. Fix it to the canister and now as that canister moves, we now have something fixed around the middle, which is now -- when you move it up and down, move the counter or the indicator on every time you press it.

So they take away the fact that you are going to fix the dose counter to the canister.

Q. And the rib that's in the '514 publication, that bumpout that again is colored white instead of red, even though I think we agreed it is part of the rib, does that white piece, is that especially designed to work with that affixed dose counter?

A. Yes, it is. Absolutely. Yes. There is a feature on the dose counter that will then meet with that feature to cause the count.

Q. And if you then took those ribs -- sorry, took the '514 publication and combined it with the '406 publication in a manner that like the '406 publication uses a dose counter

that's movable relative to the canister, would you be embracing or disregarding the fundamental teaching of the '514 publication?

A. Yeah. You will be completely disregarding the teachings of the '514 completely.

Q. Would the POSA have done that?

A. No. No. They would have looked at the '514 and thought that's a pretty neat idea.

Q. Let's quickly take a look at JTX-007.

I believe it's the page ending with Bates 392.

Thank you.

So, Dr. Lewis, do you recognize this as part of the file history from the '289 patent?

A. Yes, I do.

Q. Do you see at the very top there, Cite Number 5, Document Number 03101514?

A. Yes.

Q. Is that the '514 publication?

A. That's the '514 publication, yes.

Q. Do you see below that foreign patent bubble here, an excerpt that the examiner has initialed and added a date considered for this?

A. Yes, I do.

Q. Below it, it says, "Examiner, please initial if you considered the prior art."

In 2015, yes. Absolutely.

Q. Almost to the end of our design step procedure, I have to ask you to make another assumption.

If the POSA decided to make a dose counter instead of a dose indicator, the POSA decided to locate the dose counter such that the actuation member of the dose counter was at least partially located in the canister housing and then if the POSA decided not to affix the canister and if the POSA, excuse me, decided to then select the '406 publication, and then the POSA decided to add rails, and then the POSA decided to pick those rails from the '514 publication, would the addition of those rails necessarily result in achieving the common plane limitation of the '289 and '587 patents?

A. No. Absolutely not.

Q. Well, I think I heard Mr. Anderson testify that there are four evenly spaced rails in Figure 8A of the '514 publication -- and setting aside any dispute whether there are two or four -- how many ways are there to put four evenly spaced rails in an inhaler body?

A. Well, you can put them pretty much anywhere.

So certainly back in that period, there were rails being included, but there was no format. Each set of rails would be put into a different place by different inhaler manufacturers if they were included.

Q. And is there any teaching anywhere in the art that

Mr. Anderson has identified or that you've seen to arrange support rails in a particular location relative to components of the dose counter?

A. Absolutely not.

As I highlighted, I worked with a number of inhalers and developed inhalers and worked with companies with and without rails.

No, there was no format.

Q. And does the prior art ever disclose or suggest to the POSA that there is a reason to arrange rails in order to reduce the rocking of the canister and improve counter accuracy?

A. No. Not at all. Never.

Q. Had anyone in the art even appreciated that rocking was a problem that related to dose counter accuracy?

A. At that point it was -- no. It was unknown.

Q. So in the absence of understanding this problem, is there any reason the POSA would have aligned support rails in a common plane, the actuation member of any dose counter?

A. No. There would be no reason at all.

Q. And again, if the POSA took the rails of the '514 publication and put them in an inhaler body with the five castellations of the '406 publication, would that necessarily result in the common plane?

A. Absolutely not. No. It could be arranged in any order.

Q. Let's shift gears to the '808.

Dr. Lewis, let's start with DDX-3.18, if we could put that up on the screen.

Thank you.

So do you recall Mr. Anderson speaking about this yesterday?

A. Yes, I do. Yes.

Q. On the left, at least, the label underneath says PTX-372.

Do you understand that -- you and I talked about that.

Do you understand that to be a Cipla schematic of a dose counter?

A. Yes.

Q. Then on the right, what are they showing?

A. That's the -- from the '406 and it's Figure 26.

Q. And can you see, I guess, in there somewhere, the leaf spring of the '406 publication?

A. Yes, I think Mr. Anderson pointed out it was the yellow thing on the right. So possibly in here somewhere. That's Mr. Anderson's testimony from yesterday.

Q. Have you reviewed the '406 publication in full?

A. Yes.

Q. And do you know, based on that review, anything about the force that this leaf spring applies against -- or that acts rather against the movement of the units teeth ring in the '406 publication?

A. No.

Q. Is there anything in the '406 publication that shows the material the spring is made out of?
A. No.
Q. The size of the spring?
A. No.
Q. The scale of the relative components?
A. No. There is not.
Q. Would you need to know any of those things in order to know what the appropriate force for such a spring would be?
A. Yes, the materials above, around, yes.
Q. You were here yesterday.

Did you hear Mr. Anderson indicate at all anything to the contrary?
A. No.
Q. So would this spring in the '406 publication necessarily and always exert a force of greater than 0.3 Newtons?
A. We don't know.
Q. So I believe we also heard some testimony -- let me ask a different question.

Does the optimal force for a regulator depend on many of the things I just asked about?
A. Yes, it does. Absolutely.
Q. Size? Shape? Scale?
A. Yes. Interaction with components, yes.
Q. And are there reasons to choose resistance forces that are

low, for example, below 0.3 Newtons in the context of metered dose inhalers for a regulator?

A. Yes.

Q. What are those reasons?

A. When you are adding to an inhaler, what --

MR. BACHAND: Objection, your Honor. I think this is outside the scope of any of his reports.

MS. KAYALI: Your Honor, we would disagree with that. If you give me a moment, I will point to the paragraph.

In consultation with my colleagues, I think in the interest of time we will just move on.

THE COURT: Okay, Counsel.

BY MS. KAYALI:

Q. Let's move on, in fact, to the '552 publication.

Can we pull up DTX-162.

Could we pull up Figure -- I believe it's Figure 6.

Thank you.

And if we could blow that up.

Thank you.

So, Dr. Lewis, have you reviewed the '552 publication in full?

A. Yes, I have.

Q. And are you familiar with Figure 6?

A. Yes, I am.

Q. And having reviewed Figure 6 in the '552 publication, can

you explain to the Court whether or not the '552 publication discloses a regulator within the meaning of the '808 patent?

A. The Figure 6 does not disclose a regulator as shown in the '808 patent.

Q. And why is that?

A. The features here, which may engage here, there's no definition of how that engages and whether there is an indexing in this patent.

Q. And how does indexing relate to the regulator?

A. So the regulator is to control so that you are going in steps, and this -- so when we count in the doses, we want to go from one to the next. And in this particular patent, the definition of how you do that on the features that you need to do that isn't shown.

Q. And can we turn to Mr. Anderson's reply report on validity at paragraph 79.

MR. BACHAND: Your Honor, we object to her showing a report that's not in evidence.

THE COURT: Sorry.

Let me hear this again.

MR. BACHAND: We object to her showing our expert -- her expert a report that is not in evidence. She is not impeaching him with our expert's own testimony.

MS. KAYALI: I am not trying to impeach my witness at all, your Honor. I am asking him to offer an opinion on the

basis of the opposing expert's opinion. I guess I am not quite --

MR. BACHAND: It's hearsay. He offered an opinion at trial. That's his opinions in this case, not the totality of all the prior art he discussed in his expert report. If they wanted to ask that question, they should have asked it to Mr. Anderson. They shouldn't be bringing something that I am not even sure is on the exhibit list and if it is, we would have objected to it up and show it to their witness right now.

THE COURT: So let me get this straight.

So with regard to -- Counsel, what is it you are looking to ask him about?

MS. KAYALI: So I would like to ask him about a paragraph in Mr. Anderson's report that Mr. Anderson -- in which Mr. Anderson compares Figure 6 of the '552 publication to Figure 15 of the '950 publication, concludes that they are identical. I forget precisely the word used, but that's the import. I don't want to misquote.

MR. BACHAND: Maybe we should have the witness leave the room before she explains what she's going to have him testify to.

THE COURT: That was what I was about to say.

MS. KAYALI: Sure, absolutely.

THE COURT: The document was Mr. Anderson's report.

MS. KAYALI: That's correct, your Honor.

I'm sorry. I did not mean to go through that.

THE COURT: Now you're saying that Mr. Anderson's report is not in evidence.

MR. BACHAND: As far as I know, it is not a marked exhibit and it is not in evidence --

THE COURT: So as far --

MR. BACHAND: -- and it is hearsay.

We would have objected to it if they had tried to offer it into evidence.

THE COURT: The hearsay part I'm less concerned about.

But so the -- what you are posing is that Dr. Lewis is not able to be questioned about the contents of your expert's report.

MR. BACHAND: Your Honor, I think it is inappropriate for them to use the expert report in open court when it is not in evidence and they are not talking about something that Mr. Anderson affirmatively testified to in this case.

MS. KAYALI: Your Honor, he was asked about this document on cross-examination, and he -- I would like to explain the relevance, your Honor, but I'm mindful of your concern that the witness is still here.

THE COURT: Right.

Mine is more so about the document because I thought the document was used at some point --

MS. KAYALI: Very much so.

 THE COURT: -- in the trial to this point.

MS. KAYALI: Yes, your Honor. Absolutely.

It was used on, I believe, my colleague's cross-examination of Mr. Anderson yesterday.

THE COURT: And that's what the Court is just struggling with.

If the document was used yesterday in the course of the trial, why wouldn't it be able to be used today?

MR. BACHAND: Well, your Honor, we objected to its use yesterday. If you are going to overrule that objection and want to overrule this objection, we will, of course, defer to your Honor on that.

We think it is improper to use it, though, because it is improper hearsay, and, certainly, it is one thing to question our expert about something he previously wrote. They're questioning their own expert on that.

I don't see the relevance of that.

MS. KAYALI: If I may briefly respond, your Honor.

I think, A, it has already been used. B, it's extremely relevant to the question at issue at this particular moment, and, C, you know, I don't mean to apply the goose/gander rule excessively, but counsel certainly asked Dr. Lewis about statements in his report and, indeed, demonstratives that we did not use with him.

I'm struggling to understand why Dr. Lewis is not able

to offer an opinion based on a document that's already been shown in Court and that their expert prepared.

MR. BACHAND: Your Honor, I don't believe we asked Dr. Lewis about any of Dr. -- or Mr. Anderson's expert reports specifically or showed him any of Mr. Anderson's expert reports. That's very different than showing somebody their own thing and trying to impeach them with it.

THE COURT: So the subject Dr. -- sorry -- Dr. Lewis, Mr. Anderson.

Mr. Anderson's report that, Counsel, you want to refer to --

MS. KAYALI: Yes, your Honor.

THE COURT: -- has not been formally introduced into evidence.

MS. KAYALI: It has not, your Honor.

THE COURT: However, it was used previously in the course of the trial for what purpose?

MS. KAYALI: For the purpose -- well, again, I would like to explain, but, essentially, to impeach the witness's testimony and to undermine the basis of their validity -- his validity opinion.

THE COURT: So it was used to impeach Mr. Anderson while he was on the stand?

MS. KAYALI: It was. And, again, I'm -- the -- Mr. Anderson offered --

THE COURT: Well, this is just -- the question is just to the use.

MS. KAYALI: Yes, yes. It was --

THE COURT: It was used to impeach Mr. Anderson when he was on the stand?

MS. KAYALI: And demonstrate a flaw in his validity analysis, yes, your Honor.

MR. ADAMS: Your Honor, I was directing Mr. Anderson yesterday. It wasn't used to impeach Mr. Anderson. I recall making the objection at that time, and it was used to get him to testify to something in his report that he had looked at and compared.

It's not in evidence. It wasn't on the exhibit list. It is hearsay. It is an out-of-court statement by Mr. Anderson. So even if we were to use it to impeach Mr. Anderson, it can't be used -- I guess, you could impeach your own expert, but it was used to impeach Mr. Anderson, is there an allegation -- it wasn't even done due to that. It was to illicit testimony.

THE COURT: This was the document that was used for Mr. Anderson, the portion of his report where he had made a comparison between the two documents.

MS. KAYALI: That's --

THE COURT: And it was the one document that had not come up on the direct examination. However, it was some and

substance of his report, which he used as a comparison, which plaintiff's chose to bring up the document that he used as a comparison, which was not part of his testimony but formed a basis for his opinion.

Defense objected to that portion. I overruled the objection because I said if he used it as a portion of his basis for his opinion, I considered it fair game.

Does that characterize what happened yesterday?

MR. GREENBLUM: Yes, your Honor.

THE COURT: What we are choosing to do today is make that same reference to that same document that Mr. Anderson used as a basis of comparison to which the defense had objected to.

MS. KAYALI: That's correct, your Honor.

THE COURT: Now defense's objection is to use it for the basis of impeachment of Mr. Anderson is one purpose but to use it now for this witness to be able to comment and be questioned about it, that is the substance of the objection.

MR. BACHAND: Yes, your Honor.

The documents that they are referring to, I believe, Mr. -- I am not positive about this -- Dr. Lewis might have already addressed this in his reports. Put the documents in front of him, have him go through the documents, have him explain what the purpose and meaning of these documents are. Don't just shorthand it by referring to our expert's expert

report and say explain quickly on a leading question why you disagree with this.

THE COURT: Dr. Lewis would have reviewed Mr. Anderson's report?

MS. KAYALI: Yes. And --

THE COURT: Did he prepare a response or reply in his report?

MS. KAYALI: So the paragraph of the reply report I'm referring to, Dr. Lewis didn't have the opportunity to offer another report in time after that time because this relates to validity. So they had the last report on that.

But, certainly, Dr. Lewis addressed the substance of these references, and -- well, I have to be honest. I fundamentally disagree with defendant's position. I'm happy, instead, to do, I think, what they have just proposed, which is just put up the other document and ask Dr. Lewis to make a comparison and, hopefully, we can just move on.

THE COURT: Is there any objection to that?

MR. BACHAND: Your Honor, as long as it's not Mr. Anderson's report on the screen, I will not be objecting until I see what is happening.

THE COURT: I think we reached an agreement.

MS. KAYALI: I believe so, your Honor.

Can we keep that up on the screen, please, and then can we pull up Figure 15 of the '950 publication. That is DTX-159.

Perhaps, we could blow that up.

BY MS. KAYALI:

Q. Dr. Lewis, do you recognize this image as coming from the '950 publication?

A. Yes, I do.

Q. And, in your opinion, is its disclosure substantially identical, say, for the spring on the left-hand side there, to the disclosure in Figure 6?

A. Yes. Yes, it is.

Q. So just to make the record clear, is Figure 15 of the '950 publication substantially identical to Figure 6 of the '552 publication?

A. Yes, it is. Yes.

Q. In your opinion, does Figure 15 of the -- and the '950 publication in total disclose a regulator?

A. No, it doesn't.

Q. Why not?

A. This was subject of a Court ruling and the points of the Court ruling were that the features of the regulator were not shown in this particular image.

Q. Sorry. When you said this particular image, which image did you mean?

A. In the -- so this is the '512 -- this is the image from the '552 which was the consideration. And this is essentially similar to the '950.

Q. And when you say "was in consideration," do you mean that that's a basis for Mr. Anderson's obviousness theory?

A. Mr. Anderson considered that this showed a regulator and it doesn't.

Q. And can we take a look now at JTX-006. That's the page ending in Bates 222.

MR. BACHAND: Your Honor, we would just like to lodge an objection.

I don't know if they identified JTX-006 as something they would use in the direct, but since what we went through earlier with the expert report, I'll allow it, though.

THE COURT: Okay. But I will note the objection, Counsel.

BY MS. KAYALI:

Q. Can we pull up JTX-006 at 27222.

What does the caption of this case say? What authority was this case before?

A. It says a United States Patent and Trademark Office.

Q. And what body adjudicated this appeal?

A. This is before the Patent Trial and Appeal Board.

Q. And do you understand this to be part of the file history of the '808 patent?

A. Yes, I do.

Q. And if we turn to -- if we turn to the next page, so do you see the frame "rejections"?

A. Yes, I do.

Q. So, Dr. Lewis, does this indicate to you whether or not the PTAB rejected -- excuse me, the PTAB -- let me just strike that.

Let's move on, Dr. Lewis, to a different question.

Can we bring back up the images that we had on screen.

I am sorry. That's Figure 6 of the '552 and Figure 15 of the . . . That would be Figure 6 of DTX-162 and Figure 15 of DTX-159.

My question, Dr. Lewis, is similar to the one I asked with respect to the '406 publication.

You understand the left image, Figure 6, is that the one that Mr. Anderson is relying on to assert invalidity?

A. Yes. Yes.

Q. And you explained to us already why in your opinion it's not a regulator.

Have you reviewed the '552 -- let me ask this:

Is there any disclosure in the '552 publication of a resistance force?

A. No.

Q. Any disclosure of a numerical resistance force?

A. No, there is not.

Q. In your opinion would routine optimization of the force for a regulator, even just assuming that this was a regulator, and I understand it's not your opinion, but if this were a

 regulator, would routine optimization of resistance force lead to a force greater than .3 Newtons?

A. We don't know. We don't know. I mean, it's -- we don't know.

Q. Are there reasons to use small forces in the context of metered dose inhalers?

A. Yes. You're going to want to not add -- you are not going to want to add too much compression to the energy that the patient is going to need to push, but then, you know, you're not going to know where to place that either.

Q. So in your opinion, does the '552 publication render obvious Claim 28 of the '808 patent which requires a regulator that exerts a resistance force of greater than .3 Newtons?

A. No, no, it doesn't show any of the features required and it doesn't tell you what forces are required.

Q. Let's turn very quickly to a wrap-up exercise here.

I need to turn briefly to an opinion you had related to objective indicia of nonobviousness.

As part of your work on this case, did you determine whether in addition to defendant's products, Teva's products Qvar® with dose counter and ProAir® with dose counter, meet every limitation of the asserted claims?

A. Yes, I did.

Q. And what was your conclusion?

A. They meet all asserted claims.

A. Yes, we do.
Q. And a dose by dose counter is much better than a dose indicator.
Correct?
A. If it works, yes, it's fantastic.
Q. And earlier you mentioned the importance of airflow and how important airflow is.
Correct?
A. Yes.
Q. And the '406 publication discusses the importance of airflow.
Correct?
A. Yes.
Q. And if you turn to page 5 of the exhibit, and we can bring up paragraph 009, the '406 publication talks about using first and second counter indicators rotatable about a first and second axis respectively.
Is that right?
A. Yes, that's what it says there in the text.
Q. And you would agree that defendant's product or Cipla's product that you are accusing of infringement includes a first and second counter indicator rotatable about a first and second axis.
Correct?
A. My belief is that the -- what is described in the '406 is

entirely different to the defendant's product.

Q. I understand that, but please stay with my questions.

Okay?

Paragraph 9 states that the dose counter can fit into the available space within the housing with no or only minimal modification in shape and/or size of the housing.

Correct?

A. Yes, that's what it says there.

Q. And it also states: Also, at the same time, the counter, due to its compact size, is less influential on the product performance, e.g. on the airflow of the inhaler.

Correct?

A. Yes. It does say less influential, and I think that's the critical point here.

Any changes -- and over the products I've worked with for a very long time, small changes to clinicians are extremely important because that -- that is potentially fatal and clinicians, if they see any changes whatsoever, I've got 10, 20 years of work to do. So it may say that it's less influential in product performance, but that means there is a lot of development on that product, and Stuart says that -- sorry -- Stuart Adams {sic} says that in his follow-up publication in 2013.

Q. And if we go to paragraph 124 of DTX-116, the '406 patent also states the housing 9 is designed to minimize interference

and obstruction of a medication spray and airflow paths in the actuator housing 68.

Correct?

A. Yes, that's what it says.

Again, and I point out to minimize of influence. So minimize is still a change.

Q. Your counsel will have a chance to ask you questions after I'm done.

Okay?

A. Yes.

Q. Please stick with my question.

Okay?

Now paragraph 124 also states that the dose counter is designed to be usable with a variety of meter and valve designs and to fit compactly within commercially available actuator housing profiles so that it is not necessary to change the external configuration of those actuator housings to accommodate the inventive dose counter 202 therein.

Correct?

A. Yes, it says that.

And I just want to point out that it says -- and this is a very important point I would like to make out, that it had been designed to be used but with a variety of metered-dose valves but the only valve it shows within all of the examples is a Neotechnic 3M Spraymiser valve. As soon as you put a

Bespak valve on or a Aptar valve, '406 no longer works and that's the crux of the matter. This is a different product to your defendant's.

Q. And a skilled artisan would never have been able to make it work.

Right?

A. Very difficult. The design is entirely different.

Q. And they wouldn't even be motivated to try because it's so hard?

A. No.

And, also, the design of the '406 is fantastic. And I -- the problem I could not use this is because I could not use a Neotechnic valve, so this would not be an option for me at that time in life.

Q. The '406 publication is fantastic.

Correct?

A. Because of its use of the Neotechnic valve and its stabilization within the dose counter, it doesn't need stabilization. As it is designed in the '406, it works without stabilization. It's stabilized because of the valve design.

Q. And you think it's so fantastic that no one would ever try to improve it.

Right?

But it's not fantastic enough that they would even look at it and consider changing it?

Q. The '406 publication was not before the examiner during prosecution.

Right?

A. Which prosecution?

Q. The prosecution of any of the patents in suit.

Correct?

A. That's because it uses -- it's -- the design of the '406 is completely different to the defendant's product. And --

Q. Just stick with my question, please.

It was not before the examiner during prosecution.

Correct?

A. The '406 never mentioned -- no, it's not because it never uses any of the claims --

Q. Thank you.

A. -- of the '587.

MR. BACHAND: Your Honor, move to strike everything past the original answer.

THE COURT: So moved.

Try, again, Doctor, understanding that you are going to want to provide some additional detail, but if you can answer yes or no to that degree, please do so.

THE WITNESS: Yes.

BY MR. BACHAND:

Q. Dr. Lewis, you testified that Cipla's dose counter literally satisfies all the limitations of Claim 28 of the

'808 patent during this trial.

Correct?

A. Yes.

Q. And can we bring up DDX-3.18.

And you referenced these slides earlier during your direct.

Correct?

A. Yes.

Q. And, Dr. Lewis, this is a comparison between your infringement opinions on Claim 28 regarding Cipla's device and the '406 publication.

Correct?

A. Correct.

Q. And you agree that Cipla's dose counter and the dose counter on the '406 publication contained the same seven components ordered in the same arrangement.

Correct?

A. No, I don't agree.

Q. What are those differences in the seven components?

A. As highlighted, the components are designed to mate with a different -- a valve that is going to drop into it. So it's a completely different valve. The components will be different, different sizes, different uses.

Q. And both Cipla's device and the '406 publication contain a leaf spring.

Correct?

A. Yes, they both talk about a leaf spring. Yes.

Q. And, in your opinion, in Cipla's device, the leaf spring is the claimed regulator.

Correct?

A. In Cipla's device, yes, it's the claimed regulator.

Yes.

Q. And you also recognize, then, that in the '406 publication the leaf spring would be similarly acting as a regulator even if we don't know what force it's acting on.

Correct?

A. I haven't seen the 3M design. So no, no, I don't agree because I haven't seen that specific design working. I haven't seen the '406 design as it is. I haven't seen it actually working or moving.

Q. You read the '406 publication in detail.

Correct?

A. Yes, I did.

Q. And you understand how it's describing how it works based on that description.

Correct?

A. Yes, I do.

Q. Okay. And that description is the same as how Cipla's device works as far as how the seven components interact.

Correct?

A. Incorrect. No.

Because as I say with the valve type that they are designing, it is a very soft amount of pressure that they are using. So it's difficult --

Q. There is no valve in the dose counter. Is there, Dr. Lewis? I am just on the dose counter.

A. In this picture, no, there is no valve.

Q. Okay. In your opinion, then, the leaf spring, you have no opinion then whether the leaf spring in the '406 publication is a regulator or is not a regulator? You just can't tell because you don't have the physical device.

Correct?

A. Correct. Because of the quite different designs of the '406 and the defendant's patent. Yes, that's quite correct.

Q. And you have no idea even if it did act as a regulator, you have no idea what force would be impacted by that as a regulator.

Correct?

A. It's never discussed in the '406.

Q. Now, if they had the spring, if you had a leaf spring in your hand, you can test what that force would be.

Correct?

A. Yes.

Q. In fact, you did testing in this case about the force of leaf springs.

Right?

A. You can obtain information -- yes, you can obtain information about that specific component.

Yes, I agree.

Q. Did the manufacturers of the leaf spring provide the information about that force?

A. That's not clear in the descriptions.

Q. So you just don't know?

A. I don't have that information.

Q. A skilled artisan would be able to calculate the force just like you calculated it back in 2009.

Correct?

A. Yes, they could have done.

Q. Mitch, can we bring up some slides from Dr. Lewis' infringement opinions. I would like to start with PDX-2-092. I'm bringing these up just to really understand what you believe is missing from the '406 publication as it comes to the '808 regulator patent.

Okay?

So PDX-2-092.

Can we also bring up Figure 21 of the '406 publication?

Dr. Lewis, you agree that the dose counters shown in Figure 21 of the '406 publication looks a lot like Cipla's dose counter.

Correct?

A. There are similarities, yes.

Q. If we can bring up -- and you agree both of them are a dose counter, right? There a dose counter in the product and this is a patent describing a dose counter.

Right?

A. It's a patent describing a dose counter. There are some components inverted in different sizes as already highlighted.

Q. Thank you.

If we can bring up PDX-2-093 and we can keep the Figure 21 up, too.

Dr. Lewis, the '406 publication in Cipla's product both include a units display ring.

Correct?

A. They both include a units display ring.

Q. So based on your understanding, they both include a counter display arranged to indicate dosage information as recited in the '808 patent.

Correct?

A. There are components that look similar.

Q. Okay.

If we can go -- Mitch, if it's possible to bring up PDX-2-094. We can keep Figure 21 up, please.

Dr. Lewis, this again show s that both the '406 pub lication and Cipla's ANDA product include a unit's display ring and a tens cone.

that.

Q. I am asking you as putting your place as a skilled artisan, a skill artisan that thinks Cipla infringes, would a skilled artisan looking at this publication in 2009 believe that it was possible or likely that that leaf spring is a regulator as that term has been agreed to in this case?

A. I don't think they can because you are looking for a specific movement of a specific indexing. So we're looking for a specific movement which is only moving from A to B, not in between. And how that is designed is not obvious.

Q. Okay. So even though they work the same exact way as described -- Cipla's device works the same exact way as described in the '406 publication, a skilled artisan would be like I don't know if that's a regulator, I would need to test it?

A. As highlighted, the design is, although there are similarities and it looks the same, the actual physical design as given in the embodiment, the five embodiments in the '406 are very, very different and as also highlighted, I don't know the movement and the distances between these parts.

I do have the opportunity to evaluate the defendant's product. I don't have the ability to evaluate the '406 because I can't actually physically touch it.

Q. Let's pivot to the '552 publication or patent.

I believe it is a publication.

Thank you. Let's bring that up.

Dr. Lewis, it is your opinion that the '552 publication does not disclose a regulator.

Correct?

A. Yes.

Q. Now, you did not offer any opinions that any other structure is missing from the '552 publication that is necessary to satisfy Claim 1 of the '808 publication.

Correct? I am sorry.

Let me repeat the question, your Honor. It was terrible.

You did not offer any opinions that any other structure is missing from the '552 publication that is necessary to satisfy Claim 1 of the '808 patent.

Did you?

A. The -- as with the other items, there is -- the specific problems have not been solved at this point.

Q. And for Claim 1 the only thing that's missing, though, is the regulator in your opinion?

A. Yes.

Q. Now, let's --

A. Not entirely. I mean, there are parts missing, yes.

Q. Now, what other parts beside the regulator? I'm talking about Claim 1, not Claim 28 with the force limitation. Actually, strike that. I will move on, your Honor.

Q. You would agree that one skilled in the art would know that you need enough force on a regulator to keep the tape from unraveling.

Correct?

A. You wouldn't know that.

Q. You wouldn't know that at that time is what you're saying?

A. Certainly, yes.

Q. If you did know that, you would be able to experimentally determine what force would be required.

Right?

A. That sounds like, as I say, quite a task to do.

Q. Quite a task to do, you think.

Right?

A. I think it's possibly a very difficult task to do at that period in time.

Q. Now that the inventors of '808 publication -- patent, they performed that test.

Correct? They figured out what the force was.

A. That team is quite skilled and, yes, they spent a lot of effort. We heard the testimony. It's, yeah.

Q. Yes, the patent doesn't actually tell you how they figured that number out.

Right?

A. The value is given and that would be supported by data.

Q. It might be supported by data, but that data is not in the

patent, correct, the data underlying that?

A. It's appropriate to give a region where a preferred force is given. That gives you some context to the invention.

Q. Exactly. A skilled artisan reading that disclosure would say, okay, I understand this .3, I can test for that. That's easy. They don't need to be told to test.

Correct.

A. Well, I think that's -- it's an extremely difficult test, as you highlighted before with the drop test. You are dealing with not only trying to get this to fire and function, but also to, as you point out, not unravel, which you don't know is going to happen.

You are also trying to get this to move one indexer at a time. And if -- as we talked about the drop test, if you drop it, what happens? And what side, which way?

So to actually then work out how to do that and come up with specific numbers which are relevant, that's very difficult.

Yes.

Q. So a skilled artisan reading the '808 patent would not be able to determine whether or not the device they are making is above or below .3 Newtons because they wouldn't be able to figure out what test to run.

Right?

A. At what year are we talking?

different problem. It is a much, much easier problem to solve, and, certainly, it was solved in 1965.

Q. Yeah.

And, of course, the last sentence you say, The updated design remains an important feature of present actuators.

That's 2007. You say that updated design that includes these four equally spaced ribs, that remains an important feature in the present actuators.

Correct?

A. The additional support, yes, to make sure that, yes, metered-dose inhalers have the inner wall and they have the housing around it.

There are plenty of inhalers, as I have designed as well as others, that don't necessarily use the ribs, but it's an important design.

Yes. You need to keep the airflow through, exactly, yes.

Q. The ribs help airflow.

Right?

A. They don't help airflow. They impede airflow, and they change how the airflow occurs. You have to be careful how you put them. So if you can leave them out, as in a number of products that I worked with, then you leave them out.

Q. But your article says this modification introduced four equally spaced ribs to locate -- locate the container and

provide an annular passageway to draw air using the mouthpiece.

Correct?

A. Yes.

These are ribs for the purpose of making sure there is a space in the middle for if you made it too tight. So it was just the actual cylinder arising going around the canister. The canister wouldn't move. So there's an element of ensuring that you've got some space.

Q. Right.

A. So it's more actually adding space and ability. If you made it too tight, then it doesn't move. So they have kind of added the ability to -- so it is almost the opposite of what you're implying.

Q. Now, when you said that the updated design remains an important feature of present actuators, you also meant the ribs, right, the entirety of the design that you are talking about in this paragraph.

Right?

A. Sorry. Can you say that again?

Q. I said when you state in the last sentence that the updated design remains an important feature of the present actuators, that important design in 2007 included the four equally spaced ribs to locate the container and provide an annular passageway to draw air using the mouthpiece.

Correct?

A. No.

What I'm pointing out here is the additional support and with, certainly, the first product of Ventolin, which was a HFA version, they introduced some very good support and it was a support that's important. If you don't have the support -- as I say, I worked with a number of formulations where I don't have the ribs, but I must have the support. So the additional support, yeah.

And it's also, obviously, important to have the actual movement of the stem. That's very critical, yes, to ensure that the dose fires and the medication is delivered to the patient successfully.

Q. In the paragraph, you reference 101.

Correct?

A. Yes, I do.

Q. And let's go to the back and look at what reference 101 is.

It is a patent from 1965 by Riker Laboratories.

Correct?

A. Correct. That's the invention of the metered-dose inhaler.

Q. Correct.

And that was made by Riker Laboratories, at some point was acquired by --

A. 3M.

A. It depends. You are adding extra force. So you need to be mindful of the amount that you can.

So in this case if you're trying to stop it moving 5 millimeters, yeah, drop it in so that it stops that 5-millimeter movement. That will stop the stem.

So certainly in 1965 it was a different consideration, a different design quite course, if you like. Quite crude.

Q. Quite crude. You did refer to it as an important part of design in 2007 and still in 2007.

Right?

A. Yeah. My point was that the inhaler is very difficult to change its design. It took that long before anyone even added a support to stop it leaking in the pocket. And then it takes a long time for an inhaler to actually be developed to its next physical evolution, if you like.

Q. Dr. Lewis, before the alleged invention, a conventional pressurized dose inhaler consisted of a body portion of an actuator into which a pressurized canister containing a medicinal aerosol solution formulation may be inserted and located by means of ribs.

Correct?

A. Yes. May be inserted. Yes.

Q. In fact, if you take out DTX-223 -- if we bring up DTX-223, it is in your binder, if you would like to look at it. We can bring it up.

Dr. Lewis, this is a U.S. patent publication listing you as an inventor.

Correct?

A. Yes. Absolutely. Yes.

Q. And the publication date on this publication is September 25, 2003.

Correct?

A. Correct.

Q. So this would be in the prior art.

Correct?

A. Yes, it should be in the prior -- yes, it is in the prior art.

Q. Please turn to page 7 of the pdf. Let's go to paragraph 26.

You actually told the PTO that it was conventional, too, right, that using ribs to locate the canister was conventional.

Right?

A. Certainly location of the canister is conventional. That's the same as the 1965 design. Yes.

Q. And just because there is ribs doesn't mean it will prevent rocking.

Right?

A. It depends on the valve type. With some valve types during that period even with some actuators, it wouldn't actually function. In fact the defendant's products contains

Bespak design. There were also other versions out there by Aptar and Valois that we've heard about. Valois, V-o -- V-a-l-o-i-s.

It takes a lot of effort to use a particular valve and get it to deliver medication. In some cases, the support ribs even though -- the function is just to get them to fire the medicine. And that, I know it sounds trivial, but during this period of time there were a lot of formulations that didn't function even on that side of things.

So to go ahead and to then start thinking about fractions of a millimeter, when we were having difficulty with quite large movements. It was a completely different problem to get the can into the inhaler body and then to get as they described, the gaskets around the stem not to deform so that you end up with a consistent amount of drug.

So that was really quite difficult to do. So then to take it on further and then say we're only going to fire in this few millimeter or fractions of a millimeter, that's beyond the technology there, yes, but here it's very important and I highlight because I know it's important because otherwise my drug delivery won't work. I'm not thinking any way about trying to get it to function such -- precisely as required for a dose counter. That's really hard.

Q. Dr. Lewis, I would like to bring up a couple images from the '406 publication and an image from the publication of '512

that discloses the ribs.

Okay?

Mitch, can you bring up Figure 2A from DTX-165. It is on page 39 of the pdf.

Dr. Lewis, you'll agree -- that Figure 2A is in the '512 publication -- or I'm sorry. Dr. Lewis, you would agree that Figure 2A is in the '514 publication.

Correct?

A. Yes.

Q. You would agree that Figure 24 and Figure 27 are from the '406 publication.

Correct?

A. 24 and 27 are from embodiment 3 of the '406 publication.

Q. And you agree that a skilled artisan added four equally spaced ribs to the inhaler body of the '406 publication. Then one of those ribs, one of the castellations of the dose counter indexer and the central outlet port would lie in a common plane.

Correct?

A. Sorry. My pointer -- I lost the back to the pointer. Sorry.

Q. Okay?

THE COURT: Do you want to --

THE WITNESS: Can you please repeat that.

I did --

BY MR. BACHAND:

Q. Do you want me to repeat the question?

A. I did want to illustrate, but my pointer, the battery seems to have disappeared. I must have flicked it somewhere.

Q. So is your answer you don't agree?

A. I need to hear the question. I apologize.

THE COURT: Let's take a quick pause.

Is there another pointer, Counsel?

MS. KAYALI: If I could address the technological issue.

THE COURT: With the pointer.

MS. KAYALI: Yes. I suspect the reason is simply because it is connected to plaintiff's presentation and this is defendant's presentation.

THE COURT: So, Doctor.

THE WITNESS: I can come and point.

THE COURT: If you want to illustrate something, you can stand up by the television monitor and point it out.

THE WITNESS: Thank you. Can you repeat the question.

BY MR. BACHAND:

Q. You agree that if one of the skill in the art added the four equally spaced ribs shown in Figure 2.9 of the '514 publication to the inhaler body of the '406 publication, then one of those ribs, one of the castellations of the dose counter, the actuation member as you call it, and the central

outlet port would lie in a common plane.

Correct?

A. Can I approach the screen?

Q. I would like an answer to my question before you start summarizing.

A. I wouldn't at the ribs.

Q. That's not my question.

My question is if you added the four equally spaced ribs to the inhaler body of the '406 publication in the way they are structured in Figure 2A, one in the front, one in the back, two on each side just like they have been doing it since 1965, okay, then one of those ribs, one of the castellations of the dose counter indexer and the central outlet port would lie in a common plane.

Correct?

A. My answer is based on the fact if you see --

Q. First yes or no. And then you can proceed.

A. I wouldn't do that.

MR. GREENBLUM: Can he answer the question.

THE COURT: Doctor, yes, if we could try and answer the question first.

If you are unable to answer it yes or no, state so just so we can know if there is a yes-or-no answer initially.

THE WITNESS: If I -- no, because of several reasons.

BY MR. BACHAND:

Q. Okay. You can go sit down, Dr. Lewis, if you would like. Okay.

A. Okay.

Q. Dr. Lewis, once you are back sitting down, I'll ask you in Figure 27 you agree that this is a rear-facing dose counter.

Correct? It faces through the back?

A. Yes.

Q. And this here shows the dose counter, right, where the numbers count down?

A. It shows embodiment 3 from '406, yes.

Q. And you will see that that lines up where the dose counter is with that castellation.

Correct?

A. That dose counter castellation lines up with that value, yes.

Q. And, of course, right here in the middle in Figure 2A you also have a back rib.

Right?

A. The -- as I say, with the relevance of -- because the ferrule of that valve is sitting on the dose counter, it doesn't need any more support.

Q. Stay with my question. We are adding the rib. We're suspending disbelief just like your counsel asked you to that someone does put this in, they do add the rib.

You agree if they did add the rib where Figure 2A tells

you, where since 1965 they have been putting them, it would be in a common plane with this castellation, the center of this aperture.

Correct?

A. No. For the very reason, you've highlighted this is free and designing it, we need -- they already put a lot of material in there. They don't want to put any more in there. And also they don't want to obstruct the movement of that canister which is sitting on the dose counter, the dose counter moves with the canister. If you look when you push this, it is going to move down. If you put the rib in, it's not going to work.

Q. Yet it works in Cipla's device according to what you say?

A. No --

Q. Having that rib still works?

A. No, because Cipla's device is suspended on a stem. This is actually touching the dose counter. If you look at Figure 27, the top of the ferrule, the MDI's in touching, it is doing exactly the same as the rest is teaching. It is already in contact. If you look at Figure 27, it's in contact with the dose counter. It's already stabilized. Figure 3 is the same. It fits inside. It has no requirement. If you add that extra rib all you are doing is adding to the downsides of this design poor airflow, restriction of drug delivery. It's not a good idea. I would never do it, but it is a good design.

Q. I understand. It is a great design. Good design?

 A. Did it work, I don't know.

MR. BACHAND: Your Honor, I'm going to ask him one more time to answer the question for me and then I will give up if he refuses to answer it.

Again, I want you to assume, Dr. Lewis, as your counsel did, they actually added the rib. Even though I understand completely you do not think anybody would ever add that rib.

THE WITNESS: I understand.

BY MR. BACHAND:

Q. If they did add the rib, you would agree the rib, the castellation, the center outlet port would be in a common plane.

Correct?

A. We don't know because, again, this is a completely different design, a completely different valve. It's just not -- it doesn't -- it makes no sense to add it for the reasons I said.

If you did put those together, it's a different scale as Mr. Anderson testified. It could be bigger. It could be smaller. We just don't know. I don't know.

Q. You just don't know if you put a rib in the middle of the housing back here, as shown here, where you have the dose counter facing the middle, that the rib, the indexer and the center wouldn't line up on a common plane?

A. It wouldn't be an indexer if it's not going to function.

It doesn't -- none of this is going to work.

Q. It wouldn't be an indexer?

A. I don't -- I can't see this working.

Q. That's an actuation member in Cipla's device?

A. Yes, it is an actuation -- well, what's the question?

Q. You agree that if one skilled in the art added the four equally spaced ribs as shown in Figure 2.a to the inhaler body of the '406 publication showing Figure 27, a rib, a castellation, which you think is an actuation member because it triggers the count, and the center outlet port would all be in a common plane, a straight line.

Correct?

A. I believe someone skilled in the art wouldn't do that because it wouldn't work and the design, as I've highlighted, is very -- the design is great, but I don't know it works, and I don't know what happens if I put that rib in there. A person skilled in the art wouldn't put the rib there.

Q. I am asking you to assume they do. They are in a common plane.

Correct?

A. I don't think you get the can in.

MR. BACHAND: Your Honor, I think you understand the point.

I will pass the witness.

THE COURT: Understood.

and then we can go straight through until 5:00.

MR. GREENBLUM: If that would suit the Court.

THE COURT: The Court was anticipating 3:30 and then we would go straight through. It is 3:15. We could come back at 3:30?

MR. GREENBLUM: Sure.

THE COURT: Does that leave enough time?

MR. GREENBLUM: I think it is going to be pretty tight.

THE COURT: It we have to go a little past 5:00, we can go a little past 5:00.

MR. GREENBLUM: Understood, your Honor.

We will see you back at 3:30.

THE COURTROOM DEPUTY: All rise.

(Recess taken at 3:16 p.m. to 3:31 p.m.)

THE COURTROOM DEPUTY: All rise.

THE COURT: Thank you all. Please be seated.

I believe we are at the proverbial home stretch.

MR. LEYVA: That's right.

THE COURT: Counsel.

MR. LEYVA: Good afternoon, your Honor. I'm Ricardo Leyva from Williams and Connolly. As its final witness, Teva calls Dr. Reynold Panettieri.

(**REYNOLD PANETTIERI, MD**, PLAINTIFF WITNESS, having been duly sworn, testified as follows:)



8079874

# THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

*January 25, 2021*

**THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF THE FILE WRAPPER AND CONTENTS OF:**

**APPLICATION NUMBER:** ***15/269,249***
**FILING DATE:** ***September 19, 2016***
**PATENT NUMBER:** ***9808587***
**ISSUE DATE:** ***November 07, 2017***

Dist. of New Jersey
C.A. No. 20-10172 (JXN)(MAH)
Consolidated

**JTX-008**

Certified by

[signature]

Under Secretary of Commerce
for Intellectual Property
and Director of the United States
Patent and Trademark Office

UNITED STATES PATENT AND TRADEMARK OFFICE · DEPARTMENT OF COMMERCE

TEVAQVAR-00028753

## DETAILED ACTION

This action is responsive to applicant's filing of 9/19/2016, which has been entered into the electronic file of record.

The present application is being examined under the pre-AIA first to invent provisions.

### *Double Patenting*

The nonstatutory double patenting rejection is based on a judicially created doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the unjustified or improper timewise extension of the "right to exclude" granted by a patent and to prevent possible harassment by multiple assignees. A nonstatutory double patenting rejection is appropriate where the conflicting claims are not identical, but at least one examined application claim is not patentably distinct from the reference claim(s) because the examined application claim is either anticipated by, or would have been obvious over, the reference claim(s). See, e.g., *In re Berg*, 140 F.3d 1428, 46 USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed. Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*, 686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619 (CCPA 1970); *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d) may be used to overcome an actual or provisional rejection based on nonstatutory double patenting provided the reference application or patent either is shown to be commonly owned with the examined application, or claims an invention made as a result of activities undertaken within the

scope of a joint research agreement. See MPEP § 717.02 for applications subject to examination under the first inventor to file provisions of the AIA as explained in MPEP § 2159. See MPEP §§ 706.02(l)(1) - 706.02(l)(3) for applications not subject to examination under the first inventor to file provisions of the AIA. A terminal disclaimer must be signed in compliance with 37 CFR 1.321(b).

The USPTO Internet website contains terminal disclaimer forms which may be used. Please visit www.uspto.gov/patent/patents-forms. The filing date of the application in which the form is filed determines what form (e.g., PTO/SB/25, PTO/SB/26, PTO/AIA/25, or PTO/AIA/26) should be used. A web-based eTerminal Disclaimer may be filled out completely online using web-screens. An eTerminal Disclaimer that meets all requirements is auto-processed and approved immediately upon submission. For more information about eTerminal Disclaimers, refer to www.uspto.gov/patents/process/file/efs/guidance/eTD-info-I.jsp.

Claims 1-12 rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-10 of U.S. Patent No. 9,463,289 to Walsh et al. Although the claims at issue are not identical, they are not patentably distinct from each other because the claims recite essentially the same structure with the exception that the instant claims recite the purpose for having the first inner wall canister support formation, the actuation member, and the central outlet port lie in a common plane coincident with the longitudinal axis X, whereas the ‘289 patent recites just the structure without the purpose. The purpose does not have patentable weight as such, since it is not structure, and so the instant claims are similar in scope to claims 1-10 of the '289 patent.

Regarding claim 11 specifically, the '289 patent does not specifically say this, but if it is taught to have the first inner wall canister support formation, the actuation member, and the central outlet port lie in a common plane coincident with the longitudinal axis X, then including another inner wall canister support formation in the same plane would be obvious for similar reasons of stability.

***Claim Rejections - 35 USC § 112***

The following is a quotation of 35 U.S.C. 112(b):
(b) CONCLUSION.—The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention.

The following is a quotation of 35 U.S.C. 112 (pre-AIA), second paragraph:
The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

Claims 13-22 are rejected under 35 U.S.C. 112(b) or 35 U.S.C. 112 (pre-AIA), second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which the inventor or a joint inventor, or for pre-AIA the applicant regards as the invention.

In particular, claim 13 recites the limitations,

"and a first inner wall canister support formation extending inwardly from a main surface of the inner wall, wherein the canister housing has an aperture formed in the inner wall through which the portion of the actuation member extends, and wherein the first inner wall canister support formation intersects the aperture"

More specifically, the language, "canister support formation intersects the aperture" is indefinite because that is not what the figures show; and the specification does not contain the

word 'intersect'. The figures show coplanarity in accordance with the other independent claims but not intersection and it seems like a confusing and incorrect description to employ the word 'intersect' to describe the relationship.

Claims 14-22 depend from claim 13.

***Conclusion***

The prior art made of record and not relied upon is considered pertinent to applicant's disclosure. See form 1449 attached herewith.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to DANIEL HESS whose telephone number is (571)272-2392. The examiner can normally be reached on 9:00 AM - 5:00 PM M-F.

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Michael G. Lee can be reached on (571) 272-2398. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

## REMARKS

1. Claims 1-22 are currently pending in the application, as amended. Claims 13 and 20 have been amended. Support for the amendments can be found throughout the originally filed specification and figures, at least at paragraph [0157]. No new matter has been added.

All amendments presented herein are made solely to expedite prosecution of the application without admission as to the propriety of the rejections set forth in the present Office Action and without acquiescence to the Examiner's characterization of the claims or cited references. Applicant respectfully reserves the right to include claims of the same or different scope as previously written in one or more continuing applications.

### *Double Patenting*

2. The Examiner rejected claims 1-12 under the judicially-created doctrine of obviousness-type double patenting over claims 1-10 of U.S. Patent No. 9,463,289 (the '289 patent). Without acquiescing to the validity of the current rejection, especially in view of the amendments to the claims, Applicant encloses herewith a terminal disclaimer directed to the '289 patent in compliance with 37 C.F.R. § 1.321(c) in the interest of expediting prosecution. Accordingly, Applicant respectfully requests the rejection be withdrawn.

### *Claim Rejections 35 U.S.C. § 112*

3. The Examiner rejected claim 13-22 under 35 U.S.C. § 112, second paragraph, as indefinite. Specifically, the Examiner stated that the language "canister support formation intersects the aperture" is indefinite. Office Action page 4. Claims 14-22 were rejected for being dependent on a rejected claim. Applicant has amended claim 13 to recite the "canister support formation extends from the main surface of the inner wall to the aperture." Applicant respectfully requests reconsideration and withdraw of this rejection.

## CONCLUSION

4. Each and every ground of each rejection in the outstanding office action has been addressed herein. To the extent a particular argument in support of a rejection by the Examiner is

not expressly addressed, that argument is moot in view of the foregoing and Applicant does not acquiesce to any such argument or the Examiner's characterization of the cited references.

In view of the foregoing Amendment and remarks, Applicant respectfully submits that the present application, including claims 1-22, as amended, is in condition for allowance and such action is respectfully requested. Should the Examiner determine otherwise, Applicant's representatives suggest a telephone interview in order to expedite prosecution of the application.

Respectfully submitted,

Date: May 5, 2017

By: /Mario T. Milano/
MARIO T. MILANO
Registration No. 70,402
KENNETH J. DAVIS
Registration No. 50,688
Attorneys for Applicant

**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103-2921
Telephone: (215) 963-5000
Direct Dial: (215) 963-5909
**Customer No. 28977**

PTO/AIA/26 (04-14)
Approved for use through 07/31/2016. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| TERMINAL DISCLAIMER TO OBVIATE A DOUBLE PATENTING REJECTION OVER A "PRIOR" PATENT | Docket Number (Optional) 026723-02-5043-17US |
|---|---|

In re Application of: IVAX Pharmaceuticals Ireland

Application No.: 15/269,249

Filed: 09/19/2016

For: Dose Counter For Inhaler Having An Anti-Reverse Rotation Actuator

Norton (Waterford) Limited

Teva Pharmaceuticals Ireland

The applicant, IVAX Pharmaceuticals Ireland, owner of 100 percent interest in the instant application hereby disclaims, except as provided below, the terminal part of the statutory term of any patent granted on the instant application which would extend beyond the expiration date of the full statutory term of **prior patent** No. 9463289 as the term of said **prior patent** is presently shortened by any terminal disclaimer. The applicant hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it and the **prior patent** are commonly owned. This agreement runs with any patent granted on the instant application and is binding upon the grantee, its successors or assigns.

In making the above disclaimer, the applicant does not disclaim the terminal part of the term of any patent granted on the instant application that would extend to the expiration date of the full statutory term of the **prior patent**, "as the term of said **prior patent** is presently shortened by any terminal disclaimer," in the event that said **prior patent** later:

- expires for failure to pay a maintenance fee;
- is held unenforceable;
- is found invalid by a court of competent jurisdiction;
- is statutorily disclaimed in whole or terminally disclaimed under 37 CFR 1.321;
- has all claims canceled by a reexamination certificate;
- is reissued; or
- is in any manner terminated prior to the expiration of its full statutory term as presently shortened by any terminal disclaimer.

Check either box 1 or 2 below, if appropriate.

1. ☐ The undersigned is the applicant. If the applicant is an assignee, the undersigned is authorized to act on behalf of the assignee.

I hereby acknowledge that any willful false statements made are punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

2. ☑ The undersigned is an attorney or agent of record. Reg. No. 70402

/Mario T. Milano/ — Signature
May 5, 2017 — Date

Mario T. Milano — Typed or printed name

Title

215.963.5909 — Telephone Number

☑ Terminal disclaimer fee under 37 CFR 1.20(d) included.

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

This collection of information is required by 37 CFR 1.321. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 15269249 |
| | Filing Date | 2016-10-10 |
| | First Named Inventor | Declan Walsh |
| | Art Unit | 2876 |
| | Examiner Name | Daniel A. Hess |
| | Attorney Docket Number | 026723-5043-17US |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 7 | 2002528144 | JP | | 2002-09-03 | | | |
| | 8 | 2007062518 | WO | | 2007-06-07 | Sport Maska Inc. | | |
| | 9 | 8909078 | WO | | 1989-10-05 | Fehder | | |
| | 10 | 9628205 | WO | | 1996-09-19 | Siemens Aktiengesellschaft | | |
| | 11 | 9936115 | WO | | 1999-07-22 | 1263152 Ontario Inc. | | |
| | 12 | 03101514 | WO | | 2003-12-11 | 3M Innovative Properties Company | | |
| | 13 | 1330280 | EP | | 2003-07-30 | Norton Healthcare Limited | | |
| | 14 | 1486227 | EP | | 2004-12-15 | Norton Healthcare Limited | | |
| | 15 | 2004501685 | JP | | 2004-01-22 | | | |
| | 16 | 2005102430 | WO | | 2005-11-03 | Innovata Biomed Limited | | |
| | 17 | 2006062449 | WO | | 2006-06-15 | Ernst Horlins Ingenjorsbyra AB | | |

# DFA – Canister to the Body

To improve the reliability of assembling the Canister to the Body, the following changes have been made:

1. Rails have been added to the inside of the body to facilitate the insertion of the canister to the body. The rails, on both the right and left side of the body have a double step to guide the stem into the sump
2. The rails have been located to minimize the wobble of the canister above the counter plunger.
3. Additional rails were added to prevent excessive wobble of the canister within the body

The design of the ribs has been reviewed and approved by Teva.

| ECO No | Issue | Date | Change | Int'l |
|---|---|---|---|---|
| XX | D5 | 11/05/09 | INITIAL RELEASE | CNS |
| XX | D6-D8 | | DEVELOPMENT | CNS |
| XX | D9 | 11/24/09 | RELEASE TO TOOLING | CNS |
| XX | D10 | 12/2/09 | UPDATE DRAWINGS | CNS |

Dist. of New Jersey
C.A. No. 20-10172 (MCA)(MAH)
Consolidated
PTX-231

SECTION D-D
SECTION C-C
SEE DETAIL C
SCALE 1:1
SECTION A-A
SEE DETAIL D
SECTION J-J
DETAIL C
SCALE 4:1
DETAIL D
SCALE 10:1
FLASH 0.02 MAX

= CONTROL DIMENSION
= CRITICAL DIMENSION

| DIMENSION | GRID REF: | TYPE |
|---|---|---|
| 3.33 ±0.10 | SHT 1, B-6 | CRITICAL |
| 1.78 ± 0.10 | SHT 2, C-9 | CRITICAL |
| 0.08 ± 0.05 | SHT 2, G-4 | CRITICAL |
| | | |
| | | |

NOTES:-
1. THIS DRAWING RELATES TO THE FINISHED COMPONENT
2. DIMENSIONS MUST NOT DEVIATE FROM THIS DRAWING
3. ANY PROPOSED DIMENSION CHANGE/DRAWING AMENDMENT MUST BE APPROVED BY TEVA PHARMACEUTICALS IRL.
4. DEFINITIONS
-TSC=MEASURED TO THEORETICAL SHARP CORNER
-THK=THICKNESS
5. UNLESS OTHERWISE STATED:
-FLASH=0.1MM MAX
-MANUFACTURING RADIUS=0.2 MAX
- DRAFT TO BE 0.5° MAX INCLUSIVE
6. MOULDING SHOULD BE FREE FROM GATE MARKS, DISTORTION, OR OTHER SURFACE BLEMISHES
7. NO CRACKS, SPLITS, CHIPS, WARPING, SINKS OR FLOW LINES
8. ALL SURFACES MARKED ------- TO BE SPARK FINISHED TO VDI 21
9. ALL POLISHED SURFACES TO BE SPI-B2
10. ALL OTHER SURFACES TO HAVE NATURAL FINISH (REFER NOTE 8 & 9)
11. PART IS SYMMETRICAL ABOUT ℄
12. A CONTROL DIMENSION IS A DIMENSION TO BE MEASURED IN-PROCESS AT PRE-DEFINED INTERVALS
13. A CRITICAL DIMENSION IS A DIMENSION THAT NEEDS TO HAVE CAPABILITY DEMONSTRATED PRIOR TO TOOL RELEASE & EFFECTS THE FUNCTIONALITY OF THE PART.
14. SEE TABLE FOR SUMMARY OF CONTROL & CRITICAL DIMENSIONS.
15. OUTSIDE FORM TO BE 0.1
16. SINK MARKS 0.2MM MAX

NUMBER OF DIMS:
HIGHEST NUMBER:
NUMBER OF DIMS:
NUMBER OF DIMS:
NUMBER OF DIMS:
NUMBER OF DIMS:
Scale: 2:1
Size: A1
Drawn: C.SEARS
App'd:
Start Date: 11/05/09
THIRD ANGLE
Material: INEOS 100 MG 03, COLOR PANTONE WHITE
Finish: REFER TO NOTES
Title: TEVA, BASE
Teva
DO NOT SCALE
DIMS IN mm
Type: DETAIL
Drawing No. 02-01031-00
Sheet: 1 of 2
THIS DRAWING IS CONFIDENTIAL AND MUST NOT BE COPIED OR DISCLOSED WITHOUT WRITTEN CONSENT.

Appx6617

CONFIDENTIAL

TEVAQVAR-00462022



CONFIDENTIAL

TEVAQVAR-00462023

Appx6618

CONFIDENTIAL

TEVAQVAR-00462027



TEVA, BASE
Teva

CONFIDENTIAL

TEVAQVAR-00462028

Appx6623

# Brainstorm Spiromax "Tape Loosening"

Attending: Simon Kaar, Dan Buck, Derek Fenlon, Declan Walsh, Jan Hazenberg, Tom Maher, Paul Clancy
Date: 16-03-2010

Root cause: Degrees of freedom on the stock bobbin were identified as the root cause for unravelling of tape.

STOCK BOBBIN
NO EXTRA PARTS
STICKY TAPE
COST
ROBUSTNESS

Each individual was asked to identify design solutions to resolve the problem. The idea's where grouped and selected on the basis of the following criteria.

- No extra parts
- Minimum (zero) impact on the assembly line / process
- Robustness
- Tolerance sensitive
- Complexity
- Cost

The following concept where taken from the initial selection

1. Ratchet in stock bobbin
2. friction lever arm on stock bobbin
3. Nylon friction washer at the end of stock bobbin
4. sticky tape
5. felt pad on chassis behind the tape (tape stuck between window and felt pad)
6. friction bar at bottom of the window to connect with tape

Results rating

Dist. of New Jersey
C.A. No. 20-10172 (MCA)(MAH)
Consolidated
PTX-247

| Design solution | Minimum impact on line | Robustness | Tolerance sensitive | Complexity | Cost | total |
|---|---|---|---|---|---|---|
| 1 | 5 | 3 | 5 | 5 | 5 | 23 |
| 2 | 5 | 3 | 3 | 5 | 3 | 19 |
| 3 | 3 | 3 | 3 | 3 | 1 | 13 |
| 4 | 1 | 1 | 5 | 3 | 3 | 13 |
| 5 | 3 | 3 | 3 | 3 | 1 | 13 |
| 6 | 3 | 3 | 1 | 3 | 3 | 13 |



All submitted ideas from brain storm attached.



I:\Device
Engineering\Projects\



EXHIBIT
3
exhibitsticker.com
A-A (6:1)
H&T PRESSPART
120 Dose Counter Assembly
DC
7100-001
Approved / Rejected
SIGN
AUTHORISED SIGNATORY
Dist. of New Jersey
C.A. No. 20-10172 (MCA)(MAH)
Consolidated
PTX-372

Confidential CIPLA-BDI_0156579

Appx7105

# United States Patent [19]

Rand et al.

[11] Patent Number: 4,817,822

[45] Date of Patent: Apr. 4, 1989

[54] INDICATING DEVICE

[75] Inventors: **Paul K. Rand,** Hitchin; **Carole A. Osterweil,** Swiss Cottage; **Robert E. Newell,** Pinner, Middlesex, all of England

[73] Assignee: **Glaxo Group Limited,** London, England

[21] Appl. No.: **42,431**

[22] Filed: **Apr. 24, 1987**

[30] **Foreign Application Priority Data**

Apr. 25, 1986 [GB] United Kingdom ................ 8610121
Aug. 11, 1986 [GB] United Kingdom ................ 8619516

[51] **Int. Cl.**[4] ............................................ **B67D 5/22**

[52] **U.S. Cl.** .................................... **222/38;** 222/162; 222/185; 128/200.23

[58] **Field of Search** ...................... 222/38, 36, 23, 31, 222/162, 185; 128/200.23; 221/2, 6–8; 116/266, 264, 307; 74/422, 424.6

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,219,858 | 3/1917 | Patterson | 222/36 X |
| 2,455,962 | 12/1948 | Wheeler et al. | 222/38 |
| 2,630,027 | 3/1953 | Wunderlich | 74/424.6 |
| 3,119,557 | 1/1964 | Chapman | 222/36 X |
| 3,495,567 | 2/1970 | Hayes et al. . | |
| 3,572,282 | 3/1971 | Tump et al. . | |
| 3,655,952 | 4/1972 | Johnson et al. | 222/38 X |
| 4,188,984 | 2/1980 | Lyall | 222/38 |
| 4,350,265 | 9/1982 | Grittiths et al. | 222/38 |
| 4,565,302 | 1/1986 | Pfeiffer et al. | 222/38 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO86/02275 | 4/1986 | PCT Int'l Appl. . | |
| 998148 | 7/1965 | United Kingdom . | |
| 1290484 | 9/1972 | United Kingdom . | |
| 1317315 | 5/1973 | United Kingdom | 222/38 |
| 2063075 | 6/1981 | United Kingdom . | |
| 2092991 | 8/1982 | United Kingdom . | |
| 2104393 | 3/1983 | United Kingdom . | |

*Primary Examiner*—Joseph J. Rolla
*Assistant Examiner*—Gregory L. Huson
*Attorney, Agent, or Firm*—McAulay, Fields, Fisher, Goldstein & Nissen

[57] **ABSTRACT**

A device is described for indicating the number of doses dispensed from an aerosol container (**2, 102**) having an outlet valve member (**4, 104**) movable relative to the body of the container to dispense its contents in measured doses. Relative movement between the aerosol container body and the outlet member are detected by a ratchet wheel (**14, 114**) and ratchet driving member (**11A, 111**) which move with the body and outlet member respectively or vice versa. The ratchet wheel may in turn drive an indicating member in the form of a linear rack (**20, 119, 120**) or rotatable wheel (**116**).

**11 Claims, 5 Drawing Sheets**

DTX137
1 of 10





21
2
8
A
11b
11a
19
11
22
1
4
6
5
7
3

Fig.1

A
11a
24
20
23a
23b
14
11
15a
15
22
13
3

Fig.2

U.S. Patent Apr. 4, 1989 Sheet 2 of 5 4,817,822

8
24'
11a
11

Fig. 2a

8
19
19
14a
34
35
15
14
30
31
32
33

Fig. 2b

DTX137
3 of 10

Appx7233



117
116
115A
114
111
115
112
101
109
110
105
103
F
3/4
1/2
1/4
101
102
117
116
114
113
115A
111
112
115
108
109
110
104
106
105
107
103

Fig. 3

Fig. 4

U.S. Patent Apr. 4, 1989 Sheet 4 of 5 4,817,822

117
119
114
118
111
115
103
Fig. 5
117
119
118
113
114
111
115
102
108
104
106
103
107
105
Fig. 6

DTX137
5 of 10

Appx7235

U.S. Patent Apr. 4, 1989 Sheet 5 of 5 4,817,822

117
120
114
115A
111
115
109
110
103
105
102
101
120
117
111
115
113
108
104
106
105
107
103

Fig. 7

Fig. 8

DTX137
6 of 10

Appx7236

## INDICATING DEVICE

### FIELD AND BACKGROUND OF THE INVENTION

The present invention relates to a device for indicating the number of doses dispensed from an aerosol container, and, also, to aerosol devices, for example, inhalation devices by which medicaments contained in an aerosol may be administered to a patient.

It is well known to treat patients with medicaments contained in an aerosol, for example, in bronchodilator therapy. It is also known to use for such therapy, medicaments which are contained in an aerosol and are administered to a patient by means of an inhalation device comprising a tubular housing or sleeve in which the aerosol container os located and an outlet tube leading out of the tubular housing. The aerosol containers used in such inhalation devices have an outlet valve member at one end which can be opened either by depressing the valve member while the container is held stationary or by depressing the container while the valve member is held stationary. In the use of such devices, the aerosol container is placed in the tubular housing with the outlet valve member of the container communicating via a support with the outlet tube, for example, a nozzle or mouthpiece. When used for dispensing medicaments, for example in bronchodilation therapy, the housing is then held by the patient in a more or less upright condition and the mouthpiece or nozzle of the inhalation device is placed in the mouth or nose of the patient. The aerosol container is pressed towards the support to dispense a dose of medicament from the container which is then inhaled by the patient.

A disadvantage arising from use of such known devices is that the patient cannot determine the amount of medicament in the aerosol container at any given time. In an extreme case this could mean that the patient, possibly suffering from severe bronchospasm and needing a dose of medicament, will find that the aerosol container will not dispense a dose because its contents have already been exhausted.

### BRIEF SUMMARY OF THE INVENTION

An object of the present invention is to provide means of overcoming this disadvantage.

Accordingly, the present invention provides a device for indicating the number of doses dispensed from an aerosol container having a body and an outlet member movable relative to the body to dispense its contents in measured doses, said device comprising movement detection means responsive to relative movement between the body and the outlet member, and indicating means responsive to the movement detection means so that the indicator means is indicative of the number of movements of the body relative to the outlet member and, therefore, of the quantity of the contents of the container remaining therein or which have been discharged therefrom.

The device of the present invention is preferably adapted for removable mounting to an aerosol container located in the housing of the medical inhalation device.

In one preferred embodiment, an actuator member is provided which comprises a ring-form member for mounting to the body of the aerosol container. A further member is provided which during at least a portion of the movement of the actuator member, is held sta-

tionary with respect to the outlet member. In a preferred embodiment, this further member is held stationary by abutment with a housing in which the aerosol container is received and in which the outlet member of the aerosol container is supported during relative movement of the container body.

The device preferably comprises a ratchet wheel which is caused to rotate, by relative movement between the container body and the container housing, through a pre-determined angle. This wheel may itself bear markings to indicate the number of relative movements made between the aerosol container and outlet member but is preferably adapted to drivde, for example, an indicator rack or toothed wheel bearing such markings, employing a suitable step-down gear ratio. This latter arrangement permits the number of doses indicated to exceed many times the number of teeth on the ratchet wheel and, hence the production of a compact device.

According to a further aspect of the present invention there is provided an aerosol dispensing device comprising a housing in which an aerosol container can be located, an outlet leading from the housing and a support in the housing arranged to receive an outlet member of the aerosol container and having a passage through which the contents of the aerosol container may pass to the outlet, the aerosol dispensing device being provided with a dose indicating device according to the invention.

### BRIEF DESCRIPTION OF THE INVENTION

Embodiments of the present invention will now be described with reference to the accompanying drawings in which:

FIG. **1** is a side view, partially in section, of a first embodiment of the indicating device of the present invention mounted to a medical inhalation device;

FIG. **2** is a front view of the arrangement shown in FIG. **1** in which the indicating device is shown in section;

FIG. **2a** shows part of modified embodiment from one side;

FIG. **2b** shows a view, from the opposite side to FIG. **2** of a feature applicable both to the embodiment of FIGS. **1** and **2**, and the modified embodiment of FIG. **2a**;

FIG. **3** is a front view of a further embodiment of the invention, part of a front wall of the device being broken away;

FIG. **4** is a sectional view of the device of FIG. **3**;

FIGS. **5** and **6** are similar views illustrating one modification of the device illustrated in FIGS. **3** and **4**; and

FIGS. **7** and **8** are similar views of another modification.

### DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

The inhalation device shown in FIGS. **1** and **2** comprises a tubular housing **1** in which an aerosol container **2** can be located. The housing is open at one end (which will hereinafter be considered to be the top of the device for convenience of description) and is closed at the other. An outlet **3** leads laterally from the closed end of the housing **1**. In the embodiment illustrated, the outlet **3** is in the form of a mouthpiece intended for insertion into the mouth of the patient, but it may, if desired, be

designed as a nozzle for insertion into the patient's nostril.

The aerosol container **2** has an outlet valve member **4** at one end. This valve member can be depressed to release a measured dose from the aerosol container or, alternatively, the valve member **4** can be fixed and the main body of the container can be moved relative to the valve member to release the dose.

As shown clearly in FIG. **1**, the aerosol container **2** is located in the housing **1** so that one end protrudes from its open top. Spacer ribs (not shown) may be provided inside the housing to hold the external surface of the contaienr **2** spaced from the internal surface of the housing **1**. A support **5** is provided at the lower end of the housing **1** and has a passage **6** in which the valve member **4** of the aerosol container **2** can be located and supported. A second passage **7** is provided in the support **5** and is directed towards the interior of the outlet **3**. Thus, when the parts are in the positions shown in FIGS. **1** and **2**, the protruding portion of the aerosol container **2** can be depressed to move the container relative to the valve member **4** to open the valve and a dose of medicament contained in the aerosol will be discharged through the passage **7** and into the outlet **3** from which it can be inhaled by a patient. One dose will be released from the aerosol container each time it is fully depressed.

FIGS. **1** and **2** also show an embodiment of the dose indicating device of the present invention. This device A comprises an actuator member in the form of a ring-shaped cap member **8** which is removably located on the end of the protruding portion of the body of the aerosol container **2**. The cap member **8** is retained on the body of the aerosol container **2** by means of longitudinal ribs **21** on its internal surface so that once it is on the body it cannot be removed too easily. The top of the cap abuts the end of the body of the container **2** and moves with the body throughout its displacement towards and away from the support **5**. A pair of symmetrically placed spacing elements **19**, of which one can be seen in FIG. **1**, extend from the lip of the cap member **8** into the housing **1** and slide against the internal wall of this housing so as to guide the movement of the aerosol container body therein.

Attached to the side of the cap member **8** and movable therewith is a housing **22** which defines an indicator compartment **13**. This housing **22** extends from the cap member **8** along the external surface of the tubular housing **1**. The length of this indicator housing **22** is such that when mounted to the tubular housing **1**, it does not abut the outlet **3** as it moves downwardly with the container body.

A driving arm **11** is slidably retained within the housing **22** and is guided for movement between two limit positions defined by stop surfaces **23***a* and **23***b*. The driving arm **11** supports a projection **11***a* which extends through and is movable within a slot **11***b* in the wall of the indicator housing **22** mounted adjacent the tubular housing **1**. In this embodiment, projection **11***a* rests on the top edge **1***a* of the wall of the tubular housing **1**.

The driving arm **11** engages a ratchet wheel **14** which is mounted to the wall of the indicator housing **22**. This ratchet wheel cooperates with a ratchet pawl **15**. Whenever the body of the aerosol container **2** is depressed to open the valve member **4**, the ratchet wheel **14** moves downwards with the cap member **8** while the driving arm **11** remains stationary with respect to the support **5** by virtue of the abutment of projection **11a** with the wall of the tubular housing **1**. In view of the engagement of the driving arm **11** with the ratchet wheel **14**, this relative linear movement between these two elements results in rotation of the ratchet wheel **14** in an anticlockwise direction (as viewed in FIG. **2**) through the angle subtended by a ratchet wheel tooth.

A spur wheel **15***a* which is rotatable with the ratchet wheel **14**, engages a toothed indicator rack **20**. The gear ratio between the ratchet and spur wheel is such that the indicator rack moves through one "step" for a predetermined number of ratchet wheel "steps" and, hence, doses dispensed.

The front of the housing **22** has a window (not shown) through which a portion of the indicator rack **20** is visible. This indicator rack carries suitable markings which are displayed through the window when the given marking registers with this window. Any suitable markings may be employed, though preferably not letters, numbers or like characters which require to be read. For example, the rack can be marked with different colours of different portions so that, for example, when a red portion is displayed through the window, the patient will know that a new aerosol container must be obtained. In other alternatives, however, the indicator rack may be marked with numbers to indicate the proportion of the contents still remaining or the number of doses dispensed from or remaining in the aerosol container. In a convenient arrangement, the markings on the indicator rack indicate that the aerosol container is empty after a predetermined number of doses, for example **200**, have been dispensed, this predetermined number being less than the number of doses with which the container has been charged, say **220**, so as to allow for a margin of error.

With displacement of the cap member **8** and housing **22** towards the support **5**, a resilient member **24** attached to or part of driving arm **11**, extends obliquely between the driving arm **11** and the top wall of the housing **22** is placed under compression and distorts. Once the pressure applied to the member **8** has been released, the device A returns to the position illustrated in FIGS. **1** and **2**. The force exerted by the resilient member **24** pushes the driving arm **11** downwards within the housing **22** so as to engage a subsequent tooth of the ratchet wheel **14**.

The device illustrated in FIGS. **1** and **2** may be modified by replacing the indicator rack **20** by a toothed indicator wheel which is engaged by the spur wheel **15A**. Thus, on rotation of the ratchet wheel **14** the spur wheel **15A** drives this indicator wheel.

In a further modification of the device illustrated in FIGS. **1** and **2**, the spur wheel **15A** is replaced on the ratchet wheel **14** by a single start worm and the toothed indicator rack **20** is replaced by an indicator rack having a row of projections engageable by this single start worm. Thus, in this case, rotation of the ratchet wheel **14** rotates the single start worm which in turn drives the indicator rack.

FIG. **2***a* shows a modification of part of what is shown in FIG. **2**, the resilient member **24** being replaced by a compression spring **24'**.

FIG. **2***b* shows a device according to the invention viewed from the opposite side to FIG. **2**. The view shows a plate **30** which forms a cover for the mechanism visible in FIG. **2***b*. A slot **31** is formed in the plate **30** to define a tongue **32**, having the shape of an inverted L, connected to the remainder of the cover only by a narrow bridge **33**. An upstanding lug **34** is formed on

the base of the L and a similar lug **35** is formed on the remainder of the cover on the opposite side of the slot to the lug **34**. The material, e.g. plastics material, of which the plate is formed is sufficiently resilient that a user can urge the lugs towards one another, for example by gripping them between a thumb and finger, in which process flexing about the bridge **33** occurs. The axle **14***a* on which the wheel **14** rotates is mounted in the tongue **32**, so that urging the lugs **34** and **35** together moves the wheel out of engagement with the rack **20**. This enables the rack **20** to slide down to the end position in which it represents a value of zero doses having been dispensed. In this way the counter is reset to zero. Thus, when one container has been dispensed the counter can be removed, reset to zero, and mounted on a full container, and in this way can be reused many times.

FIGS. **3** and **4** show a medical inhalation device which comprises a tubular housing **101** in which an aerosol container **102** can be located. The housing **101** is open at one end which will hereinafter be considered the top of the device for convenience of description. The housing **101** is closed at the other end. An outlet **103** leads laterally from near the closed end of the housing **101**. In the illustarted embodiment, the outlet **103** is in the form of a mouthpiece intended for insertion into the mouth of a patient, but it may, if desired, be designed as a nozzle for insertion into the nostril of a patient.

The aerosol container **102** has an outlet valve member **104** at one end. This valve member can be depressed to release a dose from the aerosol container or, alternatively, the valve member **104** can be fixed and the main body of the container can be moved relatively to the valve member **104** to release a dose. The aerosol container **102** is located in the housing **101** so that one end protrudes from the open top of the housing as shown clearly in FIG. **4**. Spacer ribs, not shown, may be provided inside the housing to hold the external surface of the container spaced from the internal surface of the housing. A support or stem block **105** is provided at the lower end of the housing **101** and has a passage **106** in which the valve member **104** of the aerosol container **102** can be located and supported. A second passage **107** is provided in the support **105** and is directed towards the interior of the outlet **103**. Thus, when the parts are in positions shown in FIGS. **3** and **4**, the protruding portion of the aerosol container **102** can be depressed to move the container **102** relatively to the valve member **104** so that the valve will be opened and a dose of medicament contained in the aerosol will be discharged through the passage **107** into the outlet **103** from which it can be inhaled by the patient. One dose will be released from the aerosol container each time it is fully depressed.

An actuator and container retainer member in the form of a ring **108** is guided for sliding movement in the housing **101**. Locating lugs **109** protrude from the ring **108** and slide in slots **110** in the wall of the housing. The aerosol container **102** is fitted in the ring **108** in such a way that once it is fitted therein it cannot be removed therefrom and also so that the ring will move with the container **102** when it is depressed to open the outlet valve of the aerosol container. The fact that the aerosol container cannot be removed once it has been fitted prevents misuse or abuse of the product by replacement with an alternative product which may be detrimental or even dangerous to the wellbeing of a patient and contrary to medical instructions.

A driving arm **111** extends from the ring **108** through a slot **112** in the wall of the housing **101** into an indicator compartment **113**. The driving arm **111** engages a ratchet wheel **114** in the indicator compartment. The ratchet wheel co-operates with a ratchet pawl **115**. When the aerosol container **102** is depressed, the driving arm **111** moves downwards and forwards to the centre of the ratchet wheel **114**, so engaging the next adjacent ratchet tooth. When the aerosol container **102** is released, the driving arm **111** moves upwards causing the ratchet wheel **114** to rotate the distance of one tooth. Rotatable with the ratchet wheel **114** is a spur gear **115**A which engages a toothed indicator wheel **116**. Thus, the indicator wheel **116** rotates one step for each dose dispensed by depression of the body of the aerosol container **112**. The front of the indicator housing **113** has a window **117** through which a portion of the indicator wheel **116** is indicated. This indicator wheel can be given suitable markings which are displayed through the window when the given markings registers with the window. Thus, in the embodiment illustrated the indicator wheel has markings "¼", "½", "¾", "F", and "E". The markings "F" and "E" respectively denoting full and empty. Any suitable markings may be made on the indicator wheel. For example, the wheel can be marked with different colours at different positions so that, for example, when a red portion is displayed through the window, the patient will know that a new inhalation device must be obtained. In other alternatives, the indicator wheel may be marked with numbers to indicate either the number of doses dispensed from the aerosol container or the number of doses remaining to be dispensed. In a convenient arrangement, the indicator wheel is arranged to display that the aerosol container is empty after **200** doses have been dispensed, in that case the container having been charged with, say, **220** doses, to allow a margin of error.

The device illustrated in FIGS. **5** and **6** is modified so that the ratchet wheel **114** will drive a single worm **118** which in turn drives an indicator rack **119** having a row of projections engageable by the worm. The other parts of the device designated by the same references are used with reference to FIGS. **3** and **4**.

In the modified device illustrated in FIGS. **7** and **8**, the ratchet wheel **114** again rotates a spur wheel **115**A which engages and drives an indicator rack **120**. Other parts of the device have the same reference numerals that are used in the description with reference to FIGS. **3** and **4**.

The invention has hereinbefore been described in relation to medical inhalation devices but it is apparent that the invention may be applied to any container having a depressable dispensing valve, to determine the quantity of product used or that which is left in the container.

We claim:

**1**. An aerosol dispenser comprising:

(a) a housing in which an aerosol container can be located, an outlet leading from the housing and a support in the housing arranged to receive an outlet member of the aerosol container and having a passage through which the contents of the aerosol container may pass to the outlet, the outlet member being held stationary in the housing support and the body of the container moveable relative to the outlet and housing to dispense its contents in measured doses; and

DTX137
9 of 10

(b) a dose indicating device for indicating and number of doses dispensed from, or remaining in, the container, the said device comprising

(i) a linearly movable indicator means mounted externally of the said housing and moveable relative to said housing and said container;

(ii) a movement detecting member movable by movement of the body of the contaienr relative to the outlet member and housing and

(iii) means mechanically interconnecting the movement detecting member and the indicator means and responsive to movement of the movement detecting member relative to the housing to initiate movement of the indicating means incrementally.

**2.** A device according to claim **1** wherein the indicating means carries no numbers, letters, or like characters.

**3.** An aerosol dispensing device according to claim **1**, wherein the dose indicating device comprises an indicator compartment disposed on a wall of the container-receiving housing, the movement detecting member comprising an actuator member mounted on, and carried by, the body of the aerosol container so as to be displaceable with respect to the outlet member, and hence with respect to the container-receiving housing, the said actuator member carrying an arm which extends into the said indicator compartment to operate the said mechanical means.

**4.** An aerosol dispensing device according to claim **3**, wherein the said actuator member is arranged to be so mounted on the body of the aerosol container that it cannot be removed therefrom.

**5.** A device according to claim **1**, wherein the movement detecting member comprises a ratchet wheel movable with one of the aerosol container and outlet member, and a ratchet wheel driving member is provided which is movable with the other of the aerosol container and outlet member and arranged to rotate the ratchet wheel through a predetermined step upon relative movement of the aerosol container and outlet member.

**6.** A device according to claim **5**, wherein the indicator means comprises a toothed rack, and said mechanical means comprises a spur gear on said ratchet wheel which meshes with the toothed rack and drives it.

**7.** A device according to claim **5**, wherein the indicator means comprises an indicator rack having a row of projections, and said mechanical means comprises a worm on said ratchet wheel which engages the row of projections and drives the rack.

**8.** A device according to claim **1**, comprising an actuator member adapted to be removably mounted on the body of the aerosol container so as to be displaceable with respect to the outlet member, the actuator member comprising a further member which, during at least a portion of the movement of the actuator member, is held stationary with respect to the outlet member

**9.** A device according to claim **8**, wherein the said further member is arranged to be held stationary with respect to the outlet member by abutment with said housing in which the aerosol container is received and in which the outlet member is supported during relative movement of the container body.

**10.** A device according to claim **8**, wherein the actuator member comprises a ring-shaped cap adapted to be mounted on an end of the body of the aerosol container.

**11.** A device according to claim **8** comprising means for resetting the indicator means to zero.

* * * * *

DTX137
10 of 10



(19) **United States**
(12) **Patent Application Publication** (10) **Pub. No.: US 2006/0289008 A1**
**Rand et al.** (43) **Pub. Date: Dec. 28, 2006**

(54) **DISPENSER WITH DOSES' COUNTER**

(76) Inventors: **Paul Kenneth Rand**, Redhill (GB); **Peter John Brand**, Royston (GB); **James William Godfrey**, Hertfordshire (GB)

Correspondence Address:
**GLAXOSMITHKLINE**
**CORPORATE INTELLECTUAL PROPERTY, MAI B475**
**FIVE MOORE DR., PO BOX 13398**
**RESEARCH TRIANGLE PARK, NC 27709-3398 (US)**

(21) Appl. No.: **11/459,048**

(22) Filed: **Jul. 21, 2006**

**Related U.S. Application Data**

(63) Continuation of application No. 10/465,109, filed on Jun. 19, 2003, now Pat. No. 7,107,986, which is a continuation of application No. 10/224,000, filed on Aug. 20, 2002, now Pat. No. 6,601,582, which is a continuation of application No. 09/445,658, filed on Mar. 31, 2000, now Pat. No. 6.474,331, filed as 371 of international application No. PCT/EP98/03379, filed on Jun. 8, 1998.

(30) **Foreign Application Priority Data**

Jun. 10, 1997 (GB) ........................................ 9711889.7
Oct. 16, 1997 (GB) ........................................ 9721875.4

**Publication Classification**

(51) **Int. Cl.**
***B65D 83/06*** (2006.01)
***A61M 15/00*** (2006.01)

(52) **U.S. Cl.** ........................................ **128/203.15**

(57) **ABSTRACT**

There is provided a dispenser suitable for dispensing medicament, particularly medicament for use in the treatment of respiratory disorders. The dispenser comprises a housing having a support; a container, locatable within said housing, having an outlet, wherein said container dispenses through said outlet in response to movement of the container relative to the housing; and an actuation indicator having an indexing mechanism actuatable by movement of the container relative to the housing. A couple mechanism is provided which couples the indexing mechanism to the container to compensate for any variation in pre-actuation positionings of the indexing mechanism and container.



Patent Application Publication Dec. 28, 2006 Sheet 1 of 7 US 2006/0289008 A1

2
FIG. 1
1
4
6
7
5
3
FIG. 2
2
10
11
12
10
16
9
8
1
13
21
3
20
15
22
17
14

CIPLA-BDI_0184316
DTX153
2 of 14

Appx7242



Patent Application Publication Dec. 28, 2006 Sheet 2 of 7 US 2006/0289008 A1

33
33
33
19
18b
16
15
18a
13

FIG. 3

CIPLA-BDI_0184317
**DTX153**
**3 of 14**

Appx7243



Patent Application Publication Dec. 28, 2006 Sheet 3 of 7 US 2006/0289008 A1

18a
33
16
15
19
18b
FIG. 4a

18a
33
16
15
19
18b
FIG. 4b

18a
33
16
15
19
18b
FIG. 4c

18a
33
16
15
19
18b
FIG. 4d

CIPLA-BDI_0184318
DTX153
4 of 14

Appx7244



**Patent Application Publication Dec. 28, 2006 Sheet 4 of 7**  **US 2006/0289008 A1**

16
30
17
30
5
1
8

FIG. 5a

10
9
16
1
30
17

FIG. 5b

CIPLA-BDI_0184319

**DTX153**
**5 of 14**

Appx7245



Patent Application Publication Dec. 28, 2006 Sheet 5 of 7 US 2006/0289008 A1

40
41
50
49
43
47
46b
47b
46a
44
47c
48
47a
46
40
41
FIG. 6

CIPLA-BDI_0184320
DTX153
6 of 14

Appx7246



Patent Application Publication Dec. 28, 2006 Sheet 6 of 7 US 2006/0289008 A1

2
41
40
48
47c
47
47a
47b
49
50
46a
46
44
41
40
1
20

FIG. 7

CIPLA-BDI_0184321
DTX153
7 of 14

Appx7247



Patent Application Publication Dec. 28, 2006 Sheet 7 of 7 US 2006/0289008 A1

2
1
47
46
40
48
44
45
5
2
1
47
46
40
48
44
45
5
FIG. 8

FIG. 9

CIPLA-BDI_0184322
**DTX153**
**8 of 14**

Appx7248

# DISPENSER WITH DOSES' COUNTER

[0001] This application is a continuation of U.S. Ser. No. 10/465,109 filed on Jun. 19, 2003, which is a continuation of U.S. Ser. No. 10/224,000 filed on Aug. 20, 2002, now issued U.S. Pat. No. 6,601,582, which is a continuation of U.S. Ser. No. 09/445,658 filed on Mar. 31, 2000, now issued U.S. Pat. No. 6,474,331, which was filed pursuant to 35 U.S.C. 371 as a U.S. National Phase Application of International Application No. PCT/EP98/03379 filed on Jun. 8, 1998 claiming priority from GB9711889.7 filed Jun. 10, 1997 and GB9721875.4 filed on Oct. 16, 1997.

[0002] The present invention relates to a dispenser having an actuation indicating device for indicating the number of actuations thereof. In particular, the invention relates to metered dose inhalers by means of which medicaments contained in an aerosol container may be administered to a patient.

[0003] It is well known to treat patients with medicaments contained in an aerosol, for example, in bronchodilator therapy. It is also known to use for such therapy, medicaments which are contained in an aerosol and are administered to a patient by means of an inhalation device comprising a tubular housing or sleeve in which the aerosol container is located and an outlet tube leading out of the tubular housing. The aerosol containers used in such inhalation devices are designed to deliver a predetermined dose of medicament upon each actuation by means of an outlet valve member at one end which can be opened either by depressing the valve member while the container is held stationary or by depressing the container while the valve member is held stationary. In the use of such devices, the aerosol container is placed in the tubular housing with the outlet valve member of the container communicating via a support with the outlet tube, for example a nozzle or mouthpiece. When used for dispensing medicaments, for example in bronchodilation therapy, the housing is then held by the patient in a more or less upright condition and the mouthpiece or nozzle of the inhalation device is placed in the mouth or nose of the patient. The aerosol container is pressed towards the support to dispense a dose of medicament form the container which is then inhaled by the patient.

[0004] A problem arising from use of such known devices is that the patient cannot determine the amount of medicament in the container at any given time. In an extreme case this could mean that the patient, possibly suffering from severe bronchospasm and needing a dose of medicament, will find that the container will not dispense a dose because its contents have already been exhausted.

[0005] In solution to the above described problem there has been suggested the use of dose indicating devices, which typically count the number of doses delivered from or remaining in the aerosol container, thereby enabling the patient to determine how much medicament is available in the container for future use. Typically, the dose indicating device has an indexing (i.e. counting) mechanism actuated by movement of the container relative to the housing, wherein a preset amount of relative movement results in a count being indexed.

[0006] U.S. Pat. No. 4,817,822 describes an aerosol dispenser having a dose indicating device which, in a first embodiment is removably attached to the end of the protruding portion of the aerosol container. The operating mechanism of the dose counter is located within a housing which extends from the end of the aerosol container along the external surface of the tubular housing.

[0007] U.S. Pat. No. 4,817,822 describes a dispenser having a dose indicating device in which the operating mechanism of the dose indicating device is located within a compartment in the housing and is actuated by means of an actuator member attached to the aerosol container.

[0008] WO96/16686 describes an aerosol dispenser wherein the operating mechanism of the dose indicating device is electronic and wherein the actuating member comprises a microswitch set into the wall of the housing. The electronic counting mechanism and microswitch are contained within a hermetically sealed enclosure.

[0009] U.S. Pat. No. 5,482,030 describes an aerosol dispenser having a mechanical dose indicator device located in and connected to the housing in the vicinity of the outlet tube of the aerosol container when fitted.

[0010] Many different pharmaceutical products are sold in the form of aerosol containers requiring different sized container bodies and/or valves according to the required specifications. It is therefore normal for there to be dimensional variations between different aerosol containers. Even between the same products there can be dimensional variations due to manufacturing tolerances.

[0011] A problem which is common to all of the dose indicating devices discussed above is that the indexing mechanism, which is actuated by relative movement between the container body and housing, lacks any means of compensating for different pre-actuation positionings of the indexing mechanism relative to the container arising from, for example, dimensional variations between different aerosol containers. Hence, the indexing mechanisms must be dimensioned according to the product with which they are to be used, and so will not be interchangeable with other products. Furthermore, in order for the indexing mechanism to record a count accurately the dimensions of the components of any particular device must be manufactured to the required high tolerances.

[0012] The Applicants have now found that this problem can be ameliorated by use of a coupling mechanism to compensate for the different relative positions of the container and the indexing mechanism. The coupling mechanism acts such as to couple the container to the indexing mechanism. In one aspect, the coupling acts such as to couple the indexing mechanism to the rest position of the container. In another, clearly related aspect, the coupling mechanism acts such as to couple the container to a start index (i.e. start count) position of the indexing mechanism.

[0013] According to one aspect of the present invention there is provided a dispenser comprising a housing having a support; a container, insertable within said housing, having an outlet, wherein said container dispenses through said outlet in response to movement of the container relative to the housing; and an actuation indicator having an indexing mechanism actuatable by movement from a rest position of the container relative to the housing; and a coupling mechanism which acts such as to couple the indexing mechanism to said rest position.

[0014] Suitably, said coupling mechanism acts to position the indexing mechanism at a start index position when the container is at the rest position.

[0015] In one aspect, the coupling mechanism acts to position the indexing mechanism at a zero position on insertion of the container into said housing.

[0016] In another aspect, the coupling mechanism acts to position the indexing mechanism at a zero position in response to an initial ('priming') movement of the container from the rest position.

[0017] According to another aspect of the present invention there is provided a dispenser comprising a housing having a support; a container, insertable within said housing, having an outlet, wherein said container dispenses through said outlet in response to movement of the container relative to the housing; and an actuation indicator having an indexing mechanism actuatable from a start index position by movement of the container relative to the housing; and a coupling mechanism which acts such as to couple the container to said start index position.

[0018] By use of a coupling mechanism it is possible to create an actuation indicator of one size which can be used in dispensers having valves and actuators made within a wide range of manufacturing tolerances and can even fit a range of valves and actuators made to different dimensions.

[0019] Suitably, the indexing mechanism is actuatable by a predetermined movement of the container relative to the housing.

[0020] Suitably, the indexing mechanism indexes actuation by means of a predetermined rotary movement of a first member driven by movement relative to a second member during actuation of the dispenser. Preferably, the second member remains stationary relative to the housing during actuation of the dispenser.

[0021] In one preferred aspect, the first member comprises a pinion carried by a shaft through the coupling mechanism and the second member comprises a rack.

[0022] In another preferred aspect, the first member comprises a yoke for engagement with the second member through the coupling mechanism.

[0023] Suitably, the coupling element comprises a friction drive mechanism.

[0024] Suitably, the container is an aerosol container.

[0025] Suitably, the container provides measured doses. Preferably, the actuation indicator indicates the number of doses dispensed from or remaining in the container.

[0026] Suitably, the dispenser herein comprises a housing having a support; a container, locatable within said housing, having an outlet member, wherein said container is movable relative to the housing to enable dispensing therefrom and said outlet member is connectable with said support to prevent relative movement therebetween; and an actuation indicator, locatable within said housing. Preferably, the container and actuation indicator are reversably removable from the housing as a single unit.

[0027] Suitably, the actuation indicator is engagable with the container in the vicinity of the outlet member. More preferably, the actuation indicator is engagable with the outlet member.

[0028] Suitably, the actuation indicator is provided with a grip member which is engagable with a neck portion of the container. Preferably, the neck portion is adjacent to or on the outlet member.

[0029] Suitably, the housing is provided with an outlet, more preferably in the form of a mouthpiece. Preferably, the dispenser comprises a passage through which dispensed doses may pass from the container to the outlet.

[0030] Suitably, the dispenser is a breath operated inhaler which is actuable in response to the inward breath of a user.

[0031] Preferably, the dispenser herein is an aerosol dispenser comprising a housing in which a container is removably located, an outlet leading from the housing and a support in the housing arranged to receive an outlet member of the container and having a passage through which the contents of the container may pass to the outlet, the outlet member being held stationary in the housing support and the body of the container being moveable relative to the outlet and housing to dispense its contents in measured doses, and an actuation indicating device having an actuation indicator for indicating the number of doses dispensed from or remaining in the container. More preferably, the actuation indicating device is tightly connected to the container in the vicinity of the outlet member, such that the container and actuation indicating device may be removed from the housing as a single unit.

[0032] Preferably, the dispenser herein is a metered dose inhaler comprising a housing in which the container is removably located, an outlet leading from the housing, a support in the housing arranged to receive the outlet member of the container and having a passage through which the contents of the container may pass to the outlet, the outlet member being held stationary in the housing support and the body of the container being movable relative to the outlet and housing to dispense its contents in measured doses, and a window through which the actuation indicator may be viewed.

[0033] A dispenser according to the invention will now be described with reference to the accompanying drawings in which:

[0034] **FIG. 1** is a section through a standard inhalation device comprising an aerosol dispenser;

[0035] **FIG. 2** is a section through the dose indicating device as fitted to an aerosol dispenser in an inhalation device;

[0036] **FIG. 3** is a perspective view of a counting mechanism used in the dose indicating device of **FIG. 2**;

[0037] **FIGS. 4***a*, **4***b*, **4***c*, and **4***d* show the sequence of operation of the counter mechanism of **FIG. 3**;

[0038] **FIGS. 5***a* and **5***b* show a lateral and a longitudinal section through a second embodiment of the dose indicating device as fitted into the housing of an inhalation device;

[0039] **FIG. 6** shows an exploded view of a dose indicating device according to a third embodiment of the invention;

[0040] **FIG. 7** shows another exploded view of the dose indicating device of **FIG. 6** together with an aerosol container and housing;

[0041] **FIG. 8** shows a schematic section through an inhalation device comprising the dose indicating device of **FIG. 6** in a rest position; and

[0042] **FIG. 9** shows a schematic section through the inhalation device of **FIG. 8** in an actuated position.

[0043] A standard metered dose inhaler shown in **FIG. 1** comprises a tubular housing **1** in which an aerosol container **2** can be located. The housing is open at one end (which will hereinafter be considered to be the top of the device for convenience of description) and is closed at the other. An outlet **3** leads laterally from the closed end of the housing **1**. In the embodiment illustrated, the outlet **3** is in the form of a mouthpiece intended for insertion into the mouth of the patient but it may, if desired, be designed as a nozzle for insertion into the patient's nostril.

[0044] The aerosol container **2** has an outlet valve stem **4** at one end. This valve member can be depressed to release a measured dose from the aerosol container or, alternatively, the valve stem **4** can be fixed and the main body of the container can be moved relative to the valve member to release the dose.

[0045] As shown clearly in **FIG. 1**, the aerosol container **2** is located in the housing **1** so that one end protrudes from its open top. Spacer ribs (not shown) may be provided inside the housing to hold the external surface of the container **2** spaced from the internal surface of the housing **1**. A support **5** is provided at the lower end of the housing **1** and has a passage **6** in which the valve stem **4** of the aerosol container **2** can be located and supported. A second passage **7** is provided in the support **5** and is directed towards the interior of the outlet **3**. Thus, when the parts are in the positions shown in **FIG. 1**, the protruding portion of the aerosol container **2** can be depressed to move the container relative to the valve stem **4** to open the valve and a dose of medicament contained in the aerosol will be discharged through the passage **7** and into the outlet **3** from which it can be inhaled by a patient. One dose will be released from the aerosol container each time it is fully depressed.

[0046] **FIG. 2** shows the lower part of a device similar to that of **FIG. 1** but incorporating a dose indicating device according to the invention. The dose indicating device comprises a body **8** firmly attached to the aerosol container by means of tubular portion **9** formed with grips **10**. Tubular portion **9** tightly engages the periphery of valve ferrule **11** which a grip in the form of lip **10** engages around neck **12** of valve ferrule **11** which is formed during assembly when valve ferrule **11** is crimped onto aerosol container **2**. Thus the tubular portion **9** and lip **10** form a tight connection to the aerosol container which once assembled by pushing the tubular portion **9** over the valve ferrule **11** cannot easily be dissembled.

[0047] Below tubular portion **9**, body **8** forms a cradle **22** for mounting counter mechanism **13** and drive pinion **14**. Drive pinion **14** is friction mounted on counter mechanism drive shaft **15**. Drive pinion **14** is formed with a number of teeth or pegs **21** which can engage with a number of recesses or grooves formed on post **17** in the form of a rack moulded inside housing **1** and extending from the base of the housing **1** parallel to valve stem **4**.

[0048] As shown in **FIGS. 3 and 4**, drive shaft **15** is connected to driver yoke **16** of counter mechanism **13**. Driver yoke **16** has two switching latches **18***a* and **18***b* spaced either side of star wheel **19** such that driver yoke **16** may tilt about the axis of drive shaft **15** between a first position shown in **FIG. 4***b* in which switching latch **18***a* engages one side of star wheel **19**, and a second position shown in **FIG. 4***d* in which switching latch **18***b* engages the other side of star wheel **19**. Star wheel **19** is connected through a mechanism, similar to that described with reference to reference numerals **2** to **8** in FIGS. **1** to **3** of European Patent No. 0280104, to three digit wheels **33**, which have numbers printed on their circumferential faces as described below. When located in the housing **1**, counter mechanism **13** is small enough to be located to the sides of and behind support **5** so as not to interfere with the aerosol flume as it emerges from passage **7**.

[0049] The aerosol container **2** may be supplied to the patient with the dose indicating device ready assembled thereto. Alternatively, the housing **1** may be supplied to the patient with the dose indicating device located in the position shown in **FIG. 2** and the aerosol container **2** supplied separately. In this case, the patient is instructed to insert the aerosol container **2** into the housing **1** with the valve stem first. Upon first insertion of the container into the housing, the tubular portion **9** and lip **10** of the dose indicating device ride over the periphery of valve ferrule **11** of the aerosol container **2** until lip **10** snaps around neck **12**. Thereafter, the dose indicating device is attached to the aerosol container **2**.

[0050] Other means of attachment of the dose indicator to the container are envisaged including adhesive attachment; use of welded shrink sleeves; heat forming; crimping; ultrasonic welding; and by the present of an o-ring elastomer on the container which is fixedly piercable by barbs on the attachment member of the dose indicator.

[0051] To actuate the device, the protruding portion of the aerosol container is depressed as described above with reference to **FIG. 1**. As the aerosol container carrying the dose indicating mechanism moves within housing **1**, drive pinion **14** starts to turn, through its engagement with post **17**, causing rotation of drive shaft **15** and driver yoke **16**. As driver yoke **16** tilts with rotation of drive shaft **15** switching latch **18***a* moves into engagement with star wheel **19** (**FIG. 4***a*) causing an incremental anti-clockwise rotation of a half tooth pitch of the star wheel until the switching latch **18***a* can move no further in this direction, the switching latch being positioned between two adjacent teeth of the star wheel **FIG. 4***b*). At this point, drive shaft **15** cannot rotate any further and any further movement of the aerosol container into housing **1** results in drive pinion **14** continuing to rotate through its engagement with post **17** by virtue of the friction coupling between pinion **14** and drive shaft **15**.

[0052] When the valve stem **4** has reached its fully depressed position and a metered dose of medicament has been discharged from the aerosol container, the aerosol container is allowed to return to its original position. As the aerosol container and dose indicating mechanism return to their original position, drive pinion **14** starts to rotate in the opposite direction together with drive shaft **15** and driver yoke **16**. Thus, driver yoke **16** tilts such that switching latch **18***a* moves out of engagement with star wheel **19** while switching latch **18***b* moves into engagement therewith (**FIG. 4***c*), causing further incremental anti-clockwise rotation of a half tooth pitch of the star wheel until switching latch **18***b*

can move no further in this direction (**FIG. 4*d***). Again, drive shaft **15** cannot rotate any further at this point and any further movement of the aerosol container out of housing **1** results in drive pinion **14** continuing to rotate through its engagement with post **17** by virtue of the friction coupling between pinion **14** and drive shaft **15**. In this way it can be seen that the friction coupling acts as a lost motion coupling which allows the dose indicating device to be used with aerosol containers having valves with different lengths of travel of valve stem during actuation.

**[0053]** Each time the aerosol dispenser is actuated the star wheel is made to rotate through two incremental anti-clockwise movements as described above. These movements are translated through the counter mechanism into appropriate movements of the digit wheels **33**, one number on each of the printed circumferential faces of the digit wheels being clearly visible through the window **20** at the back of the housing **1** (as shown in **FIG. 2**), to indicate that a further dose of medicament has been dispensed. By having three digit wheels **33** it is possible for the dose counter to be used to count hundreds of doses. Clearly if fewer than one hundred doses are to be contained within the dispenser, the dose counter could comprise fewer digit wheels. Alternatively, if a thousand or more doses are to be contained, then one or more additional digit wheels could be added as appropriate.

**[0054]** To remove the aerosol container **2** from the housing for cleaning, the aerosol container **2** may be withdrawn from the housing **1** in the usual manner. As the container is withdrawn, the friction coupling between drive pinion **14** and drive shaft **15** allows such further movement as is required for the drive pinion to come out of engagement with the post **17** without causing any further indexing of the counter mechanism. Once removed, the housing **1** may be cleaned as described without fear of interfering with or damaging the dose indicating device, which remains firmly connected to the aerosol container **2**.

**[0055]** When the housing **1** is clean, the aerosol container **2** with dose indicating device may be re-inserted into the housing **1**. During insertion, drive pinion **14** will engage post **17** and start to rotate until the aerosol container reaches its normal rest position with the valve stem **4** located in support **5**. As the drive pinion **14** rotates, the friction coupling will act as a lost motion mechanism as described above, allowing for any travel of the aerosol container as between first engagement of drive pinion **14** and post **17**, and location of valve stem **14** in support **5**. In this way, the friction coupling automatically accommodates and compensates for different lengths of valve stems protruding from the ferrule, which would otherwise result in different relative start positions of the container relative to the indexing mechanism.

**[0056]** **FIG. 5** shows an alternative lost motion coupling mechanism which may be used in an aerosol dispenser according to the invention. In this embodiment, instead of a pinion, driver yoke **16** is formed with two resilient arms **30** between which post **17** is grippingly engaged (**FIG. 5*a***). Post **17** is formed with ribs on its surface (not shown) which provide a rough surface finish to create the level of friction required between arms **30** and post **17** such that arms **30** will grip post **17** until the load applied overcomes the friction.

**[0057]** Upon actuation of the device, as the aerosol container and dose indicating mechanism move, the friction engagement between arms **30** and post **17** cause driver yoke **16** to tilt about the axis of shaft **15** (not shown in **FIG. 5**), so moving switching latch **18*a*** into engagement with star wheel **19** as discussed in relation to the first embodiment. As switching latch **18*a*** reaches its limit of travel, driver yoke **16** can move no further, and any further movement of the aerosol container into housing **1** results in arms **30** slipping down post **17** by virtue of the friction coupling. Upon return to its original position, driver yoke **16** tilts in the other direction until switching latch **18*b*** moves into engagement with star wheel **19** and can move no further. Any further movement of the aerosol container out of housing **1** results in arms **30** slipping up post **17**.

**[0058]** FIGS. **6** to **9** show an inhalation device fitted with an electro-mechanical dose indicating device according to the invention. As with the mechanical embodiments discussed above, the dose indicating device comprises a body **40** firmly attached to the aerosol container by means of tubular portion **41** formed with grips (not shown). Tubular portion **41** tightly engages the periphery of valve ferrule **11** while a grip in the form of a lip engages around neck **12** of valve ferrule **11**. Thus the tubular portion **41** and lip form a tight connection to the aerosol container which once assembled by pushing the tubular portion **41** over the valve ferrule **11** cannot easily be disassembled.

**[0059]** Below tubular portion **41**, body **40** forms a cradle for mounting counter mechanism **43**, and defines a chamber for accommodating switch slide **44**. Switch slide **44** is a cylindrical washer made of silicone rubber and having a bore of such a diameter that, with the can and dose indicating device mounted within the actuator housing, it provides a friction fit on pin **45**, which is moulded in the housing and protrudes through a hole in body **40**. The friction fit of switch slide **44** on pin **45** ensures the switch slide will not move along the pin unless pushed.

**[0060]** Two contact members **46**, **47**, both of which comprise a switch contact and a circuit board contact, and one of which further comprises a battery contact, are mounted such that the battery and circuit board contacts are in constant contact with a first terminal of the battery **48** and printed circuit board (PCB) **49** respectively. The switch contacts do not contact each other but are positioned either side of pin **45**, and define the upper limit of movement of the switch slide **44** within its chamber. Thus, when switch slide **44** is in its position as shown in **FIG. 9**, it makes contact with both switch contacts, so closing the circuit between them due to the electrical conductivity of the silicone rubber of the switch slide. Although in the embodiment described the switch slide is made of silicone rubber, it will be appreciated that it could alternatively be made of a non-conductive rubber having an insert at its upper face made of metal or some other conductive material.

**[0061]** In addition to its connections with contact members **46**, **47**, PCB **49** also has connections to the other terminal of the battery and to a three digit liquid crystal display (LCD) **50** in a conventional manner. The PCB comprises an application specific integrated circuit (ASIC), which provides the logic by which the dose indicator can be checked, programmed and made operational, as discussed in more detail below, to keep a record of how many times the switch contact circuit is closed and drives the LCD to display the

number of doses remaining in the aerosol container. The ASIC is thus designed and programmed accordingly in a known manner.

[0062] Instead of a digital display, the LCD could alternatively be formatted to display an analogue indication. When the aerosol container is mounted in the actuator housing, LCD **50** is visible through window **20**. In the embodiment depicted in **FIG. 7**, the LCD and window are located at the back of the housing, but they could equally be located at the front or some other part of the housing.

[0063] The Counter mechanism **43** is small enough to be located to the sides of and behind the stem block (support **5**) moulded in housing so as not to interfere with the aerosol flume as it emerges.

[0064] To actuate the device, the protruding portion of the aerosol container when fitted into the actuator housing is depressed as described above. As the aerosol container carrying the dose indicating mechanism moves within the housing from its rest position (shown in **FIG. 8**), the chamber accommodating switch slide **44** moves down until the upper face of switch slide **44**, which is mounted on pin **45**, meets switch contacts **46**, **47** and the switch circuit is closed. This causes the ASIC to decrement the number displayed by the LCD **50**. As the aerosol container continues to move, a metered dose of medicament is discharged from the valve, while switch slide **44** is pushed down along pin **45** by virtue of the friction fit of the switch slide on the pin until the valve stem reaches its limit of travel and the aerosol container moves no further (**FIG. 9**). In this way, it can be seen that the friction fit of the switch slide **44** on pin **45** allows for over-travel of the valve stem after the switch circuit has been closed, so acting as a lost motion coupling. The aerosol container is then allowed to return to its original position within the housing, and as it returns, the chamber accommodating switch slide **44** moves up breaking the switch circuit as switch contacts **46**, **47** move away from switch slide **44**. Body **40** then meets the lower face of switch slide **44** and draws the switch slide up along pin **45** until the valve stem returns to its rest position (**FIG. 8**).

[0065] Because the dose indicating device is designed to be suitable for use in connection with different sized aerosol containers containing different numbers of doses to be delivered, the ASIC is designed to be factory set in accordance with the size of aerosol container with which the dose indicating device is assembled. After assembly of the dose indicating device and first connection of the battery, the ASIC enters a self-test mode. After this, the programming mode may be entered by activating the switch, allowing it to be programmed to count down from the appropriate number of doses (e.g. 200, 120, 80 or 60). This may be done automatically on a packing line. After programming has taken place, the ASIC enters the counting mode, where the LCD decrements upon closing of the switch contact circuit. When the count of zero is reached, the ASIC is designed to prevent the count from decrementing any further in a known manner. In order to prevent spurious readings due to the effects of switch 'bounce', the ASIC may be designed to decrement only after the switch circuit has been closed for a predetermined length of time in a known manner. In the event of the aerosol container getting jammed in the actuated position after operation, or the switch circuit jamming closed due to mechanical damage or contamination, the ASIC may be designed to blank the LCD to alert the user that there is a problem.

[0066] As with the other embodiments of the invention described above, the aerosol container may be withdrawn from the actuator housing in the usual manner. As the container is withdrawn, body **40** draws the switch slide up along pin **45** until it clears the pin altogether. Once removed, the housing may be cleaned without interfering with or damaging the dose indicating device, which remains firmly connected to the aerosol container.

[0067] During re-insertion of the aerosol container, which can only occur when the body of the dose indicating device is correctly orientated with respect to the housing by virtue of their respective shapes, switch slide **44** engages and is pushed up by pin **45** until the upper face meets the switch contacts. Further insertion of the aerosol container results in switch slide **44** being pushed down along pin **45** until the valve stem is seated back within support **5**.

[0068] It will be appreciated that by programming of the ASIC, one design of dose indicating device could be used in conjunction with a range of aerosol containers of various capacities. By virtue of the switch mechanism, the same design of dose indicating device can also be used in conjunction with a range of different valves having different lengths of valve stem and different stem travel specifications.

[0069] Whilst the present invention has been described in detail in respect of a metered dose inhaler actuatable manually by the patient it will be appreciated that other actuation mechanisms can be substituted. In particular, the use of a breath operated inhaler in which the actuation is assisted, and is responsive to, preferably triggered by, the inward breath of the patient, is also envisaged.

[0070] The dispenser of the invention is suitable for dispensing medicament, particularly for the treatment of respiratory disorders. Appropriate medicaments may thus be selected from, for example, analgesics, e.g., codeine, dihydromorphine, ergotamine, fenfanyl or morphine; anginal preparations, e.g., diltiazem; antiallergics, e.g., cromoglycate, ketotifen or nedocromil; antiinfectives e.g., cephalosporins, penicillins, streptomycin, sulphonamides, tetracyclines and pentamidine; antihistamines, e.g., methapyrilene; anti-inflammatories, e.g., beclomethasone dipropionate, fluticasone propionate, flunisolide, budesonide, rofleponide, mometasone furoate or triamcinolone acetonide; antitussives, e.g., noscapine; bronchodilators, e.g., albuterol, salmeterol, ephedrine, adrenaline, fenoterol, formoterol, isoprenaline, metaproterenol, phenylephrine, phenylpropanolamine, pirbuterol, reproterol, rimiterol, terbutaline, isoetharine, tulobuterol, or (−)-4-amino-3,5-dichloro-α-[[[6-[2-(2-pyridinyl)ethoxy]hexyl]methyl]benzenemethanol; diuretics, e.g., amiloride; anticholinergics, e.g., ipratropium, tiotropium, atropine or oxitropium; hormones, e.g., cortisone, hydrocortisone or prednisolone; xanthines, e.g., aminophylline, choline theophyllinate, lysine theophyllinate or theophylline; therapeutic proteins and peptides, e.g., insulin or glucagon. It will be clear to a person skilled in the art that, where appropriate, the medicaments may be used in the form of salts, (e.g., as alkali metal or amine salts or as acid addition salts) or as esters (e.g., lower alkyl esters) or as solvates (e.g., hydrates) to optimise the activity and/or stability of the medicament.

[0071] Preferred medicaments are selected from albuterol, salmeterol, fluticasone propionate and beclometasone dipropionate and salts or solvates thereof, e.g., the sulphate of albuterol and the xinafoate of salmeterol.

[0072] Medicaments can also be delivered in combinations. Preferred formulations containing combinations of active ingredients contain salbutamol (e.g., as the free base or the sulphate salt) or salmeterol (e.g., as the xinafoate salt) in combination with an anti-inflammatory steroid such as a beclomethasone ester (e.g., the dipropionate) or a fluticasone ester (e.g., the propionate).

[0073] It will be understood that the present disclosure is for the purpose of illustration only and the invention extends to modifications, variations and improvements thereto.

[0074] The application of which this description and claims form part may be used as a basis for priority in respect of any subsequent application. The claims of such subsequent application may be directed to any feature or combination of features described therein. They may take the form of product, method or use claims and may include, by way of example and without limitation, one or more of the following claims: cm That which is claimed:

1. A dispenser comprising

a housing having a support;

a container, insertable within said housing, having an outlet, wherein said container dispenses through said outlet in response to movement of the container relative to the housing; and

an actuation indicator having an indexing mechanism actuatable by movement from a rest position of the container relative to the housing; and

a coupling mechanism which acts such as to couple the indexing mechanism to said rest position.

2. A dispenser according to claim 1, wherein said coupling mechanism acts to position the indexing mechanism at a start index position when the container is at the rest position.

3. A dispenser according to claim 1, wherein the coupling mechanism acts to position the indexing mechanism at a zero position on insertion of the container into said housing.

4. A dispenser according to claim 1, wherein the coupling mechanism acts to position the indexing mechanism at a zero position in response to an initial movement of the container from the rest position.

5. A dispenser comprising

a housing having a support;

a container, insertable within said housing, having an outlet, wherein said container dispenses through said outlet in response to movement of the container relative to the housing; and

an actuation indicator having an indexing mechanism actuatable from a start index position by movement of the container relative to the housing; and

a coupling mechanism which acts such as to couple the container to said start index position.

6. A dispenser according to claim 1, wherein the indexing mechanism indexes actuation by means of a predetermined rotary movement of a first member driven by movement relative to a second member during actuation of the dispenser.

7. A dispenser according to claim 6, wherein the second member remains stationary relative to the housing during actuation of the dispenser.

8. A dispenser according to claim 6, wherein the first member comprises a pinion carried by a shaft through the coupling mechanism and the second member comprises a rack.

9. A dispenser according to claim 6, wherein the first member comprises a yoke for engagement with the second member through the coupling mechanism.

10. A dispenser according to claim 1, wherein the coupling mechanism comprises a friction drive mechanism.

11. A dispenser according to claim 1, wherein the container is an aerosol container.

12. A dispenser according to claim 1, wherein said container provides measured doses.

13. A dispenser according to claim 12, wherein said actuation indicator indicates the number of doses dispensed from or remaining in the container.

14. A dispenser according to claim 1, actuable in response to the inward breath of a user.

* * * * *

# PATENT SPECIFICATION 994,755

DRAWINGS ATTACHED.

994,755

*Date of Application and filing Complete Specification:* *June 7, 1963.* *No. 22880/63.*

*Application made in United States of America (No. 200,992) on June 8, 1962.*

*Complete Specification Published: June 10, 1965.*

© *Crown Copyright 1965.*

Index at Acceptance:—**A5** T4D; **F1** R(3A3D, 3B5, 3B12).

**Int Cl.:—A 61 m 11/00** //F 05 d.

COMPLETE SPECIFICATION.

## Aerosol Dispensing Apparatus.

We, RIKER LABORATORIES, INC., a Corporation organized under the laws of the State of Delaware, United States of America, of 19901 Nordhoff Street, Northridge, State of California, United States of America, do hereby declare the invention, for which we pray that a patent may be granted to us, and the method by which it is to be performed, to be particularly described in and by the following statement:—

The present invention relates to an aerosol dispensing apparatus and more especially but not exclusively, to such apparatus adapted to the dispensing and administering of a medicament-containing aerosol to the oral cavity of a user to promote effective inhalation therapy.

Pressurized compositions containing various medicaments are in widespread use for the relief of various nasal and bronchial disorders such as asthma, hay fever, and the like. It is common practice to associate the container which is filled with a pressurized medicament-containing composition and fitted with valve means, with an applicator, the discharge end of which is shaped to conform to the oral cavity of the user. In this way, discharge of the medicament-containing aerosol into the oral cavity is assured. Such conventional apparatus is also provided with means for admitting air into the applicator to insure scavenging of the medicament-containing aerosol from the applicator, thus providing the patient with the full discharge of medicament dispensed from the pressurized container. One construction of apparatus of this kind forms the subject of Patent No. 830,427.

Heretofore, such applicators have been supported in position by the valve stem and a small portion of the upper neck of the container. While such an arrangement is satisfactory for insuring effective inhalation therapy, the means for supporting the applicator present a possibility of leakage of the contents of the container around the valve stem due to an inadvertent striking or forcing of the container away from a position which is perpendicular to the central axis of the delivery tube. Such mechanical action can readily occur where the combination of container and applicator member is carried in the pocket of the user. It is apparent that such inadequate support of the container will promote the likelihood of lateral movement of the valve stem, thereby resulting in the leakage of the composition past the gasket surrounding the valve stem. Such leakage is obviously undesirable since it results in the loss of the composition from the container and also presents the possibility of causing staining of the clothing of the user.

It is an object of the invention to provide efficient means to support a pressurized container within an aerosol applicator member to minimize any possibility of leakage around the valve stem of the container.

The invention provides an aerosol dispensing apparatus comprising in combination with an aerosol container filled with a pressurized medicament-containing composition and having a valve controlled outlet, an applicator having a delivery tube open to the outlet and a tubular housing surrounding, or substantially surrounding, the body of the container, there being a passageway for scavenging air between the housing and the container body leading from the atmosphere into the delivery tube.

Preferably the said passageway is provided between ribs on the inside of the housing, the ribs making supporting engagement with the container body.

A specific embodiment of the invention

will now be described, by way of example and with reference to the accompanying drawings, in which:—

Figure 1 is a front elevation of an aerosol-dispensing apparatus in accordance with the invention looking into the mouth of the hollow delivery tube;

Figure 2 is a side view of the apparatus shown in Figure 1, the applicator being shown in section;

Figure 3 is a top view of the apparatus shown in Figure 1 with the aerosol container removed;

Figure 4 is a top view of the apparatus shown in Figure 1 illustrating the combination of the applicator and the dispensing container; and

Figure 5 is a detailed view in section of a portion of the applicator and dispensing container illustrating in detail a type of metering valve means for use within the container.

The aerosol-dispensing apparatus shown in the drawings includes an applicator member 11 formed with an open-ended cylindrical barrel portion or housing 12 and a hollow delivery tube member 13 communicating therewith. A pressurized container 14 is contained within the cylindrical barrel portion 12 in such a way that the closed end of the container is adjacent to the open end portion of the cylindrical barrel. The pressurized container has metering valve means 15, illustrated in detail in Figure 5 and described hereinafter, which terminates in a hollow valve stem 16. Extending from the closed bottom end 17 of the cylindrical barrel portion 12 is a valve actuating means 18 having an inner channel 19 and a shoulder 20 upon which the valve stem 16 rests and is supported. The channel 19 terminates in a discharge orifice 21 having a flared opening 22 aligned with the central axis of the delivery tube member 13.

Spaced around the inner circumference of the cylindrical barrel portion 12 are a plurality of inwardly extending ribs 23 which support the container 14 within the barrel and space it from the inner surface of the barrel to provide a clearance 24 which permits the passage of air around the container to scavenge the medicament-containing aerosol from the delivery tube 13 into the oral cavity of the user. The association of the container, the barrel and the ribs are best illustrated in Figure 4.

Referring now to Figure 5, which illustrates one form of metering valve means 15 within the pressurized container 14, the valve means 15 is formed of a valve housing 25 made of any suitable impervious material such as sheet metal and having an aperture 26 through the inner wall 27 thereof. Opposite the inner wall 27 is a lateral flange 28 having on its periphery a cylindrical flange 29 which forms, in effect, a cup into which the valve disc 30 is inserted. The valve disc is fixed within the cup by an upper neck portion 31 of the container and the valve housing is fastened within the container by means of a circumferential indented portion 32. The valve disc is provided with a cylindrical bore 33 which is aligned with a similar bore in the upper neck portion 31 of the container. The cylindrical bore is adapted to receive the valve stem 16. On the inner portion of the valve stem below the valve disc 30 is provided an enlarged collar 34 which engages the undersurface of the valve disc 30 and provides a stop against outward movement of the valve stem. Communicating with the hollow central portion of the valve stem 16 is a lateral passage 37 which is open to the atmosphere when the valve is in the non-dispensing position as shown in Figure 5.

The valve stem is urged to normal sealing position by any suitable means, as for example, a spring 36 which surrounds the valve stem and engages the undersurface of the collar 34. The other end of the spring is supported by a retainer 39. Within the space formed by the retainer 39 and the inner wall 27 of the valve housing is a second valve disc 38. Affixed to the inner portion of the valve stem and enclosed within the spring is a cylindrical member 35 having an enlarged section or collar 40 which constitutes an operating member for a second, and inner, valve.

In the operation of the valve illustrated in Figure 5, in the position illustrated therein the contents of the pressurized container 14 flow into the chamber formed by the valve housing 25 through the aperture 26. The lateral passage 37 is outside the container and the valve formed by the valve disc 30 is closed, thereby sealing the discharge of contents from the container. In use, the container is pushed in a downward direction which serves to move the valve stem in an inward direction. When it reaches an operating position, the enlarged section or collar 40 of the operating member 35 blocks the clearance 26, thereby closing the second, and inner, valve. At the same time, the lateral passage 37 in the valve stem communicates with the metering chamber formed within the valve housing 25 and the contents of the metering chamber pass through the lateral passage into the hollow portion of the valve stem which, in turn, communicates with the channel 19 in the actuating means 18, and finally, to the orifice 21. The user places the open end of the delivery tube member 13 within his mouth and presses down upon the closed portion of the container 14. By taking a deep breath at the time of actuation, administration of the medicament-containing aero-

sol emerging from the orifice 21 is insured since air passes downwardly through the clearance 24 and scavenges the medicament-containing aerosol into the oral cavity of the user.

It will be understood that various medicament-containing pressurized compositions may be employed with the aerosol-dispensing apparatus of this invention. Generally, such compositions comprise an active medicinal ingredient or combination of ingredients dissolved or suspended in a non-toxic liquefied propellant system. Typical propellants are the fluorocarbons which are well known and available under the trade mark "Freon". Useful pressurized compositions which may be employed are those described in British Patents Nos. 830,426 and 837,465.

It will also be understood that the particular construction of the valve means illustrated in Figure 5 is entirely illustrative and forms no part of the present invention. The particular metering valve illustrated therein is one of the valves described in British Patent No. 801,899. Other metering valves, for example, those disclosed in U.S. Patent No. 2,837,249 may also be employed in the pressurized container which forms a portion of the aerosol-dispensing apparatus of the present invention. For certain uses, non-metering valves may also be employed.

While the structure illustrated in the drawing shows four ribs spaced around the inner surface of the cylindrical barrel or housing and extending parallel to the central axis thereof, it will be understood by one skilled in the art that other means can be utilized to space the inner surface of the cylindrical barrel portion from the container, thereby to provide means for the passage of air around the outer surface of the pressurized container and thence to the delivery tube for introduction into the oral cavity of the user. Thus, a plurality of spaced protuberances extending from the inner wall of the cylindrical barrel can be employed; or alternatively, the ribs instead of being disposed parallel to the central axis of the barrel, can be arranged in a spiral shape. In addition, the ribs or protuberances can be integrally formed on the outer surface of the pressurized container, in which case the inner surface of the cylindrical barrel portion may be smooth.

It is an important feature of this invention that the applicator be constructed with a cylindrical barrel or housing portion which encloses substantially the entire length of the pressurized container thereby supporting the container in the proper position with no possibility of lateral movement of the valve stem. Thus, the combination of applicator and container of the present invention is adapted for carrying by the user with reduced chance of leakage and is ready for instant therapeutic use.

WHAT WE CLAIM IS:—

1. An aerosol dispensing apparatus comprising in combination with an aerosol container filled with a pressurized medicament-containing composition and having a valve controlled outlet, an applicator having a delivery tube open to the outlet and a tubular housing for surrounding, or substantially surrounding, the body of the container, there being a passageway for scavenging air between the housing and the contaainer body leading from the atmosphere into the delivery tube.

2. Apparatus as claimed in claim 1 wherein said passageway is provided between ribs on the inside of the housing, the ribs making supporting engagement with the container body.

3. Apparatus as claimed in claim 2 in which the ribs are parallel to the central axis of the housing.

4. Aerosol dispensing apparatus comprising an applicator member having a hollow delivery tube shaped to conform to the oral cavity of the user and an open-ended cylindrical barrel communicating therewith having a plurality of inwardly extending ribs spaced around the inner surface thereof, an aerosol dispensing container slidably supported within said barrel by said ribs, said container being charged with a pressurized medicament-containing composition for inhalation therapy and fitted with metering valve means having a hollow valve stem protruding therefrom to provide a passage for discharge of said composition from the container, the end of said container opposite to said metering valve means being adjacent to the open end of said barrel, and valve actuating means having a channel communicating with said valve stem and terminating adjacent to said delivery tube in a discharge orifice, said ribs defining passages for the flow of air between said container and the inner surface of said barrel to permit scavenging of the medicament-containing aerosol from the delivery tube into the oral cavity of the user.

5. Apparatus according to claim 4 wherein said ribs extend parallel to the central axis of said barrel.

6. Apparatus according to claim 5 wherein there are four ribs spaced at 90 degree intervals around the inner circumference of the housing.

CIPLA-BDI_0184744

**DTX168**
**3 of 5**

7. An aerosol dispensing apparatus substantially as herein described with reference to, and as shown in, the accompanying drawings.

BOULT, WADE & TENNANT,
111 & 112 Hatton Garden, London, E.C.1,
Chartered Patent Agents,
Agents for the Applicants.

Abingdon: Printed for Her Majesty's Stationery Office, by Burgess & Son (Abingdon), Ltd.—1965.
Published at The Patent Office, 25 Southampton Buildings, London, W.C.2,
from which copies may be obtained.

994755 COMPLETE SPECIFICATION

1 SHEET *This drawing is a reproduction of the Original on a reduced scale*

FIG. 1
FIG. 2
FIG. 3
FIG. 4
FIG. 5

CIPLA-BDI_0184746

**DTX168**
**5 of 5**

(12) INTERNATIONAL APPLICATION PUBLISHED UNDER THE PATENT COOPERATION TREATY (PCT)

(19) World Intellectual Property Organization
International Bureau

(43) International Publication Date
22 July 2004 (22.07.2004)

PCT

(10) International Publication Number
WO 2004/060260 A2

(51) International Patent Classification[7]: A61J

(21) International Application Number: PCT/US2003/038483

(22) International Filing Date: 4 December 2003 (04.12.2003)

(25) Filing Language: English

(26) Publication Language: English

(30) Priority Data:
60/434,517 18 December 2002 (18.12.2002) US

(71) Applicant (*for all designated States except US*): **GLAXO GROUP LIMITED** [GB/GB]; Glaxo Wellcome House, Berkeley Avenue, Greenford, Middlesex UB6 0NN (GB).

(72) Inventor; and
(75) Inventor/Applicant (*for US only*): **KING, Michael, L.** [US/US]; 3229 Lochinvar Drive, Durham, NC 27705 (US).

(74) Agents: **LEVY, David, J.** et al.; GlaxoSmithKline, Corporate Intellectual Property Department, Five Moore Drive, P.O. Box 13398, Research Triangle Park, NC 27709 (US).

(81) Designated States (*national*): AE, AG, AL, AM, AT, AU, AZ, BA, BB, BG, BR, BY, BZ, CA, CH, CN, CO, CR, CU, CZ, DE, DK, DM, DZ, EC, EE, EG, ES, FI, GB, GD, GE, GH, GM, HR, HU, ID, IL, IN, IS, JP, KE, KG, KP, KR, KZ, LC, LK, LR, LS, LT, LU, LV, MA, MD, MG, MK, MN, MW, MX, MZ, NI, NO, NZ, OM, PG, PH, PL, PT, RO, RU, SC, SD, SE, SG, SK, SL, SY, TJ, TM, TN, TR, TT, TZ, UA, UG, US, UZ, VC, VN, YU, ZA, ZM, ZW.

(84) Designated States (*regional*): ARIPO patent (BW, GH, GM, KE, LS, MW, MZ, SD, SL, SZ, TZ, UG, ZM, ZW), Eurasian patent (AM, AZ, BY, KG, KZ, MD, RU, TJ, TM), European patent (AT, BE, BG, CH, CY, CZ, DE, DK, EE, ES, FI, FR, GB, GR, HU, IE, IT, LU, MC, NL, PT, RO, SE, SI, SK, TR), OAPI patent (BF, BJ, CF, CG, CI, CM, GA, GN, GQ, GW, ML, MR, NE, SN, TD, TG).

*[Continued on next page]*

(54) **Title:** DRUG DELIVERY SYSTEM WITH VENTED MOUTHPIECE

(57) **Abstract:** An oral inhaler suitable for delivering a pharmaceutical formulation to a patient comprises a container having the pharmaceutical formulation comprising at least one medicament present therein, and a mouthpiece configured for oral engagement with a patient and in communication with the container, the mouthpiece having an inner surface and an outer surface; wherein the outer surface of the mouthpiece contains at least one longitudinally-extending disuniformity such that when the patient orally engages the mouthpiece at least one void space is created between the outer surface of the mouthpiece and the oral cavity of the patient so as to provide an air flow channel through the at least one void space to facilitate intake of the at least one medicament by the patient.

WO 2004/060260 A2

DTX172
1 of 37

WO 2004/060260 A2

**Published:**
— *without international search report and to be republished upon receipt of that report*

*For two-letter codes and other abbreviations, refer to the "Guidance Notes on Codes and Abbreviations" appearing at the beginning of each regular issue of the PCT Gazette.*

# DRUG DELIVERY SYSTEM WITH VENTED MOUTHPIECE

## Cross-Reference to Related Applications

The present application claims priority to Provisional Application No. 60/434,517 filed December 18, 2002, the disclosure of which is incorporated herein by reference in its entirety.

## Field of the Invention

The present invention generally relates to systems for delivering medicaments to patients and methods of using the same.

## Background of the Invention

A variety of systems for orally delivering medicaments in a fluid medium are widely known in the art. Examples include oral inhalers such as aerosol systems which typically deliver one or more medicaments in combination with a propellant (e.g., metered dose inhalers commonly known as MDIs), as well as systems that utilize dry powder formulations (e.g. dry powder inhalers commonly known as DPIs)

With respect to oral inhalers, medicaments, broadly including therapeutic, prophylactic and diagnostic agents, may be delivered locally to the lung or systemically through the lung for the treatment, prophylaxis or diagnosis of illnesses and other conditions. As an example, MDIs are aerosol delivery systems having a reservoir of compressed, low boiling point liquid propellant formulated with a medicament. Inhalers are designed to deliver a metered dose of the medicament formulation, dispensing the dose as an inhalable particulate cloud, or plume.

To deliver the medicament dose to the patient, inhalers typically have an interface with the patient. This interface is usually in the form of a mouthpiece which the patient inserts into the mouth. Many inhalers, especially those intended for drug delivery to the lungs, often require the patient to inhale during the delivery of the dose. When used as directed, conventional oral inhalers usually result in a substantially sealed interface around the perimeter of the mouthpiece. Thus, airflow generated by patient inhalation, for the most part, comes through (at least some portion of) the device itself. In light of conventional inhaler configurations, it may be desirable to completely, substantially, or partially restrict airflow through the device.

For example, it may be desirable to close off the region internal to the mouthpiece near its base in order to enclose the internal components of the inhaler. As another example, it may be desirable to eliminate airflow inlets on the outer surfaces of the body of the inhaler to prevent them being covered by the patient's hand during use, or to protect the internal components of the inhaler. Thus, there is a need for an inhaler mouthpiece that allows a patient to inhale freely during dose delivery while not requiring an airflow path through the inhaler.

In one instance, the patient holds the MDI at a predetermined distance from the mouth (e.g., several inches) and fires the inhaler. As a result, little if any airflow goes through the device and all airflow comes from immediately around the mouth. This "open mouth technique" is subject to poor orientation and aim of the inhaler, as well as increased patient-to-patient variation. Accordingly, such a technique is disadvantageous. Examples of references to the open mouth technique are as follows:

http://www.aaaai.org/patients/publicedmat/tips/inhaledmedications.stm
http://www.asthma-education.com/howto01.html
http://www.uhn.ca/programs/asthma/Pages/inhalecare.html
http://www.starbright.org/schoolasthma/pdf/mdi_white_paper.pdf
http://www.keepkidshealthy.com/asthma/using_a_mdi.html
http://shs.unc.edu/medservices/specialty_services/asthma/inhaler.html
http://www.asthmacentre.com/manual/openmdi.html

Airflow through an inhalation device may have the potential to influence the plume and thus the deposition profile of the dose of medicament. Airflow in the dose delivery passage of an inhaler, intentionally or unintentionally, typically interacts with the plume during dose delivery. A portion of the medicament particles from each dose usually deposits on the target (e.g., lungs, nasal passages, etc), a portion on the inhalation device, and a portion on a non-targeted area of the patient (e.g., oropharynx, etc). It is generally desirable to maximize the amount of each dose that deposits on the intended target, while minimizing the unwanted deposition on the device and non-targeted areas of the patient. Thus, it may be desirable to configure the airflow path to reduce unwanted deposition.

One attempt to address this problem is proposed by WO 00/50112. In particular, WO 00/50112 relates to a pressurized metered dose inhaler having an

actuator constructed and arranged so as to inhibit airflow due to patient inhalation in the vicinity of the orifice of the nozzle block when the valve stem is in the dispensing position. WO 00/50112 discloses that such a design reduces unwanted oropharyngeal deposition of medicament and increases the relative amount of medicament to the lung. Notwithstanding any possible advantages related to the teachings of WO 00/50112, such a design is believed to require an additional structural component to be employed with the inhaler.

There remains a need in the art to provide alternative airflow configurations by modifying the medicament delivery device in a relatively less complicated manner than currently realized in the art. There is a need for such configurations for use in a wide number of oral inhalers including, without limitation, MDIs and DPIs.

## Summary of the Invention

In one aspect, the invention provides an oral inhaler suitable for delivering a pharmaceutical formulation to a patient. The inhaler comprises a container having the pharmaceutical formulation comprising at least one medicament present therein; and a mouthpiece configured for oral engagement with a patient and in communication with the container, with the mouthpiece having an inner surface and an outer surface. Advantageously, the outer surface of the mouthpiece contains at least one longitudinally-extending disuniformity such that when the patient engages the mouthpiece at least one void space is created between the outer surface of the mouthpiece and the patient so as to provide an air flow channel through the at least one void space to facilitate intake of the at least one medicament by the patient. Accordingly, the patient is allowed to inhale freely during dose delivery without an airflow path internal to the inhalation device being required.

In another aspect, the invention provides a method of administering at least one medicament to a patient. The method comprises providing an oral inhaler as defined herein; and activating the oral inhaler to deliver the at least one medicament to the patient.

These and other aspects and advantages of the invention are set forth herein.

## Brief Description of the Drawings

**FIGS. 1A** through **1D** respectively illustrate perspective, side cross-sectional, top, and frontal views of an oral inhaler according to the present invention.

**FIGS. 2A** through **2E** respectively illustrate perspective, side cross-sectional, top, frontal and bottom cross-sectional views of a conventional oral inhaler.

**FIGS. 3A** through **3D** respectively illustrate perspective, side cross-sectional, top, and frontal views of an oral inhaler according to the present invention.

**FIGS. 4A** through **4E** respectively illustrate perspective, side cross-sectional, top, frontal and bottom cross-sectional views of an oral inhaler according to the present invention.

**FIG. 5** illustrates a perspective view of an oral inhaler according to the present invention.

**FIG. 6** illustrates a perspective view of a dry powder inhaler in accordance with the present invention.

**FIG. 7** illustrates a side view of a patient utilizing an oral inhaler in accordance with the present invention.

## Detailed Description of the Invention

The invention will now be described with respect to the embodiments set forth herein, which include, without limitation, the accompanying drawings. It should be appreciated that these embodiments are merely set forth to illustrate the invention, and are not to be construed as limiting the scope of the invention.

All publications, patents, and patent applications cited herein, whether *supra* or *infra*, are hereby incorporated herein by reference in their entirety to the same extent as if each individual publication, patent, or patent application was specifically and individually indicated to be incorporated by reference.

It must be noted that, as used in the specification and appended claims, the singular forms “a”, “an” and “the” include plural referents unless the content clearly dictates otherwise.

In one aspect, the invention provides an oral inhaler suitable for delivering a pharmaceutical formulation to a patient. The inhaler comprises a container having the pharmaceutical formulation comprising at least one medicament present therein; and a mouthpiece configured for oral engagement with a patient and in communication with the container, with the mouthpiece having an inner surface and an outer surface. Advantageously, the outer surface of the mouthpiece contains at least one longitudinally-extending disuniformity such that when the patient engages

the mouthpiece at least one void space is created between the outer surface of the mouthpiece and the patient so as to provide an air flow channel through the at least one void space to facilitate intake of the at least one medicament by the patient. Accordingly, the patient is allowed to inhale freely during dose delivery without an airflow path internal to the inhalation device or an additional mouthpiece component being required.

For the purposes of the invention, and as set forth in greater detail herein, the system may encompass a wide variety of inhalers including, without limitation, metered dose inhalers (MDIs) and dry powder inhalers (DPIs). Examples of such inhalers and inhaler components are described in commonly assigned U.S. Patents 4,364,923; 6,309,624; 4,335,121; 6,251,368; 5,676,929; 5,674,471; 5,290,815; 5,126,375; 5,225,445; 4,922,474; 5,674,472; 5,658,549; 5,270,305; 6,303,103; 6,309,624; 6,315,173; 6,170,717; 6,318,603; 6,238,647; 6,119,853; 6,315,112; 6,179,118; 6,149,892; 6,253,762; 6,131,566; 6,143,277, 5,590,645; 5,860,419; 5,873,360; 6,032,666; and 6,378,519, and U.S. Patent Application Serial Nos. 09/925,214 and 10/022,072, t the disclosures of which are all incorporated herein by reference.

For the purposes of the invention, the term "longitudinally-extending "disuniformity" refers to, for example, a variation, modification, inconsistency, vent, or disruption in the outer surface of the mouthpiece which extends along the length of the mouthpiece. . The configuration of the "disuniformity" varies depending on the design of the inhaler or mouthpiece. In a preferred embodiment, multiple disuniformities are distributed symmetrically about the axis of the mouthpiece. In accordance with the invention, the presence of the disuniformity provides a void space between the contact surfaces of the oral cavity of a patient and the outer surface of the mouthpiece so as to provide an air flow channel therethrough.

The disuniformity may be present in a variety of forms. Such forms include, without limitation, a protrusion, an indentation, or an opening in the outer surface. Combinations of such disuniformities may also be employed.

For the purposes of the invention, the term "protrusion" refers to a projection, such as for example a rib, that extends outward from the outer surface of the mouthpiece. The term "indentation" refers to a recess in the external surface of the mouthpiece. The term "opening" refers to the surface of the mouthpiece being

unrestricted such that the environment external to the medicament delivery system is directly exposed to the internal void defined by the inner surface of the mouthpiece. It should be appreciated that a single protrusion, indentation, or opening can be employed, or a plurality of protrusions, indentations, and/or openings.

The disuniformity can extend at various lengths along the longitudinal axis of the mouthpiece, which may be selected as deemed appropriate. For example, in one embodiment, the disuniformity may extend throughout the length of the mouthpiece. Other shorter lengths are also contemplated, i.e., the disuniformity may extend only throughout a portion of the longitudinal axis.

In the event that a plurality of disuniformities are employed, the distance between them can vary as desired. As an example, in one embodiment, the disuniformities may be equidistant from each other. Conversely, distances between individual disuniformities can also be unequal.

The disuniformity may be present at any number of locations along the outer surface area of the mouthpiece, which encompasses the top, bottom and opposing sides of the mouthpiece. As an example, in one embodiment, in the event that a plurality of disuniformities are employed, a predetermined number of such disuniformities can be present opposite to each other, such as being present on the top and bottom, or on the two sides. In a particular embodiment, an equal number of disuniformities may be present on opposing sides of the mouthpiece. Moreover, the disuniformities can be present on adjacent outer surface portions, for example, top and side in one embodiment or bottom and side in another embodiment. Furthermore, in another embodiment, disuniformities can be present throughout the outer surface of the mouthpiece, i.e., on the top, bottom, and sides.

The term "container" refers to various receptacles for holding the pharmaceutical formulation. Examples of such containers include, without limitation" canisters capable of withstanding pressure such as those that are employed in conjunction with aerosol formulations for MDIs. With respect to DPIs, examples of containers include, without limitation, pockets or pocket-like structures, such as those typically present in peelable blister packages used in conjunction with dry powder pharmaceutical formulations. In general, containers may be formed from materials known to one in the art including, without limitation, polymers, metal, and glass, as well as others.

Other accessories may be used in conjuction with the devices described herein without departing from the scope of the present invention. Such accessories include, for example, spacers.

Medicaments, which may be administered in the formulations, include, without limitation, various drugs useful in inhalation therapy. Appropriate medicaments may thus be selected from, for example, analgesics, (e.g., codeine, dihydromorphine, ergotamine, fentanyl or morphine); anginal preparations, (e.g., diltiazem; antiallergics, e.g., cromoglycate, ketotifen or nedocromil); antiinfectives (e.g., cephalosporins, penicillins, streptomycin, sulphonamides, tetracyclines and pentamidine); antihistamines, (e.g., methapyrilene); anti-inflammatories, (e.g., beclomethasone dipropionate, fluticasone propionate, flunisolide, budesonide, rofleponide, mometasone furoate, ciclesonide, triamcinolone acetonide or 6α, 9α-difluoro-11β-hydroxy-16α-methyl-3-oxo-17α-propionyloxy-androsta-1,4-diene-17β-carbothioic acid S-(2-oxo-tetrahydro-furan-3-yl) ester)); antitussives, (e.g., noscapine; bronchodilators, e.g., albuterol (e.g. as sulphate), salmeterol (e.g. as xinafoate), ephedrine, adrenaline, fenoterol (e.g as hydrobromide), formoterol (e.g., as fumarate), isoprenaline, metaproterenol, phenylephrine, phenylpropanolamine, pirbuterol (e.g., as acetate), reproterol (e.g., as hydrochloride), rimiterol, terbutaline (e.g., as sulphate), isoetharine, tulobuterol or 4-hydroxy-7-[2-[[2-[[3-(2-phenylethoxy)propyl]sulfonyl]ethyl] amino]ethyl-2(3H)-benzothiazolone); diuretics, (e.g., amiloride; anticholinergics, e.g., ipratropium (e.g., as bromide), tiotropium, atropine or oxitropium); hormones, (e.g., cortisone, hydrocortisone or prednisolone); xanthines, (e.g., aminophylline, choline theophyllinate, lysine theophyllinate or theophylline); therapeutic proteins and peptides, (e.g., insulin). It will be clear to a person skilled in the art that, where appropriate, the medicaments may be used in the form of salts, (e.g., as alkali metal or amine salts or as acid addition salts) or as esters (e.g., lower alkyl esters) or as solvates (e.g., hydrates) to optimise the activity and/or stability of the medicament. It will be further clear to a person skilled in the art that where appropriate, the medicaments may be used in the form of a pure isomer, for example, R-salbutamol or RR-formoterol.

Particularly preferred medicaments for administration using pharmaceutical formulations in accordance with the invention include anti-allergics, bronchodilators and anti-inflammatory steroids of use in the treatment of respiratory disorders such

as asthma by inhalation therapy, for example cromoglycate (e.g. as the sodium salt), salbutamol (e.g. as the free base or the sulphate salt), salmeterol (e.g. as the xinafoate salt), formoterol (e.g. as the fumarate salt), terbutaline (e.g. as the sulphate salt), reproterol (e.g. as the hydrochloride salt), a beclomethasone ester (e.g. the dipropionate), a fluticasone ester (e.g. the propionate). Medicaments useful in erectile dysfunction treatment (e.g., PDE-V inhibitors such as those employed in Vardenafil® of GlaxoSmithKline located in Research Triangle Park, North Carolina, along with alprostadil and sildenafil citrate) may also be employed.

Salmeterol, especially salmeterol xinafoate, salbutamol, especially salbutamol sulphate, fluticasone propionate, beclomethasone dipropionate and physiologically acceptable salts and solvates thereof are especially preferred.

It will be appreciated by those skilled in the art that the formulations according to the invention may, if desired, contain a combination of two or more active ingredients. Compositions containing two active ingredients are known for the treatment of respiratory disorders such as asthma, for example, formoterol (e.g. as the fumarate) and budesonide, salmeterol (e.g. as the xinafoate salt) and fluticasone (e.g. as the propionate ester), salbutamol (e.g. as free base or sulphate salt) and beclomethasone (as the dipropionate ester) are preferred.

A particularly preferred combination is a combination of fluticasone propionate and salmeterol, or a salt thereof (particularly the xinafoate salt). It should be understood that the medicaments that may be used in conjunction with the delivery system are not limited to those described herein.

The oral inhaler may be operated in various and accepted manners. For example, with respect to an MDI, in one embodiment, the canister is depressed into the actuator. The motion of the canister causes the metering valve to meter a fixed volume of the fluid forming an individual dose. The metered dose of the fluid passes into and through the valve stem, nozzle, and mouthpiece, i.e., mouthpiece. Upon leaving the pressurized environment of the canister and metering chamber, the propellant component of the fluid expands, carrying the dose to the user.

A DPI may be used by a patient orally engaging the DPI mouthpiece and inhaling air therethrough. When a patient inhales through the mouthpiece, air flows through a pocket containing a dose of pharmaceutical formulation , and eventually

out through the mouthpiece, entraining the powder and thus carrying the dose to the patient.

Various embodiments of DPI components that may be employed in accordance with the invention is described in U.S. Patent Nos. 5,590,645; 5,860,419; 5,873,360; 6,032,666; 6,378,519 and U.S. Application Nos. 09/925,214 and 10/022,072. Such embodiments encompass DISKUS® inhalers made commercially available by GlaxoSmithKline of Research Triangle Park, North Carolina. More specifically, in such embodiments, DPI includes a medicament pack having containers (e.g., pockets) which hold dry powder pharmaceutical formulation therein spaced along the length of, and defined between, two peelable sheets secured to each other. The DPI includes: (1) an opening station for receiving a container of a medicament pack used within the device, (2) means positioned to engage peelable sheets of a container which has been received in the opening station for peeling apart the peelable sheets for opening the container, and (3) an outlet, positioned to be in communication with an opened container through which a user can inhale medicament in powder form from such an open container.

Other embodiments of a DPI that is encompassed by the present invention include those described in U.S. Patent Nos. 4,627,432; 4,811,731; 5,035,237; 4,778,054; and Des 299,066. Such embodiments encompass ROTODISK® inhalers made commercially available by GlaxoSmithKline. In particular, such a device may include a housing, a tray mounted in the housing and movable between first and second positions relative to the housing, a support disk provided on the tray and adapted to receive a carrier provided with at least one medicament container. A plunger may be present which is operable to penetrate a container registered therewith to open the container.

In embodiments pertaining to MDIs, preferred formulations for use in the canisters of the present invention comprise at least one medicament and at least one propellant. For the purposes of the invention, the term "propellant" means pharmacologically inert liquids with boiling points from about room temperature (25°C) to about -25°C which singly or in combination exert a high vapor pressure at room temperature including CFCs such as freon and hydrofluorcarbons. The propellants used in the present invention are low boiling fluorocarbons, in particular, hydrofluorocarbons or hydrofluoroalkanes. Examples of preferred propellants

include, but are not limited to, a $C_{1-4}$ hydrofluoroalkane, e.g., 1,1,1,2-tetrafluoroethane and 1,1,1,2,3,3,3-n-heptafluoropropane, or a mixture thereof as propellant. Other propellants may be used including, for example, alkanes (e.g., butane and propane), along with $CO_2$ (e.g., liquid $CO_2$).

With respect to DPIs, dry powder pharmaceutical formulations administered therefrom may include, in addition to one or more medicaments, at least one ingredient. Such ingredients include, without limitation, excipients (e.g., lactose, sucrose, D-mannitol, starch, corn starch, crystalline cellulose, and light silicic anhydride), lubricants (e.g., magnesium stearate, calcium stearate, talc, and colloidal silica), binders (e.g., crystalline cellulose, sucrose, D-mannitol, dextrin, hydroxypropylcellulose, hydroxypropylmethylcellulose, polyvinylpyrrolidone, starch, gelatin, methylcellulose, and carboxymethylcellulose sodium), disintegrators (e.g., starch, carboxymethylcellulose, carboxymethylcellulose calcium, croscarmellose sodium, carboxymethylstarch sodium, and L-hydroxypropylcellulose), solvents (e.g., water, alcohol, propylene glycol, macrogols, sesame oil, corn oil, and olive oil), solubilizers (e.g., polyethylene glycol, propylene glycol, D-mannitol, benzyl benzoate, ethanol, trisaminomethane, cholesterol, triethanolamine, sodium carbonate, and sodium citrate). Co-solvents can also be employed and include, without limitation, $C_1$-$C_4$ alcohols (e.g., methanol, ethanol, isopropanol, butanol). Mixtures of any of the above ingredients may also be employed.

In another aspect, the invention provides a method of administering at least one medicament to a patient. The method comprises providing an oral inhaler as defined herein; and activating the oral inhaler to deliver the at least one medicament to the patient. Such activation may be carried out, for example, according to embodiments described herein, although it should be appreciated that other techniques can also be employed.

The invention will now be described with respect to the accompanying drawings. It should be appreciated that the drawings merely illustrate embodiments of the present invention, and do not serve to limit the scope of the invention as defined by the claims.

**FIGS. 1A** through **1D** respectively illustrate perspective, side cross-sectional, top and frontal views of an embodiment of an oral inhaler **10'** in accordance with the present invention. The inhaler **10'** is preferably present as an MDI. As depicted, the

inhaler **10'** includes a housing **20** with a cavity **30** formed therein adapted to receive a canister **40**. The canister **40** contains a quantity of medicament in suspension or solution with a pressurized liquid propellant that is gaseous at room temperature. Also included is a mouthpiece **50** having a chamber **60** with interior walls **70**, an open (distal) end **80**, and either a rear wall or a second open end (not shown). The housing **20** and the mouthpiece **50** may be a unitary structure or may be of one-piece construction.

**FIG. 1B** depicts a cross-sectional view of inhaler **10'**. As shown, canister **40** possesses a metering assembly **90** (e.g., valve) for metering a dose of pressurized liquid medicament. The metering assembly **90** is in communication with the mouthpiece **50**. Also included is a valve stem **100** for releasing the metered dose in communication with the metering assembly **90**. The housing further includes a nozzle block **110** containing a valve stem seat **115** for engaging the valve stem **100**, an expansion chamber **120** in fluid communication with the valve stem **100**, and a nozzle channel **130** in fluid communication with the expansion chamber **120**. The nozzle channel **130** has an exit orifice or nozzle **140** at one end. As depicted in **FIG. 1B**, the nozzle **140** is aligned with the open end of the conduit. One embodiment of the metering valve, expansion chamber, and nozzle is set forth in **FIG. 1B**. However, it should be appreciated that numerous deviations from this embodiment can be made without departing from the scope of the invention.

As shown in the perspective view provided by **FIG. 1A**, a plurality of protrusions (e.g., ribs) **150** are present on the top, bottom and opposing sides of the outer surface of the inhaler mouthpiece **50**. More specifically, and as depicted, the protrusions extend coaxially along longitudinal axis $l_1$of the mouthpiece. The protrusions **150** may be equidistant from each other, or alternatively may be spaced apart at different distances. In either instance, gaps, i.e., void spaces, that are present between the protrusions serve as air flow channels to facilitate intake of medicament by a patient.

**FIGS. 2A** through **2E** respectively illustrate perspective, side cross-sectional, top, frontal and bottom cross-sectional views of a conventional oral inhaler **10**.

**FIGS. 3A** through **3D** illustrate various views of an embodiment of an oral inhaler **10'** in accordance with the present invention. As shown in **FIGS. 3A** and **3D**,

a plurality of protrusions **160** are present on opposing sides of the mouthpiece and extend coaxially along the axis $l_1$.

**FIGS. 4A** through **4E** depict an additional embodiment of an oral inhaler **10'** in accordance with the invention. In this instance, indentations (denoted as **170**) are present on opposing sides of the outer surface of mouthpiece **50**. As shown, indentations **170** extend along with the longitudinal axis $l_1$ of the mouthpiece **50**.

**FIG. 5** illustrates a perspective view of another embodiment of an oral inhaler **10'** according to the present invention. Although not shown, the inhaler **10'** may have an internal assembly similar to that illustrated in **FIGS. 1B**, **2B**, **3B**, and **4B**, although other configurations may also be employed. Referring to **FIG. 5**, two openings (denoted as **290**) are present in opposing sides of mouthpiece **50** and extend along the longitudinal axis $l_1$ of mouthpiece **50**. Notwithstanding the embodiment illustrated in **FIG. 5**, it should be emphasized that other numbers of openings may be present in the mouthpiece, and in a different or similar configuration to that set forth in **FIG. 5**.

An embodiment of a DPI structured in accordance with the present invention is presented in **FIG. 6** and is denoted as **10"**. The DPI **10"** is described in U.S. Patent No. 4,811,731. In summary, the inhaler **10"** includes four principal components, namely housing **300**, tray **310**, rotatable support **320**, and cover **330**. Extending from the front of the tray is mouthpiece **50** through which medicament exits the device as it is inhaled by the patient. As seen in **FIG. 6**, an opening **300** is present which extends along the length of the mouthpiece **50**. Although not visible from this view, a second opening may be present on the opposite side of the mouthpiece **50**.

**FIG. 7** illustrates a side view of a patient employing oral inhaler **10'** according to the present invention. More specifically, in this embodiment, a plurality of protrusions **150** are present on mouthpiece **50** similar to the embodiment illustrated in **FIGS. 1A** through **1D**. In accordance with the invention, the presence of the protrusions **150** relative to the oral cavity of the patient allows for void spaces between the outer surface of the mouthpiece and the patient. Accordingly, and as represented by the arrows in **FIG. 7**, air flow channels through the void spaces are present to facilitate intake of medicament from the inhaler by the patient. Thus, the

patient is advantageously allowed to inhale freely during dose delivery without an airflow path internal to the inhalation device or an additional mouthpiece component being required.

The invention has been described in detail with respect to the embodiments described hereinabove. However, it should be appreciated that such embodiments are set forth for illustrative purposes only, and are not used to limit the scope of the invention as defined by the claims.

**THAT WHICH IS CLAIMED:**

1. An oral inhaler suitable for delivering a pharmaceutical formulation to a patient, said inhaler comprising:

a container having the pharmaceutical formulation comprising at least one medicament present therein; and

a mouthpiece configured for oral engagement with a patient and in communication with said container, the mouthpiece having an inner surface and an outer surface;

wherein the outer surface of the mouthpiece contains at least one longitudinally-extending disuniformity such that when the patient orally engages the mouthpiece at least one void space is created between the outer surface of the mouthpiece and the oral cavity of the patient so as to provide an air flow channel through the at least one void space to facilitate intake of the at least one medicament by the patient.

2. The inhaler according to Claim 1, wherein the at least one longitudinally-extending disuniformity is selected from the group consisting of at least one protrusion, at least one indentation, at least one opening in the outer surface of the mouthpiece, and combinations thereof.

3. The inhaler according to Claim 1, wherein said at least one longitudinally-extending disuniformity comprises a plurality of protrusions.

4. The inhaler according to Claim 3, wherein the plurality of protrusions are equidistant from one another.

5. The inhaler according to Claim 3, wherein the plurality of protrusions are present opposite to each other along respective sides of the mouthpiece.

6. The inhaler according to Claim 3, wherein the protrusions are present throughout the outer surface of the mouthpiece.

7. The inhaler according to Claim 3, wherein said at least one protrusion is present as one protrusion.

8. The inhaler according to Claim 1, wherein the said at least one longitudinally-extending disuniformity comprises a plurality of indentations.

9. The inhaler according to Claim 8, wherein the plurality of indentations comprise two indentations present opposite to each other along opposing sides of the mouthpiece.

10. The inhaler according to Claim 1, wherein the longitudinally-extending disuniformity is present as at least one opening.

11. The inhaler according to Claim 10, wherein the at least one opening comprises a plurality of openings.

12. The inhaler according to Claim 11, wherein the plurality of openings comprise two openings each present opposite to each other on opposing sides of the mouthpiece.

13. The inhaler according to Claim 1, wherein the pharmaceutical formulation comprises at least one medicament.

14. The inhaler according to Claim 13, wherein the at least one medicament is selected from the group consisting of analgesics, anginal preparations, antiinfectives, antihistamines, anti-inflammatories, antitussives, diuretics, hormones, therapeutic proteins and peptides, and combinations thereof.

15. The inhaler according to Claim 13, wherein the at least one medicament comprises albuterol sulphate.

16. The inhaler according to Claim 13, wherein the at least one medicament comprises salmeterol xinafoate.

17. The inhaler according to Claim 13, wherein the at least one medicament comprises fluticasone propionate.

18. The inhaler according to Claim 13, wherein the at least one medicament comprises beclomethasone dipropionate.

19. The inhaler according to Claim 13, wherein the at least one medicament comprises salmeterol xinafoate and fluticasone propionate.

20. The inhaler according to Claim 1, wherein the inhaler is a metered dose inhaler.

21. The inhaler according to Claim 20, wherein the pharmaceutical formulation is a pharmaceutical aerosol formulation comprising at least one medicament and at least one propellant.

22. The inhaler according to Claim 21, wherein the at least one propellant is a $C_{1-4}$ hydrofluoroalkane.

23. The system according to Claim 22, wherein the $C_{1-4}$ hydrofluoroalkane is selected from the group consisting of 1, 1, 1, 2-tetrafluoroethane, 1, 1, 1, 2, 3, 3, 3-heptafluoropropane, and combinations thereof.

24. The inhaler according to Claim 1, wherein the inhaler is a dry powder inhaler.

25. The inhaler according to Claim 24. wherein the pharmaceutical formulation is a dry powder pharmaceutical formulation comprising at least one medicament and at least one ingredient.

26. The inhaler according to Claim 25, wherein the at least one ingredient is selected from the group consisting of excipients, lubricants, binders, disintegrators, solvents, solubilizers, co-solvents, and mixtures of the above.

27. An oral inhaler system for delivering a pharmaceutical formulation to a patient, said inhaler comprising:

a container having the pharmaceutical formulation comprising at least one medicament present therein, the at least one medicament selected from the group consisting of analgesics, anginal preparations, antiinfectives, antihistamines, anti-inflammatories, antitussives, diuretics, hormones, therapeutic proteins and peptides, and combinations thereof; and

a mouthpiece configured for oral engagement with a patient and in communication with said container, the mouthpiece having an inner surface and an outer surface;

wherein the outer surface of the mouthpiece contains at least one longitudinally-extending disuniformity such that when the patient orally engages the mouthpiece at least one void space is created between the outer surface of the mouthpiece and the patient so as to provide an air flow channel through the at least one void space to facilitate intake of the at least one medicament by the patient, wherein the at least one longitudinally-extending disuniformity is selected from the group consisting of at least one protrusion, at least one indentation, at least one opening in the outer surface of the mouthpiece, and combinations thereof.

28. A method of administering at least one medicament to a patient, said method comprising:

providing an inhaler as defined by Claim 1; and

activating the inhaler to deliver the at least one medicament to the patient.

29. The method according to Claim 28, wherein the at least one medicament is selected from the group consisting of analgesics, anginal preparations, antiallergics, antiinfectives, antihistimines, anti-inflammatories,

antitussives, diuretics, hormones, therapeutic proteins, peptides, medicaments for treating erectile dysfunction, and combinations thereof.

30. The method according to Claim 28, wherein the at least one medicament is selected from the group consisting of fluticasone, beclomethasone, salmeterol, albuterol, ipratropium, salts thereof, esters thereof, solvates thereof, and combinations thereof.

31. The method according to Claim 28, wherein the at least one medicament comprises albuterol sulfate.

32. The method according to Claim 28, wherein the at least one medicament comprises salmeterol xinafoate and fluticasone propionate.

33. The method according to Claim 28, wherein the at least one medicament comprises fluticasone propionate.

34. The method according to Claim 28, wherein the at least one medicament comprises beclomethasone dipropionate.

WO 2004/060260 PCT/US2003/038483

1/17

40
10
20
50
60
$l_1$
70
80
70
150

Fig. 1A

DTX172
21 of 37

Appx7280

WO 2004/060260 PCT/US2003/038483

2/17

10'
30
40
50
70
90
115
60
20
80
100
70
140
130
120

Fig. 1B

DTX172
22 of 37

Appx7281

WO 2004/060260 PCT/US2003/038483

3/17

A
40
20
50
B
B
150
A

Fig · 1C

140

Fig · 1D

DTX172
23 of 37

Appx7282

WO 2004/060260 PCT/US2003/038483

4/17

40
10
20
50
70
60
80
70

FIG. 2A

DTX172
24 of 37

Appx7283

WO 2004/060260 PCT/US2003/038483

5/17

Fig. 2B

DTX172
25 of 37

Appx7284

WO 2004/060260 PCT/US2003/038483

6/17

A
40
10
30
20
B
B
50
A

Fig. 2C

10
C
C
140

Fig. 2D

DTX172
26 of 37

Appx7285

WO 2004/060260 PCT/US2003/038483

7/17

10
120
130
140
50

Fig. 2E

DTX172
27 of 37

Appx7286

WO 2004/060260 PCT/US2003/038483

8/17

140
40
10
20
50
70
60
$l_1$
80
70
160

Fig. 3D

Fig. 3A

DTX172
28 of 37

Appx7287

WO 2004/060260 PCT/US2003/038483

9/17

10´
30
40
50
70
90
115
60
20
100
80
70
140
110
130
120

Fig 3B

DTX172
29 of 37

Appx7288

WO 2004/060260 PCT/US2003/038483

10/17

A
40
30
10′
20
B
B
50
A

Fig·3c

DTX172
30 of 37

Appx7289

WO 2004/060260 PCT/US2003/038483

11/17

40
10'
20
50
60
70
80
70
170

Fig. 4A

DTX172
31 of 37

Appx7290

WO 2004/060260 PCT/US2003/038483

12/17

10′
30
40
50
70
90
115
60
20
100
80
70
140
110
130
120

Fig.4B

DTX172
32 of 37

Appx7291

WO 2004/060260 PCT/US2003/038483

13/17

A
40
10
30
20
B
B
50
A

FIG.4C

DTX172
33 of 37

Appx7292

Fig·4D

Fig·4E

WO 2004/060260 PCT/US2003/038483

15/17

40
20
10'
50
290
290

Fig. 5

DTX172
35 of 37

Appx7294

WO 2004/060260 PCT/US2003/038483

16/17

10''
300
50
FiG. 6

DTX172
36 of 37

Appx7295

WO 2004/060260 PCT/US2003/038483

17/17

10
150

Fig.7

DTX172
37 of 37

Appx7296



US00D416998S

# United States Patent [19]

**Hodson et al.**

[11] **Patent Number: Des. 416,998**

[45] **Date of Patent: ** Nov. 23, 1999**

[54] **INHALER**

[75] Inventors: **Darren Hodson**, Bridgnorth; **Anthony Mayne**, Colchester, both of United Kingdom; **Steven McGugan**, Lyngby, Denmark

[73] Assignee: **Astra Pharmaceuticals Ltd.**, Herts., United Kingdom

[**] Term: **14 Years**

[21] Appl. No.: **29/086,985**

[22] Filed: **Apr. 24, 1998**

[30] **Foreign Application Priority Data**

Nov. 14, 1997 [SE] Sweden .................................... 972473

[51] **LOC (6) Cl.** .......................................................... **29-02**

[52] **U.S. Cl.** ............................................................ **D24/110**

[58] **Field of Search** ...................... D24/110; 128/200.23, 128/200.21, 200.14, 203.15, 200.25, 204.25

[56] **References Cited**

U.S. PATENT DOCUMENTS

D. 197,687 3/1964 Gurian .................................. D24/110
D. 207,143 3/1967 Goodwin ................................ D24/110
D. 291,829 9/1987 Torongo et al. ....................... D24/110
D. 334,057 3/1993 Byram ................................... D24/110

*Primary Examiner*—Louis S. Zarfas
*Assistant Examiner*—I Simmons
*Attorney, Agent, or Firm*—Nixon & Vanderhye

[57] **CLAIM**

The ornamental design for an "inhaler," as shown and described.

**DESCRIPTION**

FIG. **1** is a perspective view from the front and one side;
FIG. **2** is a perspective view from the rear and one side;
FIG. **3** is a front view;
FIG. **4** is a rear view;
FIG. **5** is a side view;
FIG. **6** is a plan view;
FIG. **7** is an underneath plan view; and,
FIG. **8** is a perspective view from the front and one side with the cap removed.

**1 Claim, 4 Drawing Sheets**

CIPLA-BDI_0184391
**DTX174**
**1 of 5**

**U.S. Patent** Nov. 23, 1999 Sheet 1 of 4 **Des. 416,998**

FIG. 1
FIG. 2

CIPLA-BDI_0184392
**DTX174**
**2 of 5**

Appx7298

**U.S. Patent** Nov. 23, 1999 Sheet 2 of 4 **Des. 416,998**

FIG. 3
FIG. 4

FIG. 7

CIPLA-BDI_0184393
**DTX174**
**3 of 5**

Appx7299

U.S. Patent Nov. 23, 1999 Sheet 3 of 4 Des. 416,998

FIG. 5

FIG. 6

CIPLA-BDI_0184394
**DTX174**
**4 of 5**

Appx7300

U.S. Patent Nov. 23, 1999 Sheet 4 of 4 Des. 416,998

FIG. 8

CIPLA-BDI_0184395
**DTX174**
**5 of 5**

Appx7301

Liza M. Walsh
Katelyn O'Reilly
William T. Walsh, Jr.
Walsh Pizzi O'Reilly Falanga LLP
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, NJ 07102
(973) 757-1100

*Attorneys for Plaintiffs Teva Branded Pharmaceutical Products R&D Inc. and Norton (Waterford) Ltd.*

Gregory D. Miller
Gene Y. Kang
Rivkin Radler LLP
25 Main Street, Suite 501
Court Plaza North
Hackensack, NJ 07601-7021
(201) 287-2460

*Attorneys for Defendant Cipla Ltd.*

William D. Hare
Christopher Casieri
McNeely, Hare & War, LLP
12 Roszel Road, Suite C104
Princeton, NJ 08540
(609) 731-3668

*Attorneys for Defendants Aurobindo Pharma Ltd., Aurobindo Pharma USA, Inc., and Aurolife Pharma LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., and NORTON (WATERFORD) LTD.,<br><br>Plaintiffs,<br><br>v.<br><br>CIPLA LTD., AUROBINDO PHARMA LTD., AUROBINDO PHARMA USA, INC., and AUROLIFE PHARMA LLC<br><br>Defendant. | Consolidated Civil Action No. 20-10172 (JXN)(MAH) |

**JOINT CLAIM CONSTRUCTION AND PREHEARING STATEMENT**

Plaintiffs Teva Branded Pharmaceutical Products R&D, Inc. and Norton (Waterford) Ltd. (collectively, "Teva") and Defendants Cipla Ltd., ("Cipla") and Aurobindo Pharma Ltd.,

| | | |
|---|---|---|
| | '289 patent, claim 4<br>'587 patent, claims 4 and 17 | |
| 3 | "body"<br><br>'156 patent, claim 1 | "the body of the inhaler" |
| 4 | "associated with"<br><br>'156 patent, claim 1 | "related to" |
| 5 | "canister support formation"<br><br>'289 Patent, claims 1, 4<br>'587 Patent, claims 1, 4, 11-13, 15 | "a formation arranged to reduce canister rocking" |
| 6 | "actuator"<br><br>'156 Patent, claims 1, 2, 12<br><br>'512 Patent, claim 1, 5 | "A structure within the dose counter that can be moved by the canister, is moveable relative to other components of the dose counter, and effectuates movement of at least one additional dose counter component." |
| 7 | "actuator pawl arranged to engage with a first tooth of the ratchet wheel"<br><br>'156 Patent, claim 1 | "a pawl that is a part of the actuator of the dose counter that is arranged to engage with a tooth of the ratchet wheel." |
| 8 | "wall surfaces separating the canister receiving portion and the counter chamber"<br><br>'156 Patent, claim 1 | "wall surfaces of the inhaler body which are substantially perpendicular to the direction of canister movement and which divide the canister-receiving portion and counter chamber" |
| 9 | "pins"<br><br>'512 Patent, claim 1 | "shafts that extend through or into respective apertures" |
| 10 | "chassis"<br><br>'512 Patent, claim 1 | "frame of the dose counter" |
| 11 | "regulator"<br><br>'808 Patent, claims 1, 27 | "a structure of the dose counter that modulates motion of the counter display" |
| 12 | "regulate motion of the counter display"<br><br>'808 Patent, claim 1 | "modulate motion of the counter display" |
| 13 | "a pin or aperture heat staked to a respective aperture or pin"<br><br>'512 Patent, claim 1 | "a pin or aperture that is secured to a respective pin or aperture using a heat probe to compress and reform or deform the pin" |
| 14 | "fixed to the body" | "connected to the body" |

**RIVKIN RADLER, LLP**
Gregory D. Miller
Gene Y. Kang
25 Main Street, Suite 501
Court Plaza North
Hackensack, NJ 07601-7021
Telephone: (201) 287-2460
Facsimile: (201) 4890495
Email: Gregory.miller@rivkin.com

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., AND NORTON (WATERFORD) LTD.,<br><br>PLAINTIFFS,<br><br>V.<br><br>CIPLA LTD, AUROBINDO PHARMA LTD., AUROBINDO PHARMA USA, INC., and AUROLIFE PHARMA LLC<br><br>DEFENDANTS | Consolidated Civil Action No. 2:20-CV-10172-JXN-MAH<br><br>CONFIDENTIAL |

**<u>EXPERT REPORT OF GREGOR ANDERSON</u>**

stock bobbin—regulating the motion of the display to incremental movements.  *See, e.g.*, '552 Publication at 9:9-18; Fig. 6.

428.    I understand that the Parties have agreed that the term "regulator" should be construed to mean "a structure of the dose counter that modulates motion of the counter display." I also understand that the Parties have agreed that the term "regulate motion of the counter display" means "modulate motion of the counter display."  I have applied these constructions in my analysis.

429.    The '552 Publication explains that "Fig. 6 shows an exploded view of the dose counter 18 which is held taut by the action of the split hub 70."  '552 Publication at 9:9-12. Notably, split hub 70 includes at least one protrusion, visible in Figure 6.  As shown below, this extending protrusion shown in Figure 6 of the '552 Publication (left) is essentially identical to the protrusion shown in Figure 6A of the '808 Patent (right), and is even located in the same location on the split hub.



Fig. 6                    FIG. 6A

430.    Stock Bobbin 68 of the '552 Publication, like stock bobbin 110 of the '808 Patent, is shaped irregularly, like a hexagon at the entrance to the bobbin.  Although the '552 Publication does not explicitly recite the purpose of the protrusions on the split hub, it is apparent that its

purpose is to contact the interior of the stock bobbin 68, and modulate motion of the tape to prevent unwanted unrolling (e.g., to modulate it to incremental movement). This is confirmed by the ’950 Publication, which is directed to a dose counter with the same split hub, same protrusions 146, and same stock bobbin 132. *See* ’950 Publication at Fig. 15. The ’950 Publication refers to these protrusions as “radially nubs for creating resilient resistance to rotation of the bobbin 132 on the shaft 142.” *Id*. at [0057]. A comparison of the ’950 Publication and the ’552 Publication below shows that the structures are identical, but for the inclusion of a clutch spring in Figure 15.

Fig. 6

Fig. 15

431. In the above images, the protrusions, or radially nubs, are circled in green, the split hub is circled in red, and the stock bobbin is circled in purple. Thus, my opinion that the protrusion disclosed in Figure 6 of the ’552 Publication is a “regulator” that is arranged to act upon the counter display at the first station to regulate motion of the counter display at the first station to incremental movements is confirmed by the ’950 Publication.

432. I understand that Plaintiffs have contended that the structure disclosed in the ’552 Publication is not a “regulator” because it allegedly does not include “a wavelike engagement surface with concavities which engage against” the protrusions. Plaintiffs’ Response to Cipla’s Invalidity Contentions at 282. I disagree. The claim, as construed, merely requires “a structure of

#### 2. If Cipla's Leaf Spring is a "Regulator," So is the Leaf Spring in the '406 Publication

Claim 28, through its dependency from claim 1 of the '808 Patent, recites a regulator "arranged to act upon the counter display at the first station to regulate motion of the counter display at the first station to incremental movements." Plaintiffs contend that the leaf spring in Cipla's dose-counter is the claimed "regulator" that "regulate[s] motion of the counter display at the first station to incremental movements." Tr., 290:19-291:10. Yet, Dr. Lewis ignores that the dose-counter disclosed in the '406 Publication has the same leaf spring found in Cipla's Product. *Compare* PTX-372 (Cipla's dose-counter); DTX-161, Fig. 26 and [00142] and [0098] (disclosing the same leaf spring as Cipla's and explaining that the leaf spring can be flipped). Dr. Lewis conceded that "there are similarities" between the dose-counter disclosed in the '406 Publication and Cipla's Product, and that the dose-counter in the '406 Publication "looks the same" as the dose-counter used in Cipla's Product. Tr., 758:1 and 762:17. Thus, if Cipla's Product is found to meet each limitation of claim 1 of the '808 Patent, the '406 Publication similarly discloses each limitation of claim 1. FOF/COL, ¶¶ 75-77.

#### 3. The Force Limitation of Claim 28 Does Not Render Claim 28 Non-Obvious.

With regard to claim 28 of the '808 Patent, Plaintiffs contend that the leaf spring in Cipla's dose-counter provides a resistance force of greater than 0.3 N "against movement of the counter display." Tr., 297:2-24. Operationally, there is no

distinction between the leaf spring in the ’406 Publication and Cipla’s dose-counter. *Compare* PTX-372; DTX-161, Fig. 26 and [00142] and [0098] (disclosing the same leaf spring as Cipla’s and explaining that the leaf spring can be flipped). If the leaf spring in Cipla’s Product provides a resistance force “against movement of the counter display,” so must the leaf spring in the ’406 Publication. Thus, the dose-counter in the ’406 Publication must also meet this limitation, as the two dose-counters are essentially the same. *Compare* PTX-372 (Cipla’s Product), *with* DTX-161, Fig. 26 (’406 Publication); FOF/COL, ¶¶ 78-80.

The “greater than 0.3 N” resistance force does not render claim 28 non-obvious. Mr. Anderson explained that the claimed force values “are experimental” and based on routine testing. Tr., 557:12-22 (discussing this same claimed force limitation in the context of the ’552 Publication prior art analysis). Mr. Anderson further testified “as a matter of routine optimization for any POSA, they would find the appropriate force against movement of the counter display . . . .” *Id*. Likewise, Dr. Lewis conceded a POSA would have been able to calculate the force on the leaf spring in 2009, at the time of the alleged invention, just as he was allegedly able to for his infringement calculations. Tr., 757:10-13; FOF/COL, ¶¶ 81-83, 106-113. The Federal Circuit has held that values easily obtainable via routine optimization, which is the case here, are insufficient to confer patentability on claimed subject matter. *See Merck*, 874 F.3d at 730 (“Experimental details that one of ordinary skill would

have utilized via routine experimentation, armed with the principles disclosed in the prior art," insufficient to confer patentability to obvious subject matter.).

Moreover, Plaintiffs have failed to show the "greater than 0.3 N" resistance force yields any type of unexpected result sufficient to overcome the strong case of obviousness. The claimed force covers an extremely broad range of any force **greater than** 0.3 N, a minimal force Dr. Lewis characterized as "a very small number." Tr., 320:12-16. Dr. Lewis testified the purpose of the claimed regulator was to prevent counting errors caused by "nudges" to the inhaler and "prevent unwanted motion of the counter display if the counter is dropped . . . ." *See, e.g.*, *id*., 182:22-183: 24. Yet, the force caused by dropping an inhaler based on the weight of the inhaler alone approaches 0.3 N. *Id.,* 734:10-18 (Dr. Lewis testifying drop force depends on the mass of the inhaler and the typical inhaler weighs 24 grams, leading to a force of 0.24 N (i.e., "24 grams divided by a thousand times ten roughly")); FOF/COL, ¶¶ 81-83, 106-113.

Inhalers are also subject to other large forces during routine use. Dr. Lewis testified actuating a device to deliver drug requires a force of 50 N. Tr., 403:7-11. This force is 166 times greater than the minimal 0.3 N force recited in claim 28. Yet the only reason Dr. Lewis testified for a desire to use "small forces" is "you are not going to want to add to much compression to the energy that the patient is going to need to push." Tr., 728:5-13. Such testimony lacks credibility. FOF/COL, ¶¶ 207-

## VII. CIPLA DOES NOT INFRINGE THE ’808 PATENT

Teva asserts claim 28 of the ’808 patent. P. Br. at 33. Claim 28 depends from claim 27, which in turn depends from claim 1. JTX-002. Cipla’s Product does not include: “regulator,” “regulate motion of the counter display at the first station to incremental movements,” and “provides a resistance force of greater than 0.3 N against movement of the counter display.” The parties agreed a “regulator” was “a structure of the dose counter that modulates motion of the counter display.” D.I. 102 at 4. The parties also agreed “regulate motion of the counter display” means “modulate motion of the counter display.” *Id.* Under these constructions, Cipla’s Product does not satisfy either limitation.

### A. Teva Failed to Demonstrate t a t Cipla’s Product’s Leaf Spring Is the Claimed “Regulator” That “Regulate[s] Motion of t e Counter Displa ”

#### 1. The Leaf Spring Is Not a Regulator and Does Not Modulate Motion of the Counter Display

Teva points to a single component of Cipla’s Product as satisfying the “regulator” limitation. P. Br. at 39-40 (identifying the “leaf spring”). But the leaf spring is not a regulator nor does it modulate motion of the alleged counter display (i.e., the units display ring). Tr. 462:1-17, 463:18-464:8. Anderson explained that the leaf spring “pushes the indexer back up at the point it’s been activated.” Tr. 454:2-5. In other words, it “resets the indexer and units teeth ring once it’s been

activated." Tr. 464:17-465:3. Teva, however, contends that the indexer and units teeth ring are part of the "drive system," not the "counter display." P. Br. at 35.

Although the leaf spring sits within the units display ring (the alleged "counter display), Anderson explained "[i]t just sits there. It's not attached to a frame or anything…. It is free to move. It is not constrained. And you wouldn't want it to be." Tr. 463:18-464:8. Even Lewis agreed that the leaf spring is not constrained in the counter display. Tr. 311:20-312:21. Despite this agreement between the experts, Teva still contends the leaf spring resists movement of the counter display, thereby "modulat[ing] motion." P. Br. at 39-42. But under Teva's argument, any structure providing a resistance to the actuation of the dose counter (and thereby to motion of the counter display) is a "regulator." Lewis asserted that the alleged frictional force between the leaf spring and the units display ring modulates the motion of the units display ring. Tr. 291:18-292:12, 315:2-24. Lewis's analysis contradicts the intrinsic record where Teva disclaimed frictional resistance such as that imparted by a child's foot on a roundabout or brake pads on a bicycle wheel. JTX-006 at TEVAQVAR-00027183; *infra* Section VII. B.2. Teva cannot claim that Cipla's Product infringes in the specific manner that it disclaimed during prosecution. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1347 (Fed. Cir. 2001). And if claim 28 is that broad, then it is invalid over the '552 Publication and the '406 Publication. *See* D.I. 256 at 16-29.

Teva argues that "[i]f a patient pushes down on the canister with too little force, the leaf spring ensures that the units display ring does not move, such that the display does not record a count." P. Br. at 36 (emphases omitted). But the same would be true of the spring 56 in the '808 patent. *See* JTX-002 at 12:40-42. In the '808 patent, the actuation pin 34 is "biased upwardly from underneath by a return spring 56." JTX-002 at 12:40-42. This structure is shown in Figures 4A and 4B. JTX-002 at Figs. 4A and 4B (annotated).



Thus, when the canister is pressed down, the spring provides a resistance force to the movement of the actuation pin. *See* JTX-002 at 12:40-42. This is no different from the leaf spring in Cipla's Product. *See* Tr. 464:17-465:3. Under Lewis's infringement analysis, the spring 56 in the '808 patent would be a regulator. Yet, when asked repeatedly to confirm this, **Lewis simply refused to provide an answer**. Tr. 343:3-348:25. Instead, he asserted that the entire system worked together and that **other components** were a regulator. *See id.* The '808 patent does not describe spring 56 as a regulator, nor is it a regulator. *See* JTX-002.

A component that merely resets the dose counter's drive system is not a regulator because it does not "modulate motion of the counter display." As Anderson explained, all the leaf spring does is reset the indexer and units teeth ring (portions of the alleged "drive system"). Tr. 464:17-465:3. The leaf spring does not modulate motion of the counter display and is not the claimed regulator.

Regardless, if the Court accepts Teva's infringement theory regarding the leaf spring being a regulator, then the '406 Publication also discloses a regulator, and the '808 patent is invalid. *See* D.I. 256 at 11-13. As Anderson explained, there is no difference whatsoever between the leaf spring in Cipla's Product and the '406 Publication. Tr., 560:1-4, 560:20-25, 563:12-15. Even Lewis agreed that the two "look[] the same." Tr. 758:1, 762:17. Teva cannot have it both ways.

**2. <u>Teva's Defensive Attacks on Mr. Anderson Are Baseless</u>**

Teva's defensive attacks on Anderson do nothing but highlight the flaws in Teva's infringement case. First, Teva argues the basis for Anderson's non-infringement analysis was that Cipla's Products are "not a tape based device." P. Br. at 37. This is indisputably an accurate distinction between Cipla's Products and the disclosure of the Asserted Patents. It was not, however, the basis for Anderson's non-infringement opinions nor was it the extent of Anderson's testimony. *See supra* (citing Anderson's detailed explanation of non-infringement); *see also* Tr. 462:1-17 (Anderson testifying that he applied the agreed upon claim constructions).

Cipla attempts to bridge this evidentiary gap by citing (1) Dr. Lewis's testimony that 0.3 N is "a very small number"; and (2) attorney argument that "the force caused by dropping an inhaler" "approaches 0.3 N". Br. 15. Both efforts fall well short.

***First***, whether or not 0.3 N is a "very small number" is irrelevant to obviousness. *See* FOF 164, 169. To prove obviousness, Cipla must not only prove that a POSA would have believed it "possible" to increase the resistance force beyond 0.3 N, but also "on balance, desirable." *Impax Labs.*, 893 F.3d at 1381; *Winner*, 202 F.3d at 1349. To the contrary, the POSA would *not* have chosen a resistance force of greater than 0.3 N—because increasing the resistance force would add to the "compression to the energy that the patient is going to need to push." FOF 164; Tr. 728:5-13 (Lewis).

Cipla attempts to distract from its own expert's fatally deficient testimony by pointing the finger at Dr. Lewis, arguing that he "lacks credibility" because he testified that actuating Cipla's inhaler requires a force much greater than 0.3 N. Br. 15-16. Dr. Lewis in fact testified that it was difficult for him to maintain the actuation force for the length of a single question, Tr. 403:4-11—if anything, Dr. Lewis's testimony suggests it would be ill advised to require yet *more* force to be applied. Regardless, it is Cipla, not Teva who bears the burden of proof on obviousness—Dr. Lewis could have said nothing, and Cipla's evidence would still have been insufficient.

Nevertheless, Dr. Lewis's testimony is amply corroborated by the inventors' testimony that the problem they sought to solve—unwanted movement of the counter display—was itself unexpected, a fact the Federal Circuit has recognized indicative of

would have been obvious as a matter of "routine experimentation." Here too, Cipla's arguments fail. First, as the trial record reflects, Mr. Anderson never offered any opinion that a POSA would have arrived at the claimed "resistance force" *based on the '406 Publication*. *See* FOF 177. The testimony Cipla cites (Br. 14 (quoting Tr. 557:12-22)) was not directed to the '406 Publication—it concerned the '552 Publication. The difference matters. Obviousness must be based on a "specific combination of prior art elements." *ActiveVideo*, 694 F.3d at 1328. Mr. Anderson's failure is dispositive.

Second, even the testimony that Mr. Anderson did give *relied entirely on guidance in the '808 Patent's own specification*. *See* FOF 177. Mr. Anderson did not deny that approach, which he did not understand to be legally verboten:

> Q. Why did you decide to rely on the specification of the patent?
>
> A. Because it guides you. It informs you, and some of it is experimental, but some of it is very, very well defined. And they actually provide you charts showing the tolerances that they then worked to, and they give you nominals as well to work from.

Tr. 594:8-14. Of course, the law expressly forbids Mr. Anderson's reliance on the teachings of the challenged patent. Under 35 U.S.C. § 103(a), nonobviousness "shall not be negatived by the manner in which the invention was made." Mr. Anderson's reliance on the inventor's own path to invention is not "a conclusion of obviousness; that is hindsight." *Otsuka Pharm.*, 678 F.3d at 1296. It fails as a matter of law.

### C. Cipla Failed to Prove Claim 28 Would Have Been Obvious Over the '552 Publication

Cipla's alternative theory, that the '808 Patent would have been obvious over

**TABLE OF CONTENTS**
**(cont'd)**

**Page No.**

1. Claim 1 ..... 30

2. Claims 9, 11, and 12 ..... 34

3. Claim 13 ..... 34

C. Claims 1, 9, and 11-13 Would Have Been Obvious Over the '552 Publication ..... 34

1. Claim 1 ..... 35

2. Claims 9, 11, and 12 ..... 37

3. Claim 13 ..... 38

D. Claims 1, 9, and 11-13 Would Have Been Obvious Over the '406 Publication ..... 38

1. Claim 1 ..... 39

2. Claims 9 and 11-13 ..... 41

E. Claim 12 of the '156 Patent is Indefinite ..... 42

XV. INVALIDITY OF THE '808 PATENT ..... 44

A. Anticipation of the '808 Patent ..... 44

1. Anticipation of the '808 Patent by the '552 or '950 Publications ..... 44

a. Claim 1 ..... 44

B. Obviousness of the '808 Patent ..... 54

1. Obviousness of the '808 Patent by either of the '552 and '950 Publications and the POSA's Knowledge ..... 54

a. Claim 1 ..... 54

b. Claims 27 and 28 ..... 55

in incremental movement, and claim 1 is infringed, the resistive force provided by the split hubs with nubs in the stock bobbin disclosed in the '950 and '552 Publications anticipate the regulator with incremental movement of claim 1.

150.   Dr. Lewis's reliance on the Patent Trial and Appeal Board ("PTAB") decision in the appeal of a rejection of the '808 Patent based on the '950 Publication further demonstrates the inconsistency in how he is interpreting incremental movement.  Lewis Rebuttal Report at ¶¶ 744-745.   The PTAB overturned a rejection of the claims based on the '950 Publication failing to disclose a regulator capable of regulating motion in the manner recited by claim 1.   In its decision, the PTAB referred to the hexagonal structure of the bobbin and stated that "even if the evidence adequately supported that O'Leary nubs 146 interact with the hexagonal structure or some other corresponding structure of bobbin 132, it is not clear that the interaction would, as the Examiner concedes, necessarily result in incremental movement."   '808 Patent Prosecution History, Sept. 20, 2019 PTAB Decision at 5.  The PTAB decision quoted by Dr. Lewis makes clear that some structure is needed to provide the incremental movement.  However, Dr. Lewis's Opening Report essentially asserts that no such structure is needed in the dose counter to show infringement while arguing in his Rebuttal Report that there is no anticipation or obviousness because such structure is missing in Figures 6 and 15 of the '552 and '950 Publications, respectively.  Dr. Lewis appears to be arguing that the interaction between the leaf spring and the smooth surface of the units teeth ring provides that structure and results in incremental movement.  Because the interaction between the leaf spring and the smooth surface of the units teeth ring is essentially the same as that of the interaction of the nubs on the split fork 70 and the stock bobbin 68, based on Lewis's arguments the '552 and '950 Publications disclose the regulator modulating incremental movement as required by claim 1.

151.    The Lewis Rebuttal Report also is inconsistent in its description of the difference between the action of the leaf spring on the surface of units teeth ring and the interaction of the split fork with the nubs.  At paragraph 756, Dr. Lewis explains that "continuous or frictional resistance like that provided by the tape stock bobbin/split hub combination disclosed in the '552 Publication and/or radial axis nubs disclosed in the '950 Publication does not necessarily modulate the counter display to incremental movements."  Initially I note that both the '552 and '950 Publications disclose the same configuration:  a combination of tape stock bobbin mounted on a split hub with radial axis nubs.  I have reproduced Figure 6 of the '552 Publication and Figure 15 of the '950 Publication below.



Fig. 6                                                    Fig. 15

152.    Both figures show the combination of a tape stock bobbin/split hub with radial axis nubs.  The only differences between the two figures is the inclusion of a spring in Figure 15. Dr. Lewis attempts to differentiate these figures from the '808 Patent based on the alleged lack of wave-like structures.  However, as Dr. Lewis has already admitted, "to the extent that the '808 Patent describes the regulator as having a wavelike engagement surface, that was not an essential aspect of the invention," and has asserted that products (like Defendants' ANDA products) infringe even in the absence of such structures, it is clear that they do not perform the necessary

| ’950 Publication, Fig. 15 | ’552 Publication, Fig. 6 |
|---|---|

JTX-006, TEVAQVAR-00027225 (Board Op.); DTX-162, at 24 (’552 Publication); Tr. 555:21-558:3 (Anderson); D.E. 157, ¶ 151 (Anderson Reply Rep.) (Ex. A).

188. In his expert reports, Mr. Anderson advanced obviousness theories based on both the ’950 and ’552 Publications; both in his expert reports and at trial, he admitted that the ’950 and ’552 Publications “disclose the same configuration.” *See* JTX-006, TEVAQVAR-00027226 (PTAB Op.); DTX-162, at 24 (’552 Publication); Tr. 586:11-587:15 (Anderson); D.E. 157, Table of Contents, ¶¶ 151 (Anderson Reply Rep.) (Ex. A). Dr. Lewis testified that the ’950 and ’552 Publications contained materially the same disclosure. *See* Tr. 724:24-728:15 (Lewis).

189. The Patent Trial & Appeal Board (“PTAB”) reversed the examiner’s rejection, holding that O’Leary did not provide enough information to determine that its bobbin 132 (which is analogous to the ’552 Publication’s stock bobbin 68) whether



8079874

# THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

*January 25, 2021*

**THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF THE FILE WRAPPER AND CONTENTS OF:**

**APPLICATION NUMBER:** ***14/103,324***
**FILING DATE:** ***December 11, 2013***
**PATENT NUMBER:** ***9463289***
**ISSUE DATE:** ***October 11, 2016***

Dist. of New Jersey
C.A. No. 20-10172 (JXN)(MAH)
Consolidated

**JTX-007**

Certified by

Under Secretary of Commerce
for Intellectual Property
and Director of the United States
Patent and Trademark Office

UNITED STATES PATENT AND TRADEMARK OFFICE
DEPARTMENT OF COMMERCE

TEVAQVAR-00027435

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | Application Number | 14/103,324 |
|---|---|---|
| | Filing Date | 12/11/2013 |
| | First Named Inventor | Declan Walsh |
| | Art Unit | 2876 |
| | Client Number | TEVE |
| Page 1 of 3 | Matter Number | 139US1 |

**U.S. PATENT DOCUMENTS**

| Initials | Cite No. | Document Number | Issue/Publication Date | First Named Inventor | T |
|---|---|---|---|---|---|
| | 1 | 20020078949 | 06/27/2002 | OLeary | T1 |
| | 2 | 20070062518 | 03/22/2007 | Geser | |
| | 3 | 5482030 | 01/09/1996 | Klein | |
| | 4 | 8474448 | 07/02/2013 | Oi | T1 |

**FOREIGN PATENT DOCUMENTS**

| Initials | Cite No. | Document Number | Publication Date | Country | T |
|---|---|---|---|---|---|
| | 5 | 03101514 | 12/11/2003 | WO | |
| | 6 | 2004501685 | 01/22/2004 | JP | T1 |
| | 7 | 2005102430 | 11/03/2005 | WO | |
| | 8 | 2007012861 | 02/01/2007 | WO | |
| | 9 | 2008094103 | 04/24/2008 | JP | T2 |
| | 10 | 2008261423 | 10/30/2008 | JP | T2 |
| | 11 | 2009233308 | 10/15/2009 | JP | T1 |
| | 12 | 2009257392 | 11/05/2009 | JP | T2 |
| | 13 | 2010096308 | 04/30/2010 | JP | T2 |
| | 14 | 2011012325 | 02/03/2011 | WO | |
| | 15 | 2011012327 | 02/03/2011 | WO | |
| | 16 | 2501726 | 09/21/2006 | CA | |
| | 17 | 450059 | 08/13/1992 | JP | T3 |

**OTHER DOCUMENTS**

| Initials | Cite No. | Author, Title, Date, Pages, etc. | T |
|---|---|---|---|
| | 18 | Entire patent prosecution history of U.S. Patent Application No., 14/699,567, filed, April 29, 2015, entitled, "DOSE COUNTER FOR INHALER AND METHOD FOR COUNTING DOSES." | |
| | 19 | Entire patent prosecution history of U.S. Patent Application No., 14/699,578, filed, April 29, 2015, entitled, "DOSE COUNTER FOR INHALER HAVING A BORE AND SHAFT ARRANGEMENT." | |
| | 20 | Entire patent prosecution history of U.S. Patent Application No., 14/699,584, filed, April 29, 2015, entitled, "DOSE COUNTER FOR INHALER HAVING AN ANTI-REVERSE ROTATION ACTUATOR." | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

Examiner: Please initial if citation considered, whether or not citation is in conformance with MPEP Section 609. Please draw a line through the citation if it is not in conformance and it is not considered. Please include a copy of this form with the next communication to the applicant.

SyncIDS.com

# Mr. Anderson's Position

**210.** ***Limitation 1E: "wherein the canister housing has a longitudinal axis X which passes through the center of the central outlet port, the inner wall canister support formation, the actuation member, and the central outlet port lying in a common plane coincident with the longitudinal axis X."*** The actuator of the '514 Publication combined with the dose counter of the'406 Publication discloses this limitation. As discussed in Paragraphs 143-145, the '514 Publication discloses a canister housing with a longitudinal axis X passing through a central outlet port with inner wall canister support formations. As discussed in Paragraphs 121-125, when the dose counter of the '406 Publication is incorporated into an actuator, including an actuator as disclosed in the '514 Publication, the inner wall canister support formation, the actuation member, and the central outlet port lying in a common plane coincident with the longitudinal axis X. Accordingly, in my opinion, the combination of the actuator of the '514 Publication with the dose counter of the '406 Publication, discloses this limitation. In my opinion, a person of skill in the art would have been motivated to modify or select such an actuator including ribs, such as the one disclosed in the '514 Publication for use with the dose counter of the '406 Publication, and expected success in doing so, for the same reasons discussed in Section XV.C.(i). Thus, Claim 1 would have been obvious over the '514 Publication in combination with the '406 Publication.

Anderson Opening Rept. ¶ 210

**210.** ***Limitation 1E: "wherein the canister housing has a longitudinal axis X which passes through the center of the central outlet port, the inner wall canister support formation, the actuation member, and the central outlet port lying in a common plane coincident with the longitudinal axis X."*** The actuator of the '514 Publication combined with the dose counter of the'406 Publication discloses this limitation. As discussed in Paragraphs 143-145, the '514 Publication discloses a canister housing with a longitudinal axis X passing through a central outlet port with inner wall canister support formations. As discussed in Paragraphs 121-125, when the dose counter of the '406 Publication is incorporated into an actuator, including an actuator as disclosed in the '514 Publication, the inner wall canister support formation, the actuation member, and the central outlet port lying in a common plane coincident with the longitudinal axis X. Accordingly, in my opinion, the combination of the actuator of the '514 Publication with the dose counter of the '406 Publication, discloses this limitation. In my opinion, a person of skill in the art would have been motivated to modify or select such an actuator including ribs, such as the one disclosed in the '514 Publication for use with the dose counter of the '406 Publication, and expected success in doing so, for the same reasons discussed in Section XV.C.(i). Thus, Claim 1 would have been obvious over the '514 Publication in combination with the '406 Publication.